UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, JESSICA JERREAT,
KATHRYN NEEPER, JOHN DOES 1-4,
REPORTERS SANS FRONTIÈRES, REPORTERS
WITHOUT BORDERS, INC., AMERICAN
FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES (AFSCME),
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES (AFGE), AMERICAN FOREIGN
SERVICE ASSOCIATION (AFSA), and THE
NEWSGUILD-CWA,

                 Plaintiffs,

    -against-

KARI LAKE, in her official capacity as Senior
Advisor to the Acting CEO of the U.S. Agency
for Global Media; VICTOR MORALES, in his
official capacity as Acting CEO of the U.S. Agency
for Global Media; and U.S. AGENCY FOR
GLOBAL MEDIA,

                 Defendants.

Index No. 25 Civ. 2390

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

Emery Celli Brinckerhoff Abady Ward & Maazel LLP

Government Accountability Project

American Federation of Government Employees, AFL-CIO

American Foreign Service Association

American Federation of State, County and Municipal Employees, AFL-CIO

Democracy Forward Foundation

State Democracy Defenders Fund

# TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ................................................................................................iii-viii

PRELIMINARY STATEMENT ..........................................................................................1

USAGM: RELEVANT BACKGROUND AND STATUTORY FRAMEWORK ......................5

ARGUMENT ......................................................................................................................7

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........................8

      A.    Plaintiffs Are Likely to Demonstrate that Defendants Violated the APA (Counts III, V, and VI) and the Separation of Powers (Count VIII) ...........8

            1.    The Conduct Here is a Final Agency Action ...................................8

            2.    Defendants' Actions Violate Section 706(2) of the APA ..............10

            3.    Defendants' Actions Violate Section 706(1) of the APA ..............13

      B.    Plaintiffs Are Likely to Demonstrate that Defendants Violated the Statutory Firewall, Which Preserves USAGM and its Networks' Independence ...............................................................................................14

      C.    Plaintiffs' First Amendment Claims Are Likely to Succeed ....................15

            1.    *Turner* Makes Clear that Plaintiffs' Speech Is Protected by the First Amendment .........................................................................16

            2.    Defendants' Gutting VOA to Suppress Perceived "Radical" or "Leftist" Reporting Is Blatant Viewpoint Discrimination .........17

            3.    Defendants' Actions Interfere with Plaintiffs Jerreat's and John Doe 1's Exercise of Editorial Discretion...............................20

            4.    Defendants' Actions Chill Plaintiffs' Speech ...............................21

            5.    Applying *Pickering*, Defendants' Viewpoint Discrimination, Interference in Editorial Discretion, and Chilling of Speech Violate the First Amendment (Count I) ........................................22

                a.    *Pickering* Prong 1: Defendants Are Restraining Plaintiffs' Speech on Matters of Public Concern...............23

                b.    *Pickering* Prong 2: Plaintiffs' Interest in Protected Speech Outweighs the Government's Interest in Efficiency ..........................................................................24

i

D.  Defendants' Shuttering of USAGM Networks Separately the RSF Plaintiffs, TNG-CWA, and Their Members' First Amendment Right to Receive Information (Count II) .............................................26

II.  IN THE ABSENCE OF PRELIMINARY RELIEF, PLAINTIFFS WILL SUFFER IRREPARABLE HARM.......................................................27

A.  All Plaintiffs Who Produce USAGM Reporting Have Shown Irreparable Injury ......................................................................27

B.  The RSF Plaintiffs and TNG-CWA, and the Journalists Employed Outside USAGM and RFA they Represent, Have Shown Irreparable Injury ......................................................................29

C.  The Union Plaintiffs Have Shown Irreparable Injury as Organizational Plaintiffs Too...................................................30

III.  THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR PRELIMINARY RELIEF ......................................................31

IV.  PLAINTIFFS HAVE STANDING...........................................................32

A.  The Journalist Plaintiffs Have Article III Standing ..................32

B.  The Journalist Plaintiffs Also Have Third-Party Standing .......33

C.  The Union Plaintiffs and RSF Plaintiffs Have Standing ..........34

1.  The Organizational Plaintiffs All Have Associational Standing ........................................................................35

2.  The Union Plaintiffs Also Have Organizational Standing............36

3.  The RSF Plaintiffs and TNG-CWA Have Organizational Standing for Additional Reasons .....................................37

V.  PLAINTIFFS' CLAIMS ARE NOT CHANNELED TO AN ADMINISTRATIVE PROCESS ............................................................38

CONCLUSION.............................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Trs. of Univ. of N.C.-Wilmington*,
    640 F.3d 550 (4th Cir. 2011) ......................................................................................... 17

*Al-Aulaqi v. Obama*,
    727 F. Supp. 2d 1 (D.D.C. 2010) ................................................................................. 34

*Am. Acad. of Religion v. Chertoff*,
    463 F. Supp. 2d 400 (S.D.N.Y. 2006) ......................................................................... 26

*Andino v. Fischer*,
    555 F. Supp. 2d 418 (S.D.N.Y. 2008) ........................................................................... 7

*Application of Dow Jones & Co.*,
    842 F.2d 603 (2d Cir. 1988) ......................................................................................... 26

*Ashcroft v. Am. C.L. Union*,
    542 U.S. 656 (2004) ...................................................................................................... 27

*Axon Enter. Inc. v. Fed. Trade Comm'n*,
    598 U.S. 175 (2023) ................................................................................................. 40, 42

*Bano v. Union Carbide Corp.*,
    361 F.3d 696 (2d Cir. 2004) ......................................................................................... 36

*Basank v. Decker*,
    449 F. Supp. 3d 205 (S.D.N.Y. 2020) ........................................................................... 8

*Bennett v. Spear*,
    520 U.S. 154 (1997) .................................................................................................... 8, 9

*Biden v. Texas*,
    597 U.S. 785 (2022) ........................................................................................................ 9

*Brock v. United States*,
    64 F.3d 1421 (9th Cir. 1995) ....................................................................................... 40

*Carr v. Saul*,
    593 U.S. 83 (2021) ........................................................................................................ 42

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ..................................................................................... 12

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ...................................................................................................... 12

*Cmty. Health Options v. United States*,
    140 S. Ct. 1308 (2020) ............................................................................ 11

*Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*,
    356 F.3d 226 (2d Cir. 2004) .................................................................... 27

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) .................................................................. 21

*Demers v. Austin*,
    746 F.3d 402 (9th Cir. 2014) .................................................................. 17

*Duke Power Co. v. Carolina Evn't Study Grp.*,
    438 U.S. 59 (1978) ................................................................................... 33

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ................................................................................. 24

*Elrod v. Burns*,
    427 U.S. 347 (1976) ................................................................................. 28

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ................................................................................. 13

*FCC v. Fox Tel. Stations, Inc.*,
    556 U.S. 502 (2009) ................................................................................. 13

*First Nat'l Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978) ................................................................................. 21

*Food & Drug Admin. v. All. for Hippocratic Med.* (*AHM*),
    602 U.S. 367 (2024) ................................................................................. 36

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ................................................................................. 40

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ........................................................................... 16, 17

*Ghaly v. U.S. Dep't of Agric.*,
    228 F. Supp. 2d 283 (S.D.N.Y. 2002) .................................................... 41

*Gustavson v. Adkins*,
    803 F.3d 883 (7th Cir. 2015) .................................................................. 40

*Hartford Courant Co., LLC v. Carroll*,
    986 F.3d 211 (2d Cir. 2021) .................................................................... 31

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)............................................................................................ 37

*Hunt v. Wash. State Apple Advertising Comm'n*,
    432 U.S. 333 (1977)............................................................................................ 35

*Hyland v. Navient Corp.*,
    48 F.4th 110 (2d Cir. 2022) .............................................................................. 32

*Irish Lesbian & Gay Org. v. Giuliani*,
    143 F.3d 638 (2d Cir. 1998)............................................................................. 35

*J. Does 1-26 v. Musk*,
    D. Md. Case No. 25-cv-00462 (D. Md.)............................................................ 39

*John v. Whole Foods Mkt. Grp., Inc.*,
    858 F.3d 732 (2d Cir. 2017).............................................................................. 33

*Kendall v. U.S. ex rel. Stokes*,
    37 U.S. (12 Pet.) 524 (1838) ............................................................................ 12

*L.V.M. v. Lloyd*,
    318 F. Supp. 3d 601 (S.D.N.Y. 2018)............................................................... 32

*Laird v. Tatum*,
    408 U.S. 1 (1972)........................................................................................ 21, 32

*Lamont v. Postmaster General*,
    381 U.S. 301 (1965).......................................................................................... 26

*Lewis v. Cohen*,
    165 F.3d 154 (2d Cir. 1999)............................................................................. 24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).......................................................................................... 32

*Manivannan v. U.S. Dep't of Energy*,
    42 F.4th 163 (3d Cir. 2022) ............................................................................. 40

*Manning v. Am. Airlines, Inc.*,
    221 F. Supp. 301 (S.D.N.Y. 1963).................................................................... 30

*Manning v. Am. Airlines, Inc.*,
    329 F.2d 32 (2d Cir. 1964)............................................................................... 30

*Marquez v. Annucci*,
    No. 20 CIV. 1974 (AKH), 2020 WL 3871362 (S.D.N.Y. July 9, 2020)......................... 31

*McDermott v. Ampersand Publ'g, LLC,*
    593 F.3d 950 (9th Cir. 2010) ........................................................................... 21

*Miami Heald Pub. Co. v. Tornillo,*
    418 U.S. 241 (1974) ......................................................................................... 20

*Mitchell v. Cuomo,*
    748 F.2d 804 (2d Cir. 1984) ............................................................................ 32

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ......................................................................................... 20

*Morrison v. Olson,*
    487 U.S. 654 (1988) ......................................................................................... 12

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................................... 13

*NAACP v. Town of E. Haven,*
    70 F.3d 219 (2d Cir. 1995) .............................................................................. 27

*Nat'l Automatic Laundry and Cleaning Council v. Shultz,*
    443 F.2d 689 (D.C. Cir. 1971) ........................................................................ 10

*Nat'l Fed'n of Indep. Bus. v. U.S. Dep't of Labor,*
    595 U.S. 109 (2022) ......................................................................................... 12

*Nebraska Press Ass'n v. Stuart,*
    427 U.S. 539 (1976) ......................................................................................... 20

*New York C.L. Union v. New York City Transit Auth.,*
    684 F.3d 286 (2d Cir. 2012) ............................................................................ 35

*New York State Citizens' Coal. for Child. v. Poole,*
    922 F.3d 69 (2d Cir. 2019) .............................................................................. 33

*New York v. U.S. Dep't of Health & Hum. Servs.,*
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ............................................................ 13

*Nken v. Holder,*
    556 U.S. 418 (2009) ......................................................................................... 31

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ........................................................................................... 13

*Pen Am. Ctr., Inc. v. Trump,*
    448 F. Supp. 3d 309 (S.D.N.Y. 2020) ................................................ 32, 37, 38

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*,
    391 U.S. 563 (1968) ............................................................................... passim

