UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, *et al.,*

                    Plaintiffs,

        v.

KARI LAKE, *et al.*,

                    Defendants.

No. 25 Civ. 2390 (JPO)


**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER**


MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:    (212) 637-2689
*Attorney for Executive Branch Defendants*

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division


DANIELLE J. MARRYSHOW
    TOMOKO ONOZAWA
*Assistant United States Attorneys*
        - Of Counsel -

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................ **6**

**BACKGROUND** .................................................................................................... **6**

   I.   USAGM ................................................................................................ 6

   II.  Executive Order 14238 ........................................................................ 8

   III. Plaintiffs' Complaint ........................................................................... 9

**LEGAL STANDARD** ............................................................................................ **10**

**ARGUMENT** ......................................................................................................... **11**

   I.   Plaintiffs Fail to Demonstrate Irreparable Harm.................................. 11

   II.  Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits............................. 13

   III. The Balance of Equities and Public Interest Weigh in Favor of the Defendants.............. 21

**CONCLUSION** ...................................................................................................... **22**

# TABLE OF AUTHORITIES

Page(s)

Cases

*American Academy of Religion v. Cherthoff*,
  463 F. Supp. 2d 400 (S.D.N.Y. 2006) ..................................................................... 17

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ............................................................................................... 16

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985) .................................................................................. 10

*First National Bank of Boston v. Bellotti*,
  435 U.S. 765 (1978) ............................................................................................... 15

*Frankl v. HTH Corp.*,
  650 F.3d. 1334 (9th Cir. 2011) ............................................................................. 20

*Gazzola v. Hochul*,
  88 F.4th 186 (2d Cir. 2023) .................................................................................. 10

*Geller v. de Blasio*,
  613 F. Supp. 3d 742 (S.D.N.Y. 2020) ................................................................... 10

*Grand River Enter. Six Nations v. Pryor*,
  481 F.3d 60 (2d Cir. 2007) .................................................................................... 10

*Grocery Manufacturers Ass'n v. Sorrell*,
  102 F. Supp. 3d 583 (D. Vt. 2015) ....................................................................... 13

*Jayaraj v. Scappini*,
  66 F.3d 36 (2d Cir. 1995) ..................................................................................... 11

*Lamont v. Postmaster General*,
  381 U.S. 301 (1965) ............................................................................................... 16

*Li v. Chertoff*,
  No. 07 Civ. 3836, 2007 WL 4326784 (E.D.N.Y. Dec. 7, 2007) .............................. 18

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n*,
  965 F.2d 1224 (2d Cir. 1992) ............................................................................... 10

*Lyng v. Northwest Indian Cemetery Protective Ass'n*,
  485 U.S. 439 (1988) ..................................................................................... 18

*McDermott v. Ampersand Publishing, LLC*,
  593 F.3d 950 (9th Cir. 2010) ...................................................................... 15

*Miami Herald Publishing Co. v. Tornillo*,
  418 U.S. 241 (1974) ..................................................................................... 14

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ..................................................................................... 14

*Munaf v. Geren*,
  553 U.S. 674 (2008) ....................................................................................... 9

*National Black Police Ass'n v. District of Columbia*,
  108 F.3d 346 (D.C. Cir. 1997) ................................................................... 21

*New York v. DHS*,
  969 F.3d 42 (2d Cir. 2020) ......................................................................... 10

*Nken v. Holder*,
  556 U.S. 418 (2009) .............................................................................. 10, 20

*Open Tech. Fund v. Pack*,
  470 F. Supp. 3d 8 (D.D.C. 2020) ......................................................... 20, 21

*Pico v. Board of Education*,
  638 F.2d 404 (2d Cir. 1980) ....................................................................... 16

*Pratt v. Independent School District*,
  670 F.2d 771 (8th Cir. 1982) ..................................................................... 16

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ..................................................................................... 14

*Rodriguez ex rel. Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir. 1999) ....................................................................... 10

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
  515 U.S. 819 (1995) ..................................................................................... 13

*Sampson v. Murray*,
  415 U.S. 61 (1974) ....................................................................................... 11

*Sanjour v. EPA,*
    56 F.3d 85 (D.C. Cir. 1995) ................................................................. 13

*Teleanu v. Koumans,*
    480 F. Supp. 3d 567 (S.D.N.Y. 2020) ................................................ 12

