UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATSY WIDAKUSWARA, *et al.*,
                                    Plaintiffs,

-v-

KARI LAKE, in her official capacity as
Senior Advisor to the Acting CEO of the
U.S. Agency for Global Media, *et al.*,
                                    Defendants.

25-CV-2390 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiffs, who are government employees, individual journalists, unions, and nonprofits advocating for independent journalism, bring this suit against the United States Agency for Global Media ("USAGM") and its current leaders, Acting CEO Victor Morales, and his "Senior Advisor," Kari Lake.  USAGM, an agency created and funded by Congress, oversees Voice of America, the largest American broadcaster overseas, which has provided comprehensive news coverage and promoted America's democratic ideals abroad since World War II.

Plaintiffs allege that by terminating and threatening to terminate the majority of USAGM staff, ending grants to its affiliates and partner organizations, and halting programming, Defendants have violated Plaintiffs' First Amendment rights, U.S. Const. amend. I; constitutional separation of powers and the Take Care Clause, U.S. Const. art. II § 3; the Appointments Clause, U.S. Const. art. II § 2, cl. 2; the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; and the statutory provisions governing USAGM and its affiliates, 22 U.S.C. §§ 1465, 6202, 6204, 6207, 6208, 6215, 7813, 8754.

Before the Court is Plaintiffs' motion for a temporary restraining order ("TRO").  For the reasons that follow, that motion is granted.

1

I.    **Background**

A.    **Factual Background**

The following facts are drawn from the parties' submissions and, as relevant to this Order, are not in dispute.  Plaintiffs Patsy Widakuswara; Jessica Jerreat; Kathryn Neeper; John Does 1-4; Reporters Without Borders, Inc. ("RSF USA"); Reporters Sans Frontières ("RSF"); American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME"); American Federation of Government Employees, AFL-CIO ("AFGE"); American Foreign Service Association ("AFSA"); and the NewsGuild-CWA, AFL-CIO ("TNG-CWA") bring this action against Defendants Kari Lake and Victor Morales, in their official capacities, and USAGM.

USAGM is an independent executive agency (ECF No. 1 ("Compl.") ¶ 32) that "oversees federally funded broadcast networks [including] the Voice of America ('VOA'), the Office of Cuba Broadcasting ('OCB'), Radio Free Asia ('RFA'), Radio Free Europe/Radio Liberty ('RFE/RL'), Middle East Broadcasting Network ('MBN'), and the Open Technology Fund ('OTF')."  (ECF No. 41 ("Opp.") at 8.)  VOA, the oldest and perhaps the most well-known of these entities, is a radio-broadcast network that Plaintiffs describe as providing foreign citizens with "accurate, objective, and comprehensive" news.  (Compl. ¶ 1.)  "In 1942, the first transmission made by Voice of America . . . promised foreign VOA listeners:  'The news may be good or bad; we shall tell you the truth.'"  *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 341 (D.D.C. 2020); (ECF No. 49-1 at 11).  Today, the USAGM website states that the agency's mission "is to inform, engage, and connect people around the world in support of

freedom and democracy."[1]  Prior to the events at issue in this lawsuit, USAGM's grantees "had

more than 425 million listeners every week."  (Compl. ¶ 2.)

On March 14, 2025, President Donald Trump issued Executive Order 14238, entitled

"Continuing the Reduction of the Federal Bureaucracy," which demands that "the non-statutory

components and functions of [USAGM] shall be eliminated to the maximum extent consistent

with applicable law," and directs the head of USAGM to "submit a report to the Director of the

Office of Management and Budget confirming full compliance with this order and explaining

which components or functions of the governmental entity, if any, are statutorily required and to

what extent."  90 Fed. Reg. 13043 (Mar. 14, 2025).  The following day, the White House

published an article entitled "The Voice of Radical America," which states:  "President Donald J.

Trump's executive order [14238] on Friday will ensure that taxpayers are no longer on the hook

for radical propaganda."[2]

Beginning on March 15, 2025, USAGM undertook a series of actions "in furtherance of"

Executive Order 14238 and an Office of Personnel Management memorandum authorizing

agencies to place employees on administrative leave.  (Opp. at 9-10.)  The HR Director of

USAGM "placed 1,042 employees on administrative leave with full pay and benefits."  (*Id.* at

10; *see also* Compl. ¶¶ 74-75.)  Plaintiffs represented at oral argument that, at this time, seventy-

five percent of RFA employees were furloughed.  That same day, USAGM posted an update on

its website stating:  "This agency is not salvageable.  From top-to-bottom this agency is a giant

---

[1] *Mission*, U.S. Agency for Global Media, https://www.usagm.gov/who-we-are/mission/
(last visited Mar. 28, 2025).

