UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, et al.,

              Plaintiffs,

     v.

KARI LAKE, Senior Advisor to the Acting
CEO of U.S. Agency for Global Media, et al.,

             Defendants.

Civil Action No. 25-1015 (RCL)

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

BACKGROUND ................................................................................................................... 1

    I.      Statutory Function of Global Media ...................................................................... 1

    II.     Executive Order 14,238 ......................................................................................... 2

LEGAL STANDARDS .......................................................................................................... 3

ARGUMENT ......................................................................................................................... 4

    I.      Plaintiffs Are Not Likely to Prevail on the Merits of their Claims......................... 4

          A.      Several Plaintiffs Lack Standing................................................................... 4

          B.      This Court Lacks Jurisdiction Over Plaintiffs' Employment Claims ......... 7

          C.      Plaintiffs Are Unlikely to Prevail on Their Claim that Defendants Are Engaged in Viewpoint Discrimination under the First Amendment (Count I) ..................................................................................................................... 19

          D.      Plaintiffs Jerreat and John Doe 1 Cannot Demonstrate Any Violation of Their Right to Exercise Editorial Discretion ............................................. 26

          E.      Plaintiffs Are Unlikely to Succeed on Their Right to Receive Information Under the First Amendment (Count II) ...................................................... 28

          F.      Claims Relating to Any "Closure" of Global Media Are Not Ripe.......... 29

          G.      Plaintiffs Are Not Likely to Prevail on Their APA Claims (Counts III, V, VI) ............................................................................................................... 30

          H.      Plaintiffs' Mandamus Act and All Writs Act Fail (Count VII) ............... 36

          I.      Plaintiffs Are Not Likely to Succeed in their Claims that Defendants Have Violated the Statutory Firewall (Count IV) ............................................... 37

          J.      Plaintiffs Do Not Attempt to Demonstrate that They Will Succeed on Their Ultra Vires Claims, including Separation of Powers (Count VIII) and Appointments Clause (Count IX)...................................................... 38

    II.     Plaintiffs Cannot Establish Irreparable Harm ...................................................... 42

    III.    The Equities and Public Interest Weigh Against Relief ....................................... 44

    IV.    Any Relief Should be Narrowly Tailored ............................................................. 44

CONCLUSION..................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**                                                                                    *Page(s)*

*Abbott Lab'ys v. Gardner*,
   387 U.S. 136 (1967) ................................................................................ 29

*Alabama- Coushatta Tribe of Tex. v. United States*,
   757 F.3d 484 (5th Cir. 2014) ................................................................. 30

*Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*,
   357 F.3d 62 (D.C. Cir. 2004) ................................................................. 15

*\*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) ................................................... 8, 9, 39-40

*\*Am. Foreign Serv. Ass'n v. Trump*,
   ("AFSA"), Civ A. No. 25-0352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025) ....... *passim*

*Am. Hosp. Ass'n v. Burwell*,
   812 F.3d 183 (D.C. Cir. 2016) ................................................................. 36

*Ashcroft v. ACLU*,
   542 U.S. 656 (2004) ................................................................................ 29

*Axon Enterprise, Inc. v. FTC*,
   598 U.S. 175 (2023) ................................................................................ 10

*Ayele v. Dist. of Columbia*,
   704 F. Supp. 3d 231 (D.D.C. 2023) ....................................................... 42

*Bancoult v. McNamara*,
   445 F.3d 427 (D.C. Cir. 2006) ............................................................... 26

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
   502 U.S. 32 (1991) .................................................................................. 39

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................ 31

*Bowen v. Massachusetts*,
   487 U.S. 879, 910 (1988) ....................................................................... 35

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ................................................................................ 45

*Cecile Indus., Inc. v. Cheney*,
   995 F.2d 1052 (Fed. Cir. 1993) .............................................................. 18

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ............................................................... 42

*Church v. Biden*,
   573 F. Supp. 3d 118 (D.D.C. 2021) ....................................................... 43

*Cobell v. Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006) ...................................................... 30, 31

*Connick v. Myers*,
   461 U.S. 138 (1983) ............................................................................ 25

*CREW v. Off. of Special Counsel*,
   480 F. Supp. 3d 118 (D.D.C. 2020) .................................................... 6, 7

*Crowley Gov't Servs., Inc. v. GSA*,
   38 F.4th 1099 (D.C. Cir. 2022) ............................................................ 14

*Ctr. for Biological Diversity v. Trump*,
   453 F. Supp. 3d 11–54 (D.D.C. 2020) ................................................. 41

*Dalton v. Sherwood Van Lines, Inc.*,
   50 F.3d 1014 (Fed. Cir. 1995) ............................................................. 18

*Dalton v. Specter*,
   511 U.S. 462 (1994) ....................................................................... 40, 41

*Dart v. United States*,
   848 F.2d 217 (D.C. Cir. 1988) ............................................................. 40

*DCH Reg'l Med. Ctr. v. Azar*,
   925 F.3d 503 (D.C. Cir. 2019) ............................................................. 39

*Dep't of Education v. California*,
   No. 24A910, 2025 WL 1008354 (Apr. 4, 2025) (per curiam) ....................... *passim*

*Eagle Tr. Fund v. USPS*,
   365 F. Supp. 3d 57 (D.D.C. 2019) ........................................................ 40

*Elec. Priv. Info. Ctr. v. Presidential. Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017) ............................................................... 6

*\*Elgin v. Dep't of Treasury*,
   567 U.S. 1–15 (2012) ........................................................... 9, 10, 11, 39

*Farris v. Rice*,
   453 F. Supp. 2d 76–80 (D.D.C. 2006) .................................................. 43

*FDA v. All. For Hippocratic Med.*,
   600 U.S. 367 (2024) ......................................................................... 6, 7

*Fed. Trade Comm'n v. Standard Oil Co. of Cal.*,
   449 U.S. 232 (1980) ............................................................................ 29

*FedEx v. Dep't of Comm.*,
   39 F.4th 756 (D.C. Cir. 2022) ................................................ 39, 40

*First National Bank of Boston v. Bellotti*,
   435 U.S. 765 (1978) ........................................................... 27, 28

*Fla. Med. Ass'n, Inc. v. Dep't of Health, Ed. & Welfare*,
   601 F.2d 199 (5th Cir. 1979) ................................................. 36-37

*Fornaro v. James*,
   416 F.3d 63 (D.C. Cir. 2005) ..................................................... 10

*Friends of Animals v. Jewell*,
   828 F.3d 989–92 (D.C. Cir. 2016) ................................................ 4

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) ..................................................... 20, 21, 22, 23

*Garcia v. Vilsack*,
   563 F.3d 519 (D.C. Cir. 2009) .................................................... 35

*Graham v. Ashcroft*,
   358 F.3d 931 (D.C. Cir. 2004) ..................................................... 8

*Griffith v. FLRA*,
   842 F.2d 487 (D.C. Cir. 1988) .................................................... 39

*Grosdidier v. Chairman, Broad. Bd. of Govs.*,
   560 F.3d 495 (D.C. Cir. 2009) .................................................... 10

*Gulf Oil Corp. v. Brock*,
   778 F.2d 834 (D.C. Cir. 1985) ................................................ 44, 45

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ........................................................... 35, 44

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ............................................................... 4

*Indigenous People of Biafra v. Blinken*,
   639 F. Supp.3d 79 (D.D.C. 2022) .................................................. 5

*Jangjoo v. Bd. of Govs.*,
   244 F. Supp. 3d 160 (D.D.C. 2016) .............................................. 21

*Kim v. FINRA*,
   698 F. Supp. 3d 147 (D.D.C. 2023) ............................................. 44

*Larson v. Domestic & Foreign Com. Corp.*,
   337 U.S. 682 (1949) ............................................................. 40

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ................................................................. 38

*LeFande v. District of Columbia*,
   841 F.3d 485 (D.C. Cir. 2016) ................................................. 25

*Louisiana v. Biden*,
   622 F. Supp. 3d 267 (W.D. La. 2022) .................................... 33

*Lozada Colon v. Dep't of State*,
   170 F.3d 191 (D.C. Cir. 1999) ................................................. 36

*Lujan v. Defs. Of Wildlife*,
   504 U.S. 555, 560–61 (1992). ................................................... 5

*Lujan v. Nat'l Wildlife Fed.*,
   497 U.S. 871 (1990) ........................................................... 30, 31

*Mahoney v. Donovan*,
   721 F.3d 633–36 (D.C. Cir. 2013) ........................................... 10

*Mahorner v. Bush*,
   224 F. Supp. 2d 48 (D.D.C. 2002) ............................................ 5

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) .................................................... 14-15, 15

*McDermott v. Ampersand Publishing, LLC*,
   593 F.3d 950 (9th Cir. 2010) ................................................... 27

*McInnis-Misenor v. Me. Med. Ctr.*,
   319 F.3d 63 (1st Cir. 2003) ............................................... 29, 30

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ....................... 16, 17, 18, 33

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) ................................................................ 27

*Mpoy v. Rhee*,
   758 F.3d 285- 91 (D.C. Cir. 2014) .......................................... 21

*Munaf v. Geren*,
   553 U.S. 674–90 (2008) ............................................................ 3

*Nat'l Endow. for Arts v. Finley*,
   524 U.S. 569 (1998) ........................................................... 19-20

*Navab-Safavi v. Glassman*,
   637 F.3d 311 (D.C. Cir. 2011) .......................................... 21-22, 24

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................ 4, 44

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................ 30, 31

*Nyunt v. Chairman, Broad. Bd. of Govs.*,
    589 F.3d 445 (D.C. Cir. 2009) ......................................... 10, 39

*Open Tech. Fund v. Pack*,
    470 F. Supp. 3d 8 (D.D.C. 2020) ............................................ 37

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89–02 n.11 (1984) ................................................... 40

*People for Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ............................................... 4

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ............................................... 35

*Pickering v. Board of Ed. of Tp. High School Dist. 205, Will County*,
    391 U.S. 563 (1968) ......................................................... 25, 26

*Pico v. Board of Education*,
    638 F.2d 404 (2d Cir. 1980) ............................................. 28, 29

*Pleasant Grove City, Utah v. Summum*,
    555 U.S. 460 (2009) .............................................................. 19

*Pratt v. Independent School District*,
    670 F.2d 771 (8th Cir. 1982) ................................................. 28

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) .............................................................. 24

*Rankin v. McPherson*,
    483 U.S. 378 (1987) .............................................................. 25

*Reed v. Town of Gilbert*,
    576 U.S. 155–72 (2015) ......................................................... 20

*Reno v. Cath. Soc. Servs., Inc.*,
    509 U.S. 43 (1993) ................................................................ 29

*Roman Cath. Bishop of Springfield v. City of Springfield*,
    724 F.3d 78 (1st Cir. 2013) .................................................... 29

