UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PATSY WIDAKUSWARA, JESSICA JERREAT, KATHRYN NEEPER, JOHN DOES 1-4, REPORTERS SANS FRONTIÈRES, REPORTERS WITHOUT BORDERS, INC., AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES (AFSCME), AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES (AFGE), AMERICAN FOREIGN SERVICE ASSOCIATION (AFSA), and THE NEWSGUILD-CWA, <br><br>          Plaintiffs, <br><br>  -against- <br><br> KARI LAKE, in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media; VICTOR MORALES, in his official capacity as Acting CEO of the U.S. Agency for Global Media; and U.S. AGENCY FOR GLOBAL MEDIA, <br><br>          Defendants. | Case No. 1:25-cv-01015-RCL |

# REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Emery Celli Brinckerhoff Abady Ward & Maazel LLP

Government Accountability Project

American Federation of Government Employees, AFL-CIO

American Foreign Service Association

American Federation of State, County and Municipal Employees, AFL-CIO

Democracy Forward Foundation

State Democracy Defenders Fund

Media Freedom and Information Access Clinic at Yale Law School

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ..................................................................................................................3

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .........................3

          A.     All Plaintiffs Have Standing ................................................................3

          B.     The Court Has Jurisdiction Over Plaintiffs' Claims ....................................4

                1.     Plaintiffs Are Not Channeled to an Administrative Agency ...........5

                2.     The Tucker Act Does Not Divest this Court of Jurisdiction............6

          C.     Plaintiffs Are Likely to Prevail on their APA Claims ................................8

          D.     Plaintiffs Are Likely to Succeed on the Merits of their Ultra Vires and Mandamus Claims.................................................................11

          E.     Defendants' Gutting USAGM to Suppress Reporting they Dislike Is Textbook Viewpoint Discrimination in Violation of the First Amendment.................................................................................13

                1.     *Pickering* Applies to Plaintiffs' First Amendment Claims............13

                2.     Defendants Are Restraining Plaintiffs' Speech on Matters of Public Concern Because of Plaintiffs' Viewpoint .........................14

                3.     Defendants' Claimed Interest in "Balanced" and "Comprehensive" Coverage Does Not Outweigh Plaintiffs' Speech Interests ......................................................................17

          F.     Defendants' Shuttering of USAGM Networks Violates Plaintiffs Jerreat's and Doe 1's First Amendment Right to Exercise of Editorial Discretion...................................................................19

          G.     Defendants' Silencing of USAGM Reporting Violates the RSF Plaintiffs, TNG-CWA, and Their Members' First Amendment Right to Receive.........................................................................20

          H.     Defendants' Gutting of USAGM Violates the Statutory Firewall............21

    II.     PLAINTIFFS FACE IRREPARABLE HARM......................................................22

    III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION.........................................................................24

    IV.    THERE IS NO BASIS TO ARTIFICIALLY NARROW RELIEF......................24

V.    NO BOND SHOULD BE REQUIRED ..................................................................25

CONCLUSION ......................................................................................................................25

## PRELIMINARY STATEMENT

This case is brought by a diverse coalition of plaintiffs who have varied, yet equally compelling, interests in the continuation of the United States Agency for Global Media's ("USAGM") statutorily mandated broadcast functions. Plaintiffs challenge the unlawful decision to dismantle USAGM and to cease nearly all of its statutorily mandated duties. Plaintiffs ask for emergency relief to, among other things, prevent Defendants from dismantling the Agency, which would preclude any hope of resurrecting at final judgment its vital, mandatory functions, and to stop Defendants from their blatant viewpoint discrimination against USAGM staff, who produce independent journalism Defendants have branded as "radical propaganda."

All parties agree that USAGM shut down all broadcasting operations, fired every single one of its 598 personal service contractors, and put nearly all of its full-time equivalent staff on administrative leave on March 15, the day after the EO. Second Thomas Decl. ¶¶ 3, 5. On that date, all USAGM broadcast activity went silent and 94% of the agency's workforce was shut out.

Defendants also do not dispute (because they do not address), that Voice of America ("VOA"), including its 49 worldwide language services that reached 360 million listeners, remains offline to this day. Dkt. 16-18 ¶ 2; Dkt. 16-19 ¶ 5; Yazgerdi Decl. ¶ 3. And the record shows Defendants have no intention of resuming VOA's mandatory broadcasts. To the contrary, they have proposed to eliminate the entire bargaining unit of radio broadcast technicians, without whom VOA cannot broadcast, *see* Dkt. 33-2 ¶¶ 3-6, and they intend to terminate an additional 594 VOA employees, including international broadcasters, technicians, budget analysts, and electronics engineers, *see* Dkt. 33-3 ¶¶ 3-5.

To date, more than a month after being taken off the air, the only broadcast that has resumed is the Office of Cuba Broadcasting ("OCB"), which is apparently being carried out by less than

12% of the Agency's pre-March 15 workforce. Dkt. 88-4 ¶¶ 6-7.[1] But as Judge Oetken found, OCB is "hardly sufficient for USAGM's affiliates to 'reach a significant audience,'" as statutorily required. Dkt. 54 at 14; *see also* 22 U.S.C.A. § 6202(c) (enumerating what VOA *will* do); nor can it alone fulfill Congressional requirements to report on "each significant region of the world." *Id*. § 6202(a)(7), (b)(5)-(7). Nor can OCB fill the national security gap VOA's absence creates. *See* Yazdgerdi Decl. ¶¶ 5-13.[2]

In now disavowing their intent to shutter the Agency, including VOA, Defendants also ignore their own repeated assertions that the agency is "not salvageable." *See* Dkt. 16-3 at 2 (Lake: "This agency is not salvageable."); Dkt. 16-7 at 2 (Lake: "Voice of America is unsalvageable"); *see also* Dkt. 16-5 at 2 (Musk: "shut them down"). Nor do they acknowledge their baseless claims that its employees amount to "spies and terrorist sympathizers and/or supporters" who engage in "self-dealing," "over-spending," and amount to a "giant rot." Dkt. 16-3 at 2; Dkt. 16-18 ¶¶ 6-8; Dkt. 16-19 ¶¶ 11-12; Dkt. 16-21 ¶¶ 8, 10; Dkt. 16-22 ¶ 7. Defendants' claims that it simply effectuated a "pause" on agency functions is flat wrong. Dkt. 88 at 48

---

[1] Defendants say they "reinstated" all PSCs on March 28. In fact, they "advised [PSCs] that the termination of [their] personal services contract[s are] on hold until further notice" on March 29, the day after Judge Oetken entered a temporary restraining order requiring them to do so. Second J.D. 4 Decl. ¶¶ 5-6.