*Pico v. Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26*,
    638 F.2d 404 (2d Cir. 1980) ............................................................................ 27

*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*,
    670 F.2d 771 (8th Cir. 1982) .......................................................................... 27

*Ralis v. RFE/RL, Inc.*,
    770 F.2d 1121 (D.D.C. 1985) ......................................................................... 20

*Reed v. Town of Gilbert, AZ*,
    576 U.S. 155 (2015) ......................................................................................... 18

*Reese Bros., Inc. v. U.S. Postal Serv.*,
    531 F. Supp. 2d 64 (D.D.C. 2008) .................................................................. 34

*Richards v. New York State Dep't of Corr. Servs.*,
    572 F. Supp. 1168 (S.D.N.Y. 1983) ............................................................... 37

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995) ......................................................................................... 18

*Sanjour v. E.P.A.*,
    56 F.3d 85 (D.C. Cir. 1995) ...................................................................... 18, 24

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984) ......................................................................................... 34

*Spokeo, Inc. v. Robbins*,
    578 U.S 330 (2016) .......................................................................................... 32

*Statharos v. N.Y.C. Taxi & Limousine Comm'n*,
    198 F.3d 317 (2d Cir. 1999) ............................................................................ 27

*Stewart v. Evans*,
    275 F.3d 1126 (D.C. Cir. 2002) ...................................................................... 40

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) .............................................................................. 38, 39, 41

*Turner v. U.S. Agency for Glob. Media*,
    502 F. Supp. 3d 333 (D.D.C. 2020) .......................................................... passim

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016) ...................................................................................... 9, 39

*U.S. Info. Agency v. KRC,*
    989 F.2d 1211 (D.C. Cir. 1993) .................................................................................. 40

*United States v. Fausto,*
    484 U.S.439 (1988) .................................................................................................... 40

*United States v. Nat'l Treasury Emps. Union,*
    513 U.S. 454 (1995) ............................................................................................. 23, 25

*Velesaca v. Decker,*
    458 F. Supp. 3d 224 (S.D.N.Y. 2020) ...................................................................... 32

*Weaver v. U.S. Information Agency,*
    87 F.3d 1429 (D.C. Cir. 1996) .................................................................................. 23

*Weyerhaeuser Co. v. US. Fish and Wildlife Serv.,*
    586 U.S. 9 (2018) ...................................................................................................... 39

*Wilkerson v. Rahrer,*
    140 U.S. 545 (1891) .................................................................................................. 12

*Williams v. Town of Greenburgh,*
    535 F.3d 71 (2d Cir. 2008) ....................................................................................... 21

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................................................... 31

## Regulations

90 Fed. Reg. 13043 (Mar. 14, 2025) ................................................................................... 11

## PRELIMINARY STATEMENT

This is a genuine constitutional emergency.  As we speak, government officials have forbidden journalists from reporting and broadcasting the news.  As we speak, the Executive Branch, acting through Defendants Kari Lake and Victor Morales, has defied Congress by closing the United States Agency for Global Media ("USAGM") and silencing its flagship service, the Voice of America ("VOA").  As we speak, millions of listeners around the world are being deprived of the reliable news, information, and opinion for which VOA has been known for over 80 years.  And, as we speak, every journalist, editor, engineer, staffer, employee and personal services contractor at VOA and its grantee stations suffers career damage, reputational injury, and the imminent prospect of joblessness and stigma, and their labor unions suffer associated harms.  Two of the Journalist Plaintiffs are foreign nationals who hold nonimmigrant J-1 cultural exchange visas; if their VOA contracts are cancelled as of March 31, as they have been told, they face deportation to their home countries, where repressive regimes are likely to target them—an outcome that will be shared by *all* nonimmigrant visa holders who work for USAGM and its grantee networks.

President Trump has made it clear: he despises the Voice of America.  While the animus towards VOA dates back to the first Trump Administration, the immediate crisis arose on March 14, 2025.  On that date, the President issued an Executive Order directing subordinate federal officials to "eliminat[e]" USAGM "to the maximum extent consistent with applicable law;" simultaneously, the White House issued a statement entitled "The Voice of Radical America" (the "VORA Statement"), which expressly criticized VOA for the content and nature of its news coverage and the perceived political views of its reportorial and editorial staff.  *See* Compl., Dkt.

1

1 ¶¶ 69-70; Ex. B (VORA Statement).[1]  The next day, Saturday March 15, all VOA staff were placed on indefinite administrative leave effective immediately—and all VOA news service ceased.  Defendants have shut down programming that Congress has mandated must be broadcast.  Compl. ¶ 74.

Since that time, USAGM and VOA employees and contractors, including working journalists, have been barred from their offices and deprived of their ability to do their jobs.  Meanwhile, due to USAGM's abrupt and illegal grant cancellations, its grantee stations will soon be forced to do the same.  Three-quarters of the staff of Radio Free Asia ("RFA"), a statutorily-mandated grantee of USAGM, were furloughed without pay on Friday, March 21.  *Id.* ¶ 80.

Defendant Lake, the White House-appointed Special Advisor to the VOA, and Defendant Morales, the Acting CEO of USAGM, are responsible for these actions.  *Id.* ¶¶ 33-34.  In the context of justifying the shuttering of VOA and USAGM, Defendant Lake has repeatedly and expressly criticized VOA for its content, describing it as "parrot[ing] the talking-points of America's adversaries," "propaganda," and not "pro-American."  *Id.* ¶¶ 86, 88.  She has characterized VOA as being part of the "far . . . left" media, and she affirmed the view, expressed by an interviewer, that VOA should offer "more of a MAGA message" as it allegedly had historically.  *Id.* ¶¶ 90, 92.  In a written statement, Ms. Lake declared VOA, in its editorially-independent form, "not salvageable."  *Id.* ¶ 85.

With the immediacy and severity of these ongoing harms as a critical backdrop, this case raises two legal questions: *first*, whether the Executive Branch may lawfully shutter an agency—by dismissing its staff, closing its offices, and ordering the cessation of its services—where Congress created that agency by statute, funded it, and directed it to deliver those services on a

---

[1] References to "Ex." are to the exhibits annexed to the March 23, 2025 Declaration of Andrew G. Celli, Jr.

continuous basis; and, *second*, whether government officials can order the closure of a media outlet as a means to prevent journalists from reporting and publishing news, simply because these officials disapprove of how that outlet covers the news, and its journalistic viewpoint.  If our 238-year experience with constitutional government means anything, it means that the answer to both questions is no.

To begin, the Voice of America and its parent agency USAGM are entities created by statute and funded through specific appropriations of Congress.  Federal law mandates that the VOA continuously broadcast news, information, and opinion to the world.  The editorial independence of VOA is also statutorily mandated:  a "Firewall" is set forth in law that expressly forbids the Executive Branch from dictating or interfering with the content of VOA broadcasts.  That Firewall is mission critical.  It demonstrates to the world the value of the free press, as enshrined in the U.S. Constitution.  Without the Firewall, USAGM is a propaganda vehicle, little different than "the state-run propaganda that dominates media" in the countries where "VOA and its sister networks broadcast."[2]

These mandates, and the constitutional provisions and principles that permit Congress to enact them, require the maintenance of VOA—but they do more: they imbue the employees of USAGM and its networks, including VOA, with full First Amendment rights.  These journalists have the right to report and publish news, information and opinion free from interference by the Executive Branch.  Those rights have been violated by Defendants' abrupt cessation of VOA's news operations and their unprecedented and continuing lock-out of its workforce and

---

[2] *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 342 (D.D.C. 2020).

cancellation of its grantees' contracts—all of which, the record shows, were motivated by the Administration's objections to VOA's content, in other words: rank viewpoint discrimination.

Because the individual Journalist Plaintiffs, their fellow employees, the labor unions that represent them (AFSCME, AFGE, and AFSA), the employees of USAGM grantee networks like RFA and their union (News Guild-CWA), and VOA audience members like Reporters Sans Frontières and Reporters Without Borders, Inc. (the "RSF Plaintiffs") all have standing and are suffering ongoing irreparable harm, Plaintiffs are likely to prevail on the merits of their First Amendment claims.  In light of the constitutional principles at stake, the human toll imposed on thousands of workers, and the bankruptcy of Defendants' claims of "waste, fraud, and abuse" as a justification for the total shutdown, the equities strongly favor the issuance of a TRO to maintain the status quo, and a preliminary injunction to restore USAGM and VOA, their employees, contractors and grantees, to the status quo pre-March 14, 2025, and protect their rights to practice journalism free from Executive Branch interference under both the statutory Firewall and the Free Speech and Press Clauses of the First Amendment.  *See* Sections I(B)-(E), *infra*.

The same relief is mandated under the Administrative Procedure Act, the Mandamus and All Writs Act, and Articles I and II of the Constitution, including the appropriations and appointments clauses thereof and principles of separation of powers.  Defendants' conduct in shuttering VOA and USAGM, and depriving USAGM grantees of funds, violates statutory mandates, including as to funding of and the provision of service by VOA and USAGM and its grantees, and directly undermines the role and function of Congress in our constitutional system. Such Executive Branch overreach cannot be permitted to continue; an injunction is warranted— indeed necessary—under these unprecedented conditions.  *See* Section I(A), *infra*.

4

## USAGM: RELEVANT BACKGROUND AND STATUTORY FRAMEWORK

Plaintiffs incorporate by reference the facts alleged in their Complaint.  The following is an overview of USAGM's structure and governing statutes.

### *USAGM's Statutory Mandates*

USAGM is a Congressionally established independent agency.  22 U.S.C. § 6203(a).   It is governed by broadcasting standards and principles, including, among other requirements, that U.S. international broadcasting "be designed so as to effectively reach a significant audience," and "include news which is consistently reliable and authoritative, accurate, objective, and comprehensive."  22 U.S.C. § 6202(a)(7), (b)(1).

VOA, now part of USAGM, is an integral part of USAGM's pursuit of those mandates. Congress requires that "[VOA] must win the attention and respect of listeners."  22 U.S.C. § 6202(c).  To do so:

> (1) VOA *will serve* as a consistently reliable and authoritative source of news.  VOA news will be accurate, objective, and comprehensive.

> (2) VOA *will represent* America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions.

> (3) VOA *will present* the policies of the United States clearly and effectively, and will also present responsible discussions and opinion on these policies.

*Id*. (emphasis added).  Congress has also decided that it "would be in the national interest" to broadcast to Cuba "news, commentary and other information about events in Cuba and elsewhere to promote the cause of freedom in Cuba."  Radio Broadcasting to Cuba Act, 97 Stat. 749 § 2; 22 U.S.C. § 1465 (1983).  It assigned to USAGM the duty to "provide for the open

communication of information and ideas through the use of radio broadcasting" and television

broadcasting to Cuba.  Pub. L. 98-111 § 3; 22 U.S.C. § 1465a; Television Broadcasting to Cuba

Act, Pub. L. 101-246, 104 Stat. 15 § 241; 22 U.S.C. § 1465aa et seq.