*Time Warner Cable of New York City v. Bloomberg L.P.,*
    118 F.3d 917 (2d Cir. 1997) .............................................................. 11

*Transohio Sav. Bank v. Dir. Off. Of Thrift Supervision,*
    967 F.2d 598 (D.C. Cir. 1992) ........................................................... 19

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State,*
    25 Civ. 465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) .................... 19

*U.S. Telecom Ass'n v. FCC,*
    359 F.3d 554 ...................................................................................... 20

*United States v. Munsingwear, Inc.,*
    340 U.S. 36 (1950) ............................................................................. 21

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000) ........................................................................... 13

*We The Patriots USA, Inc. v. Hochul,*
    17 F.4th 266 (2d Cir. 2021) ........................................................... 9, 11

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) ........................................................................... 9, 10

Statutes

8 U.S.C. § 1182(e) ................................................................................... 12

22 U.S.C. § 8754(7)(A) ............................................................................ 18

22 U.S.C. § 6201 ........................................................................................ 6

22 U.S.C. § 6202 ........................................................................................ 9

22 U.S.C. § 6202(a) ................................................................................. 17

22 U.S.C. § 6202(c)(1) ............................................................................ 17

22 U.S.C. § 6203 ........................................................................................ 7

22 U.S.C. § 6203(a) ................................................................................................ 17

22 U.S.C. § 6204(a) ............................................................................................ 7, 18

22 U.S.C. § 6204(a)(5) .................................................................................. 6, 7, 18

22 U.S.C. § 7813 .................................................................................................... 18

22 U.S.C. § 1465a .................................................................................................. 17

National Defense Authorization Act of 2017, Pub. L. 114-328 ............................. 6

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47 ......................... 19

Other Authorities

Executive Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025) ................................. passim

The United States Agency for Global Media ("USAGM" or the "Agency"), Kari Lake, in her official capacity as Senior Advisor to the Acting CEO of USAGM, and Victor Morales, in his official capacity as Acting CEO of USAGM (together, the "Defendants" or the "Government") submit this Memorandum of Law in Opposition to Plaintiffs' Motion for a Temporary Restraining Order (Dkt. No. 17).

## PRELIMINARY STATEMENT

Plaintiffs attempt to transform a suit about adverse employment actions into one that warrants the extraordinary remedy of a temporary restraining order. However, Plaintiffs have not demonstrated any irreparable harm—any adverse employment action can be remedied by monetary damages. To the extent any Plaintiffs must return to their home countries due to the expiration of their J-1 visa, that is the nature of the program—J-1 visas are issued as part of a foreign exchange program, and such visa holders are required by the terms of the program to return to their home countries until they have legal status in the United States. All other harms (such as the alleged harm caused by the absence of VOA news coverage) are purely speculative and far from concrete. Nor have Plaintiffs established that they have any likelihood of success on the merits of their First Amendment claims—USAGM has reduced operations universally across the Agency without regard to any particular viewpoint. And the balance of equities tips in the Government's favor, because the temporary restraining order sought by Plaintiffs would disrupt the lawful exercise of authority by the Agency.

## BACKGROUND

### I.    USAGM

The United States funds and operates a network of broadcast media organizations throughout the world to "promote the right of freedom of opinion and expression" and to advance "the goals of United States foreign policy." 22 U.S.C. § 6201. These broadcast organizations are

supervised and governed by USAGM.  In furtherance of that mission, USAGM oversees federally-funded broadcast networks: the Voice of America ("VOA"), the Office of Cuba Broadcasting ("OCB"), Radio Free Asia ("RFA"), Radio Free Europe/Radio Liberty ("RFE/RL"), Middle East Broadcasting Network ("MBN"), and the Open Technology Fund ("OTF").  Among other requirements, Congress directed that all government-funded and operated international broadcasts under the USAGM umbrella "shall" be "consistent with the broad foreign policy objectives of the United States," and "shall include" "a balanced and comprehensive projection of United States thoughts and institutions."  *Id.* § 6202(a)(1), (b)(2); *see also id.* § 6202(c)(2) (same for VOA broadcasts).

Congress further authorized that USAGM employ grants to fund the entities under its supervision.  Section 6204(a) authorizes USAGM's CEO to: "make and supervise grants and cooperative agreements for broadcasting and related activities" and "allocate funds appropriated for international broadcasting activities among the various elements of the [USAGM] and grantees, subject to reprogramming notification requirements in law for the reallocation of funds."  22 U.S.C. § 6204(a)(5), (a)(6).