[2] *The Voice of Radical America*, The White House (Mar. 15, 2025),
https://www.whitehouse.gov/articles/2025/03/the-voice-of-radical-america/ (last visited Mar. 28,
2025).

rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken.  While there are bright spots within the agency with personnel who are talented and dedicated public servants, this is the exception rather than the rule."[3]

On March 16, 2025 "USAGM terminated contracts with all [approximately 598] personal services contractors," whose pay will end on March 31, 2025.  (Opp. at 9.)  Lake also terminated the grant agreements for RFE/RL, RA, and the OCB.[4]  (Compl. ¶¶ 78, 141.)  And on Monday, March 17, 2025, USAGM's Director for Stations and Operations instructed "all USAGM Foreign Service employees" to shut down all transmitters, place locally employed staff on leave, and expect to be placed on administrative leave themselves within two days.  (*Id.* ¶ 83.)

According to Plaintiffs at the time of filing suit and moving for emergency relief, "Defendants have shut down *all USAGM operations*."  (ECF No. 17 ("Mem.") at 20 (emphasis in original).)  And "VOA is no longer reporting the news" or "broadcasting content."  (Compl. ¶ 82.)

The Court has been apprised of several updates in the operations of USAGM since Plaintiffs commenced this action.  On March 25, 2025, USAGM's HR Director notified union

---

[3] *USAGM, Senior Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease that Burdened the Taxpayers and Enforces Trump's Executive Order to Drastically Downsize Agency*, U.S. Agency for Global Media (Mar. 15, 2025), https://www.usagm.gov/2025/03/15/u-s-agency-for-global-media-complies-with-presidential-executive-order-to-reduce-the-federal-bureaucracy/ (last visited Mar. 28, 2025).

[4] Since Plaintiffs' filing of this motion, Lake issued a letter to RFE/RL stating that the grant termination was "rescinded" (ECF No. 40-1 at 5), after Judge Lamberth of the U.S. District Court for the District of Columbia granted a TRO in a separate case brought by RFE/RL, ordering that USAGM, its leaders, "and their agents take no steps and impose no obligations relating to closing out the plaintiff's grant."  *RFE/RL, Inc. v. Lake*, No. 25-CV-799, 2025 WL 900481, at *5 (D.D.C. Mar. 25, 2025).  Though Defendants have not filed any updates regarding the status of RFA's or any other grantee's contract, USAGM's HR Director stated in her declaration filed on March 27, 2025 that "I have been advised that the Office of Cuba Broadcasting resumed radio service on March 26, 2025, and television broadcasting resumed on March 27, 2025."  (ECF No. 43 ¶ 7.)

officials that all non-retiring radio broadcast technicians, and approximately 594 "broadcast journalists, technicians, budget analysts, electronics engineers, and others" would receive termination notices within weeks.  (ECF No. 33 at 2.)  And "on March 27, 2025, the Office of Cuba Broadcasting resumed transmission of radio and television programming."  (Opp. at 10; *see also* ECF No. 43 ¶ 7.)

### B.    Procedural History

Plaintiffs commenced this suit on March 21, 2025, by filing their complaint.  (Compl.)  On March 24, 2025, Plaintiffs sought emergency relief by filing a motion (styled as a proposed order to show cause) for a TRO (ECF No. 15) and filing a memorandum in support (Mem.).  The Court held a telephonic conference that same day (*see* ECF No. 19), scheduling briefing and a hearing on the motion (ECF No. 22).

After the exchange of several status update letters filed by both parties (ECF Nos. 24, 28, 33, 34, 35), Defendants opposed the TRO motion on March 27, 2025 (Opp.).  On March 28, 2025, the Reporters Committee for Freedom of the Press and the Committee to Protect Journalists moved to file an amicus curiae brief in support of Plaintiffs' motion for emergency relief.  (ECF No. 49.)  The Court heard in-person argument on the present motion, as well as a request for venue transfer filed after the motion for emergency relief (*see* ECF No. 35), on March 28, 2025.  (*See* ECF Nos. 22, 36.)