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ......................................................... 20, 24

*Sampson v. Murray,*
  415 U.S. 61 & n.68 (1974) .................................................................... 42, 43

*Sanjour v. EPA,*
  56 F.3d 85 (D.C. Cir. 1995) ..................................................................... 20

*Schneider v. Kissinger,*
  412 F.3d 190 (D.C. Cir. 2005) ................................................................. 26

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) ................................................................... 4

*Sierra Club v. EPA,*
  292 F.3d 895 (D.C. Cir. 2002) ................................................................... 5

*Spectrum Leasing Corp. v. United States,*
  764 F.2d 891 (D.C. Cir. 1985) ................................................................. 19

*Steadman v. Gov., U.S. Soldiers & Airmen's Home,*
  918 F.2d 963, 967 (D.C. Cir. 1990)........................................................... 10

*Steenholdt v. FAA,*
  314 F.3d 633 (D.C. Cir. 2003) ................................................................. 35

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) .................................................................................. 9

*Turner v. U.S. Agency for Global Media,*
  502 F. Supp. 3d 333, 366 (D.D.C. 2020)...................................... 11, 13, 22

*U.S. Conf. of Catholic Bishops v. Dep't of State,*
  Civ. A. No. 25-465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) .................. 15, 18, 34

*U.S. Info. Agency v. Krc,*
  989 F.2d 1211, 1217 (D.C. Cir. 1993)........................................................8

*U.S. Telecom Ass'n v. FCC,*
  359 F.3d 554 (D.C. Cir. 2004 .................................................................. 42

*United States Sugar Corp. v. EPA,*
  830 F.3d 579 (D.C. Cir. 2016) ................................................................. 36

*United States v. Curtiss-Wright Exp. Corp.,*
  299 U.S. 304 (1936) ................................................................................ 26

*United States v. Fausto,*
  484 U.S. 439–50 (1988) ......................................................................... 8, 9

*United States v. Nat'l Treasury Emps. Union,*
  513 U.S. 454–66 (1995) .......................................................................... 23

*United States v. Playboy Ent. Group, Inc.*,
  529 U.S. 803 (2000) ................................................................................................ 24

*Versata Dev. Corp. v. Rea*,
  959 F. Supp. 2d 912 (E.D. Va. 2013) ..................................................................... 35

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
  714 F.3d 186 (4th Cir. 2013) ................................................................................... 30

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015) ................................................................................................ 20

*Weaver v. Info. Agency*,
  87 F.3d 1429 (D.C. Cir. 1996) ............................................................................ 9, 10

*Webster v. Doe*,
  486 U.S. 592 (1988) ................................................................................................ 35

*Wilburn v. Robinson*,
  480 F.3d 1140 (D.C. Cir. 2007) .............................................................................. 24

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................................... 4

**Statutes**

5 U.S.C. § 701 ........................................................................................................... 35

5 U.S.C. § 704 ........................................................................................................... 34

5 U.S.C. § 2105 ...................................................................................................... 7, 16

5 U.S.C. § 2301 ........................................................................................................... 9

5 U.S.C. § 2302 ........................................................................................................... 9

5 U.S.C. § 7703 ........................................................................................................... 8

5 U.S.C. §§ 2302 ....................................................................................................... 14

22 U.S.C. § 6202 ................................................................................................. *passim*

22 U.S.C. § 6203 .................................................................................................. 26, 32

22 U.S.C. § 6204 .......................................................................................... 2, 36, 37, 38

22 U.S.C. § 6206 .................................................................................................. 15, 16

22 U.S.C. § 6208a. ...................................................................................................... 1

22 U.S.C. § 7813 ....................................................................................................... 33

22 U.S.C. § 8754 ....................................................................................................... 33

22 U.S.C. §§ 6204 ....................................................................................................... 2

28 U.S.C. § 1331 ......................................................................................................... 8

28 U.S.C. § 1491 .................................................................................................. 15, 34

41 U.S.C. § 7102 ................................................................................................ 18

41 U.S.C. § 7103 ................................................................................................ 18

41 U.S.C. § 7104 ................................................................................................ 18

**Rules**

Rule 12 ............................................................................................................... 35

Rule 65 ............................................................................................................... 45

**Other**

90 Fed. Reg. 13043 (Mar. 14, 2025) ............................................................ 3, 44

Defendants Kari Lake, in her official capacity as a Senior Advisor to the Chief Executive Officer ("CEO") of United States Agency for Global Media ("Global Media"), Victor Morales, in his official capacity as Acting CEO of Global Media, and Global Media, through their undersigned counsel, oppose Plaintiffs' motion for a preliminary injunction ("Pls.' Mot.," ECF No. 17).[1] For the reasons explained herein, Plaintiffs are unable to demonstrate that they are likely to succeed on the merits, that they have suffered irreparable harm, and that the balance of the equities or the public interest tip in their favor. The Court should deny the motion.

## BACKGROUND

### I.    Statutory Function of Global Media

The mission of United States Agency for Global Media is to inform, engage, and connect people around the world in support of freedom and democracy. *See* https://www.usagm.gov/who-we-are/mission/. In furtherance of that mission, Global Media oversees multiple entities, including Voice of America. *See id.*; *see also* 22 U.S.C. § 6208a. To effectuate its oversight authority, Congress granted Global Media's CEO the authority to, among other things: "supervise all broadcasting activities conducted" by such entities; "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all such [entities'] activities within the context of the broad foreign policy objectives of the United States"; and "[t]o undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could be made more efficient and economical," "To review, evaluate,

---

[1]    The Government is filing this response on a compressed time frame since this action originated in the Southern District of New York, was transferred to this District after entry of a temporary restraining order, and counsel for Defendants changed once the case changed districts. Should the Court be inclined to award anything other than temporary relief, the Court should stay any such order to allow the Government time to seek reconsideration or authorization to seek appellate review from the Solicitor General, as appropriate. The Government also reserves the right to make additional arguments at a later stage in the litigation.

and determine, at least annually, after consultation with the Secretary of State, the addition or deletion of language services." 22 U.S.C. §§ 6204(a)(1), (a)(2), (a)(4) (a)(8).

In December 2016, Congress passed and then-President Obama signed the 2017 National Defense Authorization Act, which established Global Media's current governing structure. National Defense Authorization Act of 2017, Pub. L. 114-328, 130 Stat. 2000, 2549, § 1288. That law restructured governance of the Global Media broadcast networks by dissolving a governing board structure and centralizing control in a single CEO. 22 U.S.C. §§ 6203, 6204(a)(1), (b). Congress vested the CEO with the many powers previously held by the board, including to "ensure" broadcast activities are consistent with the standards Congress established, including that they be "balanced and comprehensive," *id*. §§ 6204(a)(3), 6202(b)(2), and to "appoint such personnel for the [CEO] as the [CEO] may determine to be necessary." *Id*. § 6204(a)(11). The current Acting CEO of Global Media is Victor Morales, who holds broad supervisory authority accorded to him by statute. *Id*. § 6204(a).

Global Media employs full-time employees and has contractual relationships with personal services contractors, who are not Global Media employees, but have an employer-employee relationship governed by contract. Global Media currently employs a total of approximately 1,147 full-time employees and as of March 14, 2025 has active employment contracts with approximately 598 PSCs. *See Widakuswara v. Lake*, Civ. A. No. 25-2390, Defs.' Opp. Pls.' Temp. Rest. Order, Decl. of Crystal Thomas ¶ 3 (S.D.N.Y. Mar. 27, 2025) (ECF No. 41).

## II.    **Executive Order 14,238**

On January 20, 2025, and as amended on March 4, 2025, Charles Ezell, the Acting Director of the U.S. Office of Personnel Management ("OPM"), issued a memorandum (the "OPM Mem.") titled "Guidance on Probationary Periods, Administrative Leave and Details." *See* https://www.opm.gov/media/yh3bv2fs/guidance-on-probationary-periods-administrative-

leaveand-details-1-20-2025-final.pdf. The OPM Memorandum provided that agencies "have the discretion to grant paid administrative leave to employees to help manage their workforces when it is in their best interest to do so." OPM Mem., at 2. On March 14, 2025, the President issued Executive Order 14,238, which directed that Global Media's "non-statutory components and functions" be eliminated and that its "performance of [its] statutory functions and associated personnel" be reduced to "the minimum presence and function required by law." Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025). In furtherance of the OPM Memorandum and the Executive Order, on March 15, 2015, Global Media placed 1,042 employees on administrative leave with full pay and benefits. Declaration of Crystal Thomas ("Thomas Decl.") ¶ 5. On March 16, 2025, Global Media terminated contracts with all personal services contractors, who will be paid through March 31, 2025. *Id.* On March 28, 2025, all personal services contractors were reinstated and are receiving full pay and benefits, but they are not currently working. Thomas Decl. ¶ 5. The agency has retained the ability to recall employees from administrative leave to work status as it seeks to implement the Executive Order. *Id.*

Further to its intent to uphold Global Media's performance of its statutory functions and associated personnel, on March 27, 2025, the Office of Cuba Broadcasting resumed transmission of radio and television programming to maintain Global Media's statutory requirements. Thomas Decl. ¶ 6.

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). To warrant relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The third and fourth factors of the analysis—harm to others and the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.  Plaintiffs Are Not Likely to Prevail on the Merits of their Claims

#### A.  Several Plaintiffs Lack Standing

Plaintiffs RSF and RSF USA, AFSCME, AFGE, and AFSA lack Article III standing. Under any theory of standing, "the irreducible constitutional minimum" requires that, (1) the plaintiff have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of Animals v. Jewell*, 828 F.3d 989, 991–92 (D.C. Cir. 2016) (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992)). Membership-based associations like Plaintiffs can establish standing in one of two ways: they can assert "associational standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). The above-named Plaintiffs fail to make the showing required for either associational standing or organizational standing.

##### 1.  Plaintiffs Fail to Demonstrate Associational Standing

Plaintiffs AFSCME, AFGE, and AFSA bring this action on behalf of their members. To show associational standing, an organization must demonstrate that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted, nor the relief requested requires that an

individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

These Plaintiffs assert that at least one of their members are injured because, since receiving the administrative-leave notices, members have been contacting the union seeking information and guidance, they are forced to make critical decisions, some have chosen to retire, and receiving the notices has caused substantial stress, fear, and confusion. *See* Compl. ¶¶ 99–101. Plaintiffs fail to meet the "constitutional minimum," demonstrating that at least one of its members suffered an injury that is "concrete and particularized" as well as "actual or imminent." *Lujan*, 504 U.S. at 560 (citation omitted); *Summers*, 555 U.S. at 498. Plaintiffs' emotional harm certainly is not impending. Although Plaintiffs fear what may happen next in the future, this "amounts to nothing more than speculation about future events that may or may not occur," especially given Global Media remains operational, contrary to what Plaintiffs suggest. *Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002) ("The plaintiff's allegation that he will suffer an increased chance of losing his life if President Bush initiates a military conflict with Iraq, amounts to nothing more than speculation about future events that may or may not occur."), *aff'd* 2003 WL 349713 (D.C. Cir. 2003); *Indigenous People of Biafra v. Blinken*, 639 F. Supp.3d 79, 85 (D.D.C. 2022) (concluding that the John Does who "reasonably fear[] injury at the hands of the Nigerian government"—after the United States's sale of aircrafts to the Nigerian government—failed to plead a sufficient injury-in-fact). Without injury, Plaintiffs fail to demonstrate associational standing to bring this action and seek any relief.