[2] OCB accounts for less than five percent of the budget Congress appropriated for USAGM's federal entities. *See* Compl. ¶¶ 45-46 (citing appropriations laws). VOA, by contrast, accounts for 50.9% of the annual federal-entity budget. Per Congress's express order, these funds are not fungible without notice to Congress, and even with notice cannot be reallocated by more than five percent. *Id*. ¶ 47.

## ARGUMENT

### I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

#### A.    All Plaintiffs Have Standing

Defendants begin by conceding that the individual named Plaintiffs and The News Guild-CWA ("TNG-CWA") have standing. Dkt. 88 at 14. That alone is enough for this case to move to the merits on all claims.[3]

But Defendants are wrong that the public-sector unions (AFSCME, AFGE, AFSA) and RSF/RSF USA ("RSF") do not have organizational or associational standing. Starting with the public-sector union's organizational standing: A union representing federal employees is required by statute to represent "the interests of all employees in the unit it represents." 5 U.S.C. § 7114(a)(1). Plaintiffs' opening submissions described at length how that responsibility extends to responding to members' concerns and trying to plug the information gap that USAGM has created by its unilateral, unexplained actions. *See* Dkt. 16-16 ¶¶ 10-11; Dkt. 16-13 ¶¶ 10, 15-17, 20-21; Dkt. 16-14 ¶¶ 5, 12, 14, 17. The unions are expending significant resources to counteract USAGM's obstruction of their ability to perform their core services advising members about the terms of their employment and the implication of Defendants' actions. That is enough. *See People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015).

Defendants also do not mention their decisions to eliminate the entire AFSCME 1418 bargaining unit and terminate 594 AFGE members, thereby depriving both unions of dues and

---

[3] *See UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 362 (D.C. Cir. 2003); *see also* Dkt. 17 at 29-28 (TNG-CWA members harmed as employees and reputational harm); *id*. at 38-39 (TNG-CWA members harmed as listeners); *id*. at 27-28 (all Plaintiffs' First Amendment rights harmed); *see also id*. at 26 (TNG-CWA has First Amendment right to receive).

existentially threatening AFSCME 1418. *Nat'l Treasury Emps. Union v. I.R.S.*, No. CIV.A. 04-CV-0820, 2006 WL 416161, at \*2 (D.D.C. Feb. 22, 2006) (loss of dues confers standing).

Regarding RSF's organizational standing, Defendants ignore that VOA "frequently covers RSF's reports and advocacy efforts," meaning that "loss of VOA weakens [RSF's] ability to amplify press freedom concerns throughout the world" and to distribute the organization's work product. Dkt. 16-15 ¶ 19.

As to associational standing, Defendants ignore that the members of the labor organizations and RSF produce programming for USAGM or its statutory grantees and suffer a First Amendment harm by having their work silenced. *See* Dkt. 17 at 33-34, 35, *see also id.* at 27-28 (detailing irreparable harm to all who are "involved in producing reporting for USAGM and its grantee networks"). Defendants also wrongly claim that the public-sector union members do not face "imminent" harm because they have merely been placed on administrative leave. This argument is flatly inconsistent with their later insistence that the same exact action could be brought before the MSPB as a prohibited personnel practice. *See* Dkt. 88 at 11-12. It also ignores, again, their own stated "decision" to terminate 623 AFGE and AFSCME members. *See* Dkt. 33-2 at 5; Dkt. 33-3 at 6. As to RSF, Defendants ignore that RSF members rely on VOA broadcasts abroad to inform their own reporting and their personal safety—facts detailed extensively at Dkt. 16-15. All Plaintiffs plainly have standing on multiple grounds.

### B.    The Court Has Jurisdiction Over Plaintiffs' Claims

Defendants' attempt to pick off the individual Plaintiffs on jurisdictional grounds fails for the same reasons provided in Plaintiffs' opposition to Defendants' motion to dissolve the TRO and Plaintiffs' opening brief. *See* Dkt. 17 at 47-51; Dkt. 89 at 2-18. We incorporate those arguments by reference and provide limited elaboration. *See Kauffman v. Anglo-Am. Sch. of Sofia*, No. CIV.A.

88-3419 (RCL), 1991 WL 222423 at *2 (D.D.C. Oct. 17, 1991) (permitting incorporation by reference).

### 1.    Plaintiffs Are Not Channeled to an Administrative Agency

To summarize, this Court has jurisdiction *at least* because multiple Plaintiffs have no connection to federal employment (TNG-CWA, RSF, RSF USA). Defendants concede that one of those plaintiffs, TNG-CWA, also has standing. But in fact, each Plaintiff in this case appropriately invokes this Court's jurisdiction to stop the unlawful shuttering of a statutorily mandated agency because: this case simply does not implicate federal employment statutes; even if it did, the claims at issue are not of a type that Congress intended to be channeled to agency adjudication; even if Congress intended that these claims be channeled to the CSRA or OSC, its intent has been defeated by the decimation of those bodies, contrary to the statutory scheme; and exercising jurisdiction here is necessary to rein in USAGM's violation of multiple clear statutory directives. *See* Dkt. 89 at 8-10 (elaborating on each point).

Defendants rely primarily on *AFSA v. Trump*, No. 1:25-CV-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025). But, as noted in Dkt. 89 at 10, *AFSA* did not include plaintiffs without a connection to federal employment. 2025 WL 573762, at *4 n.1. *AFSA* also acknowledged that "it may be the case that . . . in the long run, plaintiffs' assertions of harm could flow from their constitutional and APA claims regarding the alleged unlawful 'dismantl[ing]' of USAID," but that the allegations of irreparable harm before the court at the preliminary injunction stage "flow[ed] essentially from their members' existing employment relationships with USAID." *Id.* at *7. Not so here, where the harms stem from USAGM's incontrovertible cessation of nearly all its statutorily mandated broadcasts and grant funding.

Defendants then seek to distinguish *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020), despite recognizing its similarity, by claiming that this case is more closely

tied to "working conditions." There are at least two problems with that argument. *First*, Defendants are inconsistent about whether being placed on administrative leave is a meaningful change to working conditions—here they say yes, but as it relates to standing they say no. *Second*, part of Judge Howell's reasoning in finding the First Amendment *Turner* claim not channeled was that it upended "background assumption behind doing journalism at VOA and the networks." *Id*. at 367. That upending is at its maximum here where Defendants have ceased *all* journalism at VOA. Sure, ceasing all operations will more obviously affect employment relationships, but it also more obviously precludes administrative agencies from ordering appropriate relief: No one contends that the MSPB could order USAGM to start broadcasting its 49 language services again. Finally, *Turner*, like *AFSA*, lacked non-federal-employee plaintiffs.