USAGM is also required by statute to fund via grants Radio Free Europe/Radio Liberty

("RFL/RL"), Radio Free Asia ("RFA"), Middle East Broadcasting Networks, Inc., and the Open

Technology Fund.  *See* 22 U.S.C. §§ 6204(a)(5), (6), § 6207(f), § 6208, § 6215.  USAGM has

acknowledged that these provisions "dictate how the CEO must exercise his § 6204 grant-

making authority when dealing with" named grantees.  Def.'s Opp. to Pls.' Mot. TRO, at 4,

*Open Technology Fund v. Pack*, No. 20-cv-1710, ECF 7, 2020 WL 7041426 (D.D.C. filed June

26, 2020).

These grantees, with VOA, carry out precise programming mandates on USAGM's

behalf.  22 U.S.C. § 7813 requires USAGM to "increase" broadcasts to North Korea and

maintain "a goal of providing 12-hour-per-day broadcasting to North Korea, including

broadcasts by [RFA] and [VOA]."  And 22 U.S.C. § 8754(7)(A) requires USAGM by way of

VOA's Persian News Network and RFE/RL "to provide hourly live news update programming

and breaking news coverage capability 24 hours a day and 7 days a week."

### *Recent Appropriations*

Congress appropriated funds for USAGM and conditioned their use.  For Fiscal Year

2025, Congress has appropriated $875 million for USAGM to carry out international

communication activities.  *See* Further Consolidated Appropriations Act of 2024, Pub. L. No.

118-47, div. F, tit. I, 138 Stat. 460, 735 (2024) ("2024 Appropriations Act").  $260 million of

that money must go to VOA, while other specified amounts must go to grantee organizations such as RFE/RL and RFA.[3]

USAGM has limited discretion to deviate from those specifically designated amounts. The 2024 Appropriations Act—whose conditions the FY2025 continuing resolutions adopted—forbids USAGM from reprogramming more than 5% of any designated amount, and only with notice to Congress.  2024 Appropriations Act, div. F, tit. I, 138 Stat. 735; *see also* Explanatory Statement, 170 Cong. Rec. at H2087 (defining "regular notification procedures").  Nothing gives USAGM the authority to shut itself down.  Congress even placed limits on USAGM's (and other agencies') ability to shut down more discrete items.  The agency cannot suspend or eliminate any "program, project, or activity," and it cannot close or downsize any "bureaus, centers, or offices," unless it gives the congressional appropriations committees at least 15 days' advance notice.  2024 Appropriations Act, div. F, Sec. 7015, 138 Stat. 766.  No such notice has been provided; nor in these circumstances would it be effective, as the actions taken to date have impacted more than 5% of the USAGM budget.

## ARGUMENT

"In this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction."  *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) (collecting cases).  A plaintiff seeking a TRO or preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest."  *Basank*

---

[3] *See id.* (requiring funds to be allocated in accordance with table in "the explanatory statement" described in section 4"); *id.* § 4 (identifying explanatory statement); Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024) ("Explanatory Statement") (setting forth table designating how funds appropriated for international broadcasting "are allocated").

*v. Decker*, 449 F. Supp. 3d 205, 210 (S.D.N.Y. 2020).  In this case, each factor militates in favor of provisional relief.  The Court should grant Plaintiffs' motion for a TRO and preserve the immediate status quo, and then enter a preliminary injunction enjoining Defendants from further violating the APA and separation of powers, infringing Plaintiffs' First Amendment rights, and breaching the Statutory Firewall, by returning USAGM to the lawful status quo that existed before these violations began on March 14, 2025.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    Plaintiffs Are Likely to Demonstrate that Defendants Violated the APA (Counts III, V, and VI) and the Separation of Powers (Count VIII)

The APA authorizes courts to review "final agency action," and set aside any that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §§ 704, 706(2)(C), (A).  Defendants' decision to shut down USAGM flagrantly violates multiple provisions of the U.S. Code, arrogates legislative authority to the executive, and is arbitrary and capricious.

### 1.    The Conduct Here is a Final Agency Action

Defendants' decision to shut down USAGM, including VOA, is a  final agency action subject to review under the APA.  It both "mark[s] the consummation of the agency's decision making process" and is a determination of "rights or obligations . . . or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

*First*, Defendants' dismantling of USAGM marks the consummation of the decision-making process.  The President and his Administration have publicly contemplated shutting down USAGM since at least February.  Richard Grenell, the President's Envoy for Special Missions, said in February that VOA and RFE are "relic[s] of the past.  We don't need

government paid media outlets." Ex. E.  Special Government Employee and head of the

Department of Government Efficiency Elon Musk retweeted Grenell's comments, adding, "Yes,

shut them down." *Id*.  Then, on March 6, three days after Lake's appointment as Senior Advisor,

USAGM sent an email to "All Staff" seeking to compile personal contact information to reach

staff should the President's efforts to dismantle the federal government lock staff out from their

work accounts. Ex. AA.

On March 15, one day after the President's executive order, all USAGM staff, including

VOA staff, were put on paid administrative leave, shut out of their work email and offices,

broadcasts were taken off the air, and grants cancelled.  There is nothing "tentative" about

ousting the vast majority of an agency's staff from its operations, cancelling grants, and ending

the vast majority of an agency's programs. *See U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,

578 U.S. 590, 597 (2016) (citing *Bennett*, 520 U.S. at 177–178); *see Biden v. Texas*, 597 U.S.

785, 808–09 (2022) (holding that Department of Homeland Security's decision to end the

Migrant Protection Protocols program was a final agency action because it forbade staff "to

continue the program in any way from that moment on" (cleaned up)).

*Second*, legal rights and obligations flow from the decision to shut down USAGM.

Thousands of USAGM and VOA staff have been placed on administrative leave.  Ex. Q

(Herman Decl.) ¶ 10; Ex. M (Dryden Decl.) ¶ 12; Ex. N (Hickey Decl.) ¶ 13.  Radio Free Asia

staff have been furloughed after USAGM purported to cancel its grant. Ex. P (Schleuss Decl.) ¶¶

9-10.  USAGM's statutorily mandated broadcasts are no longer on the air.  Compl. 82; Ex. M ¶¶

14, 19.  Nor are the broadcasts of its statutorily mandated grantees.  There is no indication that

Defendants intend to resume these functions.

Finally, the decision to dissolve USAGM derives from top agency officials, not agency staff. *See Nat'l Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C. Cir. 1971) (holding agency head approval of an agency action as a "signpost[] of authoritative determination, finality[,] and ripeness").

### 2. Defendants' Actions Violate Section 706(2) of the APA

By shutting down USAGM, including ceasing its programming and cutting off funding to its grantees, Defendants have violated statutory law. Defendants have violated:

- 2017 National Defense Authorization Act, which mandates that the agency "shall continue to exist within the Executive branch of Government as an entity described in section 104 of title 5, United States Code"—as an independent agency. Pub. L. 114-328, 130 Stat. 2000, 2549 § 1288; 130 Stat. 2549; 22 U.S.C. § 6203.

- Voice of America's charter, which requires the VOA "will serve as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive." 22 U.S.C. § 6202(c).

- The requirement that U.S. international broadcasting "shall . . . be designed so as to effectively reach a significant audience," and "include news which is consistently reliable and authoritative, accurate, objective, and comprehensive." 22 U.S.C. § 6202(a), (b).

- Congress's programming mandates. USAGM is no longer providing "for the open communication of information and ideas through the use of" radio and television broadcasting to Cuba, as it is required to do. 22 U.S.C. §§ 1465a, 1465aa, 1465bb, 1465cc. Nor is it transmitting 12-hour-per-day broadcasting to North

Korea or "hourly live news update programming" 24/7 to Iran. 22 U.S.C. §§
7813, 8754(7)(A).

- Congress's grant funding requirements. USAGM's decision to cut all grant
  funding violates 22 U.S.C. §§ 6204(a)(5), (6), 6207(f), 6208, 6215.

- Congress's 2025 appropriations and the conditions placed thereon. See Compl. ¶¶
  45-48.

Defendants cannot dispute that these are unequivocal mandates. *See Me. Cmty. Health
Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("shall" connotes a non-discretionary
"requirement"). Indeed, President Trump's March 14, 2025, Executive Order titled "Continuing
the Reduction of the Federal Bureaucracy," which immediately preceded Defendants' gutting of
USAGM, recognizes that Congress has exercised the authority to create USAGM as an
independent agency and to mandate its functions. *See* Exec. Order No. 14238, 90 Fed. Reg.
13043 (Mar. 14, 2025). The order purports to respect Congressional decision-making by
preserving USAGM's "minimum presence and function required by law." *Id.* § 2(a).

But that is not how the order has been carried out: Defendants have shut down *all
USAGM operations.*

What's more, even if the agency were to reopen at a pared-back capacity, as the
executive order contemplates, USAGM would still be in violation of Congress's recent
appropriations. Congress appropriated $875 million for USAGM's international communication
activities in FY2025 and further designated the programs to which those funds "shall be
allocated." Compl. ¶¶ 45-46. Defendants cannot disregard that non-discretionary command:
"the Administration may not redistribute or withhold properly appropriated funds in order to
effectuate its own policy goals." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235

11

(9th Cir. 2018). Moreover, by terminating grants and otherwise moving to shut down USAGM, Defendants far exceed the 5 percent cap on reallocations Congress allowed. In the process, USAGM is also transgressing Congress's command that appropriated funds not be used to "suspend or eliminate a program, project, or activity" or to "close [or] … downsize" any "bureaus, centers, or offices" unless the agency gives the House and Senate Appropriations Committees 15 days' advance notice, *see* Compl. ¶ 47, which it has not provided.

For the same reasons, Defendants' actions are contrary to the U.S. Constitution given their violation of the separation of powers and the Take Care Clause. The power to make law resides exclusively with the legislative branch. U.S. Const. art. I, § 1; *Wilkerson v. Rahrer*, 140 U.S. 545, 562 (1891). Because "[a]dministrative agencies are creatures of statute," the power to establish, reorganize, and abolish agencies rests squarely with Congress. *Nat'l Fed'n of Indep. Bus. v. U.S. Dep't of Labor*, 595 U.S. 109, 117 (2022). The President may not "enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). The President has a constitutional duty to "take care that the laws [Congress has passed] be faithfully executed." *Morrison v. Olson*, 487 U.S. 654, 690 (1988); U.S. Const. art. II § 3. But this "take care" authority does not provide the president the power to forbid the execution of congressionally enacted laws. *See Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838). In blatantly violating multiple provisions of the U.S. Code, Defendants have violated the separation of powers by arrogating power to the executive branch that rightfully resides with the legislature.[4]

Defendants' actions are also arbitrary and capricious. They came mere hours after the President's executive order and did not give a justification for shutting the agency down. The agency posted a statement on its website on March 15, the same day that it acted against staff

---

[4] Plaintiffs are also likely to succeed on their constitutional separation of powers claim (Count Eight) for these reasons.

and took its broadcasts off the air, claiming that an unidentified entity had made "egregious findings." Ex. C. The findings were not supported by any documentation or any specific details. *See id.* And the agency did not explain why these findings, even if true, required the agency to cease all functions. Perhaps most egregious, the agency failed to comply with the terms of the executive order that it purported to implement by shutting down statutorily mandated functions. The absence of "reasoned analysis" accompanying Defendants' actions render them arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[W]here [an] agency has failed to provide even [a] minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law."). This conclusion is especially true here, given that Defendants' action constituted a change in policy and affects serious reliance interests. *See FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 515 (2009); *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 547 (S.D.N.Y. 2019).