In December 2016, Congress passed and then-President Obama signed the 2017 National Defense Authorization Act, which established USAGM's current governing structure.  National Defense Authorization Act of 2017, Pub. L. 114-328, 130 Stat. 2000, 2549, § 1288.  This law restructured governance of the USAGM broadcast networks by dissolving a governing board structure and centralizing control in a single Chief Executive Officer ("CEO").  22 U.S.C. §§ 6203, 6204(a)(1), (b).  Congress vested the CEO with the many powers previously held by the board, including the authority to "direct and supervise all broadcasting activities," *id*. § 6204(a)(1); to "assess the quality, effectiveness, and professional integrity" of broadcast activities, *id*. §

6204(a)(2); to "ensure" broadcast activities are consistent with the standards Congress established, including that they be "balanced and comprehensive," *id*. §§ 6204(a)(3), 6202(b)(2); and to "appoint such personnel for the [CEO] as the [CEO] may determine to be necessary." *Id*. § 6204(a)(11). The current Acting CEO of USAGM is Victor Morales, who holds broad supervisory authority accorded to him by statute. 22 U.S.C. § 6204(a). Defendant Kari Lake is the Special Adviser to USAGM, and is authorized to act under authority delegated to her by defendant Morales.

USAGM employs full-time employees and has contractual relationships with Personal Service Contractors ("PSCs"), who are not USAGM employees, but have an employer-employee relationship governed by contract. USAGM currently employs a total of approximately 1,147 full-time employees and as of March 14, 2025 has active employment contracts with approximately 598 PSCs. Declaration of Crystal Thomas ("Thomas Decl."), ¶ 3. Nearly all of USAGM's workforce has been located in the Washington, D.C. area. USAGM currently has approximately 1,040 full-time federal employees with duty stations in the Washington, D.C. area. *Id.* ¶ 4. In addition, as of March 14, 2025, USAGM contracted with approximately 475 personal services contractors in the Washington, D.C. area. *Id.*[1]

## II.    Executive Order 14238

On January 20, 2025, and as amended on March 4, 2025, Charles Ezell, the Acting Director of the U.S. Office of Personnel Management, issued a memorandum (the "OPM Memorandum") titled "Guidance on Probationary Periods, Administrative Leave and Details." *See* https://www.opm.gov/media/yh3bv2fs/guidance-on-probationary-periods-administrative-leave-and-details-1-20-2025-final.pdf. The OPM Memorandum provided that federal agencies "have

---

[1] By contrast, USAGM has only 14 full-time employees and contracts with only 25 PSCs in the New York City area. *Id.* ¶ 4.

the discretion to grant paid administrative leave to employees to help manage their workforces when it is in their best interest to do so." OPM Memorandum, at 2. On March 14, 2025, President Trump issued Executive Order 14238, which directed that USAGM's "non-statutory components and functions" be eliminated and that its "performance of [its] statutory functions and associated personnel" be reduced to "the minimum presence and function required by law." Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025). In furtherance of the OPM Memorandum and the Executive Order, on March 15, 2015, USAGM placed 1,042 employees on administrative leave with full pay and benefits. Thomas Decl. ¶ 6. On March 16, 2025, USAGM terminated contracts with all personal services contractors, who will be paid through March 31, 2025. *Id.* The agency has retained the ability to recall employees from administrative leave to work status as it seeks to implement the Executive Order. *Id.*

Further to its intent to uphold USAGM's performance of its statutory functions and associated personnel, on March 27, 2025, the Office of Cuba Broadcasting resumed transmission of radio and television programming to maintain USAGM's statutory requirements. Thomas Decl. ¶ 7.

## III.    Plaintiffs' Complaint

On March 21, 2025, plaintiffs—comprised of several full-time employees and personal service contractors of the VOA, a director of USAGM, a non-profit organization, and four labor organizations—sued defendants Lake, Morales, and USAGM for allegedly placing employees and contractors on paid administrative leave, temporarily ceasing broadcasting and programming operations, and terminating grant agreements. Plaintiffs have: asserted violations of the First Amendment, the Separation of Powers Clause, and the Appointments Clause of the constitution; violations of Sections 706(1) and 706(2) of the Administrative Procedure Act; alleged that defendants breached the "statutory firewall" set forth in 22 U.S.C. §§ 6202, 6204; seek relief

under the Mandamus Act and the All Writs Act; and alleged that defendants acted in an *ultra vires* manner. *See generally* Compl. (ECF No. 1).