## II.    Legal Standard

"The standards for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 . . . are identical."  *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020) (quotation marks omitted).  A party seeking either form of emergency relief "must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities

tips in their favor; and (4) an injunction is in the public interest." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (enumerating the same factors). "When the federal government is a party, the last two factors merge." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d at 294 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## III.    Discussion

### A.    Likelihood of Success

Plaintiffs contend that, by terminating and threatening to terminate USAGM staff, silencing broadcasts, and cancelling grants,[5] Defendants violated the APA and several constitutional provisions. (Mem. at 19-25.) Plaintiffs alternatively request mandamus relief. (*Id.* at 13.) Because Plaintiffs have shown a likelihood of success on the merits of their APA claims, the Court need not and does not reach their remaining claims at this stage.

### 1.    Final Agency Action

The APA provides for judicial review of a "final agency action" when "there is no other adequate remedy in a court." 5 U.S.C. § 704. An agency action is final if it "'mark[s] the consummation of the agency's decisionmaking process' and is 'one by which rights or

---

[5] Defendants include a brief footnote in their opposition memorandum stating: "To the extent that Plaintiffs challenge the termination of various grants between USAGM and third parties, this Court lacks jurisdiction to adjudicate such disputes." (Opp. at 21 n.3.) While Plaintiffs have certainly raised the cancellation of grant contracts as one concerning fact in a constellation of actions Defendants took to rapidly dismantle USAGM, "the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 376-77 (2d Cir. 1999) (adopting the *Megapulse* framework). "The [Plaintiffs'] claims are, at their core, assertions that the [Defendants] acted in violation of federal law—not its contracts." *California v. U.S. Dep't of Educ.*, __ F.4th __, No. 25-1244, 2025 WL 878431, at *2 (1st Cir. Mar. 21, 2025).

obligations have been determined, or from which legal consequences will flow.'"  *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

Beginning on March 15, 2025, USAGM has taken several actions to implement the mandates of President Trump's Executive Order 14238.  Senior Advisor Lake has terminated the grant agreements for affiliate organizations.  (Compl. ¶ 78.)  USAGM's Director for Stations and Operations has instructed "all USAGM Foreign Service employees" to shut down radio transmitters, place local staff on leave, and expect administrative leave themselves shortly.  (*Id.* ¶ 83.)  And, during the briefing period on the present motion, USAGM's HR Director emailed union officials that over 600 "broadcast journalists, technicians, budget analysts, electronics engineers, and others" would receive termination notices within weeks.  (ECF No. 33 at 1-2.)  There is also reason to believe that that number is an underestimate and that such a timeline will be expedited.  As Plaintiffs astutely point out in their response to Defendants' request for "an initial bond of $23.1 million" to cover twenty-one days during which a TRO may be in force, if the agency expects to lose $1.1 million per day on payroll costs (*see* ECF No. 28 at 2), "that necessarily means Defendants intend to terminate hundreds or thousands of employees in the next 21 days if Plaintiffs' TRO is not granted."  (ECF No. 33 at 3.)

Taken together, the Court agrees with Plaintiffs that these actions were final, and not "tentative or interlocutory in nature."  (Mem. at 18 (citing *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016)).)  The termination of contracts with partner organizations and the dismantling of critical infrastructure leading to the complete halt of agency programming are final agency actions.  *See Biden v. Texas*, 597 U.S. 785, 807 (2022) (holding that an "attempt[] to terminate" an agency's programming constitutes a "final agency action").

And while placing employees on temporary leave presents what is perhaps a closer call, the fact that the head of HR has since followed up to confirm that at least 600 of these individuals will be terminated within weeks indicates that final agency decisions on these personnel have been made.  (*See* ECF No. 33-2 at 5; ECF No. 33-3 at 6.)  As USAGM put it themselves:  "This agency is not salvageable . . . and [is] irretrievably broken."[6]  Such language further underscores the finality of the agency actions at issue.