### 2.    Plaintiffs Fail to Demonstrate Organizational Standing

Any attempt by RFS and RFS USA, AFSCME, AFGE, and AFSA to establish organizational standing fares no better. To establish organizational standing, a plaintiff must demonstrate "that the defendant's actions cause a 'concrete and demonstrable injury to the

organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Elec. Priv. Info. Ctr. v. Presidential. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (cleaned up). To determine whether a plaintiff's allegations are sufficient to convey organizational standing, a court must find that the plaintiff satisfied two prongs: (1) the defendants' "action or omission . . . injured [the plaintiff's] interest;" and (2) that the plaintiff "used its resources to counteract that harm." *Id.* (quoting *PETA*, 797 F.3d at 1094).

Here, RSF and RSF USA allege that they will suffer irreparable harm because "the loss of [Voice of America] would weaken [their] ability to amplify press freedom concerns throughout the world." Compl. ¶ 97. The unions claim that if Global Media is dismantled, they would no longer be able to represent their members and would lose hundreds of dues-paying members, their bargaining position would be diminished, and their ability to carry out their missions would be impaired. *Id.* ¶¶ 99–101. Plaintiffs fail to demonstrate a "concrete and demonstrable injury to [its] activities," *Citizens for Responsibility & Ethics in Wash. ("CREW") v. Off. of Special Counsel*, 480 F. Supp. 3d 118, 127 (D.D.C. 2020), rather their claims are purely speculative. Indeed, Voice of America has not been dismantled and Global Media remains operational.

Further, the organizations insist that they have devoted a considerable number of resources responding to members concerns and providing guidance pertaining to the reduction in the force. *See* Compl. ¶¶ 99–101. Fundamentally, however, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. All. For Hippocratic Med.*, 600 U.S. 367, 394 (2024). Plaintiffs do not contend that they are using their resources to counteract any purported harm as it pertains to Global Media ensuring its compliance with Executive Order 14,238. *See id.* Without such a showing, Plaintiffs cannot "spend its way

into standing." *All. for Hippocratic Med.*, 600 U.S. at 294. Also, to any extent that Plaintiffs claim

their organizations' missions have been compromised, that is not enough. *CREW*, 480 F. Supp. 3d

at 128 (citing *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C.

Cir. 2006)). Accordingly, certain Plaintiffs' request to enjoin Defendants will not succeed on the

merits because they lack standing.

### B.    This Court Lacks Jurisdiction Over Plaintiffs' Employment Claims

Two jurisdictional bars defeat other of Plaintiffs' claims. First, some of Plaintiffs claims

are precluded under the Federal Service Labor–Management Relations Statute ("FSL-MRS"), the

Civil Service Reform Act ("CSRA"), and the Foreign Service Act ("FSA"). Congress has

precluded district court jurisdiction over Plaintiffs' challenges to Defendants' decisions regarding

their employment. *Am. Foreign Serv. Ass'n v. Trump* ("*AFSA*"), Civ A. No. 25-0352 (CJN), 2025

WL 573762, at *8 (D.D.C. Feb. 21, 2025) (quoting *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217

(D.C. Cir. 1993)).  Second, Plaintiffs John Does 3 and 4 are not civil service employees appointed

under 5 U.S.C. § 2105(a)(1). Pls.' Mot. at 48. They were hired by Voice of America under personal

services contracts, which are governed by the Contract Disputes Act; the Court of Federal Claims

enjoys exclusive jurisdiction over such claims. Recently, the Supreme Court agreed when it issued

its decision to stay a temporary restraining order in *Dep't of Education v. California*, No. 24A910,

2025 WL 1008354, at *1 (Apr. 4, 2025) (per curiam). In *California*, the Supreme Court stayed a

temporary restraining order that had "enjoin[ed] the Government from terminating various

education-related grants." *Id.* at *1.  The Supreme Court held that the government was "likely to

succeed in showing the District Court lacked jurisdiction to order the payment of money under the

[Administrative Procedure Act]," *id.* at *1–2, reasoning that "the Tucker Act grants the Court of

Federal Claims jurisdiction over suits based on 'any express or implied contract with the United

States.'" *Id.* at *2 (quoting 28 U.S.C. §1491(a)(1)).

1.    The Civil Service Reform Act and Federal Service Labor-Management
      Relations Statute Precludes Plaintiffs' Claims

Although district courts have jurisdiction over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("*AFGE*"), 929 F.3d 748, 754 (D.C. Cir. 2019). As detailed below, Congress has precluded jurisdiction for the claims brought by Plaintiffs Widakuswara, Jearret, Neeper, and John Does 1 and 2.

The CSRA and FSL-MRS together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees. *AFGE*, 929 F.3d at 752 (regarding FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (regarding CSRA more broadly). In these statutes, Congress provided that most federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the Merit Systems Protection Board for employment disputes, the Federal Labor Relations Authority for labor disputes, or the Office of Special Counsel for certain "prohibited personnel practices." For foreign service officers, the Foreign Service Act of 1980 ("FSA") "provides an analogous system for reviewing allegedly adverse actions taken against those employees." *Krc*, 989 F.2d at 1217. Judicial review, if any, is generally available only following the exhaustion of administrative review. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *United States v. Fausto*, 484 U.S. 439, 448–50 (1988)); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

"Personnel actions" that fall within the Office of Special Counsel's ("OSC") purview include "any. . . significant change[s] in duties, responsibilities, or working conditions." 5 U.S.C.

§ 2302(a)(2)(A)(xii). The CSRA enumerates thirteen circumstances under which personnel actions become "prohibited personnel practices," which must be brought before OSC in the first instance. *Id*. § 2302(b). One of those thirteen "prohibited personnel practices" occurs when a "personnel action" violates "any law, rule, or regulation implementing, or directly concerning, the merit system principles" listed in the statute. *Id*. § 2302(b)(12). These principles require, in relevant part, "proper regard for [employees'] constitutional rights." *Id*. § 2301(b)(2). Consequently, personnel actions that implicate violations of constitutional rights, including alleged violations of the First Amendment, are prohibited personnel practices that generally fall within the CSRA's exclusive remedial scheme. *See, e.g., Weaver v. Info. Agency*, 87 F.3d 1429, 1432 (D.C. Cir. 1996).

In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)," to conclude that the union plaintiffs in that case could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754. Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See id*. at 755 (citations omitted).

The Supreme Court repeatedly has held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–15 (2012); *Fausto*, 484 U.S. at 455. Likewise, the D.C. Circuit repeatedly has recognized that the FSL-MRS and the CSRA readily satisfy the first prong of the *Thunder Basin* framework. *See AFGE*, 929 F.3d at 755 (concluding that union plaintiffs could not challenge in district court three executive orders related to federal employment); *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005); *but see Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023). In other words,

Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework.

As to covered actions, beyond restricting judicial review of covered constitutional claims, the CSRA prevents district courts from deciding the merits of APA claims challenging an agency's "'systemwide'. . . policy interpreting a statute," its "implementation of such a policy in a particular case," *Nyunt v. Chairman, Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quoting *Fornaro*, 416 F.3d at 67–69), or its decision to engage in " 'a type of personnel action' the [CSRA] does not cover," *Mahoney v. Donovan*, 721 F.3d 633, 635–36 (D.C. Cir. 2013); *see generally Grosdidier v. Chairman, Broad. Bd. of Govs.*, 560 F.3d 495, 497 (D.C. Cir. 2009) (holding that federal employees "may not circumvent the [CSRA's] requirements and limitations by resorting to the catchall APA to challenge agency employment actions"). As the D.C. Circuit put it bluntly: "what you get under the CSRA is what you get," even if what you get is nothing at all. *Fornaro*, 416 F.3d at 67.

With respect to constitutional claims, even in cases centering on CSRA–covered actions, the Supreme Court has considered the availability of "meaningful review" in an Article III judicial forum when evaluating the scope of the CSRA's exclusive remedial scheme, *Elgin*, 567 U.S. at 10, and the D.C. Circuit has similarly consistently determined that federal employees have "a right to federal court review of their constitutional claims," *Weaver*, 87 F.3d at 1433. Although there exists a narrow exception to the exhaustion rule for employees covered under the CSRA when the raise "constitutional claim issues totally unrelated to the CSRA procedures," *Steadman v. Gov., U.S. Soldiers & Airmen's Home*, 918 F.2d 963, 967 (D.C. Cir. 1990), this exception is a narrow one, and does not excuse exhaustion requirement for claims, that, while framed as constitutional challenges, are in truth a disguised "vehicle" to challenge CSRA–covered personnel actions or

practices. *Elgin*, 567 U.S. at 22; *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 366 (D.D.C. 2020).

Plaintiffs Widakuswara, Jerreat, Neeper, and John Doe 1 and 2 do not allege that they exhausted their administrative remedies. Pls.' Mot. at 48-50. Instead, they contend that claim channeling does not apply in this case because their claims "do not fall within employment statutes," *id*. at 50. Thus, they argue that their claims fall outside of the CSRA's scope because they challenge the "shutdown" of Global Media "as a whole" and since they are currently in a "paid status," even if they are not working, their claims are not truly employment claims. *Id*. at 49-50. Plaintiffs' assertion that placement on administrative leave is not a CSRA covered action is incorrect. *See e.g., California*, 2015 WL 1008354, at *1 ("[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" (quoting 5 U.S.C. § 702)). Importantly, another judge of this Court recently described that statutory scheme when addressing analogous claims by unions of federal employees challenging executive actions that they asserted would "systematically dismantle" the agency that employed them. *AFSA*, 2025 WL 573762, at *1 (quoting plaintiffs' complaint). For civil servants, the "applicable statutory scheme is set forth in the FSL-MRS and the CSRA[.]" *Id*. at *8. At bottom, Plaintiffs' complaints are employment claims cloaked as constitutional or APA challenges.