USAGM can't function without employees, so of course part of mandating that it continues to exist and function requires precluding it from dispensing with everyone who does the work. That doesn't make this case merely about employment. *See Nat'l Treasury Emps. Union v. Vought*, No. CV 25-0381 (ABJ), 2025 WL 942772 , at *46 (D.D.C. Mar. 28, 2025) (enjoining employee terminations except terminations for cause in service of preserving CFPB), *administratively stayed*, 2025 WL 996856.

## 2. The Tucker Act Does Not Divest this Court of Jurisdiction

The Tucker Act does not divest this Court of jurisdiction over Doe 3 and 4's pursuit of the same claims that all plaintiffs in this case pursue—that Defendants are unlawfully dismantling USAGM. While the Tucker Act provides the Court of Federal Claims with exclusive jurisdiction over "contract claims against the government," Does 3 and 4 do not assert contract claims. *Transohio Sav. Bank v. Dir., OTS*, 967 F.2d 598, 609 (D.C. Cir. 1992), *overruled in part on other grounds*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017). Importantly, the fact that a contract is involved is not enough to make a claim a "contract claim." *Id.* The question is

6

whether the claims "are founded *only* on a contract, or whether they stem from a statute or the Constitution." *Transohio*, 967 F.2d at 609 (emphasis added). The analysis is the same under the Contract Disputes Act. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 76 (D.C. Cir. 1985).

Does 3 and 4's claims are not founded on a contract, let alone "only" on one. The "source of rights" Does 3 and 4 assert derive from the Constitution and statute, not from their contracts. *See* Compl. ¶¶ 102-160. The Complaint does not so much as mention the contracts' terms or claim they were breached. Indeed, Doe 3 and 4's claims are no different from the claims of other non-contractee Plaintiffs—so necessarily could not arise from contracts the other Plaintiffs do not have. While Defendants' brief details various provisions of Plaintiffs' contracts, those terms are beside the point.[4] Where, as here, "there is no question of whether the contract forbids termination," but rather "only a question of whether the Constitution," or statute, "forbids it," that claim is not a "contract action." *Navab-Safavi v. Broadcasting Bd. of Governors*, 650 F. Supp. 2d 40, 68 (D.D.C. 2009) (discussing VOA personal services contractor's First Amendment claim against USAGM predecessor).

The "type of relief sought" likewise is not contractual. Plaintiffs seek an injunction barring Defendants from unlawfully dismantling USAGM—which wiping out USAGM's workforce (including terminating the freelance contractor journalists) would do. Even if that injunctive relief might in some ways have similar effects to ordering specific performance on Does 3 and 4's (and

---

[4] While Defendants object that Plaintiffs did not file copies of their contracts with their motion, Dkt. 88 at 16, their claims do not depend on any contract term, making such filing unnecessary. Moreover, after Defendants demanded them, Plaintiffs provided copies of Does 3 and 4's contracts with their personal information redacted. *Id.* at 16 n.3. As for defense counsel's demand for the Doe plaintiffs' identities, the Doe Plaintiffs have moved to proceed pseudonymously—including by keeping their identities from Defendants—given their legitimate fears of retaliation by the Defendants themselves. Dkt. 14. Defendants have not filed an opposition to that pending motion.

other PSCs') contracts, district courts are not "forbidden from granting injunctive relief merely because that relief might be the equivalent of ordering specific performance of a government contract." *Transohio*, 967 F.2d at 611.

Defendants also challenge this Court's jurisdiction to require them to make, and honor, grants to the grantee networks. That challenge fails for the reasons explained in Plaintiffs' opposition to Defendants' motion to dissolve the TRO. *See* Dkt. 89 at 2-6. Defendants now add that, since the Supreme Court's emergency-docket order in *Department of Education v. California*, No. 24A910, 145 S. Ct. 966 (2025) (per curiam), other courts have stayed or denied "the types of remedies sought here." Dkt. 88 at 34. But those other cases are distinguishable for largely the same reasons as *California* itself—they involved competitive grant programs where only the grant agreement, and not any statute, entitled the *plaintiff* grantees to funds. *See* Dkt. 89 at 5-6; *Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, No. 1:25-CV-00702-JRR, 2025 WL 863319, at *10 (D. Md. 2025); Compl. ¶¶ 14-17, 40, *Mass. Fair Housing Ctr. v. HUD,* No. 25-cv-30041 (D. Mass. 2025) (ECF 1).

For these reasons as well, Defendants' argument that Plaintiffs' APA claims are barred because there are other adequate remedies at law is wrong. *See* Dkt. 88 at 44-45.

## C.    Plaintiffs Are Likely to Prevail on their APA Claims

Defendants argue the APA claims are not ripe because USAGM is not "closed." Dkt. 88 at 39. But Plaintiffs' claims that Defendants are violating multiple laws and the Constitution do not hinge on the Agency being completely "closed." It hinges on their decision to abandon statutory directives. As discussed above, on March 15, Defendants shut down all USAGM operations and declared the Agency "not salvageable." VOA, the heart of the agency, remains closed and has no

prospect of resuming operations. And statutory grantees are still battling for their funding.[5] *See* Third Schleuss Decl. ¶ 3. The Agency has made its decision and is carrying it out; there is no ripeness issue.

For these same reasons, Plaintiffs have identified discrete and final agency action subject to judicial review. March 15 marked the "consummation of [the] agency's decisionmaking process to comply with the President's executive order." *Drs. for Am. v. Off. of Pers. Mgmt.*, No. CV 25-322 (JDB), 2025 WL 452707, at *5 (D.D.C. Feb. 11, 2025). It "bound [VOA] staff by forbidding them to continue the [work of the agency] in any way from that moment on," thereby making it reviewable agency action. *Biden v. Texas*, 597 U.S. 785, 808–09 (2022); *see also* Order Granting TRO, Dkt. 54 at 7-8; *Gomez v. Trump*, 485 F. Supp. 3d 145, 193 (D.D.C. 2020) (agency's suspension of statutory duty amounts to final agency action). The fact that the ramifications of that decision are still unfolding does not render the decision itself unreviewable. *See NTEU*, 2025 WL 942772, at *10-12. Nor does the fact that Defendants may later change their mind and allow some employees to work undermine finality. "The mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future."). Defendants do not dispute that the decision affected rights or obligations or effected legal consequences.