### 3. Defendants' Actions Violate Section 706(1) of the APA

The APA also provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). This type of APA claim arises "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphases in original). It is akin to mandamus under the All Writs Act. *Id*. at 63.

For the reasons discussed above, Defendants' actions are a final agency action. Defendants have violated section 706(1) of the APA by unlawfully withholding the programming and grants that USAGM is required to provide under the statutory provisions discussed above. This Court should therefore compel USAGM to act to come into compliance with these provisions.

B.    **Plaintiffs Are Likely to Demonstrate that Defendants Violated the Statutory Firewall, Which Preserves USAGM and its Networks' Independence**

By gutting USAGM and preventing its networks' newsgathering and news dissemination, Defendants have violated the Statutory Firewall.

In creating USAGM (and its predecessors) and its networks, including VOA, Congress created the Statutory Firewall to protect the independence and integrity of its journalists and their reporting. Federal law provides that "United States international broadcasting shall . . . be conducted in accordance with the highest professional standards of broadcast journalism." 22 U.S.C. § 6202(a)(5)-(6). To meet that goal, Congress stated that VOA will "serve as a consistently reliable and authoritative source of news," and that its news "will be accurate, objective, and comprehensive." 22 U.S.C. § 6202(c)(1). VOA must also "represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions." 22 U.S.C. § 6202(c)(2). Critically, to achieve these goals, the Statutory Firewall requires USAGM's CEO, Defendant Morales, to "respect the professional independence and integrity of [USAGM], its broadcasting services, and the grantees of the Agency." 22 U.S.C. § 6204(b).

Here, Defendants have egregiously violated the Statutory Firewall and violated USAGM's independence by preventing USAGM's networks, including VOA, from participating in newsgathering and news dissemination entirely, all on the basis of USAGM's networks' perceived viewpoint, which the Trump Administration disapproves of. Defendants have also impugned USAGM and its networks' integrity by smearing their staff, including accomplished journalists and public servants, as incompetent or, worse, as "spies" and "terrorist sympathizers." Ex. C. Defendants' viewpoint-based interference in USAGM's operations is precisely the type of conduct the Statutory Firewall was enacted to prevent.

14

### C.    Plaintiffs' First Amendment Claims Are Likely to Succeed

The employees of USAGM and its grantee stations are not typical government employees.  They are *journalists*, especially those like Plaintiffs who work for a *sui generis* broadcaster—VOA—mandated by Congress to be independent and insulated from political control.   The activities of employees of USAGM and its grantees are protected by the First Amendment.  This was the central holding in *Turner*, the definitive case on the First Amendment rights of VOA journalists.  *Turner* held that VOA journalists' speech and press activities are protected by the First Amendment, subject to the test established by the Supreme Court in *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.,* 391 U.S. 563 (1968). *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 376 (D.D.C. 2020).

As explained below, even assuming the government speech test from *Pickering* applies to Defendants' conduct, the Journalist Plaintiffs [5]—a group comprised of both full-time VOA employees and journalists working as independent professional services contractors ("PSCs") with VOA— are likely to succeed on their First Amendment claims (both on their own behalf and, through third-party standing, on behalf of their USAGM journalist colleagues) because: (1) their expressive activities at VOA involve matters of public concern, and (2) their interest in protected speech outweighs any governmental interest in efficiency.[6]  And the same holds true for all their fellow employees, represented in this case by the Federal Employee Unions, and

---

[5] The "Journalist Plaintiffs" include Plaintiff Widakuswara, the VOA White House Bureau Chief and a full-time equivalent federal employee ("FTE") of VOA; Plaintiff Jerreat, the VOA Press Freedom Editor and an FTE of VOA; Plaintiff Neeper, the Director of Strategy and Performance Assessment at USAGM, where she is an FTE; Plaintiffs John Doe 1 and John Doe 2, journalists at VOA and FTEs of VOA; and Plaintiffs John Doe 3 and John Doe 4, PSCs, i.e., independent freelance journalists, working under a contract with VOA.  "Individual Plaintiffs" refers to the Journalist Plaintiffs and Plaintiff Neeper, a Director at USAGM.

[6] The government speech doctrine is more aptly applied to employee speech that is subject to government control because it is what the government employer has commissioned or approved.  Because Defendants lack control over the day-to-day operations of VOA and the journalistic output of the Journalist Plaintiffs, the government speech doctrine is an ill fit for the Journalist Plaintiffs' First Amendment claims.  Regardless, the Journalist Plaintiffs are likely to succeed even under the *Pickering* government speech test.

employees of USAGM grantee stations like those represented in this case by TNG-CWA.  The evidence is clear:  Defendants decided to place all USAGM employees on administrative leave *en masse*, and to cancel USAGM grantee station grants, because Defendants (and the President) viewed the editorial output of VOA and USAGM grantees as tainted by leftist "radical" bias. Defendants' conduct in shuttering USAGM has done far worse than "chilled" Plaintiffs' speech. It has silenced that speech.  Separately, the closure of VOA and USAGM and the silencing of their programming violates the RSF Plaintiffs' members' First Amendment right to receive information.

1. ***Turner* Makes Clear that Plaintiffs' Speech Is Protected by the First Amendment**

As a general matter, government employees who engage in expressive activities as part of their jobs—i.e., who engage in "government speech"—do not enjoy the same First Amendment protections as private citizens.  *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  But government-employed or -retained journalists who work behind the Statutory Firewall at USAGM, including those who report for VOA, are the exception to this rule.  That is the holding of *Turner*.  Because, by Congressional design, VOA journalism is independent and statutorily protected from editorial interference by the Executive Branch, VOA is *not* "government speech." *Turner*, 502 F. Supp. at 376.  It is speech fully protected under the First Amendment.  *Id.*

*Turner* provides the roadmap for the merits of Plaintiffs' First Amendment claim.[7]  In *Turner*, senior managers at USAGM/VOA alleged that USAGM's Trump-era leadership violated plaintiffs' First Amendment rights.  502 F. Supp. at 347.  USAGM's leadership had "systematically removed USAGM and network employees charged with enforcing the firewall,"

---

[7]  In *Turner*, the plaintiffs were employees, not PSCs.  *See Turner*, 502 F. Supp. 3d at 347.  Accordingly, *Turner*'s channeling of certain claims is not applicable to the PSCs and other non-employee Plaintiffs here. *See* Section V, *infra*.

influenced "employment decisions related to editorial and journalistic personnel," and sought to control editorial "content" and "investigations," which had a "detrimental chilling effect on VOA journalists." *Id.* at 348-50. The *Turner* plaintiffs also asserted USAGM investigated "coverage they perceive[d] as . . . biased against President Trump." *Id.* at 349.

After holding that a VOA supervisor had both Article III standing, *see id.* at 356-61, and third-party standing on behalf of other VOA journalists, *see id.* at 361-62, the court conducted a detailed analysis of "which First Amendment standard controls." *Id.* at 373. The *Turner* court held that "the speech of government-employed editors and journalists," such as VOA employees is not constrained by the "customary employee-speech jurisprudence" of *Garcetti*, pointing to *Garcetti*'s recognition that some "non-customary" government employees—academics were the example in *Garcetti*—"'implicate[s] additional constitutional issues.'" *Id.* (quoting *Garcetti*, 547 U.S. at 425). Following the precedent set by the Ninth Circuit in *Demers* and the Fourth Circuit in *Adams*, *Turner* held that "speech made in relation to editorial and journalistic activities [of government-employed journalists] is protected under the First Amendment, using the analysis set forth in *Pickering*." *Id.* at 376; *see Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014) (holding that *Garcetti* does not apply to public university employee's teaching and writing activities); *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 562 (4th Cir. 2011) (same).

Because *Turner*, like this case, involved First Amendment claims brought by VOA journalists, *Turner* applies with equal force here, and this Court should hold that Plaintiffs' have First Amendment rights, subject to application of the *Pickering* balancing test.

### 2. Defendants' Gutting VOA to Suppress Perceived "Radical" or "Leftist" Reporting Is Blatant Viewpoint Discrimination

Once the court finds Plaintiffs' speech and press reporting is protected by the First Amendment, it is clear those First Amendment rights were (at least likely) violated. Defendants

engaged in viewpoint discrimination by shutting down all USAGM broadcasts and publishing

and placing USAGM employees on indefinite administrative leave.  Defendants have all but said

as much: their public statements evidence that Defendants seek to silence journalistic output

because of its content, and that they and their government superiors, including President Trump,

regard that content as adverse to the Administration and its political agenda.

"It is perhaps the most fundamental principle of First Amendment jurisprudence that the

government may not regulate speech on the ground that it expresses a dissenting viewpoint."

*Sanjour v. E.P.A.*, 56 F.3d 85, 97 (D.C. Cir. 1995).  "Discrimination against speech because of

its message is *presumed to be unconstitutional*" and is an "egregious form of content

discrimination."  *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828

(1995) (emphasis added).  Silencing USAGM's journalism on specific issues constitutes

viewpoint discrimination.  As the Supreme Court explained, the "First Amendment's hostility to

content-based regulation extends not only to restrictions on particular viewpoints, but also to

prohibition of public discussion of an entire topic."  *Reed v. Town of Gilbert, AZ*, 576 U.S. 155,

169 (2015).

Defendants' viewpoint discrimination is not subtle.  It is front and center in Defendants'

own public statements.  For example, in Defendant Lake's March 15, 2025 press release

regarding Defendants' gutting of VOA, she boasted that USAGM is "a giant rot" because its

broadcasters (i.e., VOA and grantee stations like RFA) "create false narratives" and "parrot[] the

talking-points of America's adversaries," and that "terrorist sympathizers" have "infiltrat[ed] the

agency."  Ex. C.[8]

---

[8] Likewise, Elon Musk, Senior Advisor to the President and de facto head of the United States DOGE Service, recently characterized USAGM broadcasters, including VOA, as "just radical left crazy people talking to themselves while torching $1B/year of US taxpayer money."  Elon Musk (@elonmusk), X (Feb. 9, 2025, 5:02 a.m.), https://x.com/elonmusk/status/1888574212316582230.