On March 24, 2025, plaintiffs filed a motion for a preliminary injunction and a temporary restraining order ("TRO") (ECF No 15). Plaintiffs' TRO seeks to have Defendants temporarily enjoined:

> (A)   [F]rom taking any further actions to implement or effectuate the March 14, 2025 and March 15, 2025 Actions as to USAGM, or take any action to reduce USAGM's workforce (whether employees, contractors, or grantees), included but not limited to (i) proceeding with any further attempt to terminate, reduce-in-force, place on leave, or furlough any USAGM employee, or contractor, (ii) terminating (or proceeding with terminating as announced) any USAGM grant or contract or proceeding with terminating any USAGM Personal Services Contractors (PSCs) who received notice after March 14, 2025 that their contract would be terminated, including but not limited to John Doe 3 and John Doe 4 who received notice that their contracts would be terminated on March 31, 2025, or (iii) closing any USAGM office or requiring employees or contractors in overseas offices to return to the United States.

*See* ECF No. 15, at 3.

## LEGAL STANDARD

Issuance of a temporary restraining order "is an 'extraordinary and drastic remedy' that is 'never awarded as of right.'" *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). As such, it may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). To obtain this relief, a plaintiff "'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023) (quoting *Winter*, 555 U.S. at 20); *see also Geller v. de Blasio*, 613 F. Supp. 3d 742, 746 (S.D.N.Y. 2020) ("The standard for determining whether to grant a motion for a temporary restraining order is the same as used in evaluating a

motion for a preliminary injunction." (citing *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n*, 965 F.2d 1224, 1228 (2d Cir. 1992)). When "the Government is the opposing party," the assessment of the balance of the equities and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT[2]

### I.    Plaintiffs Fail to Demonstrate Irreparable Harm

Plaintiffs have not made any showing that they would suffer irreparable harm absent a temporary restraining order enjoining the Defendants. As the Second Circuit has recognized, "[p]erhaps the single most important prerequisite for the issuance of a [temporary restraining order] is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985) (citations omitted). "Irreparable harm is injury that is neither remote nor speculative," *New York v. DHS*, 969 F.3d 42, 86 (2d Cir. 2020) (citation omitted), but rather is "actual and imminent," *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (citation omitted). Given the primacy of irreparable harm in the temporary restraining order analysis, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Grand River Enter. Six Nations v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation and internal quotation marks omitted). Plaintiffs fail to meet that burden.

While Plaintiffs attempt to create irreparable harm by asserting claims with a constitutional dimension, Plaintiffs fundamentally complain of adverse employment actions (i.e., placement on paid administrative leave or the termination of an employment contract) that can be remedied by money damages at the end of the litigation. "It is well settled . . . that adverse employment

---

[2] The Government makes these arguments for the limited purpose of defending against Plaintiffs' application for a Temporary Restraining Order, and reserve the right to make additional arguments at later stages of the litigation.

consequences are not the type of harm that usually warrants injunctive relief because economic harm flowing from those employment actions is typically compensable with monetary damages." *We The Patriots USA, Inc.*, 17 F.4th at 294; *see also Sampson v. Murray*, 415 U.S. 61, 91-92 (1974) ("[L]oss of income and . . . the claim that her reputation would be damaged . . . falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction[.]").    And this Court has instructed that while the alleged "impairment of First Amendment rights can undoubtedly constitute irreparable injury . . . it often will be more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering wither the infliction of those consequences is likely to violate any of the plaintiff's rights." *Time Warner Cable of New York City v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997).    And at bottom, "where monetary damages may provide adequate compensation, a preliminary injunction"—much less a temporary restraining order—"should not issue." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995).    Because the harms to which the Plaintiffs are subject—administrative leave and reduction in force actions— are fundamentally adverse employment actions, these are not properly considered irreparable harms.

And the remaining harms are purely speculative.    Two of the John Doe Plaintiffs assert that they have legal status based on a J-1 visa and risk removal absent the entry of a preliminary injunction.    But at best, Plaintiffs merely assert that this "harm" is occurring earlier than scheduled. The John Doe Plaintiffs concede that "[u]nder the terms of the J-1 exchange program, [they are] obligated to return to [their] home countr[ies] after [their] program ends and reside there for two years."    Compl. Ex. W ¶ 3; *see also* Compl. Ex. X ¶ 3 (acknowledging that they are in the United States under a J-1 visa).    "J-1 visas provide temporary status to foreign professionals who have 'no

intention of abandoning' their home countries but come to the United States to work or study."