It is also clear that these decisions impact Plaintiffs' rights and obligations and that legal consequences will flow from Defendants' actions.  Hundreds of employees and contractors will be terminated "in the next few weeks" (ECF No. 33-2 at 5; ECF No. 33-3 at 6), which will result in lost salaries, health care, and other employment benefits.  Broadcasts by USAGM and its grantees have been taken off the air, resulting in audiences missing the "comprehensive" news mandated by statute.  (Mem. at 18-19.)  And grants to organizations like RFA and MBN have been cancelled, which have caused these organizations to halt operations entirely.  (Compl. ¶ 141.)

The Court is thus satisfied, and Defendants do not dispute, that judicial review of these actions is proper under the APA.

### 2.      Arbitrary and Capricious

Plaintiffs argue that Defendants' actions are arbitrary and capricious because they occurred "mere hours after the President's executive order and did not give a justification for shutting the agency down."  (Mem. at 21.)  The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law."

---

[6] *See supra* note 3.

5 U.S.C. § 706(2)(A).  An agency acts arbitrarily and capriciously when it fails to "supply a reasoned analysis" for a change in policy.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).  To constitute "reasoned analysis," the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *State Farm*, 463 U.S. at 43).  Thus, "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law."  *Id.*

Defendants failed to provide such reasoned analysis.  In their memorandum in opposition to Plaintiffs' TRO motion, they provide a single sentence of explanation for the colossal changes that have occurred at USAGM since March 15, 2025.  (*See* Opp. at 10.)  Defendants state that the lay-offs and grantee contract terminations were "[i]n furtherance of the OPM Memorandum and the Executive Order [14238]."  (Opp. at 10.)  This single line, devoid of data or any independent explanation, is grossly insufficient and falls far short of reasoned analysis.  Nor do Defendants attempt to explain why they then immediately halted all of USAGM's functions and put all of its personnel on leave without explanation, when President Trump's Executive Order stated that only "non-statutory components and functions" be eliminated "to the maximum extent consistent with applicable law."  *Cf.* 90 Fed. Reg. 13043 (Mar. 14, 2025).  This "applicable law" surely includes APA Section 706(2)(A), which Defendants appear to have ignored.

Further, Defendants have failed to indicate that they ever considered any of the reliance interests of the soon-to-be terminated employees, the defunded program recipients, or the 425 million listeners to VOA and the other USAGM grantees.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("When an agency changes course . . . it must

be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.  It would be arbitrary and capricious to ignore such matters.")

Because Defendants failed to provide adequate reasoning behind the sweeping changes to USAGM and seemingly failed to consider any reliance issues in effectively closing the agency, they have likely violated Section 706(2)(A) of the APA.  Plaintiffs have thus met their burden of establishing a likelihood of success on the merits.

### 3.    Constitutional Violations

Defendants' dismantling of USAGM presents further concerns under Section 706(2), as it appears to violate, at minimum, the Take Care Clause and separation of powers principles of the United States Constitution.  "The Administrative Procedure Act requires federal courts to set aside federal agency action that is 'not in accordance with law,' . . . which means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original) (quoting 5 U.S.C. § 706(2)(A)).  This encompasses actions that "failed to meet statutory, procedural, or constitutional requirements." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971).

### a.    Take Care Clause

Article II of the Constitution provides that the President "shall take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  "Just as the Constitution prevents Congress from intruding on the President's power to execute the laws, the President — and his subordinates — do not wield 'authority to set aside congressional legislation by executive order.'" *State v. Trump*, __ F. Supp. 3d __, No. 25-CV-1144, 2025 WL 573771, at *24 (S.D.N.Y. Feb. 21, 2025) (quoting *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999)). Though some aspects of the Supreme Court's Take Care Clause jurisprudence are less than clear,

it has been the case for centuries that neither the President, nor his executive branch, may unilaterally refuse to carry out a congressional command. *See Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 525 (1838) ("To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution; is a novel construction of the constitution, and entirely inadmissible.")