Here, all three factors point toward preclusion. First, a finding of preclusion will not thwart meaningful judicial review. In essence, Plaintiffs Widakuswara, Jearret, Neeper, and John Does 1 and 2 challenges conditions of their employment, their inability to access their "work email and offices," their placement on administrative leave, and the perceived consequences or incidental effects that will flow from that placement, whether related to financial benefits or repatriation. But

an employee's placement on administrative leave can be challenged under the CSRA or FSL-MRS. *Nat'l Treasury Emps. Union v. Trump*, Civ. A. No. 25-0420 (RC), 2025 WL 561080, at *5 (D.D.C. Feb. 20, 2025) (recognizing that the FSLMRS and CSRA together precluded district court's jurisdiction over federal employees' unions' challenges to terminations of their members, reductions in force, and offers of deferred resignation). As can the other actions they complain of, namely, access to their work email and their physical offices.

Judge Nichols came to the same conclusion in *AFSA*, 2025 WL 573762, at *8. There, plaintiffs moved for a preliminary injunction challenging the "dismantling" of the U.S. Agency for Intentional Development ("USAID"), couching their challenges against the President's exercise of his executive powers as violations of the APA and the Constitution. One of the grounds for plaintiffs' challenge was the placement of its members on administrative leave. *Id*. at *8 ("plaintiffs' complaints about the effects on their members of being placed on administrative leave and of being asked to return to the United States on an expedited basis are, at bottom, archetypal complaints about changed employment conditions and their follow-on effects—which at this point appear to be largely financial."). Analyzing plaintiffs' claims with respect to the *Thunder Basin* factors, Judge Nichols concluded that Congress had precluded such claims because they were intended to "proceed exclusively" through the statutory schemes in the CSRA and the FSL-MRS. *Id*. at *8-9. It thus appeared likely that domestic USAID employees or union representatives could object to the agency's administrative leave placements under either the CSRA or FSL-MRS. *Id*. Much like here, the plaintiffs in *AFSA* sought the "cessation of certain employment conditions presently affecting their members, such as their placement on administrative leave, their expedited repatriation, and their inability to perform certain job duties they previously held." *AFSA*, 2025 WL 573762, at *10. Finally, even if the "farthest reaches of plaintiffs' lawsuit involve 'separation-

of-powers issues' and 'whether a statute or the Constitution has authorized the President to act in a particular way,' the 'preliminary' questions the lawsuit poses are plainly employment-related—such as the lawfulness of the government's changes to plaintiffs' members' employment conditions." *Id*. Because the same is certainly true here, the same result is warranted.

Plaintiffs rely heavily on *Turner*, 502 F. Supp. 3d at 366-67, to argue that their claims are not employment actions that are precluded under the CSRA or any other statutory remedial scheme. There are important distinctions to note from *Turner*. First, at the preliminary injunction stage, the court did not grant relief with respect to the Voice of America's director's claims "related "to the statutory firewall or statutorily protected journalistic independence or. . .'unlawful' action in general," i.e., her APA claims, her claims arising under the International Broadcasting Act, and her ultra vires claims. *Id*. That is because the court concluded the CSRA plainly precludes judicial review of statutory claims by covered employees related to their employment, whether (or not) the allegations amount to a "personnel action," or "prohibited personnel practice" explicitly enumerated in the CSRA or whether the CSRA provides a remedy for such claims. *Id*. at 367. Accordingly, the district court concluded that it lacked subject matter jurisdiction over those claims, making a likelihood of success on these claims "highly doubtful" for purposes of the preliminary injunction. *Id*. Second, while the district court ultimately found that the director was likely to succeed on her First Amendment challenge, Defendants respectfully disagree with that conclusion, as the director's challenges, much like the challenges here, necessarily implicate the "working conditions" at Global Media.

For example, changes to Global Media's purported autonomy or the "firewall" are necessarily employment actions, because at bottom they challenge policy decisions regarding how employees at the agency can perform their duties, i.e., what news will be broadcast, the way that

the agency and its employees will function, conditions of employment or the way that Plaintiffs perform their job. *See e.g.*, 5 U.S.C. §§ 2302(a)(2)(A)(xii); 2301(b)(2), 2302(b)(12). These claims fall squarely within the CSRA's structure. Because Defendants actions have arguably "changed the way" that Plaintiffs perform their job, they are necessarily changes to Plaintiffs "working conditions," covered by the CSRA and subject to the jurisdictional exhaustion requirement.

Moreover, the *Turner* court noted that the CSRA question was a "close one" and that defendants there, advancing substantially similar arguments, "proffered a strong argument," that the director's claims were precluded by the CSRA. *Id*. Indeed, one of the grounds for which the court found that the claim represented the "unusual" one where jurisdictional exhaustion was not required, *id*. at 370, was because the director had not been subject to "other personnel actions." That is not the case here, where all the individual plaintiffs have been placed on administrative leave, "shut out" from their work computers and offices. Thus, unlike *Turner*, the issues raised by Plaintiffs here are not "totally unrelated to the CSRA procedures," rendering this Court without subject matter jurisdiction for their employment-based challenges. The Court should decline to follow *Turner* in finding that this case presents the unusual one where a First Amendment challenge would not require jurisdictional exhaustion under the CSRA, FLS-MRS, or FSA.

 2. This Court Lacks Jurisdiction Over the Contract Claims of Plaintiffs John Does 3 and 4

Generally, the federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *id*., that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215

(2012). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

When a party seeks to challenge the terms of a contract that it has entered with the United States, the proper remedy is typically suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract"—including agreements like those that Plaintiffs John Does 3 and 4 have—"with the United States." 28 U.S.C. § 1491(a). As the D.C. Circuit has explained, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (cleaned up); *see also U.S. Conf. of Catholic Bishops v. Dep't of State*, Civ. A. No. 25-465 (TNM), 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025), *appeal docketed* No. 25-5066 (D.C. Cir.)[2]; *see also California*, 2025 WL 1008354, at *1 (noting that the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over suits based on any express or implied contract with the United States).

In 2002 Congress passed the "Foreign Relations Authorization Act," which gave the Director of the International Broadcasting Bureau the authority to establish a "pilot program [] for the purpose of hiring United States citizens or aliens as personal services contractors." Pub. L. 107-228 § 504(a), 116 Stat. 1350 (2002) (codified at 22 U.S.C. § 6206 note). As directed, these "personal services contractors" were offered "without regard to Civil Service and classification laws, for service in the United States as broadcasters, producers, and writers in the International

---

[2]    On March 28, 2025, the D.C. Circuit denied plaintiffs' motion for an injunction pending appeal and set a schedule for briefing and oral argument for September 2025.

Broadcasting Bureau to respond to new or emerging broadcast needs or to augment broadcast services." *Id*. Crucially, Congress contemplated that these personal service contractors would be hired "without regard to Civil Service and classification laws." An "employee" is defined as "an individual who is . . . appointed in the civil service" by a federal employee acting in an official capacity. 5 U.S.C. § 2105(a)(1).

In this case, Plaintiffs John Does 3 and 4 fail to allege that they are "employees" of Global Media or Voice of America. *See* Compl. ¶¶ 22, 23. Nor could they, as Plaintiffs John Does 3 and 4 acknowledge that they are on personal services contracts with the agency. *Id*.; *see also* Pls.' Mot. at 25 n.5; *see also id*. at 38 ("the two PSC Plaintiffs—contractor-journalists John Does 3 and 4— are foreign nationals working and living in the United States on J-1 visas."). This Court looks at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). In this case, both of those considerations make clear that this Court lacks jurisdiction over these claims.

Notably, Plaintiffs have not provided copies of their contracts in support of their motion, but rather gloss over the contractual nature of their dispute. Detrimental to Defendants' defense of this action, Plaintiffs repeatedly refused to identify for Government's counsel the identity of John Does 3 and 4, notwithstanding several requests for this information so that Defendants could adequately raise their jurisdictional arguments.[3]

As demonstrated in the attached (Exs. 1 and 2), the personal services contracts at issue contain a termination clause (clause four): "Termination of this Contract shall be conducted in

---

[3]    It was only on April 14, 2025 at 1:45 pm (the day of Defendants' response deadline), that counsel for Plaintiffs provided counsel for Defendants with redacted copies of the relevant contracts for John Does 3 and 4. Defendants are still entitled to the identity of all Doe Plaintiffs in order to defend against the claims in this action, even if the Court ultimately allows John Does 1-4 to proceed pseudonymously.

accordance with the terms of the attached [Global Media] Personal Services Contractor Handbook." Article 15 of the Personal Services Handbook governs terminations of the contracts. *See* Ex. 3. Article 15(a) provides: "Either party may terminate this Contract with the Agency at any time for any reason by providing the other party with 15 calendar days' written notice. Should the Agency decide to terminate this Contract for Convenience of the Government, the required written notice will be provided by the [Contracting Officer]. The written notice will explain the basis for the termination, and the effective date of the termination. [Global Media] reserves the right to require the [personal services contractor] to telework while the Agency determines whether to issue a termination notice. [Global Media] may also place a [Personal Services Contractor] on administrative leave while determining whether to issue a termination notice." *Id*. On March 15, 2025, in accordance with the terms of the contracts and the Personal Services Contract Handbook, Global Media notified personal services contractors, to apparently include John Does 3 and 4, that their contracts would be terminate effective March 31, 2025 (Compl. ¶¶ 22, 23).

Clause five states that "the [Personal Services Contractor] will be performing services under this contract. The [Personal Services Contractor] understands and acknowledges that [Personal Services Contractor] is not a [Global Media] employee within the competitive or excepted service or for any other purposes under the law. The [Personal Services Contractor] understands and acknowledges that this applies notwithstanding any and all provisions of this contract." *See* Exs. 1, 2 at 1. Clause 10, "Disputes," states that "This contract is subject to the Contract Disputes Act of 1978. All dispute resolution between the [Personal Services Contractor] and the Government arising out of this Contract shall be conducted in accordance with the procedures included in the Personal Services Contractor Handbook." *Id*. at 2. Some personal services contracts also state that certain clauses of the Federal Acquisition Regulation ("FAR") are

incorporated into the contract. For example, it may incorporate FAR 212-4, Contract Terms and Conditions, which renders the contract subject to disputes under 41 U.S.C. Chapter 71 (the Contract Disputes Act). *See* https://www.acquisition.gov/far/52.212-4 *(*last visited April 13, 2025).

Simply put, Plaintiffs' contract claims are barred under the provisions of the Contract Disputes Act, specifically 41 U.S.C. § 7103(a), because they were not first. . . submitted to and denied by a contracting officer. *Id*. The Contract Disputes Act "applies to any express or implied contract. . . made by an executive agency for. . . the procurement of services." 41 U.S.C. § 7102(a)(2). Under the Act, "[e]ach claim by a contractor against the [f]ederal [g]overnment relating to a contract shall be submitted to the contracting officer for a decision." 41 U.S.C. § 7103(a)(1). After such a claim has been made, "a contractor may bring an action directly on the claim in the United States Court of Federal Claims." 41 U.S.C. § 7104(b)(1). That plainly did not occur here.