---

[5] Defendants' claim that Plaintiffs' APA claims "at bottom" challenge the EO is confusing and baseless. Dkt. 88 at 43. As our opening brief said, "The order purports to respect Congressional decision-making by preserving USAGM's 'minimum presence and function required by law.' But that is not how the order has been carried out[.]" Dkt. 17 at 20. Plaintiffs' APA claims plainly challenge Defendants' actions to implement the EO.

In painting this case as a "programmatic attack," Defendants gloss over the distinction between court orders requiring an Agency to take legally compelled action (this case), and those micromanaging the manner in which an Agency fulfills its statutory duties (not this case). *See Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 191 (D.C. Cir. 2016). In simplest terms, Plaintiffs' APA claims point to mandatory statutory directives on the one hand, and the literal radio silence of VOA programming on the other (as well as cessation of mandatory grants). This is a classic APA action, the scope of which is immense only because of the magnitude of Defendants' noncompliance. *See NTEU*, 2025 WL 942772, at *12 ("Defendants can hardly complain that the focus of the action is too broad; it was the[y] who chose to paint with a broad brush, not plaintiffs."); *see also Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011) (APA relief awarded where agency did not comply with statutory commands).

Defendants devote fewer than two pages to the merits of whether they have violated the APA. Dkt. 88 at 42-43. Remarkably, they are silent on Plaintiffs' claim that Defendants have acted arbitrarily and capriciously, notwithstanding that Judge Oetken premised the TRO partly on that basis. Dkt. 54 at 8-10. Even if USAGM could lawfully abandon its statutory duties (it clearly cannot, explained below), it would still need to explain such a dramatic shift in policy and demonstrate reasoned, considered decision-making that accounts for reliance interests. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Defendants have failed to offer any reason to depart from Judge Oetken's reasoning that they likely violated the APA.

Defendants also do not address their statutory responsibility to make grants to the statutory grantees, including 22 U.S.C. §§ 6204(a)(4), (5), 6208(a)(1), nor do they address their brazen violation of the relevant Appropriations Acts, *see* Compl. ¶¶ 45-48.

Defendants do argue that by keeping OCB on-air, they have complied with their statutory duties. As discussed above, OCB represents a small component of USAGM and cannot carry out all its statutory mandates. *See* Dkt. 54 at 14-15 (Judge Oetken holding as much). OCB is separate from VOA, which is required by 22 U.S.C. § 6202(c) and § 6202(b)(3) to be on the air. Broadcast to only Cuba, moreover, is not "designed so as to effectively reach a significant audience," *id.* § 6202(a)(7), does not "meet needs which remain unserved by the totality of media voices available to the people of certain nations," does not include "information about developments in each significant region of the world," and does not present "a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen." *Id.* § 6202(b)(5)-(7); *see also Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("shall" connotes a non-discretionary "requirement").

Moreover, although the North Korean and Iran programming mandates are phrased in less mandatory terms than VOA's mandates and the USAGM broadcasting standards, it is absurd to claim that by broadcasting nothing at all to those countries, USAGM is in compliance with Congress's directive that USAGM establish "a goal of providing 12-hour-per-day broadcasting to North Korea," 22 U.S.C. § 7813, and develop a "strategy to" broadcast to Iran 24/7, 22 U.S.C. § 8754(7)(A). Courts can discern from a statutory scheme "congressional intention to pursue a general goal. If the agency action is found not to be reasonably consistent with this goal, then the courts must invalidate it." *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985).

### D.    Plaintiffs Are Likely to Succeed on the Merits of their Ultra Vires and Mandamus Claims

Plaintiffs already addressed *Leedom v. Kyne*, 358 U.S. 184 (1958), and its hand-in-glove fit with this case in their earlier brief, Dkt. 89 at 16-17. In sum, (i) there is no express statutory preclusion at play in this case; (ii) USAGM is in violation of unambiguous statutory mandates,

discussed above; and (iii) Defendants do not argue that any administrative body could order it to comply with those mandates. The ultra vires claim is therefore properly pled and mandamus is an appropriate judicial remedy. *See In re Aiken Cnty.*, 725 F.3d 255, 266–67 (D.C. Cir. 2013) (Kavanaugh, J.) (exercising mandamus where executive agency "disregard[ed] federal law").

Nor are Plaintiffs' claims purely statutory. Dkt. 88 at 51. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Defendants refuse to perform statutorily required functions and are withholding mandatory appropriations. Because they are acting directly contrary to Congressional mandates, the only source of power that they could plausibly rely on is the Constitution. *See id.*; *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities[.]"); *In re Aiken Cnty.*, 725 F.3d at 259 ("[T]he Executive [and subordinate executive agencies] must abide by statutory mandates and prohibitions.").

Defendants' reliance on *Dalton v. Specter*, 511 U.S. 462 (1994), is therefore inapposite. *Dalton* "merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996). Here, "[w]hile the government disputes whether it is engaged in the elimination of [USAGM] as a matter of fact, it is not suggesting that doing so would have been an exercise of discretion authorized by the statute in question as the Secretary's actions were in *Dalton*." *NTEU*, 2025 WL 942772, at *8-9; *see also Aids Vaccine Advoc. Coal. v. United States*

*Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *17 (D.D.C. Mar. 10, 2025) (also rejecting *Dalton* argument).

### E. Defendants' Gutting USAGM to Suppress Reporting they Dislike Is Textbook Viewpoint Discrimination in Violation of the First Amendment

Plaintiffs are likely to succeed on the merits of their First Amendment viewpoint discrimination claim. *First*, as Judge Howell concluded in *Turner*, the First Amendment protects USAGM broadcasters' speech, pursuant to the balancing test articulated by the Supreme Court in *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.,* 391 U.S. 563 (1968). *Second*, the Trump Administration's own statements, including various public statements by Defendant Lake, make clear that they decided to gut USAGM and stop its journalism to silence viewpoints Defendants disagree with. *Third*, Defendants' asserted interest in "balanced" coverage does not outweigh Plaintiffs' interest in commenting upon matters of public concern.