In addition, the Trump administration's public statements—which clearly reflect the views of President Trump, the man who appointed Defendant Lake "Special Advisor" to Defendant Morales Acting CEO of USAGM; the President's view should be imputed, at the very least, to Defendants—make clear that Defendants' conduct toward USAGM is intended to stop USAGM from *all* reporting and *all* publishing on what they deem are "radical" topics. The White House's press release contemporaneous with the VOA-shut down was entitled "The Voice of Radical America;" it explained that Defendants' actions were "taken to ensure that taxpayers are no longer on the hook for radical propaganda." Ex. B. It provided a list of examples of VOA journalism the Trump administration has deemed off-limits, including: "anti-Trump comments," an article about "white privilege," an article "downplaying the validity of the Hunter Biden laptop story," journalism "too favorable to . . . Joe Biden," and a segment about "transgender migrants seeking asylum in the United States." *Id.* That same day, President Trump doubled down in a social media post, stating that "U.S. taxpayers shouldn't be funding" articles that discuss 'white privilege' or news coverage that does not refer to Hamas members as 'terrorists.'" Ex. Z.[9] Just as *Turner* found, "penalize[ing] and chill[ing] speech . . . . on the basis of [a] perceived viewpoint" that the reporting is "anti-Trump" is prototypical viewpoint discrimination, and it is unconstitutional. *Turner,* 502 F. Supp. 3d at 381.

The impact of Defendants' conduct here goes beyond mere "chill" of protected First Amendment activity (though there is chilling, see *infra*, Section I.C.4). It constitutes actual *silencing*—a shutting down of speech that is accomplished by government shutdown of the agency. VOA and its sister networks are government-funded media outlets with guaranteed

---

[9] Likewise, Elon Musk, Senior Advisor to the President and de facto head of the United States DOGE Service, recently characterized USAGM broadcasters, including VOA, as "just radical left crazy people talking to themselves while torching $1B/year of US taxpayer money." Ex. E.

editorial independence.  Cessation of their right and ability to publish news and opinion is no different in kind than if government officials, unhappy about the coverage they'd received in the New York Times, or the views expressed on its Op-Ed page, rolled up to the Times Building, ordered everyone out, and padlocked the doors.  *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) ("[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights.").

Defendants' viewpoint discrimination also directly undermines the mission of USAGM, which, "in contrast to the state-run propaganda that dominates media in the countries where VOA and its sister networks broadcast, . . . combat[s] disinformation and deception with facts, told through an American lens of democratic values.  *Turner*, 502 F. Supp. 3d at 342.  "[T]o transform these outlets into house organs for the United States Government would be inimical to their fundamental mission."  *Id.* (quoting *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1125 (D.D.C. 1985) (cleaned up).

### 3.  Defendants' Actions Interfere with Plaintiffs Jerreat's and John Doe 1's Exercise of Editorial Discretion

As editors at VOA, Plaintiffs Jerreat and John Doe 1 have each suffered an additional, unique First Amendment injury: Defendants have violated their right to exercise editorial discretion.

In the press context specifically, the First Amendment separately prohibits any interference with "the exercise of editorial control and judgment."  *Miami Heald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *accord Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). Governmental influence on a newspaper's staffing decisions, for instance, violates the First Amendment, because a "publisher's choice" of reporters and editors "affects the expressive content of its newspaper" and is "bound to affect what gets published."  *McDermott v.*

*Ampersand Publ'g, LLC*, 593 F.3d 950, 962-63 (9th Cir. 2010); *see First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784-85 (1978) ("In the realm of protected speech, the legislature is constitutionally disqualified from dictating . . . the speakers who may address a public issue.").[10] By placing USAGM employees on administrative leave, Defendants have directly interfered with Plaintiffs Jerreat's exercise of editorial control and judgment with respect to the VOA Press Freedom Desk, which she "oversee[s] and exervise[s] editorial discretion over," and which covers "attacks, threats, and harassment of journalists across the globe," Ex. S (Jerreat Decl.) ¶ 2, and with Plaintiff John Doe 1's exercise of "editorial control, judgment, and discretion" in John Doe 1's role as a VOA editor, Ex. U (John Doe 1 Decl.) ¶ 4.

### 4.    Defendants' Actions Chill Plaintiffs' Speech

The going-forward prospects for Plaintiffs, even if they are retained by USAGM or its grantee stations, are grim indeed, which is why Plaintiffs are separately likely to succeed in demonstrating that Defendants' actions chill Plaintiffs' *future* free expression.  "Government action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights."  *Cooksey v. Futrell*, 721 F.3d 226, 236 (4th Cir. 2013).[11]

Here, Defendants' actions have already deterred—and, without Court intervention, will continue to deter—Plaintiffs from exercising their First Amendment rights in at least three ways

---

[10] This foundational rule of constitutional law is also embodied in the Statutory Firewall, which explicitly states that "[t]he Secretary of State and the Chief Executive Officer [of USAGM], in carrying out their functions, shall respect the professional independence and integrity of [USAGM], its broadcasting services," including VOA, "and the grantees of the Agency."  22 U.S.C. § 6204(b).

[11] "[C]onstititial violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights."  *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *see Williams v. Town of Greenburgh*, 535 F.3d 71, 78 (2d Cir. 2008) (holding that to prove a deprivation of free speech, plaintiff must "come forward with evidence showing either that (1) defendants silenced him *or* (2) defendants' actions had some actual, non-speculative chilling effect on his speech" (emphasis added)).

that would cause a person of "ordinary firmness" to toe the Administration's line.  *First*, Defendant Lake's and President Trump's public statements ensure that every journalist employee at USAGM and its grantees knows that Trump administration actors outside of the Statutory Firewall are closely monitoring the content of their coverage for views the administration disagrees with.  *Second*, Defendants have made clear that their content-based scrutiny of USAGM speech is not an empty threat.  Having pulled the plug on USAGM reporting, placed VOA staff on indefinite administrative leave, and made Plaintiffs' reporting work literally impossible—Plaintiffs are locked out of their VOA email and offices, and grantees have lost their funding—Defendants have sent a message to Plaintiffs that, even if they are permitted to return to work, their speech rights will be monitored, controlled, and curtailed.  *Third¸* Defendants have made clear the March 15 actions are only the first step of a larger campaign to dismantle USAGM and change its character, with Defendant Lake stating there is "too much rot in the agency to salvage it."  Compl. ¶ 89.  Defendants' actions don't merely create an unconstitutional chill on Plaintiffs' expressive activity by accident; they are *designed* to do so.

> ### 5.    Applying *Pickering*, Defendants' Viewpoint Discrimination, Interference in Editorial Discretion, and Chilling of Speech Violate the First Amendment (Count I)

Defendants' flagrant viewpoint discrimination, interference in editorial discretion, and forward-looking chilling of Plaintiffs' speech clearly restrain protected speech—that much is clear.  But the case law requires that courts apply the balancing test articulated by the Supreme Court in *Pickering*.  *See Turner*, 502 F. Supp. 3d at 376.  Under *Pickering*, "[r]estraints on the speech of government employees on 'matters of public concern' are governed by a balancing test; they are permissible where the government interest in 'promoting the efficiency of the public services it performs through its employees' outweighs the interests of prospective speakers and their audiences in free dissemination of the speakers' views.'"  *Weaver v. U.S.*

*Information Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996) (quoting *United States v. Nat'l*

*Treasury Emps. Union*, 513 U.S. 454, 467 (1995) ("*NTEU*")).  Defendants' actions here fail the

*Pickering* test.

> a.    ***Pickering*** **Prong 1: Defendants Are Restraining Plaintiffs'**
> **Speech on Matters of Public Concern**

With respect to the first prong of the *Pickering* balancing test, Defendants have restrained

and, absent relief from this Court, will continue to restrain Plaintiffs' reporting on matters of

public concern.  Generally, "speech relates to a matter of public concern if it is of political,

social, or other concern to the community, with particular consideration given to speech that

concerns issues about which information is needed or appropriate to enable members of society

to make informed decisions about the operation of their government."  *Turner*, 502 F. Supp. at

376.

It is beyond dispute that VOA journalists, and those at its grantee stations, speak on

matters of public concern.  After all, that is USAGM's statutory mandate.  USAGM and its

networks are required to "promote respect for human rights, including freedom of religion," 22

U.S.C. § 6202(a)(8), include "information about developments in each significant region of the

world," *id.* § 6202(b)(6), and feature "a variety of opinions and voices from within particular

nations and regions prevented by censorship or repression from speaking to their fellow

countrymen," *id.* § 6202(b)(7).  On March 14 alone, VOA journalists published articles on the

United States' expulsion of South Africa's ambassador amid deteriorating relations between the

two countries[12] and President Trump's speech at DOJ, where he "promised to seek accountability for those who pursued legal cases against him."[13]

Since March 15, 2025, the USAGM-employed Plaintiffs have been muzzled—all VOA broadcasts have been stopped and VOA has not published a single news article.  The first prong of the *Pickering* test is easily satisfied here.

> **b.    *Pickering* Prong 2: Plaintiffs' Interest in Protected Speech Outweighs the Government's Interest in Efficiency**

Where, as here, the plaintiffs' speech "addresses a matter of public concern, a court then balances the interests of the employer in providing 'effective and efficient' public services against the employee's First Amendment right to free expression."  *Lewis v. Cohen*, 165 F.3d 154, 162 (2d Cir. 1999).  "The more the employee's speech touches on matters of significant public concern, the greater level of disruption to the government that must be shown" for the government to overcome *Pickering*'s balancing test, i.e. a "sliding-scale approach." *Id.*  In addition, when analyzing the government's interest, *Pickering* does not ask "whether some conceivable 'governmental' interest might be constitutionally advanced" by the government. *Sanjour*, 56 F.3d at 96.  Rather, the second prong of the *Pickering* test is concerned with the "interests the [government] itself asserts."  *Id.* (quoting *Edenfield v. Fane*, 507 U.S. 761, 768 (1993)).

Relatedly, the sheer scope of Defendants' conduct here—pulling the plug on *all* VOA and other networks' journalism, and placing *virtually all* VOA, USAGM and grantee staff on administrative leave—"makes the Government's burden heavy" with respect to their restriction

---

[12] "US to expel South Africa ambassador as relations deteriorate," VOA News (Mar. 14, 2025), https://www.voanews.com/a/us-to-expel-south-africa-ambassador-as-relations-deteriorate/8011493.html.

[13] "Trump vows accountability for those who pursued him in court cases," VOA News (Mar. 14, 2025), https://www.voanews.com/a/trump-vows-accountability-for-those-who-pursued-him-in-court-cases-/8011522.html.

of Plaintiffs' journalistic activity. *NTEU*, 513 U.S. at 467. The "widespread impact" of Defendants' hostile takeover of the broadcaster "gives rise to far more serious concerns than could any single supervisory decision" concerning "one employee's speech." *Id.* at 466-68. *Turner* made this same point: because defendants' actions against VOA journalists had "sweeping implications for the current and prospective speech of present and future employees," that "weigh[ed] heavily against defendants in the *Pickering* analysis." *Turner*, 502 F. Supp. 3d at 381. *Turner*'s analysis is even more persuasive here, where Defendants have determined that the "agency is not salvageable," Ex. C, and halted all USAGM journalism.

To justify its gutting of USAGM, Defendants offer two rationales. Neither outweighs Plaintiffs' and their audiences' interests in free dissemination of Plaintiffs' views on matters of significant public concern.