*Teleanu v. Koumans*, 480 F. Supp. 3d 567, 570 (S.D.N.Y. 2020) (quoting 8 U.S.C.

§ 1101(a)(15)(J)).  Indeed, "J-1 visas carry a two-year foreign residence *requirement* that requires

the holder to return to his home country upon expiration of the visa for two years before applying

for permanent legal residence in the United States."  *Id.* (citing 8 U.S.C. § 1182(e)) (emphasis

added).  In other words, the John Doe Plaintiffs' alleged harm is not fairly traceable to Defendants'

actions—Plaintiffs merely describe the terms of the program that they agreed to and attempt to

convert it into legally cognizable harm.

And to the extent other Plaintiffs assert that the absence of VOA coverage is an irreparable

harm, that too is insufficient.  Plaintiffs have not articulated any concrete consequences of the

absence of VOA coverage.  Nor is there any allegation that the VOA is the only source of news

abroad.  At best, Plaintiffs allege that VOA is "one of" the only sources of news abroad.  *See* Pls.'

TRO Br. at 30.  But any consequences that might flow from the absence of news specifically from

VOA is purely speculative—indeed, Plaintiffs do not even attempt to articulate them, or

demonstrate that other news sources are inadequate.

## II.    Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits

### A.    Plaintiffs Have Failed to Demonstrate That Any Content Manipulation Has Taken Place

Count I of the complaint alleges that Defendants' acts constitute viewpoint discrimination

against the VOA Journalists and other USAGM employees represented by the federal employee

unions in violation of the First Amendment.  Compl. ¶¶ 103–105; *see also* Pls.' TRO Br. at 17–20.

However, to constitute impermissible viewpoint discrimination, the "speech in question [must be]

defined by its content."  *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 811

(2000).  Put another way, a finding of viewpoint discrimination depends on "the message expressed

such that the identity of who can and cannot speak is 'based on hostility—or favoritism—towards the underlying message expressed,'" or the speaker's "opinion or perspective" or "specific motivating ideology." *Grocery Manufacturers Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 624 (D. Vt. 2015) (cleaned up) (citations omitted).

Contrary to plaintiffs' contentions, however, USAGM's current suspension of broadcasting activities and the placement of employees on administrative leave applies to all of the agency's activities—except for its broadcasting activities in Cuba, which the agency acknowledges it is statutorily mandated to perform—and does not, as plaintiffs contend, amount to a "[s]ilencing [of] USAGM's journalism on specific issues." Pls.' TRO Br. at 18. Unlike the cases cited by plaintiffs, USAGM's actions apply to the entire agency's efforts to reduce its operations to statutorily-mandated activities to comply with Executive Order 14238, and are not targeted to suppress specific viewpoints or content. *See, e.g., Sanjour v. EPA*, 56 F.3d 85, 97 (D.C. Cir. 1995) (invalidating, on First Amendment grounds, federal regulations that prohibited EPA employees "from receiving travel expense reimbursement from private sources for unofficial speaking or writing engagements concerning the subject matter of the employees' work, while permitting such compensation for officially authorized speech on the same issues"); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 837 (1995) (public university's refusal to reimburse printing costs of student magazine which published Christian viewpoints violated First Amendment, where other student news were eligible for funding); *Reed v. Town of Gilbert*, 576 U.S. 155, 171–72 (2015) (holding as invalid under the First Amendment town code governing outdoor signs which treated certain types of signs more favorably, and "temporary directional signs" for events such as Sunday church services less favorably).

**B.    Plaintiffs Jerreat and John Doe 1 Cannot Demonstrate Any Violation of Their Right to Exercise Editorial Discretion**

Plaintiff Jessica Jerreat is a full-time employee of USAGM and serves as the VOA Press Freedom Editor, Compl. ¶ 18; Compl. Ex. S ("Jerreat Decl."), at ¶ 2 (ECF No. 16-19).  Plaintiff John Doe 1 is also a full-time employee and a VOA journalist.  Compl. ¶ 20; Compl. Ex. U ("John Doe 1 Decl."), at ¶ 3.  Both Jarreat and John Doe 1 were placed on administrative leave on March 15, 2025.  Jarreat Decl. ¶ 3; John Doe 1 Decl. ¶ 4.  Plaintiffs contend that Jerreat and John Doe 1 have been deprived of their right "to exercise editorial discretion" under the First Amendment by virtue of their leave status.  Pls.' TRO Br. at 20.