Federal agencies are "creatures of statute." *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). USAGM, VOA, and USAGM's statutory predecessor, the Board for International Broadcasting, were created by Congress through statute. *See Turner*, 502 F. Supp. 3d at 343-47 (detailing the statutory history of USAGM and its predecessor). Congress also funds USAGM entirely through specific, line-item appropriations. *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024) (allocating $857,214,000 "[f]or necessary expenses to enable the United States Agency for Global Media (USAGM), as authorized, to carry out international communication activities . . . . Provided . . . [t]hat funds appropriated under this heading shall be made available in accordance with the principles and standards set forth in section 303(a) and (b) of the United States International Broadcasting Act of 1994 (22 U.S.C. 6202) and section 305(b) of such Act (22 U.S.C. 6204)"); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1106, 139 Stat. 9, 10 (2025) (extending FY2024 appropriations through September 30, 2025). In addition to these line-item appropriations, Congress placed limits on USAGM's ability to eliminate programming and downsizing offices without providing Congress

with at least fifteen days' notice.[7]  *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. F, Sec. 7015, 138 Stat. 460, 766-67.

The executive's job, meanwhile, is limited to "tak[ing] Care" that such statutes be "faithfully executed."  U.S. Const. art. II, § 3.  Withholding congressionally appropriated funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on this constitutional mandate.  And while Lake has continually used phrases such as "shed[ing] everything that is not statutorily required" at USAGM, and "streamlining our operations to what is statutorily required by law,"[8] insinuating that these actions fall within the statutory parameters laid out by Congress, such language is impossible to square with what Plaintiffs allege has happened—that is, that "Defendants have shut down *all USAGM operations*."  (Mem. at 20 (emphasis in original).)  Lake's qualified phrasing also strains credulity when the very same agency webpage reads:  "This agency is not salvageable" and "From top-to-bottom this agency is a giant rot and burden to the American taxpayer—a national security risk for this nation—and irretrievably broken."[9]

### b.    Separation of Powers

Related to Plaintiffs' Take Care Clause claim is their argument that Defendants' actions violate the separation of powers implicit in our constitutional design.  Article I grants Congress the power of the purse, *see* U.S. Const. art. I, § 8, cl. 1, and the power to legislate, *see id.* § 8, cl. 18.  Meanwhile, however, "[t]here is no provision in the Constitution that authorizes the

---

[7] At oral argument on the present motion, Defendants' counsel stated that she did not have information about whether such notices have been sent at all, much less whether they were in fact sent fifteen days prior to March 15, 2025.

[8] *Supra* note 3.

[9] *Supra* note 3.

President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

By withholding the funds statutorily appropriated to fully administer USAGM, VOA, and its affiliates, *see supra* Section III.A.3.a., the executive is usurping Congress's power of the purse and its legislative supremacy. As the D.C. Circuit put it, "a President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). The Ninth Circuit has similarly held that, "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals. Because Congress did not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).

Plaintiffs have thus shown a likelihood of success on the merits of their claim that Defendants acted "not in accordance with the law" and "contrary to constitutional right, power, privilege, or immunity" by violating the Take Care Clause and separation of powers. 5 U.S.C. §§ 706(A), (B).

### 4.    Unlawfully Withheld Actions

Plaintiffs further argue that by "withholding the programming and grants that USAGM is required to provide under the statutory provisions [of 22 U.S.C. §§ 1465, 6202, 6204, 6207, 6208, 6215, 7813, and 8754]," Defendants have also violated Section 706(1) of the APA. (Mem. at 22.) The APA provides that a "reviewing court shall . . . compel agency action unlawfully

withheld or unreasonably delayed." 5 U.S.C. § 706(1). "Both [federal agencies'] power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013). The Supreme Court has cautioned that, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original).

At the very least, Defendants' actions violate USAGM's governing statute, 22 U.S.C. § 6202, which mandates that "United States international broadcasting shall," among other requirements: "be consistent with the broad foreign policy objectives of the United States," 22 U.S.C. § 6202(a)(1); "be designed so as to effectively reach a significant audience," *id.* § 6202(a)(7); "include . . . news which is consistently reliable and authoritative, accurate, objective, and comprehensive," *id.* § 6202(b)(2); "include . . . the capability to provide a surge capacity to support United States foreign policy objectives during crises abroad," *id.* § 6202(b)(4); and provide "reliable research capacity to meet the criteria under this section," *id.* § 6202(b)(8).