Moreover, there is no genuine dispute that the Court of Federal Claims enjoys exclusive jurisdiction over claims arising out of the Contracts Disputes Act. *See Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1055 (Fed. Cir. 1993) ("The [Contract Disputes Act] exclusively governs Government contracts and Government contract disputes."). Put differently, "[w]hen the Contract Disputes Act applies, it provides the exclusive mechanism for dispute resolution; the Contract Disputes Act was not designed to serve as an alternative administrative remedy, available at the contractor's option." *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995).

In any event, the latter *Megapulse*, 672 F.2d at 968, factor is dispositive here. The nature of relief Plaintiffs John Does 3 and 4, seek sounds in contract. *See Conf. of Catholic Bishops*, 2025 WL 763738, at *7-8. It asks the Court to "order Defendants to take all necessary steps to return [Global Media] and its employees, contractors, and grantees to their status prior to the March 14,

2025, Executive Order…including by reinstating and permitting employees or contractors that were placed on leave, furloughed, terminated, experienced a reduction in force, or had their contracts changed, canceled or modified…to return to work." Compl. at 53. Thus Plaintiffs "seek the classic contractual remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). But this Court cannot order the Government to continue to perform under a contract. *Id*. Such a request for an order that the government "must perform" on its contract is one that "must be resolved by the Claims Court." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985); *see also California*, 2025 WL 1008354 at *1 (the "Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," and "as we have recognized, the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money[.]'") (cleaned up). In sum, this Court lacks jurisdiction over John Does 3 and 4's contract claims.

### C. Plaintiffs Are Unlikely to Prevail on Their Claim that Defendants Are Engaged in Viewpoint Discrimination under the First Amendment (Count I)

Setting aside the jurisdictional bars to Plaintiffs' constitutional claims, they are not likely to succeed on the merits of their First Amendment claims (Count I). Compl. ¶¶ 103–105; *see also* Pls.' Mot. at 26-28.

The First Amendment's Free Speech Clause does not apply to the government's own speech. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009); *see also id.* at 464 ("the placement of a permanent monument in a public park is best viewed as a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause"). A government entity may "speak for itself," and "select the views that it wants to express." *Id*. at 467–68. Indeed, it is the government's duty to incorporate public opinion and act accordingly, including through speech. *See Nat'l Endow. for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in

judgment) ("It is the very business of government to favor and disfavor points of view."). "Were the Free Speech Clause interpreted otherwise, government would not work." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

Unlike the cases cited by Plaintiffs, Global Media's actions apply to the entire agency's efforts to reduce its operations to statutorily mandated activities to comply with Executive Order 14238 and are not targeted to suppress specific viewpoints or content. *See, e.g., Sanjour v. EPA*, 56 F.3d 85, 97 (D.C. Cir. 1995) (invalidating, on First Amendment grounds, federal regulations that prohibited EPA employees "from receiving travel expense reimbursement from private sources for unofficial speaking or writing engagements concerning the subject matter of the employees' work, while permitting such compensation for officially authorized speech on the same issues"); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 837 (1995) (public university's refusal to reimburse printing costs of student magazine which published Christian viewpoints violated First Amendment, where other student news were eligible for funding); *Reed v. Town of Gilbert*, 576 U.S. 155, 171–72 (2015) (holding as invalid under the First Amendment town code governing outdoor signs which treated certain types of signs more favorably, and "temporary directional signs" for events such as Sunday church services less favorably).

Plaintiffs' claims do not rest on allegations that these journalists' speech as citizens are chilled; rather, they claim that their speech "pursuant to their official duties" is being chilled by the fear that they may face "employer discipline" for it. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *see* Compl. ¶¶ 102-108 (alleging that Defendants violated the First Amendment by "depriving" Global Media journalists and their "colleagues who support them in the dissemination of news and opinion, of their First Amendment rights to freedom of speech and freedom of the press" by interfering in Global Media's "editorial independence by ceasing agency operations, "

"chill[ing] news coverage" and "expressing certain viewpoints and chill[ing] journalistic activities").

Such allegations do not give rise to a First Amendment claim. *Garcetti*, 547 U.S. at 421–22. In *Garcetti*, a deputy district attorney brought a First Amendment claim alleging that he was disciplined for preparing a memorandum as part of his official duties recommending that a prosecution being pursued by his office be dropped. *Id*. at 413-15. The Court, citing its analysis in *Pickering v. Board of Education of Township High School District 205, Will County*, 391 U.S. 563 (1968), and subsequent cases, recognized that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom" and that "[w]hen [public employees] speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Garcetti*, 547 U.S. at 418–19. As a result of these concerns, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes," and thus have "no First Amendment cause of action based on his or her employer's reaction to the speech." *Id*. at 418, 421. The Court further noted that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id*. at 421–22. Since *Garcetti*, the D.C. Circuit has made clear that public employee speech is made "'pursuant to . . . official duties" and not protected even when the speech at issue is outside the employee's job description, and that this "official duties" exception encompasses speech about the employee's job duties in certain circumstances. *See, e.g., Mpoy v. Rhee*, 758 F.3d 285, 290- 91 (D.C. Cir. 2014). Courts have applied the *Garcetti/Pickering* test in analyzing First Amendment retaliation claims asserted by Voice of America personnel. *See, e.g., Jangjoo v. Bd. of Govs.*, 244 F. Supp. 3d 160, 170-73 (D.D.C. 2016); *see also Navab-Safavi v.*

*Glassman*, 637 F.3d 311, 317 (D.C. Cir. 2011). While Plaintiffs briefly acknowledge *Garcetti*, they maintain that the test articulated in *Pickering* applies based on this Court's holding in *Turner*. *See* Pls.' Mot. at 24; *Turner*, 502 F. Supp. 3d at 376. *Turner* is not controlling or precedential.

Here, the speech on which Plaintiffs' claims are based is speech made pursuant to Global Media journalists' "official duties." *Garcetti*, 547 U.S. at 421. The speech at issue is, indeed, the core duty that the journalists were hired to perform. *See, e.g.*, Pls.' Mot. at 24. Plaintiffs do not complain of any purported retaliation against journalists for speech as private "citizens about matters of public concern." *Garcetti*, 547 U.S. at 419. Instead, their complaint exclusively revolves around the allegations that their agency head is chilling news coverage expressed in the Voice of America's official content. *See, e.g.*, Compl. ¶ 104. Any alleged discipline or retaliation for the speech these journalists were hired to make on behalf of the United States, under the supervision of Global Media leadership, does not violate the First Amendment.

Plaintiffs resist this conclusion relying on *Turner's* finding that Voice of America journalism is not customary employee speech because it is, in part, protected from "editorial interference" by the Executive Branch. Pls.' Mot. at 25. This conclusion is undermined by the plain language of the International Broadcasting Act. While it may be true that the Act recognizes a "firewall" intended to maintain journalistic integrity, it also undoubtedly represents Government speech because Global Media and in turn, its broadcasting stations, are meant to represent the foreign policies and objectives of the United States. *See* 22 U.S.C. § 6202(a), (b). For example, the International Broadcasting Act requires that broadcasting "be consistent with the broad foreign policy objectives of the United States," 22 U.S.C. § 6202(a)(1), that it be "a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society," *id*. § 6202(b)(2), and be "clear and effective presentation of the

policies of the United States Government and responsible discussion and opinion on those policies, including editorials, broadcast by Voice of America, which present the views of the United States Government," *id.* § 6202(b)(3). While the journalists have a responsibility to produce news that is "consistently reliable, and authoritative, accurate, objective, and comprehensive," *id.* § 6202(b)(1), it is also undoubtedly a reflection and a representation of the United States government and the foreign policies of the administration. *E.g., Garcetti*, 547 U.S. at 426 ("our precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job."). At its core, this is Government speech as contemplated by *Garcetti* regardless of Plaintiffs' gloss. As one court in this District has noted, Voice of America's "content constitutes government speech that is not protected by the First Amendment." *Achagzai v. Broad. Bd. of Govs.*, Civ. A. No. 14-0768 (RDM), 2016 WL 471274, at *8 (D.D.C. Feb. 8, 2016).

Plaintiffs contend that the government speech doctrine is "an ill fit" for the journalist Plaintiffs First Amendment claims, but even if viewed under the scope of *Pickering*, they are likely to succeed. Not so. To establish a First Amendment violation, a public employee must meet several elements under *Pickering*. First, the public employee must have spoken as a private citizen, addressing matters of public concern. *See Garcetti*, 547 U.S. at 422. Second, if the "private citizen/public concern" requirement is met, then the court "must 'arrive at a balance between the interests of the employee, [as] a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.'" *United States v. Nat'l Treasury Emps. Union* ("*NTEU*"), 513 U.S. 454, 465–66 (1995) (quoting *Pickering*, 391 U.S. at 568). Third, the employee must show that his or her speech was a substantial or motivating factor in prompting the challenged personnel

action. *Wilburn v. Robinson,* 480 F.3d 1140, 1149 (D.C. Cir. 2007) (cleaned up). Finally, the employee must refute any showing by the government employer that it would have reached the same decision in the absence of the protected speech. *Id.* The first two of these four questions are questions of law for the court to resolve. *Navab-Safavi*, 637 F.3d at 316.

Plaintiffs argue that Defendants' perceived actions of "gutting" Voice of America to "suppress radical" or "leftist" reporting amounts to viewpoint discrimination. Pls.' Mot. at 26-27, 34. In the same breath, however, Plaintiffs recognize the facts most fatal to their cause of action: Defendants have paused "all" of Global Media broadcasts (with exceptions based on statutory operating requirements) and have placed "all" employees on administrative leave. *Id.* at 27. To constitute impermissible viewpoint discrimination, the "speech in question [must be] defined by its content." *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 811 (2000). Put another way, a finding of viewpoint discrimination depends on the message expressed such that the identity of who can and cannot speak is "based on hostility—or favoritism—towards the underlying message expressed," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 393 (1992) and "the opinion or perspective," or "the specific motivating ideology," of the speaker. *Rosenberger*, 515 U.S. at 829.

It cannot be that Defendants have engaged in viewpoint discrimination when they have paused the activities of an entire organization and restricted all broadcasts minus those required by statute. This is bolstered by Plaintiffs reliance on certain comments made by administration officials, regarding the "radical propaganda" attributed to Voice of America. Pls.' Opp. at 28. It is undisputed that Global Media is intended to promote the foreign policy interests and objectives of the Government. *See e.g.,* 22 U.S.C. § 6202. The President's core executive powers include matters of foreign policy. Defendants action do not amount to viewpoint discrimination because Defendants have not singled out any one viewpoint—regardless of Plaintiffs citations to certain

comments made by Lake or other individuals who are not even named defendants in this action.[4] Plaintiffs argue that "silencing [Global Media's] journalism on specific issues constitutes viewpoint discrimination," *id.*, but Plaintiffs do not point to any one specific "issue" that Global Media has purportedly silenced. Indeed, they acknowledge that Global Media has paused broadcasting on a much larger scale. At bottom, Plaintiffs do not point to any specific viewpoint-based content that they allege has been suppressed. This alone makes it unlikely that Plaintiffs will succeed on their First Amendment claims.