#### 1. *Pickering* Applies to Plaintiffs' First Amendment Claims

Plaintiffs agree that when typical government employees speak "pursuant to their official duties," their speech is generally not protected by the First Amendment pursuant to *Garcetti v. Ceballos*, 547 U.S. 410 (2006). But the individual Plaintiffs here are not typical government employees and their speech is not pure government speech. *See id.* at 425 (recognizing the work of certain government employees "implicates additional constitutional interest that are not fully accounted for by [the Supreme Court'] customary employee-speech jurisprudence"); *Tripp v. Dep't of Defense*, 284 F. Supp. 2d 50, 55-57 (D.D.C. 2003) (reporters for DOD-published *Stars and Stripes* entitled to First Amendment protections). They are *journalists* and production support staff who work for a *sui generis* agency—one that has a statutory mandate to produce journalism with "professional independence and integrity." 22 U.S.C. § 6204(b). Recognizing VOA employees' unique position as both government employees *and* newsmakers, Judge Howell

concluded in *Turner* that "speech made in relation to editorial and journalistic activities [of government-employed journalists] is protected under the First Amendment, using the analysis set forth in *Pickering*," and is "not fully accounted for by *Garcetti*." *Turner*, 502 F. Supp. at 375-76. *Turner* is the definitive case on USAGM employees' First Amendment rights.

Defendants do not offer any reason to depart from *Turner*'s sound analysis or even analyze *Turner*'s reasoning. Instead, they simply assert that *Turner* is "not controlling or precedential," Dkt. 88 at 22,[6] and generally point to *Garcetti* and other cases where the speech at issue, unlike the speech here and in *Turner*, was pure government speech. *See, e.g.*, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) (placement of religious monument in public park); *Nat' Endowment For Arts v. Finley*, 524 U.S. 569 (1998) (National Endowment for the Arts statutory merit criteria did not violate First Amendment); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) (Texas specialty license plate designs). The Court should follow Judge Howell's well-reasoned opinion in *Turner* and analyze Plaintiffs' First Amendment claims under the *Pickering* framework.

### 2.    Defendants Are Restraining Plaintiffs' Speech on Matters of Public Concern Because of Plaintiffs' Viewpoint

The record makes clear that Defendants have silenced USAGM broadcasts, including VOA—both because of the perceived "radical" viewpoint of USAGM's reporting, generally, and

---

[6] In passing, Defendants cite *Achagzai v. Broadcasting Board of Governors* for the proposition that VOA's content is government speech that is "not protected by the First Amendment." No. 14-0768 (RDM), 2016 WL 471274, at *8 (D.D.C. Feb. 8, 2016). Unlike *Turner*, the court in *Achagzai*, an employment discrimination case, did not engage in any First Amendment analysis before arriving at this conclusion which is, at most, dicta. Relatedly, *Jangjoo*, another VOA employment case cited by Defendants is inapposite because it involved a First Amendment employment retaliation claim related to an employee's internal complaints, not his journalism. *See Jangjoo v. Broad. Bd. of Govs.*, 244 F. Supp. 3d 160, 170 (D.D.C. 2017) (plaintiff's internal emails "air[ing] grievances" against supervisors were subject to *Garcetti*).

VOA's reporting on specific topics the White House deems off-limits. This muzzling of USAGM journalists based on their perceived viewpoint violates the First Amendment.

Defendants do not dispute that USAGM employees speak on matters of public concern. Nor do Defendants contest that, as a result of Defendants' pulling the plug on VOA and grantee broadcasting, USAGM employees, including all Plaintiffs who contribute to USAGM reporting, have been restrained from reporting on matters of public concern.

Unable to contest these points, Defendants instead argue that these Plaintiffs' First Amendment rights are not implicated here because Defendants have halted *all* journalism at VOA and grantee broadcasters, and not "singled out any one viewpoint." Dkt. 88 at 24. In other words, Defendants' claim that because they took a chainsaw to an entire agency's reporting instead of using a scalpel to excise specific journalistic positions they disagree with, they did not run afoul of the First Amendment. Defendants' argument misses the mark for three reasons.

*First*, Defendants are wrong in contending that viewpoint discrimination "[must be] defined on its content." Dkt. 88 at 24 (quoting *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 811 (2000)) (modification in Defendants' brief). Defendants deceptively modify the *Playboy* quote to imply that it articulated a test for viewpoint discrimination, rather than merely discussing "the speech at issue" in that case. 529 U.S. at 811. In reality, the Supreme Court has held the opposite: viewpoint discrimination does *not* require a content-based purpose, *see Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 642 (1994) ("[W]hile a content-based purpose may be sufficient in certain circumstances to show that a regulation is content-based, it is not necessary to such a showing in all cases."), and has clarified that viewpoint discrimination is impermissible if it is based on animus, even if facially neutral, *see Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015).

*Second*, here, Defendants' public statements demonstrate that they *do* disagree with the content of Plaintiffs' speech, *and* that Defendants' actions are based on animus. For example, in a press release that was issued regarding Defendants' shutdown of VOA, *see* Dkt. 16-2, the Trump administration characterized VOA as "[t]he Voice of Radical America" and explained that Defendants' actions were "taken to ensure that taxpayers are no longer on the hook for radical propaganda." Meanwhile, Defendant Lake issued a press release characterizing VOA's reporting as "parrot[ing] the talking-points of America's adversaries" and described USAGM staff as "terrorist sympathizers." Dkt. 16-3. Such statements constitute irrefutable evidence of viewpoint discrimination.

*Third*, contrary to Defendants' assertion that "Plaintiffs do not point to any specific viewpoint-based content that they allege has been suppressed," Dkt. 88 at 25, Plaintiffs' record unambiguously demonstrates that Defendants *are* targeting specific, articulable viewpoints. Defendants overlook that the White House's VORA Statement—issued the same day Defendants gutted USAGM—included concrete examples of VOA viewpoints the Trump administration considers too "radical" to publish. *See* Dkt. 16-B. These off-limits topics include, among others, "anti-Trump comments," an article about "white privilege," an article "downplaying the validity of the Hunter Biden laptop story," coverage "too favorable to . . . Joe Biden," and a segment about "transgender migrants seeking asylum in the United States." *Id.* Defendants do not acknowledge this White House press release at all, though it constitutes direct evidence of Defendants discriminating on the basis of VOA journalists' specific "opinion[s] or perspective[s]." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Defendants argue that "a finding of viewpoint discrimination depends on . . . hostility—or favoritism—towards the underlying message expressed." Dkt. 88 at 24. The White House's and

Defendant Lake's statements demonstrate Defendants' "hostility towards the underlying message expressed" at VOA and its grantee broadcasters, triggering First Amendment scrutiny. Any other conclusion would grant the government carte blanche to bypass the First Amendment's prohibition on viewpoint discrimination as long as the government silences an entire network on the basis of its viewpoint instead of specific journalists or broadcasts. For example, if the White House determined that CBS, as a broadcaster, published reporting with a viewpoint that was too "radical," and revoked CBS's broadcast license to take its views off the air, such an action would clearly constitute unconstitutional viewpoint discrimination. Here too, Defendants' silencing of USAGM broadcasters on the basis of their perceived "radical" viewpoint runs afoul of the First Amendment (with the added caveat that *Pickering* applies because USAGM's journalists are government employees).