**Defendants' first rationale: halting "radical" reporting.** Defendants assert that their actions are necessary to rid USAGM and VOA of what Defendants perceive as a "radical" and "leftist" reporting. In other words, by Defendants' own public statements, their viewpoint discrimination is not just a means to an end—it's their ultimate goal. But viewpoint discrimination cannot be an aspect of "government efficiency" because it does nothing to "promot[e] the efficiency of the public services [VOA] performs through its employees," as *Pickering* requires. *NTEU*, 513 U.S. at 467. Far from making USAGM's public services more efficient, Defendants' actions *disrupt* them and directly thwart federal law, which requires USAGM and VOA to broadcast, and undermines Congress's goal of "continu[ing] . . . United States international broadcasting" to "enhance the promotion of information and ideas, while advancing the goals of United States foreign policy," *id.* § 6201(4). Defendants' first rationale for its restriction on Plaintiffs' speech fails under *Pickering*.

**Defendants' second rationale: "waste, fraud, and abuse."** Defendants assert, without explanation, that they must gut USAGM and VOA to stop "[w]aste, fraud, and abuse." Ex. C. The only examples Defendants have mustered are in Defendant Lake's March 15, 2025 press release, where she makes a passing reference to USAGM's "quarter-of-a-billion-dollar [office] lease," unspecified "[e]ye-popping self-dealing," and "$100s-of-millions being spent on fake news companies." *Id.* Even accepting for the sake of argument that each is an example of "waste, fraud, [or] abuse," Defendants' actions in halting all USAGM programming and preventing the USAGM-employed Plaintiffs from reporting do nothing to address these purported wrongs and therefore fail to swing the *Pickering* balance in Defendants' favor.

### D.    Defendants' Shuttering of USAGM Networks Separately the RSF Plaintiffs, TNG-CWA, and Their Members' First Amendment Right to Receive Information (Count II)

Defendants' actions also violate the RSF Plaintiffs and TNG-CWA's—and their members'—First Amendment right to receive information. "It is a well-settled principle of constitutional law that the First Amendment includes not only a right to speak, but also a right to receive information and ideas." *Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400, 414 (S.D.N.Y. 2006) (collecting cases); *see Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.") (Brennan, J., concurring).[14]

"[T]o avoid a finding that [they] acted unconstitutionally" in halting USAGM networks' journalism, thereby depriving the RSF Plaintiffs' correspondents and TNG-CWA's journalist-members of a vital source of information, Defendants "must establish that a substantial and

---

[14] *See also In re Application of Dow Jones & Co.*, 842 F.2d 603, 607 (2d Cir. 1988) (recognizing First Amendment right to receive).

reasonable governmental interest exists for interfering with [RSF and RSF-USA's] right to receive information," *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 777 (8th Cir. 1982) (citing *Pico v. Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26*, 638 F.2d 404, 415-16 (2d Cir. 1980)), and that they have used the "least restrictive means" to "achieve that goal," *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 666 (2004).  For the reasons detailed above for the Journalist Plaintiffs' First Amendment claim, Defendants' two asserted governmental interests—stopping "radical" reporting and "waste, fraud, and abuse"—fail to meet this test with respect to the right-to-receive claim.

## II.    IN THE ABSENCE OF PRELIMINARY RELIEF, PLAINTIFFS WILL SUFFER IRREPARABLE HARM

Under this prong, the movant must demonstrate "that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages."  *NAACP v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995).  Plaintiffs are all likely to suffer irreparable harm if the Court does not issue a temporary restraining order and preliminary injunction.

### A.    All Plaintiffs Who Produce USAGM Reporting Have Shown Irreparable Injury

The violations of First Amendment rights of all Plaintiffs involved in producing reporting for USAGM and its grantee networks—the Individual Plaintiffs and the Union Plaintiffs on behalf of their members who produce USAGM content—constitute irreparable injury.  In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm for purposes of a TRO or preliminary injunction.  *See, e.g.*, *Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) (where a movant "allege[s] deprivation of a constitutional right, no separate showing of irreparable harm is necessary"); *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) (same).  "The loss of First

27

Amendment freedoms" specifically, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see id.* (irreparable harm where movant's "First Amendment interests were either threatened or in fact being impaired").

Plaintiffs are likely to succeed in showing that Defendants' actions have already violated and continue to violate their First Amendment rights because, among other things, they result in viewpoint or content-based discrimination, interference in editorial discretion, and the chilling of First Amendment expression. These current and future harms are sufficient to demonstrate irreparable harm.

But the irreparable harm to the employees of USAGM and its grantee stations goes well beyond First Amendment injury. These Plaintiffs—who include not only the named Individual Plaintiffs, but all employees of USAGM (represented by the Federal Employee Unions) and of RFA (represented by TNG-CWA)—are suffering reputational injury and injury to their career prospects by being the subject of Defendants' claims that USAGM is "unsalvageable" and riddled with bias, waste, fraud, "spies," and "terrorist sympathizers" such that closure of USAGM is necessary. Ex. C; *see* Ex. R (Widakuswara Decl.) ¶¶ 6-8; Ex. S ¶¶ 11-12; Ex. U ¶¶ 8, 10; Ex. V (John Doe 2 Decl.) ¶ 7. These Plaintiffs also suffer under the threat of job termination and loss of their career standing. *See* Ex. R ¶¶ 4-5; Ex. S ¶¶ 11-12; Ex. V ¶ 4. In particular, employees of USAGM grantee RFA have already been furloughed without pay and placed on notice that their health insurance and other benefits will only be maintained through April 2025. Ex. P ¶ 10. Because of the sensitive work these employees do, many as expatriots from repressive regimes, their loss of employment status carries significant risks of retaliation against them and their families. *Id.* ¶¶ 12-13, 20. And all employees, whatever their country of

origin, are facing major decisions, and the emotional stress therefrom, due to the uncertainty of whether USAGM will exist at all: should they retire (as some already have chosen)?  How will they pay for basic necessities, such as food and childcare?  Ex. M ¶¶ 15-16, 22; Ex. P ¶¶ 12, 20).[15]

Moreover, and separately, the two PSC Plaintiffs—contractor-journalists John Does 3 and 4—are foreign nationals working and living in the United States on J-1 visas.  Absent preliminary relief, they risk a loss of status and deportation to their home countries.  In the case of John Doe 3, the authoritarian government now in power in his home country has expressed its antipathy toward VOA; he risks imprisonment for 10 years for his work for VOA.  Ex. W (Doe 3 Decl.) ¶ 4.  In the case of John Doe 4, he is a member of a minority group that is regularly persecuted in his home country; compelling him to return is likely to put him in physical danger. Ex. X (Doe 4 Decl.) ¶¶ 4-5.  And the same is true for reporters at grantee stations, such as those at RFA whose interests are represented in this case by Plaintiff TNG-CWA, who are also on nonimmigrant visas and would have to return to their home countries and face potential retaliation from repressive regimes.  Ex. P ¶¶ 13, 20.

**B.    The RSF Plaintiffs and TNG-CWA, and the Journalists Employed Outside USAGM and RFA they Represent, Have Shown Irreparable Injury**

The RSF Plaintiffs and TNG-CWA can also demonstrate that Defendants' actions have caused and will continue to cause them irreparable harm as advocacy organizations, and to the non-USAGM correspondents they represent and who affiliate with them.  Those harms are set out at length in their declarations, *see* Ex. O (Bruttin Decl); Ex. P, and include but are not limited to depriving journalists abroad, including RSF correspondents, of "a trustworthy source of news

---

[15] Plaintiff Neeper, a non-journalist FTE of USAGM, satisfied the irreparable harm element for these same reasons.

and information" in places "where VOA is one of the few, if not the only sources of independent

and reliable news," Ex. O ¶ 6; depriving the RSF Plaintiffs of "a critical reliable source for

monitoring press freedom and political developments"—a critical part of their mission, *id.* ¶ 8;

and preventing RSF correspondents from corroborating with VOA journalists to identify reliable

information, *id.* ¶ 13.  With respect to TNG-CWA's, Defendants' actions directly interfere with

TNG-CWA's journalist-members' ability to access USAGM grantee broadcasts, including

RFA's, which provide a "free flow of information, over radio airwaves and online" in countries

where "there is no media freedom."  Ex. P ¶¶ 15-17.

### C.    The Union Plaintiffs Have Shown Irreparable Injury as Organizational Plaintiffs Too

The four Union Plaintiffs in this case have each asserted standing on behalf of the

individual employees they represent, and the clear irreparable harm suffered by those members is

analyzed above.  But the Union Plaintiffs also satisfy the irreparable harm element in their own

right as organizations.  In the wake of Defendants' shutdown of USAGM, the Union Plaintiffs

have been forced to divert their resources to assisting their members' concerns regarding being

placed on indefinite administrative leave and their future employment.  *See* Ex. M ¶¶ 20-21; Ex.

N ¶ 17.  Each Union Plaintiff has also demonstrated that it faces imminent irreparable financial

harm as a result of Defendants' actions.  The Union Plaintiffs' operational budgets rely

extensively on their members' voluntary membership dues, which will inevitably decrease if

members are terminated.  *See* Ex. M ¶ 22; Ex. N ¶ 18; Ex. P ¶ 11; *see also Manning v. Am.*

*Airlines, Inc.*, 221 F. Supp. 301, 307 (S.D.N.Y. 1963), *aff'd*, 329 F.2d 32 (2d Cir. 1964) (granting

union's motion for preliminary injunction where union demonstrated that it would be irreparably

harmed by interruption in collection of member dues).  Relatedly, the Union Plaintiffs'

bargaining power will be diminished if it loses members due to potential or actual terminations. *See* Ex. M ¶ 22.

## III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR PRELIMINARY RELIEF

The balance of the equities and public interest "factors merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021) (same). In assessing these factors, courts must "balance[ing] the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," as well as "the public consequences" of granting preliminary relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

The balance of the equities and the public interest here weigh heavily in Plaintiffs' favor.

*First*, as to the Journalist Plaintiffs specifically, the equities favor a temporary restraining order because "the public interest is best served by ensuring the constitutional rights of persons within the United States are upheld." *Marquez v. Annucci*, No. 20 CIV. 1974 (AKH), 2020 WL 3871362, at *6 (S.D.N.Y. July 9, 2020). In opposing Plaintiffs' motion, Defendants may claim that preliminary relief will thwart the government's attempts to stop unspecified "[w]aste, fraud, and abuse." Ex. C. For the reasons provided above, this rationale is a pretextual distraction from Defendants' actual stated goal: the silencing of VOA journalists whose views Defendants disagree with. Moreover, it is at odds with Congress's mandate that requires USAGM broadcasts and grantmaking. But even accepting Defendants' "waste, fraud, and abuse" rationale at face value, the balance of the equities favors Plaintiffs. As the Second Circuit has held, "[f]aced with [] a conflict between the [government's] financial and administrative concerns on the one hand, and the risk of substantial constitutional harm to plaintiffs on the

other, we have little difficulty concluding that . . . the balance of the hardships tips decidedly in [plaintiffs'] favor." *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984).