The First Amendment protects entities or individuals "engaging in expressive activity, including compiling and curating others' speech" from being "directed to accommodate messages it would prefer to exclude."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024).  For example, "[t]he choice of material to go into a newspaper, and the decisions made as to the limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" that is protected by the First Amendment.  *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  But Jarreat and John Doe 1's asserted harms do not arise out of any alleged acts that dictated what they could and could not write about, but more broadly boil down to their loss of their job duties and responsibilities, which is a cognizable harm (to be sure, one that is not irreparable), but not one that implicates the First Amendment right to editorial discretion.  This is not a scenario where the Government has dictated the subjects about which individuals may speak, and the cases Plaintiffs cite are therefore inapposite.  *See McDermott v. Ampersand Publishing, LLC*, 593 F.3d 950, 952 (9th Cir. 2010) (district court did not abuse discretion in denying injunctive relief in the form of an order requiring a publisher to reinstate employees discharged for union activity directed at

pressuring the newspaper's owner and publisher to refrain from exercising editorial control over news reporting); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 768 (1978) (invalidating on First Amendment grounds state criminal statute that prohibited banks and business corporations to make certain expenditures to influence the vote on referendum proposals).

### C.    Plaintiffs RSF and RSF-USA Cannot Demonstrate Any Violation of Their Right to Receive Information

Count II of plaintiffs' complaint alleges that defendants' actions violated the First Amendment rights of the members of plaintiff Reporters Sans Frontièrs ("RSF") and its United States affiliate, plaintiff Reporters with Borders, Inc. ("RSF USA") (together, the "RSF Plaintiffs") and of plaintiff TheNewsGuild-CWA, AFL-CIO ("TNG-CWA"), "to receive information," insofar as temporarily suspending the operations of the USAGM networks deprived these members of "a [vital] source of information."    Compl. ¶¶ 110-116; Pls.' TRO Br. at 26.    According to the complaint, RSF is an international non-profit organization with "correspondents around the globe who rely on reporting from USAGM broadcasters," Compl. ¶ 11, while RSF USA allegedly oversees RSF correspondents working in North America and similarly "rel[ies] on VOA as an indispensable source of information." *Id.* ¶ 24.  TNG-CWA is the "largest labor union representing journalists and media workers in North America," and represents a bargaining unit of about 100 employees of USAGM grantee RFA. *Id.* ¶ 30.

However, none of the First Amendment cases cited by plaintiffs establishes that journalists and media workers have the constitutional right to access USAGM-funded information beyond the statutory minimum requirements established by Congress.  In *Pratt v. Independent School District*, 670 F.2d 771 (8th Cir. 1982), the Eighth Circuit held that in educational contexts, "the First Amendment precludes local authorities from imposing a 'pall of orthodoxy' on classroom instruction which implicates the state in the propagation of a particular religious or ideological

viewpoint," *id.* at 776, and ruled that a school board's decision to exclude a specific film from a high-school curriculum violated the First Amendment*, id.* at 779. *Pico v. Board of Education*, 638 F.2d 404 (2d Cir. 1980), *aff'd* 457 U.S. 853 (1982), similarly analyzed the "First Amendment rights, applied in the light of the special characteristics of the school environment, [which] are available to teachers and students," and involved a constitutional challenge to a school board's decision to remove "three works of fiction, four autobiographies, two anthologies, and one work of non-fiction, from the school libraries and curriculum" of a local school district. *Id.* at 406, 412 (citations omitted).

*Ashcroft v. ACLU*, 542 U.S. 656 (2004), also had nothing to do with the rights of journalists, but held that the Child Online Protection Act, which sought to criminalize the posting of Internet content deemed harmful to minors, likely violated the First Amendment because it imposed burdens on constitutionally-protected speech. *Id.* at 663-65. Nor do the other cases cited in plaintiffs' motion support the existence of a broad First Amendment right for all journalists to maintain continuous access to USAGM-funded media. *See Lamont v. Postmaster General*, 381 U.S. 301, 302-03, 305 (1965) (striking down Postal Service statute requiring the screening and withholding of unsealed mail containing "communist political propaganda" from designated foreign countries because it imposed a "limitation on the unfettered exercise of the addressees First Amendment rights"); *American Academy of Religion v. Cherthoff*, 463 F. Supp. 2d 400, 414 (S.D.N.Y. 2006) (holding that "the First Amendment rights of American citizens are implicated when the Government excludes an alien from the United States on the basis of his political views, even though the non-resident alien has no constitutionally or statutorily protected right to enter the United States to speak.")