Defendants argue that they have "maintain[ed]" what they concede are "statutory requirements" by permitting the OCB to resume transmission of radio and television programming on March 27, 2025. (Opp. at 10.) But the retention of thirty-three employees from the OCB and "approximately 31 other employees" whom USAGM's HR Director states she has "recalled from administrative leave" (ECF No. 43 ¶¶ 7-8) is hardly sufficient for USAGM's affiliates to "reach a significant audience," 22 U.S.C. § 6202(a)(7), be capable "to provide a surge capacity to support United States foreign policy objectives during crises abroad," *id.*

§ 6202(b)(4), or provide "reliable research capacity to meet the criteria under this section," *id.* § 6202(b)(8).  Defendants have not provided any reassurance that these sixty-four recently re-instated employees can carry out all of USAGM's statutory mandates.

Further, though Defendants have for some reason singled out OCB programming as the only broadcasting activities "it is statutorily mandated to perform" (Opp. at 15), it appears unlikely that restarting USAGM's Cuba programming alone meets the agency's statutory requirement to broadcast "information about developments in each significant region of the world."  22 U.S.C. § 6202(b)(6).  Defendants also ignore the statutory mandates for VOA. USAGM's governing statute specifically provides that the VOA broadcasts "will serve as a consistently reliable and authoritative source of news," *id.* § 6202(c)(1), "will represent America, not any single segment of American society," *id.* § 6202(c)(2), and "will present the policies of the United States clearly and effectively," *id.* § 6202(c)(3).  The statute uses the commands of "shall" and "will" in each of its three sub-sections, indicating that none of these congressional mandates are optional.  *See id.* § 6202(c); *see also Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").  Meanwhile, "[a]s a result of Defendants' actions, VOA is no longer reporting the news.  Its website has not been updated since March 15, 2025, with the website headlining now out-of-date articles.  It is no longer broadcasting content."  (Compl. ¶ 82.)

By terminating and threatening to terminate the majority of USAGM staff, cancelling grants to its grantee networks abroad, and shutting down the transmitters that serve as the conduits for any radio programming to listeners abroad, Defendants have failed to carry out the clear, specific statutory mandates of the agency's governing statute.  None of the statutory

requirements enumerated above can be effectuated if the agency has been shuttered.  And Defendants have failed to persuade the Court that their actions have been sufficiently narrow in scope such that USAGM is somehow still operational.  Plaintiffs have thus shown a sufficient likelihood of success on the merits on their APA Section 706(1) claim at this stage.

### B.    Irreparable Harm

Plaintiffs have adequately demonstrated that they would be irreparably harmed if temporary relief were not granted.  The Second Circuit has maintained that "[i]rreparable harm is 'the single most important prerequisite for the issuance of [emergency relief].'"  *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)); *Uppal v. New York State Dep't of Health*, 756 F. App'x 95, 96 (2d Cir. 2019) (summary order).  To plead irreparable harm, "[t]he movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."  *Rodriguez*, 175 F.3d at 233 (quoting *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995)).

The dismantling of USAGM would clearly cause employees, contractors, and grantees irreparable harm.  And Plaintiffs have offered sufficient evidence that Defendants are doing just that.  Defendants have already placed a total of "[a]pproximately 1,300 VOA journalists and other employees" on administrative leave (Compl. ¶ 75), furloughed others (*id.* ¶ 80), and stated that over 600 more employees will be terminated within "weeks" (ECF No. 33-2 at 5; ECF No. 33-3 at 6).  While Defendants are correct that an individual's job loss alone ordinarily does not rise to irreparable harm because "the injuries that generally attend a discharge from employment—loss of reputation, loss of income and difficulty in finding other employment—do not constitute the irreparable harm," *Guitard v. U.S. Sec'y of Navy*, 967 F.2d 737, 742 (2d Cir. 1992) (citing *Sampson v. Murray*, 415 U.S. 61 (1974)), the mass lay-off of an agency's staff is a

different question.  *See JTH Tax, LLC v. Agnant*, 62 F.4th 658, 668 (2d Cir. 2023) (holding that there is irreparable harm "where the viability of the plaintiff's business is threatened" (quotation marks omitted)).

In essence, these furloughs and lay-offs entail the dismantling of human infrastructure required to run USAGM, VOA, and USAGM's grantees.  Combined with Lake's cancelling grants to fund affiliate networks (Compl. ¶ 78), the shutting down of USAGM's radio transmitters abroad (*id.* ¶ 83), and the termination of contracts with partner agencies like the Associated Press that facilitate the sharing and republication of current news (*id.* ¶ 67), these actions have ensured that "all USAGM operations" have been "shut down" (Mem. at 20 (emphasis omitted)), and, as a result, "VOA is no longer reporting the news . . . [or] broadcasting content" (Compl. ¶ 82).