 *Pickering*'s second step requires the Court to balance competing interests: it must weigh the plaintiff's interest "as a citizen, in commenting upon matters of public concern[,]" against the government's interest "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568; *LeFande v. District of Columbia*, 841 F.3d 485, 494 (D.C. Cir. 2016). This balancing may entail several factors: among them, "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Moreover, a government employer can act before an employee's speech disrupts the functioning of an office. *Connick v. Myers*, 461 U.S. 138, 152 (1983) ("[W]e do not see the necessity . . . for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.").

---

[4] Plaintiffs' citation to certain comments made by Elon Musk regarding his personal views on Voice of America are not relevant as Musk is not a named Defendant in this action and does not maintain a leadership role at Global Media or Voice of America. Pls.' Mot. at 27 n.8.

Plaintiffs cannot satisfy the second prong of the *Pickering* test. 391 U.S. at 568; Pls.' Mot. at 33. The Government has a strong interest in advancing its foreign policy objectives and ensuring that those objectives are being presented in a "balanced" "comprehensive" way, 22 U.S.C. § 6202(b)(2), that Voice of America will represent "America" not "any single segment of American society," and will therefore present "a balanced and comprehensive projection of significant American thought and institutions." *Id*. § 6202(c)(2), (3). The President shares broad executive authority in determining the foreign policies objectives of the United States. Global Media, as an executive agency (*id*. § 6203(a)), is bound to its statutory obligation to ensure that its broadcasts are consistent with those policies. Undoubtedly, diplomacy and foreign relations fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (The President's power in the field of international relations "does not require as a basis for its exercise an act of Congress."); *see Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot [] be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions . . . entrusted foreign affairs and national security powers to the political branches[.]"). In sum, Plaintiffs are unlikely to succeed in demonstrating that Defendants have engaged in viewpoint discrimination.

### D.    Plaintiffs Jerreat and John Doe 1 Cannot Demonstrate Any Violation of Their Right to Exercise Editorial Discretion

Plaintiff Jessica Jerreat is a full-time employee of Global Media and serves as the Press Freedom Editor, Compl. ¶ 18; Compl. Ex. S ("Jerreat Decl."), at ¶ 2 (ECF No. 16-19). Plaintiff John Doe 1 is also a full-time employee and a Voice of America journalist. Compl. ¶ 20; Compl. Ex. U ("John Doe 1 Decl."), at ¶ 3. Both Jarreat and John Doe 1 were placed on administrative

leave on March 15, 2025. Jarreat Decl. ¶ 3; John Doe 1 Decl. ¶ 4. Plaintiffs contend that Jerreat and John Doe 1 have been deprived of their right "to exercise editorial discretion" under the First Amendment by virtue of their leave status. Pls.' Mot. at 29.

The First Amendment protects entities or individuals "engaging in expressive activity, including compiling and curating others' speech" from being "directed to accommodate messages it would prefer to exclude." *Moody v. NetChoice*, LLC, 603 U.S. 707, 731 (2024). For example, "[t]he choice of material to go into a newspaper, and the decisions made as to the limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" that is protected by the First Amendment. *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Jarreat and John Doe 1's asserted harms do not arise out of any alleged acts that dictated what they could and could not write about, but more broadly boil down to their loss of their job duties and responsibilities, which is a cognizable harm (to be sure, one that is not irreparable, nor one that this court has jurisdiction to redress), but not one that implicates the First Amendment right to editorial discretion. As noted above, this is not a scenario where the Government has dictated the subjects about which individuals may speak, and the cases Plaintiffs cite are therefore inapposite. *See McDermott v. Ampersand Publishing, LLC*, 593 F.3d 950, 952 (9th Cir. 2010) (district court did not abuse discretion in denying injunctive relief in the form of an order requiring a publisher to reinstate employees discharged for union activity directed at pressuring the newspaper's owner and publisher to refrain from exercising editorial control over news reporting); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 768 (1978) (invalidating on First Amendment grounds state criminal statute that prohibited banks and business corporations to make certain expenditures to influence the vote on referendum proposals).

### E.    Plaintiffs Are Unlikely to Succeed on Their Right to Receive Information Under the First Amendment (Count II)

Count II alleges that defendants' actions violated the First Amendment rights of the members of RSF and its RSF USA and of TheNewsGuild-CWA, AFL-CIO ("TNG-CWA"), "to receive information," insofar as temporarily suspending the operations of the Global Media networks deprived these members of "a [vital] source of information." Compl. ¶¶ 110-116; Pls.' Mot. at 35. As alleged, RSF is an international non-profit organization with "correspondents around the globe who rely on reporting from [Global Media] broadcasters," Compl. ¶ 11, while RSF USA allegedly oversees RSF correspondents working in North America and similarly "rel[ies] on VOA as an indispensable source of information." *Id*. ¶ 24. TNG-CWA is the "largest labor union representing journalists and media workers in North America," and represents a bargaining unit of about 100 employees of USAGM grantee RFA. *Id*. ¶ 30.

However, none of the First Amendment cases cited by plaintiffs establishes that journalists and media workers have the constitutional right to access Global Media-funded information beyond the statutory minimum requirements established by Congress. In *Pratt v. Independent School District*, 670 F.2d 771 (8th Cir. 1982), the Eighth Circuit held that in educational contexts, "the First Amendment precludes local authorities from imposing a 'pall of orthodoxy' on classroom instruction which implicates the state in the propagation of a particular religious or ideological viewpoint," *id*. at 776 and ruled that a school board's decision to exclude a specific film from a high-school curriculum violated the First Amendment, id. at 779. *Pico v. Board of Education*, 638 F.2d 404 (2d Cir. 1980), aff'd 457 U.S. 853 (1982), similarly analyzed the "First Amendment rights, applied in the light of the special characteristics of the school environment, [which] are available to teachers and students," and involved a constitutional challenge to a school board's decision to remove "three works of fiction, four autobiographies, two anthologies, and one

work of non-fiction, from the school libraries and curriculum" of a local school district. *Id*. at 406, 412 (citations omitted). Finally, *Ashcroft v. ACLU*, 542 U.S. 656 (2004), also had nothing to do with the rights of journalists, but held that the Child Online Protection Act, which sought to criminalize the posting of Internet content deemed harmful to minors, likely violated the First Amendment because it imposed burdens on constitutionally-protected speech. *Id*. at 663-65.

### F.    Claims Relating to Any "Closure" of Global Media Are Not Ripe

Counts III, V, VI are not ripe for review because Global Media is not closed.  The ripeness doctrine reflects both "Article III limitations on judicial power" and "prudential reasons for refusing to exercise jurisdiction." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148-49 (1967). Moreover, in making prong two determinations, courts consider pragmatic issues that would arise from considering the agency action to be reviewable. *Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242-43 (1980) (considering that reviewing particular agency action would "interfere[] with the proper functioning of the agency" and turn "prosecutor into defendant before adjudication concludes").

Prudence restrains courts from intervening into matters that may be reviewed at another time, especially where constitutional issues are raised. *See Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013). "The critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (citation omitted).  Global Media is not closed. Rather, it has resumed its broadcasting in

Cuba, *infra* § I.G.1, and brought back other employees to provide mission support, *id*. Any harms identified by Plaintiffs are speculative or, at best, transitory.

**G.     Plaintiffs Are Not Likely to Prevail on Their APA Claims (Counts III, V, VI)**

Plaintiffs are unlikely to be able to demonstrate a likelihood of success on the merits of their APA claims on multiple, independent grounds.

       1.     Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a Discrete Final Agency Action

As a threshold matter, Plaintiffs do not identify a discrete and circumscribed agency action that Global Media has taken and that could specifically be redressed by a federal court. Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (APA limits judicial review to "circumscribed, discrete agency actions"). These final agency actions must be "circumscribed [and] discrete." *S. Utah*, 542 U.S. at 62. The APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama- Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up). "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

Plaintiffs' claims and requested injunction present exactly the type of wholesale challenge that the APA forbids. To the extent that Plaintiffs argue that the "decision to shut down the agency" is the "discrete" agency action challenged, that assertion is belied by the law and the facts.

On the law, Plaintiffs' allegations reveal that they do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of Global Media's management of the agency. Instead of presenting the court with a "narrow question to resolve," *Cobell*, 455 F.3d at 307, Plaintiffs challenge a host of individual actions—some that have occurred and some that have not, *see, e.g.,* Pls.' Mot. at 11 ("[T]his case raises [the question of] whether the Executive Branch may lawfully shutter an agency—by dismissing its staff, closing its offices, and ordering the cessation of its services."); *id*. at 51 ("[T]his is a case about reviving and sustaining a Congressionally mandated independent agency's entire existence.").  Addressing this type of claim would require the Court to supervise all the agency's activities and determine how the agency would accomplish each statutorily-mandated function—an even more extreme kind of supervisory claim than was at issue and rejected in *Lujan*. *See* 497 U.S. at 892-93. Such a claim would completely circumvent the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *S. Utah*, 542 U.S. at 66-67.[5]

---

[5]    Although Defendants maintain that Plaintiffs have failed to carry their, in the event the Court reaches the finality analysis, Defendants maintain that Plaintiffs cannot show final agency action either. Considering the operations that are ongoing and the fact that Global Media has only paused other activities while it determines next steps to bring the agency into compliance with the Executive Order, Plaintiffs fail to show that Global Media has consummated any decisionmaking or otherwise met the "finality" test set out in *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

On the facts, Plaintiffs cannot show that there has been a "decision" to shut down the agency because Global Media has not ceased all operations. Thirty-three employees at the Office of Cuba Broadcasting ("Cuba") have been reinstated to work status and broadcasting has currently resumed in Cuba. *See* Thomas Decl. ¶ 6. Indeed, Cuba's news website is up to date, and live radio and television programming is currently being broadcast on its website and into Cuba. *See* https://www.martinoticias.com (last visited April 13, 2025). In addition to Cuba, the agency has recalled approximately 69 other employees from administrative leave to provide mission support including broadcasting support for Cuba broadcasting, facilities management, contracts management, and IT support. Thomas Decl. ¶ 7.  Plaintiffs cannot show that such a "decision to shut down the agency" has occurred.