### 3.    Defendants' Claimed Interest in "Balanced" and "Comprehensive" Coverage Does Not Outweigh Plaintiffs' Speech Interests

Turning to the second prong of the *Pickering* test, Plaintiffs' "interest in commenting upon matters of public concern" outweighs the "interest of [Defendants] in promoting the efficiency of the public services it performs through its employees." *Sanjour v. E.P.A.*, 56 F.3d 85, 100 (D.C. Cir. 1995) (cleaned up). "The D.C. Circuit has applied a sliding-scale approach at this stage, under which "a 'stronger showing' of interference with the employer's operation 'may be necessary if the employee's speech more substantially involve[s] matters of public concerns,'" *Turner*, 502 F. Supp. 3d at 377 (quoting *LeFande v. D.C.*, 841 F.3d 485, 494 (D.C. Cir. 2016)), and "has recognized that USAGM and its media outlets have an interest in maintaining an appearance of 'the highest journalistic credibility' that is owed weight in the *Pickering* analysis,'" *id.* (quoting *Navab-Safavi v. Glassman*, 637 F.3d 311, 316 (D.C. Cir. 2011)). Because Plaintiffs' speech

17

substantially involves matter of public concern, Defendants must make a "stronger showing" with respect to the second prong of the *Pickering* test.

As an initial matter, Defendants now abandon the interests they originally asserted regarding their gutting of USAGM and mass silencing of USAGM's journalism: stopping perceived "radical" reporting and unspecified "[w]aste, fraud, and abuse." Dkt. 16-3. Those two goals, which the White House and Defendant Lake repeated in public statements, do not appear anywhere in Defendants' *Pickering* analysis. For the reasons provided in Plaintiffs' opening brief, neither passes scrutiny under *Pickering*.

Instead, Defendants now attempt to sidestep *Pickering* and assert, as a blanket rule, that the IBA gives them the authority to gut USAGM and silence USAGM's journalism to advance the government's "foreign policy objectives" and ensure that "those objectives are being presented in a 'balanced' and 'comprehensive' way." Dkt. 88 at 26 (quoting 22 U.S.C. § 6202(b)(2)).  Here, as in *Turner*, the Court should reject Defendants' effort to weaponize 22 U.S.C. § 6202(b)(2) and use it to undermine the journalistic integrity of USAGM, obliterate the Statutory Firewall, and violate the First Amendment rights of USAGM employees.

In granting a preliminary injunction in *Turner*, Judge Howell held that the defendants' actions, which, like here, were taken "on the basis of perceived viewpoint," "weigh[ed] heavily against defendants in the *Pickering* analysis." *Id.* at 381. In so holding, *Turner* explicitly rejected *the same argument Defendants advance here*: that, under 22 U.S.C. § 6202(b)(2), defendants must be able to "ensure that VOA and the networks present a balanced and comprehensive projection of United States thought and institutions." *Id.* at 382 (cleaned up); *see* Dkt. 88 at 26. Following *Turner*'s reasoning, in light of the Statutory Firewall and "the IBA's separation of evaluative and review responsibilities from the day-to-day responsibilities assigned to the networks, any argument

that it is 'reasonably necessary' under the IBA regime" for Defendants to gut the agency and pull the plug on all broadcasting "is questionable at best." *Turner*, 502 F. Supp. 3d at 382. After all, "more tailored methods," short of gutting the agency and halting broadcasts, "are available if defendants wish to monitor VOA and network coverage in order to carry out their statutory responsibilities." *Id.* "For example, VOA's Best Practices Guide anticipates that USAGM leadership will communicate challenges to VOA's reporting down the chain, presenting one alternative forum through which defendants could seek information about VOA stories." *Id.* (cleaned up). Defendants' chainsaw approach is not reasonably necessary to advance its asserted interest and therefore fails the *Pickering* balancing test.

### F.    Defendants' Shuttering of USAGM Networks Violates Plaintiffs Jerreat's and Doe 1's First Amendment Right to Exercise of Editorial Discretion

Defendants agree that Plaintiffs Jerreat and Doe 1 are both full-time employees who are editors at VOA and have been placed on administrative leave. Dkt. 88 at 26-27. Defendants therefore concede that these editor plaintiffs have been barred from exercising *any* editorial discretion at VOA. Nevertheless, Defendants argue that these Plaintiffs' right to exercise editorial discretion is not implicated because Defendants have not told them "what they could and could not write about." Dkt. 88 at 27. This is another version of their viewpoint discrimination argument, addressed above, that Defendants' gutting of USAGM cannot trigger First Amendment scrutiny because it silenced the entire agency and not specific stories.

Yet again, Defendants ignore the Trump administration's own statements, which demonstrate that Defendants halted all journalistic and editorial activity at VOA, including Plaintiffs Jerreat's and Doe 1's exercise of editorial discretion, to purge USAGM and its broadcasters of "radical" viewpoints, including journalism regarding topics the White House doesn't like. *See* Dkt. 16-3. The White House's VORA Statement explained that Defendants'

actions were taken to stop "radical propaganda" at VOA, including coverage featuring "anti-Trump comments" and which was "too favorable to . . . Joe Biden"—precisely the type of editorial interference the First Amendment prohibits. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper . . . and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" that is protected by the First Amendment). Defendants cannot hide from their own public statements, including the VORA Statement's list of editorial topics that are, from the Trump administration's perspective, too "radical" to publish.

### G.    Defendants' Silencing of USAGM Reporting Violates the RSF Plaintiffs, TNG-CWA, and Their Members' First Amendment Right to Receive

Defendants' shutdown of USAGM's broadcasts violates RSF, TNG-CWA, and their members' First Amendment right to receive comprehensive news that USAGM's networks are statutorily mandated to broadcast. The First Amendment "protects the right to receive" information and ideas. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965). Defendants do not dispute this. Their sole claim is that there is no right to USAGM-funded "information beyond the statutory minimum requirements established by Congress." ECF 88 at 28. This argument fails for two reasons.

*First*, Defendants' violations of USAGM's governing statute are precisely what infringes Plaintiffs' right to receive. As Judge Oetken found in granting the TRO, USAGM's statutory requirements cannot "be effectuated if the agency has been shuttered," and its retention of sixty-four employees to support the OCB was "hardly sufficient for USAGM's affiliates to 'reach a significant audience.'" Dkt. 54 at 14-16. *See supra* at 1.C.