*Second*, granting preliminary relief will advance the public interest by preventing Defendants from further violating the Firewall Statutes and Congressional broadcasting mandates. "[T]here can be no doubt that the public interest favors requiring the government to comply with the law." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2020); *see L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018) ("[T]his Court is hard-pressed to see how setting aside an unlawful practice could be against the public interest.").

## IV.    PLAINTIFFS HAVE STANDING

Article III requires that plaintiffs establish "the irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robbins*, 578 U.S 330, 338 (2016). While all Plaintiffs have standing here, "[s]tanding is satisfied so long as at least one named plaintiff can demonstrate the requisite injury." *Hyland v. Navient Corp.*, 48 F.4th 110, 117 (2d Cir. 2022).

### A.    The Journalist Plaintiffs Have Article III Standing

The Journalist Plaintiffs can readily demonstrate standing. As detailed in Section II.A, *supra*, the Journalist Plaintiffs have suffered injuries in fact to their First Amendment Rights as a result of Defendants' conduct. *See Laird*, 408 U.S. at 13-14 (holding that "a [speaker's] claim of specific present objective harm or a threat of specific future harm" with the effect of chilling speech provides standing); *Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 321 (S.D.N.Y. 2020) (journalist had standing where government stripped away "his press credentials after he asked [the President] critical questions about the Administration, barring [the reporter] from the

venue necessary to perform his job").  "For purposes of the standing inquiry, the Court must treat [the Journalist Plaintiffs' First Amendment] claim as true." *Turner*, 502 F. Supp. 3d at 258; *see John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017) ("When the defendant asserts a 'facial' challenge to standing" courts "are to presume that general allegations embrace those specific facts that are necessary to support the claim.") (cleaned up)).

The remaining two elements of standing—causation and redressability, which are "two sides" of the same coin—are also easily satisfied with respect to the Journalist Plaintiffs' injuries. *Turner*, 502 F. Supp. 3d at 361 (cleaned up).  The Journalist Plaintiffs' injuries are "fairly traceable" to Defendants actions; indeed Defendants—the government actors who halted all VOA broadcasts and placed Plaintiffs on administrative leave—are the "sole cause of [Plaintiffs'] injuries." *Id.*  Likewise, an order from this Court enjoining Defendants from further infringing Plaintiffs' rights would restore Plaintiffs' ability to participate in expressive journalistic activity at USAGM and eliminate any chilling effects.  *See id.*

### B.    The Journalist Plaintiffs Also Have Third-Party Standing

The Journalist Plaintiffs also have third-party standing to raise claims on behalf of their USAGM journalist colleagues.  Third-party standing is available to plaintiffs who, in addition to their own Article III standing, can successfully demonstrate: "(1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." *New York State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019).  This standard is intended to ensure that "the most effective advocate of the rights at issue is present to champion them." *Duke Power Co. v. Carolina Evn't Study Grp.*, 438 U.S. 59, 80 (1978).

As to the first factor, the court in *Turner*, discussed at length above, *see supra*, Section I.C.i, held that a VOA supervisor plaintiff had "a sufficiently 'close relationship'" with journalists at VOA and the other USAGM networks because she and her journalist colleagues all

were "subject to the same statutory restrictions, mandates, and principles" governing USAGM, and she personally had a "broad responsibility for implementation of the journalistic principles" at issue in that case. *Turner*, 502 F. Supp. 3d at 361-62. This same reasoning applies to the Journalist Plaintiffs here, who have a close relationship with and are identically situated as their fellow USAGM journalist colleagues.

As to the second factor, a plaintiff need only show that "there is some impediment to the real party in interest's ability to assert his own legal rights." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 31 (D.D.C. 2010) (collecting cases). Even this lenient standard is further "relax[ed]" where a plaintiff asserts First Amendment claims. *Reese Bros., Inc. v. U.S. Postal Serv.*, 531 F. Supp. 2d 64, 69 (D.D.C. 2008); *see Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956-57 (1984) (noting that certain concerns "justify a lessening of prudential limitations on standing," particularly "when there is a danger of chilling free speech"). In *Turner*, the court held the VOA supervisor plaintiff met this factor because her VOA journalist colleagues feared retaliation by USAGM leadership in response to their participation in the litigation. *See Turner*, 502 F. Supp. 3d at 362. This reasoning is even more persuasive in this case, where Defendants have already placed virtually every VOA employee on administrative leave, and now intend to gut the USAGM, which Defendants consider "a giant rot" and "not salvageable." Ex. C.

The Journalist Plaintiffs therefore have standing in their own right and on behalf of their USAGM journalist colleagues.

### C.    The Union Plaintiffs and RSF Plaintiffs Have Standing

Each of the organizational Plaintiffs—all four Union Plaintiffs and the two RSF Plaintiffs—has standing.

### 1.    The Organizational Plaintiffs All Have Associational Standing

The Organizational Plaintiffs have associational standing on behalf of their members.

*See New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).  An

organization can sue on behalf of its members when (1) the members could sue in their own

right; (2) the interests the organization seeks to protect are germane to its purpose; and (3)

neither the claim pursued nor the relief requested requires the participation of individual

members.  *See Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998); *Hunt v.

Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). The six organizational

Plaintiffs easily satisfy each element.

As a threshold matter, because each of the Union Plaintiffs has associational standing to

represent its members, and because each of the Union Plaintiffs represents bargaining units of

employees involved in the production of USAGM journalism—whether as USAGM employees

(in the case of AFSCME, AFGE, and AFSA) or as RFA employees (TNG-CWA)—the Union

Plaintiffs have the same standing as the individual Journalist Plaintiffs as to all claims.

Each organization has also submitted a declaration describing the distress and uncertainty

regarding members' personal futures, their audience retention, and the continued viability and

safety of international reporting that Defendants' actions have caused.  *See* Ex. M ¶¶ 15-18; Ex.

P ¶¶ 12, 19; Ex. N ¶ 16.  Many of the organizations' members have worked—some of them

literally for decades—to support and build the journalistic efforts at VOA and the other USAGM

entities; Defendants' actions threaten to destroy their legacy.  In broadcasting, if programing is

on every day and suddenly stops, the station will begin to lose its audience, and the longer it is

off-air, the harder it is to gain the audience back.  Ex. P ¶ 19; Ex. M ¶ 18.  This damage to

USAGM programming directly injures the careers of all employees of USAGM and its grantees,

as well as their mission of combatting autocracy with the free and open journalism that USAGM and its grantees' programs provide.

Of particular note, TNG-CWA's members and RSF's members include journalists who travel to dangerous foreign countries where USAGM broadcasts to report the news. These journalists have been made less safe and seen their mission of promoting free press severely damaged by the shuttering of USAGM operations. Ex. P ¶¶ 15-18; Ex. O ¶¶ 9, 15. Moreover, 75 percent of TNG-CWA's members have been indefinitely furloughed, as of March 21. Ex. P ¶ 10. They stand to lose their medical and life insurance at the end of April. *Id*.

As for the second and third factors, each organization exists for the purpose of assisting its members. *See* Ex. M ¶ 6 ; Ex. P ¶¶ 11, 17-18; Ex. N ¶ 5. Bringing this lawsuit to defend the existence of the agency where their members work, or that funds their members' work, and the continued viability of the international free press to which they have dedicated their careers, is germane to that purpose. Finally, the declaratory and injunctive relief that Plaintiffs seek pertains to Defendants' wholesale dissolution of USAGM and does not depend on the individual circumstances of any union member, making it unnecessary for any member to participate. *See Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004).

## 2.    The Union Plaintiffs Also Have Organizational Standing

The Union Plaintiffs also each have organizational standing in their own right because Defendants' unlawful actions have "directly affected and interfered with [their] core business activities," not merely their "abstract social interests." *Food & Drug Admin. v. All. for Hippocratic Med.* (*AHM*), 602 U.S. 367, 395 (2024). The Union Plaintiffs have been, and will continue to be, injured in the performance of their core pre-existing activities of providing representational services to employees in their affected bargaining units. *See* Ex. P ¶¶ 10-11; Ex. M ¶¶ 10, 15-17, 20-21; Ex. N ¶¶ 5, 12, 14, 17. These injuries are indistinguishable from those

36

found to support standing in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982).  As in *Havens*, Defendants' actions plainly interfere with the Union Plaintiffs' ability to perform one of their core, pre-existing services: providing advice and counsel to their affiliates and members. 455 U.S. at 379.

The Union Plaintiffs also face direct financial harm in the form of lost dues.  *See Richards v. New York State Dep't of Corr. Servs.*, 572 F. Supp. 1168, 1179 (S.D.N.Y. 1983) (loss of membership dues resulting from defendants' unlawful actions sufficient to establish organizational standing).  For example, 75 percent of CWA's relevant bargaining unit was furloughed on March 21, immediately depriving CWA of those member dues.  Ex. P ¶ 10.  At least three AFSCME members submitted applications to retire as a direct result of Defendants' actions, which will similarly deprive AFSCME of those members' dues.  Ex. M ¶ 22.

### 3.    The RSF Plaintiffs and TNG-CWA Have Organizational Standing for Additional Reasons

The RSF Plaintiffs and TNG-CWA also have organizational standing with respect to their First Amendment right-to-receive claim and for the other unconstitutional acts resulting in the shuttering of USAGM programs.  "An organization has standing in its own right to seek judicial relief from injury to itself where the organization meets the same [Article III] standing test that applies to individuals."  *Pen Am. Ctr.*, 448 F. Supp. 3d at 323 (cleaned up).

For purposes of the First Amendment, "[a]n organization's right to receive information is impaired when it is unable to hear from a speaker who is willing to speak, but who has been obstructed by government action."  *Id.*  Here, the RSF Plaintiffs and TNG-CWA have organizational standing because Defendants' actions have injured its organizational right to receive speech from USAGM broadcasters, including VOA.  "RSF correspondents rely on VOA and USAGM grantees [] as listeners in places where the local media is unreliable.  Those

correspondents . . . are now deprived of a trusted source that shaped their reporting, informed RSF's advocacy, and protected their safety."  Ex. O ¶ 9.  Likewise, TNG-CWA members, other than those working for RFA, report stories that require travel to other countries, including countries like China with repressive media where these journalists rely on USAGM content.  Ex. P ¶¶ 15-16.

This is a "classic First Amendment injur[y]."  *Pen Am. Ctr.*, 448 F. Supp. 3d at 321; *see id.* (holding that plaintiff had standing to bring First Amendment claim where his "right to receive the speech of his [journalist] colleagues ha[d] been impeded").  And it is also a harm stemming from the other unlawful acts resulting in the shuttering of USAGM (e.g., violation of the APA and Separation of Powers), which have equally caused the harm to journalists abroad who can no longer rely on USAGM content, and which is contrary to the core advocacy mission of both RSF and TNG-CWA to promote a free press so that their members' profession can continue to exist and be safe from authoritarian harm.  Ex. P ¶¶ 17-18.