### D.      USAGM Has Been Reduced Only to Its Statutory Minimum

Plaintiffs are unlikely to be able to demonstrate a likelihood of success on the merits of their APA claims because USAGM has not ceased all operations—33 employees at the Office of Cuba Broadcasting ("OCB") have been reinstated to work status and broadcasting has currently resumed in Cuba.  *See* Thomas Decl. ¶ 7.  Indeed, OCB's news website is up to date, and live radio and television programming is currently being broadcast on its website and into Cuba.  *See* https://www.martinoticias.com (last visited March 27, 2025).  And because this broadcasting is occurring, Plaintiffs cannot show that USAGM is violating any statute requiring the Agency to make any specific broadcasts.

First, USAGM is operational—it does "continue to exist within the Executive Branch of the Government" as an independent agency.  22 U.S.C. § 6203(a).  And Plaintiffs' arguments that USAGM is no longer "serv[ing] as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive," 22 U.S.C. § 6202(c)(1), or that it is not "designed so as to effectively reach a significant audience," and "include news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), hinge on a factual scenario where broadcasting is not occurring in any form.  That is not the case.  *See* Thomas Decl.  ¶ 7.  Second, the only country-specific broadcasting cited by Plaintiffs that is required by statute—into Cuba—is occurring.  *See* 22 U.S.C. §§ 1465a, 1465aa, 1465bb, 1465cc.  While Plaintiffs argue that USAGM is somehow required to broadcast into North Korea 12 hours a day, *see* Pls.' TRO Br. 10-11, that is inaccurate.  Plaintiffs omit the full text of the provision—"It is the *sense of Congress* that . . . the Broadcasting Board of Governors should increase . . . broadcasts, including news rebroadcasts, to North Korea from current levels, with *a goal of* providing 12-hour-per-day broadcasting to North Korea."  22 U.S.C. § 7813 (emphasis added).  And "[c]ourts have held that a 'statute's use of the terms 'should' and the 'the sense of Congress' indicate that the

statute is merely precatory' and does not create an enforceable right." *Li v. Chertoff*, No. 07 Civ. 3836, 2007 WL 4326784 at *5 (E.D.N.Y. Dec. 7, 2007); *see also Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 455 (1988) (acknowledging that a "sense of Congress" joint resolution does "not change any existing State or Federal law" and "has no teeth in it"). Nor, as Plaintiffs argue, is USAGM required to broadcast "hourly live news programming" 24/7 to Iran. *See* Pls.' TRO Br. 11. Instead, the statute merely required that—"90 days after August 10, 2012," various components of the federal government were required to "submit to the appropriate congressional committees a comprehensive strategy to . . . expand[] Voice of America's Persian News Network and Radio Free Europe/Radio Liberty's Radio Farda to provide hourly live news update programming and breaking news coverage capability 24 hours a day and 7 days a week." 22 U.S.C. § 8754(7)(A). No action taken by the agency impacts this statutory requirement.

Nor is it mandatory that the agency continue to fund grants. The statutes that Plaintiffs cite merely allows the agency to fund grants, it does not require them to continue. *See* 22 U.S.C. §§ 6204(a)(5) (giving the CEO the "authorit[y]" to "make and supervise grants"); *id.* § 6204(a)(6) (giving the CEO the "authorit[y]" to "allocate funds appropriated for international broadcasting activities among the various elements of the Agency and grantees"); *id.* § 6207(f) ("Grants authorized . . . for RFE/RL, Incorporated, shall be *available* to make annual grants" (emphasis added)); *id.* § 6208 ("Grants authorized . .. shall be *available* to make annual grants for the purpose of carrying out radio broadcasting to Asia"); *id.* § 6215(b)(1) ("[T]he Board of Broadcasting Governors is authorized to make grants to support Radio Free Afghanistan.").