Further, shutting down necessary systems, laying off personnel, and terminating contracts, even ones that might be able to be eventually reinstated, halt agency function in the short term and threaten the efficacy of the agency in the long-term.  It would take USAGM months, if not years, to piece back together the infrastructure, staff, and contractual relationships to fully function again after this damage is done.  In short, these harms cannot be remedied with mere money damages.

Additionally, the 425 million listeners to VOA and USAGM's affiliates and grantees will miss the comprehensive, objective news coverage of the many breaking world events that seem to happen daily in the current moment (s*ee* Compl. ¶ 2), and many of those listeners may tune out completely once the air waves have been silent for long enough, thus defeating the statutorily defined purpose for USAGM and VOA, *see* 22 U.S.C. § 6201 ("It is the policy of the United States to promote the right of freedom of opinion and expression, including the freedom to seek,

receive, and impart information and ideas through any media and regardless of frontiers . . . . The continuation of existing United States international broadcasting . . . would enhance the promotion of information and ideas, while advancing the goals of United States foreign policy." (quotation marks omitted)).  This time off-air also harms Plaintiff RSF, whose members "routinely rely on VOA as an indispensable source of information" (Compl. ¶ 24) and "rely on VOA and USAGM grantees networks as listeners in places where the local media is unreliable" (ECF No. 16-15 ¶ 9).  RSF's Director General states in her declaration that its correspondents "many of whom operate in hostile environments with limited access to credible local media—are now deprived of a trusted source that shaped their reporting, informed RSF's advocacy, and protected their safety." (*Id.*)  The effective shuttering of VOA and other USAGM-funded networks thus irreparably harms RSF correspondents who lack other ways of obtaining reliable information about political changes and safety concerns in the countries where they live and from which they report.

Finally, at least two of the John Doe Plaintiffs "are foreign nationals working and living in the United States on J-1 visas." (Mem. at 38.)  Without relief by this Court, Plaintiffs state that "they risk a loss of status and deportation to their home countries." (*Id.*)  Even standing alone, other courts have found that the loss of a J-1 nonimmigrant visa constitutes irreparable harm.  *See Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 394 (M.D.N.C. 2019).  Moreover, hasty deportation would be a particularly acute problem for these reporters.  John Doe 3 would be "obligated to return to [his] home country . . . and reside there for two years." (ECF No. 16-23 ¶ 3.)  Doe 3's home country "is governed by an authoritarian regime that has labeled VOA a subversive organization," and he testified that he "risk[s] imprisonment for over 10 years on charges of spreading 'false information'" for his reporting. (*Id.* ¶ 4.)  John Doe 4, meanwhile, "is

a member of a minority group that is regularly persecuted in his home country," and Plaintiffs

aver that deporting him there would "likely . . . put him in physical danger." (Mem. at 38; *see*

*also* ECF No. 16-24 ¶ 4.) Plaintiffs' fear of retribution from their home countries appears far

from fanciful. Amici state that "at least nine journalists and media workers who worked for or

contributed to VOA or its regional outlets have been killed in connection with their work since

2003," while "[n]ine others have been imprisoned." (ECF No. 49-1 at 15.) And, even if these

Plaintiffs are not detained or punished abroad, they may not be able to effectively return to the

United States, even if their visas were reinstated or renewed. *See Kabenga v. Holder*, 76 F.

Supp. 3d 480, 487 (S.D.N.Y. 2015) (noting that even if the government promises "the facilitation

of an alien's return," that return is ultimately "contingent on ICE protocol" and the government

would "not necessarily fund an alien's travel" back to the United States (cleaned up)).