First, Global Media "continue[s] to exist within the Executive Branch of the Government" as an independent agency. 22 U.S.C. § 6203(a). Plaintiffs' arguments that the agency is no longer "serv[ing] as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive," 22 U.S.C. § 6202(c)(1), or that it is not "designed so as to effectively reach a significant audience," and "include news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), hinge on a factual scenario where broadcasting is not occurring in any form. That is not the case.

Second, the only country-specific broadcasting cited by Plaintiffs that is required by statute—into Cuba—is occurring. *See* 22 U.S.C. §§ 1465a, 1465aa, 1465bb, 1465cc. While Plaintiffs argue that Global Media is somehow required to broadcast into North Korea twelve hours a day, *see* Pls.' Mot. at 19-20, that is inaccurate. Plaintiffs omit the full text of the provision—"It is the sense of Congress that . . . the Broadcasting Board of Governors should increase . . . broadcasts, including news rebroadcasts, to North Korea from current levels, with a goal of

providing 12-hour-per-day broadcasting to North Korea." 22 U.S.C. § 7813. Courts have held that a statute's use of the word "should" does not create an enforceable right.    *See Jolly v. Listerman*, 672 F.2d 935, 945 (D.C. Cir. 1982) ("[U]se of the word 'should'. . . detracts significantly from any claim that this guideline is more than merely precatory."). Nor, as Plaintiffs argue, is Global Media required to broadcast "hourly live news programming" twenty-four hours a day seven days a week to Iran. Pls.' Mot. at 20. Instead, the statute merely requires that—"90 days after August 10, 2012," various components of the federal government were required to "submit to the appropriate congressional committees a comprehensive strategy to . . . expand[] Voice of America's Persian News Network and Radio Free Europe/Radio Liberty's Radio Farda to provide hourly live news update programming and breaking news coverage capability 24 hours a day and 7 days a week." 22 U.S.C. § 8754(7)(A). Nothing has impacted this requirement.

Although Plaintiffs attempt to cloak this action as an "administrative" challenge or a Constitutional challenge, at bottom, their challenge is to the underlying Executive Order issued by the President on March 14, 2025. Because an executive order is a presidential action, and not an agency action, Plaintiffs' challenges to the Executive Order under the APA are not reviewable. *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 288 (W.D. La. 2022) (holding that a challenge to EO 14008 "cannot be reviewed under the APA because the President is not an agency"). Plaintiffs' claims that the Executive Order is somehow premised upon evidence that lacked veracity, and did not make appropriate findings, are all non-cognizable under the APA. *See id*.

      2.     To the Extent Plaintiffs' Challenge the Cancelation of Grants, Plaintiffs'
                  APA Claims Fail Because this Court Lacks Jurisdiction

To the extent Plaintiffs' challenge the cancellation of the grants, Plaintiffs are unlikely to prevail on the merits of their APA claims because this Court lacks jurisdiction to adjudicate or enforce Global Media's grants.  As explained *supra* § 1.B.2, under the Tucker Act, any claim based

on "an express or implied contract with the United States"—like a grant agreement—must be brought in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1). The Supreme Court recently reaffirmed this jurisdictional line in *California*:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Nor does the waiver apply to claims seeking "money damages." *Ibid*. True, a district court's jurisdiction is "not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

*California*, 2025 WL 1008354 at *1; *see also Catholic Bishops*, 2025 WL 763738 at *4 (explaining that the D.C. Circuit has long "interpreted the Tucker Act as providing the exclusive remedy for contract claims against the government" (cleaned up)). Since *California*, courts have been reacting by withholding or staying orders that would have required the types of remedies sought here. *See, e.g.*, *Am. Ass'n of Colleges for Teacher Ed., et al. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025) (granting the Government's motion to stay a preliminary injunction because of *California*); *Mass. Fair Housing Cent. et al v. HUD*, Civ. A. No. 25-30041 (D. Mass Apr. 14, 2025) (dissolving temporary restraining order considering the Supreme Court's decision in *California*). Accordingly, to the extent Plaintiffs' claims rest on the cancellation of grants, that is fundamentally a contract dispute that belongs in the Court of Federal Claims.

      3.     Plaintiffs APA Claims Fail Because There Are Adequate Alternative <u>Remedies Available</u>

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in court," *id*., reflects that "Congress did not intend the general grant of review in the APA to duplicate

existing procedures for review of agency action," *Bowen*, 487 U.S. at 903. As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing putative APA claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6) because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit). As already described above in § I.B.1, 2, this is, in essence, an employment action, and there are CSRA, FSL-MRS, or FSA remedies. To the extent this case rests on grant cancelations or contract claims, then the Court of Federal Claims provides an adequate alternative under the Tucker Act. For all these reasons, Plaintiffs are unlikely to succeed on their APA claims.

### 4.    Global Media's Actions Are Committed to Agency Discretion by Law

The International Broadcasting Act provides no meaningful standard by which a court might adjudicate Plaintiffs' claims; satisfaction of § 6204(b) is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency action is "committed to agency discretion by law" when a "statute is drawn to that a court would have no meaningful standard against which to judge the agency's exercise of discretion," which renders "meaningful judicial review impossible." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). This is true "even where Congress has not affirmatively precluded review." *Heckler*, 470 U.S. at 830. Hallmarks of a decision committed to agency discretion include a statute that puts the onus on the agency, not the courts, to apply a standard, *see Webster v. Doe*, 486 U.S. 592, 600 (1988), and general criteria that make it difficult for courts to meaningfully second-guess an agency's determination, *see id*. ("advisable in the interests of the United States" is unreviewable).

Section 6204(b) is just such a law. It calls on Global Media's CEO to "respect" the "professional independence" of (among others) the broadcast networks. When read in conjunction with the broad supervisory authority that Congress bestowed on the CEO, neither statutory term in § 6204(b) is capable of judicial application. Congress required the CEO to "supervise" the networks, to "assess the professional integrity" of the networks, and to "ensure" that coverage is "balanced and comprehensive." 22 U.S.C. § 6204(a); *id.* § 6202(b). The statutory scheme, considered as a whole, requires the CEO to determine the appropriate balance between competing factors—his supervisory demands and the networks' independence. But how to strike that balance is left to the CEO's discretion. *Cf. United States Sugar Corp. v. EPA*, 830 F.3d 579, 640 (D.C. Cir. 2016).

### H.    Plaintiffs' Mandamus Act and All Writs Act Fail (Count VII)

Plaintiffs claims under the Mandamus Act and All Writs Act fail for the simple reason that they are not causes of action that are meant to be sustained in the alternative. For a court to issue a remedy of mandamus, a plaintiff must show "(1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). Regarding a defendant's duty to act, "The law must not only authorize the demanded action, but require it; the duty must be clear and indisputable." *Lozada Colon v. Dep't of State*, 170 F.3d 191, 191 (D.C. Cir. 1999). Here, Plaintiffs have not pointed to any non-discretionary duty, and they have ample adequate alternative remedies to bring their claims.

Similarly, as to the All-Writs Act, courts of appeals have rejected its use to create remedies when sources of law already provide parallel ones. *Fla. Med. Ass'n, Inc. v. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 202 (5th Cir. 1979) ("While the All Writs Act empowers a district court to fashion extraordinary remedies when the need arises, it does not authorize a district court to

promulgate an Ad hoc procedural code whenever compliance with the Rules proves inconvenient."). Plaintiffs are unlikely to establish a likelihood of the success on the merits on Count VII.

### I.  Plaintiffs Are Not Likely to Succeed in their Claims that Defendants Have Violated the Statutory Firewall (Count IV)

Plaintiffs contends "[b]y gutting [Global Media] and preventing its networks' newsgathering and news dissemination, Defendants have violated the Statutory Firewall." Pls.' Mot. at 14. Plaintiffs' assertions lack merit.

The statutory firewall is violated "only when the [Global Media] CEO engages in day-to-day control." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 26 (D.D.C. 2020), *opinion vacated, appeal dismissed*, No. 20-5195, 2021 WL 11096700 (D.C. Cir. Mar. 16, 2021). "The CEO may not, for example, tell broadcasters what stories to cover or how to cover them. Nor may the CEO fire a particular staff member or command that a piece be assigned to a specific reporter. He may and must, however, oversee the operations of the Networks by exercising the statutory powers Congress gave him[.]" *See id.* (citing *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1126 (D.C. Cir. 1985) (explaining that while Global Media does not have "control of [the Networks'] operations," it is "obviously an important and powerful actor on this stage," and its "powers and duties" are "substantial")).

Section 6204(b) requires that Global Media "respect the professional independence and integrity of the Board, its broadcasting services, and the grantees of the Board." 22 U.S.C. § 6204(b). This provision promotes the national interest, not private interests, because Congress recognized that for Global Media to accomplish its foreign policy mission of promoting democratic values it must be able to balance its supervisory functions against a degree of network independence. *See OTF*, 2020 WL 3605935, at *2; *see also* 22 U.S.C. § 6202(a) (requiring U.S.

international broadcasting efforts to support U.S. foreign policy objectives among other American values); *id*. § 6204(a)(2) (assigning the CEO of Global Media with the responsible to "assess the . . . professional integrity" of activities within the context of foreign policy objectives). Given that purpose, and the discretion it plainly accords Global Media in its application, it is doubtful that Congress intended for any private party to sue to enforce its terms. *See e.g., Turner*, 502 F. Supp. 3d at 366 (noting that the court lacked jurisdiction over claims brought under the International Broadcasting Act given CSRA channeling).

Voice of America has not been ordered to cover certain stories or how to cover them. The relevant statute provides that Voice of America will "serve as a consistently reliable and authoritative source of news" and that it will be "accurate, objective, and comprehensive." 22 U.S.C. § 6202(c)(1). Notably, the Executive Order does not prevent Voice of America from fulfilling their statutory principles, rather, the Executive, has determined that—while continuing to operate—Global Media will do so at its statutory minimum. Voice of America has not been "dismantled," as Plaintiffs allege. Rather, the agency has pressed the pause button to determine how to come into full compliance with the Executive Order. This is hardly permanent. At bottom, Plaintiffs are unhappy with the direction in which Voice of America is heading, but Plaintiffs' arguments, however, do not demonstrate a cognizable violation of the statutory firewall.

J.    **Plaintiffs Do Not Attempt to Demonstrate that They Will Succeed on Their Ultra Vires Claims, including Separation of Powers (Count VIII) and Appointments Clause (Count IX)**

Plaintiffs' Constitutional claims and *ultra vires* claims lack merit.