*Second*, the Supreme Court and courts in this circuit and others have found a First Amendment right to receive information "in a variety of contexts." *Student Press Law Ctr. v.*

*Alexander*, 778 F. Supp. 1227, 1233 (D.D.C. 1991) (reporting by student press on campus crime).[7] Defendants' argument that there is no caselaw on the specific right to receive "Global Media-funded information," Dkt. 88 at 28, plainly contradicts the consistent understanding that the right exists in multiple contexts. Notably, Defendants do not argue their actions would satisfy *any* level of scrutiny required by the burden placed on Plaintiffs' right to receive information. Nor could they—Defendants' attempts to advance a purported interest in stopping "radical" reporting does not satisfy First Amendment scrutiny.

### H.    Defendants' Gutting of USAGM Violates the Statutory Firewall

As explained above, Defendants have not innocuously "pressed the pause button" at USAGM, *contra* Dkt. 88 at 38; they have pulled the plug on broadcasting, placed nearly all employees on administrative leave, and caused the majority of grantee employees to be furloughed on the basis of their perceived "radical" viewpoint and coverage of topics the White House has deemed off-limits.   Likewise, Plaintiffs are not merely "unhappy with the direction in which [VOA] is going."  *Contra id.*  Since over a month ago, VOA has not changed "direction[s]," it has functionally ceased to exist. The Statutory Firewall does not allow Defendants to "step[] into the newsroom themselves" and impose their editorial and journalistic prerogatives onto USAGM's broadcasting, as they have done here. *Turner*, 502 F. Supp. 3d at 382.[8] Nor does it permit

---

[7] *See, e.g.*, *Board of Educ. v. Pico,* 457 U.S. 853, 868 (1982) (school libraries); *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390 (1969) (radio broadcasting); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 757, (1976) (advertising); *Taylor v. ADR Tr. Corp.*, 56 F.3d 1497, 1508 (D.C. Cir. 1995), *opinion amended on reh'g*, 66 F.3d 1226 (D.C. Cir. 1995) (whistleblowing); *In re Application of Dow Jones & Co.*, 842 F.2d 603, 607 (2d Cir. 1988) (news media seeking information from participants in a criminal trial).

[8] Plaintiffs did not move for emergency relief based on their Appointments Clause claim (Count IX). Plaintiffs therefore do not address Defendants' arguments on that claim at this juncture.

Defendants' wholesale, ultra vires gutting of USAGM on the basis of its journalists' perceived viewpoint.[9]

## II.    PLAINTIFFS FACE IRREPARABLE HARM

Defendants fail to address much of the "laundry list" of irreparable harms that Judge Oetken identified, Dkt. 54 at 16-20, focusing only on what they characterize as "adverse employment actions," Dkt. 88 at 52-53. Defendants therefore apparently concede that Plaintiffs face irreparable harm from: (1) threats to Agency efficacy in the event it ever resumes its functions, including the documented difficulty of regaining an audience built over the course of 80 years; (2) harm to RSF Plaintiffs who rely on VOA while living and reporting abroad; and (3) harm to Does 3 and 4 from the loss of their visas. *See* Dkt. 54 at 16-20.[10]

Defendants also do not address the irreparable harm TNG-CWA and its members face. Members who work at RFA have been furloughed without pay since March 21. RFA cannot return those employees to pay status until USAGM agrees to resume its grant funding on a consistent basis. Not only do members face unemployment, but they also face losing their health insurance as soon as May 1. *See* Third Schleuss Decl. ¶¶ 4-6. That presents an acute problem for at least three members whose reliance on health insurance is detailed at paragraph 7. Such harm is irreparable. *See Risteen v. Youth For Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002). Moreover, RFA's 35 H1B-visa workers face furlough as soon as April 18, which places them at

---

[9] Relatedly, the Statutory Firewall is not "committed to agency discretion by law" or otherwise incapable of judicial review. *Contra* Dkt. 88 at 35. 22 U.S.C. § 6204(b) is mandatory: it requires the USAGM CEO to "respect the professional independence and integrity of the Agency" and its broadcasters. Defendant Lake's and the Trump administration's public statements impugning USAGM's broadcasters' journalistic independence and integrity are direct proof of Defendants' violation of the Statutory Firewall

[10] As an update, once Doe 3's J1 visa expires he will have to leave the United States, but he has received a waiver from the obligation to return to his home country for two years after departing the United States. *Cf.* Doe 3 Decl. ¶ 3.

risk of being deported to their home countries, which include repressive regimes that punish journalists. *See id*. ¶ 8; *see also* Dkt. 16-15 ¶ 10 (detailing Vietnam's persecution of journalists, including those working on USAGM programming); Dkt. 16-16 ¶ 13 and pages 14-15, 21-22 (TNG-CWA member statements). TNG-CWA members who do not work at RFA, but who travel abroad for their reporting, rely on VOA to inform their own reporting and personal safety. They are similarly irreparably harmed as listeners by its silence. *See* Dkt. 16-16 ¶¶ 15-16.

The harm to the public-sector union plaintiffs, *supra* at I.A, alone establishes irreparable harm. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016) ("obstacles" that "make it more difficult for" organizations "to accomplish their primary mission . . . provide injury for purposes both of standing and irreparable harm"). Moreover, the fact that USAGM has not yet carried out its "decision" to terminate union members—because it has been barred from doing so by the TRO in this case—does not change that the unions face the decimation of their membership, and in AFSCME's case, the elimination of the entire bargaining unit that Local 1418 represents. Dkt. 33-2 ¶¶ 3-6, Dkt. 33-2 at 5; Dkt. 33-3 at 6 ("notice of management's decision to implement a reduction in force," including "plan to send termination notices to" 623 union-represented employees "in the next few weeks"). "Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction." *Id*. at 9.

Moreover, none of the Plaintiffs' harms are mere employment harms remediable through damages. Plaintiffs face losing their jobs at a *sui generis* Agency to whose mission they have dedicated their professional careers. The loss is in service of ending, at least, VOA and RFA broadcasts. This is a "genuinely extraordinary situation." *Sampson v. Murray*, 415 U.S. 61, 92 (1974). It is "unlikely [Plaintiffs] could ever find work approaching what [they] now do[]" because this work does not exist elsewhere. *Bonds v. Heyman*, 950 F. Supp. 1202, 1215 (D.D.C. 1997)

(finding irreparable harm from loss of employment at Smithsonian). Moreover, without preliminary relief, the Agency stands to fall apart, meaning there will be no USAGM to return to. Does 3 and 4 also face the imminent loss of health insurance. Doe 4 Decl. ¶ 4. Moreover, in eliminating Plaintiffs' jobs, Defendants have labeled them spies and terrorist sympathizers, among other things. *See supra* at p.2.[11] These are not run-of-the-mill employment harms.