## V.    PLAINTIFFS' CLAIMS ARE NOT CHANNELED TO AN ADMINISTRATIVE PROCESS

Defendants may argue, as the Administration has elsewhere, that this Court lacks subject matter jurisdiction over Plaintiffs' claims on the theory that Congress *impliedly* intended to "channel" any claims by federal employees or their unions into an administrative adjudicatory scheme under the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 1101 et seq., and the Foreign Service Act ("FSA"), 22 U.S.C. § 4101 et seq., *before* being heard in federal court, under the doctrine established by *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-13 (1994).  That implied doctrine is inapplicable to Plaintiffs' claims.

To start, multiple Plaintiffs in this case are not even conceivably channeled because they have no connection to the CSRA or the FSA: (1) the RSF Plaintiffs, which are nongovernmental

organization of independent journalists; (2) TNG-CWA, a labor organization of private sector employees who work for a USAGM grantee; and (3) John Doe 3 and John Doe 4, individual PSCs who are not *employees* covered by the exhaustion requirements of the FSA but rather contract independently with USAGM. Congress has established no agency to hear such claims, and therefore the Court *at least* has jurisdiction over these Plaintiffs, who can proceed with their claims now even if the Court concludes that the other Plaintiffs may not.

A federal court recently held as much in a case brought by federal-sector unions and non-governmental organizations. The court observed that never before has a third-party plaintiff—one whose rights have been affected by a federal government personnel action, but who is not an employee subject to administrative personnel-dispute channels—been administratively channeled under *Thunder Basin*. *See* Feb. 28, 2025 Order, Dkt. 45, *AFGE v. OPM*, No. 25-cv-01780 (N.D. Cal.). The mere fact that a federal personnel action is "embedded within the dispute" does not divest the court of subject matter jurisdiction. *Id*. "Such a rule would stretch that doctrine too far." *Id*.; Mar. 18, 2025 Order, Dkt. 74, *J. Does 1-26 v. Musk,* D. Md. Case No. 25-cv-00462 (D. Md.) (exercising subject matter jurisdiction over constitutional challenge to shutdown of USAID brought by PSCs). That conclusion is only reinforced by the nature of the claims in this case. The APA, which forms the basis of multiple claims here, "creates a basic presumption of judicial review for one suffering legal wrong because of agency action." *Weyerhaeuser Co. v. US. Fish and Wildlife Serv.,* 586 U.S. 9, 22 (2018) (cleaned up). Any exceptions are narrowly construed. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc*., 578 U.S. 590, 601-02 (2016)

The RSF, TCG-CWA, and PSC Plaintiffs suffice to establish subject matter jurisdiction. But in any event, none of the Plaintiffs is channeled in this case because none challenges a

specific personnel action taken against them.  In assessing whether Congress has implicitly

stripped a court's jurisdiction by channeling cases to an agency forum, the "ultimate question" is

always "how best to understand what Congress has done."  *Axon Enter. Inc. v. Fed. Trade

Comm'n*, 598 U.S. 175, 186 (2023).  Neither the CSRA nor the FSA "implicitly" route

"fundamental, even existential" questions about the structure of our constitutional system to

agencies that handle employment and labor disputes.  *Id.* at 180, 185.  The CSRA provides an

administrative process for a covered federal employee to seek review of specified adverse

personnel actions taken against that employee.  *United States v. Fausto*, 484 U.S.439, 445-47

(1988).  The FSA establishes a similar system for certain foreign service employees.  *See U.S.

Info. Agency v. KRC*, 989 F.2d 1211, 1217 (D.C. Cir. 1993).

    The mere fact that the challenged government action affects federal employees does not

divest this court of jurisdiction.  This court must assess, claim by claim, whether each is "of the

type Congress intended to be reviewed within th[e] statutory structure.'"  *Free Enter. Fund v.

Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (cleaned up).  As a result, *Turner*

specifically found that First Amendment claims against USAGM fell outside CSRA's scopes,

and other courts reached the same conclusion for other claims.  *See Turner,* 502 F. Supp. 3d at

367.[16]

    Plaintiffs' claims similarly fall outside the CSRA's and FSA's scope.  The claims of the

individual Plaintiffs and the Federal Union Plaintiffs on behalf of their members challenge the

USAGM shutdown *as a whole*, including the aspects of that shutdown like contract and award

---

[16] *See also, e.g.*, *Stewart v. Evans,* 275 F.3d 1126, 1128–23 (D.C. Cir. 2002) (federal employee could pursue Fourth Amendment claim through *Bivens* action); *Manivannan v. U.S. Dep't of Energy*, 42 F.4th 163, 174 (3d Cir. 2022) (exercising jurisdiction over federal supervisor-employee conversion claim); *Gustavson v. Adkins*, 803 F.3d 883, 888-90 (7th Cir. 2015) (installing a hidden camera in the women's bathroom of a VA facility was not a "personnel action" covered by the CSRA); *Brock v. United States*, 64 F.3d 1421, 1424-25 (9th Cir. 1995) (sexual assault claim "fits no category of personnel actions listed in" the CSRA).

terminations that have no connection to their *employment* at all.  They likewise do not implicate union collective bargaining agreements or rights, and thus do not even arguably implicate the labor relations review schemes of the Federal Service Labor-Management Relations Statute ("FSLMRS"), at Chapter 71 of the CSRA*,* or the Foreign Service Labor Relations Board ("FSLRB"), 22 U.S.C. 4106.  *Cf. SEIU,* 975 F.3d at 151 (likely no subject matter jurisdiction over challenge to executive orders addressing "collective bargaining, work time for representational activities, and discipline and discharge")*.*  Individual (non-contractor) employees of USAGM are currently in a paid status; it is the networks that are not working.  *See Ghaly v. U.S. Dep't of Agric.*, 228 F. Supp. 2d 283, 289 (S.D.N.Y. 2002) (paid administrative leave not a CSRA-covered adverse action).  The goal of this litigation is to make sure they are turned back on.  At bottom, no Plaintiff "allege[s] a change in the conventionally understood circumstances of her employment, like a change in schedule or chain of command" but "instead major shifts to the background assumptions behind doing journalism at VOA and the networks" of USAGM.  *Turner*, 502 F. Supp. 3d at 367.[17]

The claims at issue simply do not fall within the federal employment statutes.  But if they did, a return to *Thunder Basin* principles would confirm this Court's jurisdiction.  Three guideposts inform the jurisdictional assessment: (1) whether denying district court jurisdiction could "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "entirely collateral" to the statute's review provisions; and (3) whether the claim is "outside the agency's expertise."  510 U.S. at 212-13 (cleaned up).  To be clear, these are guideposts, not a checklist of

---

[17] *See Turner*, 502 F. Supp. 3d at 367 ("[D]ramatic shifts in policy and practice that implicate the very constitutional rights on which U.S.-funded international broadcasting is predicated are outside the bounds of a 'working condition.'").

conjunctive requirements. *Axon*, 598 U.S. at 186. Even so, all three guideposts reinforce the propriety of this Court's jurisdiction.

First, this is a case about reviving and sustaining a Congressionally mandated independent agency's entire existence. Judicial review under the CSRA or FSA would come only after multiple layers of agency review, a process that could take years. *See* 5 U.S.C. § 7703 (judicial review provision in CSRA); 22 U.S.C. § 4140 (judicial review provision in FSA); *cf. Axon*, 598 U.S. at 213-16 (Gorsuch, J., concurring) (describing multi-year history of cases subject to statutory administrative review schemes). By that time, USAGM itself would be dead and buried, rendering judicial review of Plaintiffs' core claims completely meaningless.

Second and third, this case involves fundamental constitutional questions, decidedly not the type of questions the relevant administrative bodies "customarily handle[]," rendering it both outside the statute's review provisions and the agency's expertise. *Axon*, 598 U.S. at 186. There are not threshold employment questions mixed with the weighty constitutional ones that the agencies would be well equipped to handle.[18] And "agency adjudications are generally ill suited to address structural constitutional challenges," *Carr v. Saul*, 593 U.S. 83, 92 (2021), including appointments clause challenges, *Axon*, 598 U.S. at 186.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order and motion for a preliminary junction should be granted.

---

[18] *See Axon,* 598 U.S. at 906 ("[U]nlike in *Elgin,* ruling for [Plaintiffs] on expertise-laden grounds would not 'obviate the need' to address their constitutional claims—which, again, allege injury not from this or that ruling but from" a more fundamental constitutional injury.").

Dated:      March 24, 2025
                New York, New York

GOVERNMENT ACCOUNTABILITY
PROJECT

_____ /s/ _____
David Z. Seide
1612 K Street, NW
Washington, DC 20006
(202) 457-0034
davids@whistleblower.org

*Counsel for Plaintiffs Patsy Widakuswara,*
*Jessica Jerreat, Kathryn Neeper, John Doe*
*1, John Doe 2, John Doe 3, and John Doe 4*

AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO (AFSCME)

_____ /s/ _____
Teague Paterson
Matthew Blumin*
Georgina Yeomans*
1625 L Street, N.W.
Washington, D.C. 20036
(202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

*Counsel for Plaintiff American Federation*
*of State, County, and Municipal Employees,*
*AFL-CIO (AFSCME)*

Respectfully Submitted,

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

_____ /s/ _____
Andrew G. Celli, Jr.
Debra L. Greenberger
Daniel M. Eisenberg
Nick Bourland
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
acelli@ecbawm.com
dgreenberger@ecbawm.com
deisenberg@ecbawm.com
nbourland@ecbawm.com

*Counsel for Plaintiffs Patsy Widakuswara,*
*Jessica Jerreat, Kathryn Neeper, John Doe*
*1, John Doe 2, John Doe 3, John Doe 4,*
*American Federation of State, County and*
*Municipal Employees (AFSCME); American*
*Federation of Government Employees*
*(AFGE); American Foreign Service*
*Association (AFSA); and the NewsGuild-*
*CWA*

AMERICAN FOREIGN SERVICE
ASSOCIATION

_____ /s/ _____
Sharon Papp*
Raeka Safai*
2101 E Street, N.W.
Washington, D.C. 20037
(202) 338-4045
papp@afsa.org
safai@afsa.org

*Counsel for Plaintiff American Foreign*
*Service Association (AFSA)*

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO

_____/s/_____
Rushab Sanghvi*
80 F. Street, NW
Washington, DC 20001
(202) 639-6424
SanghR@afge.org

*Counsel for American Federation of
Government Employees, AFL-CIO (AFGE).*

DEMOCRACY FORWARD
FOUNDATION

_____/s/_____
Kristin Bateman*
Robin F. Thurston*
Skye L. Perryman*
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs American Federation
of State, County and Municipal Employees
(AFSCME); American Federation of
Government Employees (AFGE); American
Foreign Service Association (AFSA); and
the NewsGuild-CWA*

STATE DEMOCRACY DEFENDERS
FUND

_____/s/_____
Norman L. Eisen*
Joshua Kolb*
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Norman@statedemocracydefenders.org
Joshua@statedemocracydefenders.org

*Counsel for Reporters Sans Frontières,
Reporters Without Borders, Inc., American
Federation of State, County and Municipal
Employees (AFSCME); and American
Federation of Government Employees
(AFGE)*

**Pro hac vice* application forthcoming*