And Congressional appropriations statutes make funding available for grant awards and other operations without mandating that any sum within the appropriation be directly granted to a particular entity. The relevant appropriation law's statement that the "funds appropriated under

this heading shall be *allocated* in accordance with the table," Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 735 (emphasis added), does not mandate a payment. Furthermore, Congressional appropriations recognize flexibility for reprogramming among different USAGM grantees, and do not categorically mandate specific payment amounts. *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 735 (noting that "funds may be reprogrammed within and between amounts designated in such table [i.e., for each USAGM grantee or federal entity], subject to the regular notification procedures of the Committees on Appropriations, except that no such reprogramming may reduce a designated amount by more than 5 percent.").[3]

E.    **The USAGM's Delegation of Authority to an Internal Special Adviser is Within the Bounds of Law**

Plaintiffs allege that Defendant Lake's actions are outside of her authority, because she is "purporting to exercise the authority of the USAGM Chief Executive Officer without Presidential appointment or Senate confirmation."   Compl. ¶ 159.   But to the extent Defendant Lake is exercising authority delegated to her by USAGM's Chief Executive Officer, Defendant Lake's actions fall within the bounds of law.[4]   Express statutory authority for delegation is not required to delegate powers to a subordinate within the agency. *Frankl v. HTH Corp.*, 650 F.3d. 1334, 1350 (9th Cir. 2011); *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004 ("When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal

---

[3] To the extent that Plaintiffs challenge the termination of various grants between USAGM and third parties, this Court lacks jurisdiction to adjudicate such disputes.  These claims sound in contract, and are thus committed to the exclusive jurisdiction of the Court of Federal Claims.  *See, e.g.*, *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 25 Civ. 465, 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025), *appeal docketed* USCA Case No. 25-5066; *see also Transohio Sav. Bank v. Dir. Off. Of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992).

[4] At this time the Government does not have sufficient information from the Agency regarding the scope of Defendant Lake's delegated authority.

officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent.") (citing decisions).

### III.    The Balance of Equities and Public Interest Weigh in Favor of the Defendants

A temporary restraining order also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor.  *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party").  Granting the temporary restraining order that Plaintiffs are seeking would disrupt USAGM's efforts to comply with Executive Order 14238's directive that USAGM's "non-statutory components and functions" be eliminated and that its "performance of [its] statutory functions and associated personnel" be reduced to "the minimum presence and function required by law."  Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025).  In this context, granting plaintiffs' temporary restraining order would disrupt USAGM's oversight and management of this process, to ensure that its mandate under the Executive Order is properly fulfilled while effectively maintaining its statutory obligations.

In another case seeking preliminary equitable relief against USAGM, a court recognized that "thwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest."  *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020), *opinion vacated as moot, appeal dismissed*, No. 20-5195, 2021 WL 11096700 (D.C. Cir. Mar. 16. 2021).[5]  The district court in that case recognized that "[s]etting USAGM's priorities and managing, at a broad level, U.S. international broadcasting is the prerogative of the USAGM CEO—not that of plaintiffs, and certainly not of this Court." *Id.* at 31.  Finally, as discussed above,

---

[5] The district court's opinion in *Open Tech. Fund v. Puck* was vacated under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950), after the case became moot while on appeal.  Thus, the district court's reasoning retains its persuasive value.  *See, e.g.*, *National Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 354 (D.C. Cir. 1997) ("[S]ince the district court's opinion will remain 'on the books' even if vacated, albeit without any preclusive effect, future courts will be able to consult its reasoning.").

plaintiffs will not suffer any irreparable harm from the denial of their temporary restraining order, because each of the potential harms that plaintiffs have identified are economic, and therefore inherently not irreparable; speculative; or asserted on behalf of a third party not before this Court. Accordingly, on these facts, the balance of the equities and the public interest militate against the entry of relief.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a temporary restraining order.

Dated:  New York, New York
        March 27, 2025

                                    Respectfully submitted,

                                    MATTHEW PODOLSKY
                                    Acting United States Attorney for the
                                    Southern District of New York
                                    *Attorney for Defendants*

                        By:     */s/ Tomoko Onozawa*
                                    DANIELLE J. MARRYSHOW
                                    TOMOKO ONOZAWA
                                    Assistant United States Attorneys
                                    86 Chambers Street, 3rd Floor
                                    New York, New York 10007
                                    Tel: (212) 637-2689/2721


                                    YAAKOV M. ROTH
                                    Acting Assistant Attorney General
                                    Civil Division