Defendants argue that the revocation of these J-1 visas is not irreparable harm because it

merely forces John Does 3 and 4 to leave the country "earlier than scheduled." (Opp. at 13.) But

that argument fails to account for the fact that, absent Defendants' actions, these two Plaintiffs

would have had time and notice to find a new job to sponsor a subsequent visa, or to apply for

another kind of visa to stay in the country. Here, however, they were told on March 16, 2025,

that their contract would be terminated on March 31, 2025, and were notified that their visas

would expire that same date, with a one-month grace period to get their affairs in order to leave

the country. (ECF No. 16-23 ¶ 3; ECF No. 16-24 ¶ 3.) Given the time it takes to find a job that

will sponsor a visa and then proceed through a full hiring process, and the even longer timeline

on which the federal government works to process visas, it is likely impossible for John Does 3

and 4 to pursue either of these options in time to prevent deportation. Thus, contrary to

Defendants' depiction, the immediate termination of John Does 3 and 4's contracts and visas is

not merely speeding up the inevitable.  Moreover, as a result of this compressed timeframe, John Does 3 and 4 lack even a meaningful opportunity to plan for the risks associated with returning to their home countries, much less to mitigate those risks or find alternate destinations abroad.

For all these reasons, Plaintiffs have established irreparable harm.

### C.     Balance of Equities and Public Interest

To weigh these final factors, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief . . . pay[ing] particular regard for the public consequences" that would result in granting the emergency relief sought.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks omitted).  This factor, too, favors Plaintiffs.

While Plaintiffs have put forward a laundry list of injuries that would result if this Court fails to grant a TRO, *see supra* Section III.B., Defendants argue only that granting the TRO "would disrupt USAGM's efforts to comply with Executive Order 14238's directive[s]" (Opp. at 22).  However, the Court has already noted that Defendants appear to be failing to implement that Order.  *See supra* Section III.A.2.  After all, Executive Order 14238 states that all action should be taken "consistent with applicable law."  90 Fed. Reg. 13043 (Mar. 14, 2025).  As this Court explained, the problem here is that Defendants have failed to act consistently with the law.

Further, it bears note that granting this TRO merely requires what is already statutorily mandated both by congressional appropriations for this fiscal year and by the statutes already governing USAGM, VOA, and other affiliates.  The Court agrees with Judge Hellerstein that "there can be no doubt that the public interest favors requiring the government to comply with the law."  *Velesaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2020).

### D.    Rule 65 Bond

Finally, Defendants have asked the Court to impose "an initial bond of $23.1 million," which they argue is proper under Federal Rule of Civil Procedure 65(c) "for 'costs and damages sustained' by Defendants if they are later found to 'have been wrongfully enjoined.'"  (ECF No. 28 at 2 (quoting Fed. R. Civ. P. 65(c)).)  Defendants explain that such a number represents the "approximately $1.1 million per day to maintain the status quo" multiplied by "an estimated 21-day TRO period."  (*Id.*)

The Court agrees with Plaintiffs that such a demand is not merited.  Requiring that plaintiffs suing the government to vindicate constitutional and statutory rights post bonds of over $1 million a day would ensure that very few individuals could afford to sue the federal government.  Notably, the expenditure of which Defendants complain is merely disbursing the line-item appropriations Congress has already granted USAGM for this fiscal year.  *See supra* Section III.A.3.a.  Defendants can hardly gripe about abiding by their constitutional role as members of the executive branch.  *See id.*; *supra* Section III.A.3.b.

The Defendants' request for a Rule 65(c) bond of $23.1 million is denied, and the bond requirement is waived.

## IV.    Conclusion

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order is GRANTED.

IT IS HEREBY ORDERED that, pending the hearing and determination of Plaintiffs' motion for a preliminary injunction, Defendants, and those acting in concert with them, are temporarily enjoined from taking any further actions to implement or effectuate the March 14, 2025 Executive Order entitled "Continuing the Reduction of the Federal Bureaucracy" as to USAGM and the March 15, 2025 email issued to all VOA staff, or take any action to reduce

USAGM's workforce (whether employees, contractors, or grantees), included but not limited to (i) proceeding with any further attempt to terminate, reduce-in-force, place on leave, or furlough any USAGM employee, or contractor, (ii) terminating (or proceeding with terminating as announced) any USAGM grant or contract or proceeding with terminating any USAGM Personal Services Contractors (PSCs) who received notice after March 14, 2025 that their contract would be terminated, including but not limited to John Doe 3 and John Doe 4 who received notice that their contracts would be terminated on March 31, 2025, or (iii) closing any USAGM office or requiring employees or contractors in overseas offices to return to the United States.

     SO ORDERED.

Dated:  March 28, 2025
       New York, New York

_____
J. PAUL OETKEN
United States District Judge