The leading Supreme Court decision on *ultra vires* review is *Leedom v. Kyne*, 358 U.S. 184 (1958). That case arose from an improper certification of a collective-bargaining unit—an interlocutory order excluded from the judicial-review provision of the National Labor Relations Act. *See id*. at 185, 187. Nonetheless, the Supreme Court held that district-court review was

available because the order was "made in excess of [the agency's] delegated powers and contrary to a specific prohibition" in the National Labor Relations Act.  *Id*. at 188–89. Time and again, courts have stressed that ultra vires review has "extremely limited scope." *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988); *see Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (*Kyne* does not "authoriz[e] judicial review of any agency action that is alleged to have exceeded the agency's statutory authority"). The D.C. Circuit has described a *Kyne* claim as "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt*, 589 F.3d at 449.

To sufficiently allege an ultra vires claim, the plaintiff must aver: "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory."  *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (cleaned up). The third requirement is especially demanding. "Only error that is patently a misconstruction of the" pertinent statute, "that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief."  *FedEx v. Dep't of Comm*., 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up). In other words, an agency violates a "clear and mandatory" statutory command only when the error is "so extreme that one may view it as jurisdictional or nearly so." *Griffith*, 842 F.2d at 493. Plaintiffs cannot meet that demanding standard.

To begin, as discussed above, there is no dispute that Plaintiffs have possible remedies via the CSRA, FSL-MRS, or FSA. This precludes courts from providing supplemental remedies, including through *ultra vires* review. And second, the exclusive review procedures of the FSL-MRS, CSRA, or FSA will provide Plaintiffs with a meaningful and adequate opportunity for

judicial review of their claims. *See Elgin*, 567 U.S. at 21 (finding "constitutional claims can receive meaningful review within the CSRA scheme"); *AFGE*, 929 F.3d at 757 ("[U]nions here are not cut off from review and relief. Rather, they can ultimately obtain review of and relief from the executive orders by litigating their claims through the statutory scheme in the context of concrete bargaining disputes."). Consequently, *ultra vires* review is inappropriate—no federal statute has precluded all judicial review of the agency's conduct. *See e.g., FedEx*, 39 F.4th at 764.

Although the availability of a statutory remedy is alone sufficient to defeat Plaintiffs' *ultra vires* claims (i.e., Counts VIII and IX) on the first two prongs of the *ultra vires* test, their claims also fail on the third prong, because Defendants has not violated any "clear and mandatory" statutory command. Allegations of constitutional error do not establish *ultra vires* action. *See Eagle Tr. Fund v. USPS*, 365 F. Supp. 3d 57, 68 n.6 (D.D.C. 2019) (Jackson, J.) ("[A] constitutional claim is separate from an ultra vires claim."). Neither do claims that "simply involve a dispute over statutory interpretation." *Dart v. United States*, 848 F.2d 217, 231 (D.C. Cir. 1988). Rather, an officer may be said to act ultra vires "only when he acts 'without any authority whatever.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02 n.11 (1984); *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) (suit must allege that official is "not doing the business which the sovereign has empowered him to do").

Moreover, Plaintiffs' separation of powers and appointment clause claims likewise fail. First, Plaintiffs' separation of powers *ultra vires* claim is barred at the outset because it is purely statutory. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review . . . ." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his

statutory authority." *Id*. at 472. The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the executive officers rely on an unconstitutional statute. *Id*. at 473, n.5. Neither of those situations applies here. Thus, Plaintiffs cannot bring independent constitutional claim. *See e.g., Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51–54 (D.D.C. 2020) (dismissing constitutional claims challenging border wall construction based on *Dalton*).

Contending that the challenged actions violate the separation of powers, Plaintiffs are advancing the similar arguments the Supreme Court rejected in *Dalton*. Plaintiffs' alleged separation-of-powers claims hinge entirely on, respectively, whether Defendants acted in accordance with statutory obligations and Global Media regulations. *See generally* Compl. ¶¶ 148– 52. The outcome of the issues Plaintiffs raises depends on resolution of statutory and regulatory claims rather than any unique separation-of-powers principles. If Plaintiffs' argument were accepted, then every garden-variety action by a federal agency alleged to be in violation of a statutory provision could also for the same reason be alleged to violate the constitutional separation of powers. "Under *Dalton*, [Plaintiffs] cannot recast these types of claims as constitutional." *Ctr. for Biological Diversity*, 453 F. Supp. 3d at 53; *see Dalton*, 511 U.S. at 474 (stating that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration.").

Second, in terms of Plaintiffs' appointment clause *ultra vires* claim, Plaintiffs allege that Defendant Lake's actions are outside of her authority, because she is "purporting to exercise the authority of the [Global Merida] Chief Executive Officer without Presidential appointment or Senate confirmation." Compl. (ECF No. 1) ¶ 159. To the extent Defendant Lake is exercising

authority delegated to her by Global Media's Chief Executive Officer, Defendant Lake's actions fall within the bounds of law. Express statutory authority for delegation is not required to delegate powers to a subordinate within the agency. *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004 ("When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent.") (citing decisions). Accordingly, for these reasons, Plaintiffs' *ultra vires* claims are unlikely to succeed on the merits.

## II.    Plaintiffs Cannot Establish Irreparable Harm

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury "both certain and great" and "of such imminence that there is a 'clear and present' need for equitable relief in order to prevent irreparable harm." *Id.* (quoting *Wis. Gas Co. v. Fed. Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98. The mere fact that a complaint alleges a violation of a constitutional right does not automatically demonstrate an irreparable injury. *Ayele v. Dist. of Columbia*, 704 F. Supp. 3d 231, 239 (D.D.C. 2023) ("[T]here is no per se rule that the violation of any constitutional right is inherently irreparable.").

Plaintiffs fundamentally complain of adverse employment actions (i.e., placement on paid administrative leave, inability to access their workstations, or the termination of an employment contract) that can be remedied by money damages at the end of the litigation. Fundamentally, employment decisions, even up to a loss of employment, are only irreparable in "genuinely extraordinary situation[s]." *Sampson v. Murray*, 415 U.S. 61, 92 & n.68 (1974). Loss of income or reputation are not such extraordinary situations. *See Sampson* at 89–92; *see also id.* at 92 n.68

(declining "to define in advance of their occurrence" what might constitute extraordinary circumstances but ruling out "insufficiency of savings or difficulties in immediately obtaining other employment . . . however severely they may affect a particular individual"). And this case does not present such a situation; the employees at issue here have merely been told to stop work on their current assignments. *See, e.g., Farris v. Rice*, 453 F. Supp. 2d 76, 79–80 (D.D.C. 2006) ("[C]ases are legion holding that loss of employment does not constitute irreparable injury"). Although Plaintiffs contend that the effective shuttering of Voice of America may constitute such an extraordinary circumstance, Pls.' Mot. at 37-38, such a situation is not before the Court. Global Media has placed its employees on administrative leave temporarily to determine how to bring the agency into compliance with the Executive Order. And the placement on administrative leave itself cannot present irreparable injury, especially where any incidental harms Plaintiffs' face from this action can be redressed through the CSRA or FSL-MRS. *See Sampson*, 415 U.S. at 92 n.68; *supra* Section I.B.

Plaintiffs assert that they are suffering "reputational injuries" (Pls.' Mot. at 37), but those are clearly connected to "standard employment harms" and, therefore, are insufficient to demonstrate irreparable injury. *AFSA*, 2025 WL 573762, at *5. Moreover, any argument that a collective reputational injury suffices ("All employees of Global Media are suffering reputational injury and injury to their career by being the subject of Defendants' claim that [Global Media] is unsalveagble," Pls.' Mot. at 37)) is at odds with decisions that have held that harms to third parties do not satisfy the irreparable harm requirement. *See, e.g., Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021). Voice of America employees generally are not parties to this lawsuit, and it follows that Plaintiffs cannot rely on speculative harms to third parties to establish irreparable harm in this context.

III.   **The Equities and Public Interest Weigh Against Relief**

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.  These factors tilt decisively against granting a preliminary injunction here.  *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), appeal dismissed, No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025).  Granting a preliminary injunction would disrupt Global Media's efforts to comply with Executive Order 14,238's directive that its "non-statutory components and functions" be eliminated and that its "performance of [its] statutory functions and associated personnel" be reduced to "the minimum presence and function required by law."  Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025).

The public has an interest in permitting the President to take decisive action when it comes to setting his policy priorities for Global Media and its broadcasting networks. Entering any sort of preliminary relief would displace and frustrate the President's decision about how to best address those issues. *Heckler*, 470 U.S. at 831–32. As discussed above, Plaintiffs will not suffer any irreparable harm from the denial of their request for preliminary relief, because the potential harms that plaintiffs have identified are fundamentally economic or reputational, and therefore inherently not irreparable; speculative; or asserted on behalf of a third party not before this Court.

IV.   **Any Relief Should be Narrowly Tailored**

It would be inappropriate for the Court to issue a preliminary injunction in any form. Should the Court do so, however, "an injunction must be narrowly tailored to remedy the harm shown." *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985).  Here, at most, Plaintiffs attempted to show that they face irreparable injury from Voice of America employees being placed

on administrative leave and shut out from their offices and workstations. *See* Pls.' Mot. at 27-31. To the extent the Court is inclined to award any preliminary relief, this is not a class action, so any relief should be appropriately tailored to only the individually named Plaintiffs in this action. As the Government explained in its motion to dissolve (ECF No. 73), the scope of the temporary restraining order is overly broad and should not be extended. *See generally id*. An injunction that reaches broadly would be improper because it would prevent Global Media from executing any employment action and actions and placing any employee on administrative leave for any reason whatsoever, it interferes with the day-to-day operations of an Executive Branch agency that should have available to it a full array of leave options. The current Temporary Restraining Order, if extended to a Preliminary Injunction, would defy established principles barring equitable relief that is "more burdensome to the defendant[s] than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Should the Court decide to issue any preliminary relief, the Government respectfully requests that the Court stay its order for a short period to permit the Government an opportunity to consider whether to seek reconsideration or appellate review.  It should also issue an appropriate bond pursuant to Rule 65.

## CONCLUSION

For these reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated: April 14, 2025

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By: */s/ Brenda González Horowitz*
    BRENDA GONZÁLEZ HOROWITZ
    D.C. Bar No. 1017243
    STEPHANIE R. JOHNSON
    Assistant United States Attorneys
    Main: (202) 252-2500

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, et al.,

            Plaintiffs,

    v.

KARI LAKE, Senior Advisor to the Acting
CEO of U.S. Agency for Global Media, et al.,

            Defendants.

Civil Action No. 25-1015 (RCL)

## [PROPOSED] ORDER

UPON CONSIDERATION of Plaintiffs' motion for a preliminary injunction, and the entire record herein, it is hereby

ORDERED that Plaintiffs' motion is DENIED.

It is further ORDERED that the parties shall meet and confer to determine a schedule for further proceedings.

SO ORDERED:

_____
Date

_____
ROYCE C. LAMBERTH
United States District Judge

- 46 -