Finally, this is a First Amendment case. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (even short loss of First Amendment rights is irreparable).

## III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION

Plaintiffs incorporate their arguments from their opposition to Defendants' motion to dissolve the TRO. *See* Dkt. 89 at 18-20. Defendants argue that their interest in complying with the EO outweighs any public interest favoring an injunction. They ignore that their actions are contrary to the EO, *see supra* at 1-2. They also ignore the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12; *see also NTEU*, 2025 WL 942772, at *43 (rejecting government's exact same equities argument). And they ignore the public interest in international broadcast. *See RFE/RL, Inc. v. Lake*, No. 1:25-CV-799-RCL, 2025 WL 900481, at *4 (D.D.C. Mar. 25, 2025); *see generally* Yazdgerdi Decl. (detailing harm to this interest).

## IV.    THERE IS NO BASIS TO ARTIFICIALLY NARROW RELIEF

The diverse coalition of Plaintiffs in this case all rely on USAGM's continued functionality, including its fulfillment of its statutory broadcast requirements and its grantmaking

---

[11] Defendants' assertion that "Voice of America employees generally are not parties to this lawsuit" is wrong, given that the named Plaintiffs are, as are members of AFSCME, AFGE, and AFSA. Moreover, Plaintiffs *do* assert third-party standing. Dkt. 17 at 42-43.

obligations. The comprehensive relief Plaintiffs request is necessary to keep the Agency intact, and performing its statutory duties, so that it is not irretrievably lost at the end of this litigation. The record shows that going dark after 80 years of continuous broadcast threatens the Agency's future viability, as would dispensing with its dedicated and specialized staff. Dkt 16-13 ¶ 18; Dkt. 16-16 ¶ 19. A comprehensive injunction is therefore "necessary to provide complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

## V.    NO BOND SHOULD BE REQUIRED

The government's bond request should be denied. "[N]o bond" is required where it would effectively deny "plaintiffs their right to judicial review of administrative action." *Nat'l Council of Nonprofits v. OMB*, No. CV 25-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (citing cases). That arises where a bond would "hold Plaintiffs hostage" for the harm from the government's unlawful withholding of "previously committed funds." *Id.* (noting that defendants "will personally face no monetary injury from the injunction"). These concerns animated Judge Oetken's bond waiver and are unchanged now. Dkt. 54 at 21; *see also* Dkt. 89 at 19. Nor is a stay pending appeal merited based on Defendants' bare, unreasoned request for one.

## CONCLUSION

For the foregoing reasons and those provided in Plaintiffs' opening brief, Plaintiffs' motion for a preliminary injunction should be granted.

Dated:          April 16, 2025
                New York, New York

Respectfully Submitted,

GOVERNMENT ACCOUNTABILITY
PROJECT

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

_____/s/_____
David Z. Seide (D.C. Bar # 421899)
1612 K Street, NW
Washington, DC 20006
(202) 457-0034
davids@whistleblower.org

_____/s/_____
Andrew G. Celli, Jr.**
Debra L. Greenberger**
Daniel M. Eisenberg (D.C. Bar # 90017823)
Nick Bourland**
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
acelli@ecbawm.com
dgreenberger@ecbawm.com
deisenberg@ecbawm.com
nbourland@ecbawm.com

*Counsel for Plaintiffs Patsy Widakuswara,
Jessica Jerreat, Kathryn Neeper, John Doe
1, John Doe 2, John Doe 3, and John Doe 4*

AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO (AFSCME)

_____/s/_____
Teague Paterson (D.C. Bar # 144528)
Matthew Blumin (D.C. Bar # 1007008)
Georgina Yeomans (D.C. Bar # 1510777)
1625 L Street, N.W.
Washington, D.C. 20036
(202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

*Counsel for Plaintiff American Federation
of State, County, and Municipal Employees,
AFL-CIO (AFSCME)*

*Counsel for Plaintiffs Patsy Widakuswara,
Jessica Jerreat, Kathryn Neeper, John Doe
1, John Doe 2, John Doe 3, John Doe 4,
American Federation of State, County and
Municipal Employees (AFSCME); American
Federation of Government Employees
(AFGE); American Foreign Service
Association (AFSA); and the NewsGuild-
CWA*

AMERICAN FOREIGN SERVICE
ASSOCIATION

_____/s/_____
Sharon Papp (D.C. Bar # 107992)
Raeka Safai (D.C. Bar # 977301)
2101 E Street, N.W.
Washington, D.C. 20037
(202) 338-4045
papp@afsa.org
safai@afsa.org

*Counsel for Plaintiff American Foreign
Service Association (AFSA)*

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO

_____/s/_____
Rushab Sanghvi (DC Bar # 1012814)
80 F. Street, NW
Washington, DC 20001
(202) 639-6424
SanghR@afge.org

*Counsel for American Federation of
Government Employees, AFL-CIO (AFGE).*


DEMOCRACY FORWARD
FOUNDATION

_____/s/_____
Kristin Bateman (admitted only in
California; practice supervised by members
of the D.C. bar)**
Robin F. Thurston (D.C. Bar # 1531399)
Skye L. Perryman (D.C. Bar # 984573)
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org


*Counsel for Plaintiffs American Federation
of State, County and Municipal Employees
(AFSCME); American Federation of
Government Employees (AFGE); American
Foreign Service Association (AFSA); and
the NewsGuild-CWA*

STATE DEMOCRACY DEFENDERS
FUND

_____/s/_____
Norman L. Eisen (D.C. Bar # 435051)
Joshua Kolb**
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Norman@statedemocracydefenders.org
Joshua@statedemocracydefenders.org

*Counsel for Reporters Sans Frontières,
Reporters Without Borders, Inc., American
Federation of State, County and Municipal
Employees (AFSCME); and American
Federation of Government Employees
(AFGE)*


MEDIA FREEDOM & INFORMATION
ACCESS CLINIC - YALE LAW
SCHOOL[1]

_____/s/_____
David A. Schulz (D.C. Bar # 459197)
127 Wall Street
New Haven, CT 06520
(212) 663-6162
David.schulz@YLSClinics.org

*Counsel for Plaintiffs Patsy Widakuswara,
Jessica Jerreat, Kathryn Neeper, and John
Does 1-4*



** *Pro hac vice* application pending

---

[1] The views expressed herein do not purport to represent the institutional views of Yale Law
School, if any.