UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, JESSICA JERREAT,
KATHRYN NEEPER, JOHN DOES 1-4,
REPORTERS SANS FRONTIÈRES,
REPORTERS WITHOUT BORDERS, INC.,
AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES
(AFSCME), AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES (AFGE),
AMERICAN FOREIGN SERVICE
ASSOCIATION (AFSA), and THE
NEWSGUILD-CWA,

                    Plaintiffs,

    -against-

KARI LAKE, in her official capacity as Senior
Advisor to the Acting CEO of the U.S. Agency for
Global Media; VICTOR MORALES, in his
official capacity as Acting CEO of the U.S.
Agency for Global Media; and U.S. AGENCY
FOR GLOBAL MEDIA,

                  Defendants.

Case No. 1:25-cv-01015-RCL

---

# PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE

Emery Celli Brinckerhoff Abady Ward & Maazel LLP

Government Accountability Project

American Federation of Government Employees, AFL-CIO

American Foreign Service Association

American Federation of State, County and Municipal Employees, AFL-CIO

Democracy Forward Foundation

State Democracy Defenders Fund

Media Freedom and Information Access Clinic at Yale Law School

## INTRODUCTION

Far from demonstrating their compliance with Part (3) of the Court's April 22, 2025, preliminary injunction, Defendants' opposition to Plaintiffs' motion for an order to show cause leaves Plaintiffs and the Court with more questions than answers, and further establishes that today's Voice of America ("VOA") is a Potemkin village of an agency—one where, following the termination of hundreds of Personal Services Contractors (PSCs), almost the entire remaining workforce is on administrative leave and facing imminent termination, language services have been reduced from 49 to just four, statutorily-mandated radio broadcasts are happening only in one country, and a once-robust 24-hour journalistic enterprise with a global audience is now producing just a few minutes of original material.

The Court's April 22, 2025, Order granting Plaintiffs' motion for a preliminary injunction did not need to "dictate the contours of compliance with the [International Broadcasting] Act's statutory mandates," *contra* Defs. Br. at 11, both because (1) the Act's provisions governing VOA already provide specific broadcasting standards, and (2) Congressional appropriations to the agency reflect statutory requirements in and of themselves. Defendants have failed to show that they are compliant with either source of law.

Accordingly, Plaintiffs respectfully request that the Court grant Plaintiffs' motion. In light of Defendants' noncompliance to date, it is particularly critical that Defendants produce their "plan to restore VOA programming to fulfil its statutory mandate." *see* Pls. Mot., ECF No. 112 at 9. It is vexing that Defendants did not already do so in their response to the instant motion on June 13, despite having sent to Congress on June 3 what purports to be a "plan" of "what the statutory minimum is" entitled "USAGM Stat Min." Declaration of Georgina Yeomans (Yeomans Decl.) Ex. A. That "plan" identifies only 81 employees—out of more than 1,000

currently working at the agency—who, it contends, are "tied to what statute states USAGM shall do." *Id*. at 1-2.

By any reasonable measure, the current state of affairs at VOA fails to meet the requirements imposed by federal law, and the "plan" Defendants have provided to Congress (but not this Court) as to what constitutes the "statutory minimum" would not and could not cure that deficiency. This Court should therefore order Defendants to show cause why they have not violated part (3) of this Court's injunction in the form requested by Plaintiffs' motion, including by immediately producing their current plan to restore VOA programming to fulfill its statutory mandate. Should the Court issue such an order, Plaintiffs could then promulgate expedited discovery requests, consistent with the Order, to help further determine the true extent of Defendants' noncompliance.

## ARGUMENT

### I. DEFENDANTS HAVE FAILED TO RESTORE VOA PROGRAMMING AS MANDATED BY PART (3) OF THE PRELIMINARY INJUNCTION

#### a. USAGM is Subject to Mandatory Programming and Spending Requirements

Part (3) of the Court's April 22, 2025, preliminary injunction requires Defendants to "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news,' 22 U.S.C. § 6202(c)." ECF No. 99 at 1-2. The gravamen of Defendants' response brief is that USAGM has "wide discretion" in determining not only what news to broadcast, but also in authoritatively declaring what its governing statutes require. In framing their argument, Defendants largely ignore the myriad Congressional mandates apparent in its governing legislation, including appropriations laws. It is therefore worth reiterating those mandates.

2

The code sets forth eight standards and ten principles that U.S. international broadcasting *shall* meet. 22 U.S.C. § 6202(a), (b). Among other things, U.S. international broadcasting *shall* "be designed so as to effectively reach a significant audience." *Id*. § 6202(a)(7). U.S. international broadcasting "*shall* include":

- "news which is consistently reliable and authoritative, accurate, objective, and comprehensive";

- "programming to meet needs which remain unserved by the totality of media voices available to the people of certain nations";

- "information about developments in each significant region of the world";

- "a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen";

- and "reliable research capacity to meet the criteria under this section."

*Id*. § 6202(b)(1), (5)-(8) (emphasis added).

Voice of America is specifically tasked with "communicating directly with peoples of the world by radio." 22 U.S.C. § 6202(c). It "must win the attention and respect of listeners." *Id*. It therefore "*will* serve as a consistently reliable and authoritative source of news," among other mandates. *Id*. § 6202(c)(1) (emphasis added).

USAGM is also required to "communicate directly with the peoples of the world by television," governed by a charter materially similar to the Voice of America radio broadcast charter. 22 U.S.C. §§ 1464a(b), 6202(c).

As Defendants acknowledge in their Opposition to Plaintiffs' Motion, there are also specific programming requirements USAGM must fulfill. Defendants acknowledge 22 U.S.C. § 6201(4), 22 U.S.C. § 6215, and Pub. L. No. 111-84, 123 Stat. 2553 § 1262 (2009), are

mandatory programming requirements. *See* Defs. Br. at 3-4. Section 6201(4) is Congress's finding that "continuation of existing United States international broadcasting, and the creation of a new broadcasting service to the people of the People's Republic of China and other countries of Asia which lack adequate source of free information, would enhance the promotion of information and ideas, while advancing the goals of United States foreign policy." Section 6215 mandates the creation of "Radio Free Afghanistan" and required that USAGM submit a plan to Congress for "surrogate broadcasting services in the Dari and Pashto languages to Afghanistan." And section 1262 of the 2010 National Defense Authorization Act authorized $15 million for USAGM "to expand Farsi language programming and to provide for the dissemination of accurate and independent information to the Iranian people through radio, television, Internet, cellular telephone, short message services, and other communications."

Defendants thus acknowledge the importance of specific statutory broadcast mandates as well as Congressional appropriations in defining their statutory obligations. They nonetheless fail to acknowledge multiple other, similar mandates. For instance, in 2004, Congress expressed its "sense" "that the United States should" adopt "a goal of providing 12-hour-per-day broadcasting to North Korea, including broadcasts by Radio Free Asia and Voice of America." 22 U.S.C. § 7813(a)(1). It therefore ordered the agency to submit a report outlining a plan to do so. *Id*. § 7813(b). In the 2017 North Korean Human Rights Reauthorization Act, Congress reiterated that USAGM "should broadcast to North Korea in the Korean language information on rights, laws, and freedoms afforded through" the governing documents of North Korea, the United Nations, and "any other applicable treaties or international agreements to which North Korea is bound." 22 U.S.C. § 7814(a)(5). It requested a new report setting forth "a detailed plan for improving broadcasting content for the purpose of targeting new audiences and increasing

listenership." *Id*. § 7814(a)(7)(A). And it required USAGM to submit annual reports every year *until 2027* regarding, among other things, "the effectiveness of actions taken pursuant" to that section. *Id*. § 7814(a)(7)(B).

And in 2012, Congress requested "a comprehensive strategy to . . . expand Voice of America's Persian News Network and [RFE/RL's] Radio Farda to provide hourly live news update programming and breaking news coverage capability 24 hours a day and 7 days a week." 22 U.S.C. § 8754(7)(A).

Defendants also ignore Congress's 2024 Appropriations Act, which remains binding on Defendants and specified multiple requirements of USAGM. Congress appropriated over $260 million for Voice of America to carry out its duties and specifically provided that "significant modifications to USAGM broadcast hours previously justified to Congress, including changes to transmission platforms (shortwave, medium wave, satellite, Internet, and television), for all USAGM language services shall be subject to regular notification procedures of the Committees on Appropriations." *See* Further Consolidated Appropriations Act of 2024, Pub L. No. 118-47, 138 Stat. 460, 735-36; *see also* Compl. ¶¶ 45-46 (citing appropriations laws setting funding levels for USAGM and Voice of America and explaining those provisions were carried over to 2025 fiscal year). It forbade USAGM from reprogramming more than five percent of Voice of America's funding and provided that even that modest reprogramming was subject to a 15-day notice period to Congress. 2024 Appropriations Act, div. F, tit. I, 138 Stat. 735; see 170 Cong. Rec. at H2087. The 2024 Appropriations Bill also included funds to "maintain broadcasting hours into North Korea at levels not less than the prior fiscal year." 138 Stat. 813.

Moreover, various appropriations acts and congressional reports throughout USAGM's existence shed light on what Congress meant in crafting the agency's standards and principles.

*See, e.g.*, Pub. Law No. 102-138, § 234 (Foreign Relations Authorization Act, Fiscal Years 1992 and 1993) ("As soon as practicable but not later than one year after enactment, the Voice of America Kurdish language programming pursuant to this section shall be broadcast for not less than 1 hour each day."); *id*. § 233 ("The Director of the United States Information Agency shall establish distinct Croatian and Serbian programs within the Yugoslavian section of the Voice of America"); H. Rept. 116-444, at 37 (Committee report for bill that became Pub. Law. No. 116-260 (Consolidated Appropriations Act, 2021)) (supporting USAGM 24/7 Russian Language television network, VOA's Latin America Division programming, VOA Pacific Islands activity, Ukrainian service of VOA, and "support[ing] VOA initiating a Sindhi language service").

**b. Defendants Have Failed to Show They Are Compliant with Their Statutory Mandates**

*i. VOA Is Not Broadcasting to North Korea*

Congress has unambiguously required that Voice of America broadcast reliably to North Korea, but the agency has no plans to resume doing so. First, USAGM is out of compliance with the 2024 Appropriation Act's requirement that it "maintain broadcasting hours into North Korea at levels not less than the prior fiscal year." 138 Stat. 813. In 2024, Voice of America spent $6 million on its Korea service. Yeomans Decl. Ex. B. at 66.

Other provisions of law support the mandatory nature of North Korean broadcast. The 2004 North Korea Human Rights Act sets forth Congress's "sense" that USAGM should adopt a "12-hour-per-daybroadcasting to North Korea" goal. 22 U.S.C. § 7813(a). That provision provides clarification in interpreting the "audience" and "nations" Congress wants USAGM to target through 22 U.S.C. § 6202. USAGM will no doubt respond that "sense of Congress" provisions do not have independent force of law. But they can be useful in interpreting other mandatory provisions. *State Highway Comm'n of Missouri v. Volpe*, 479 F.2d 1099, 1116 (8th

Cir. 1973) ("sense of Congress" provisions are useful in interpreting mandatory statutory provisions); *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 38-81 (1969) ("Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction.").

If those provisions were not clear enough, USAGM also has an ongoing duty to report to Congress on the effectiveness of its broadcasting to North Korea. *Id*. § 7814(a)(7)(B); *see Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 483 (7th Cir. 2024) (inclusion of a reporting requirement with a "sense of Congress" statement indicates that the issue is of great concern to Congress).

The lack of VOA programming to North Korea, and indeed the lack of programming to any country in East Asia other than China, also falls far short of the statutory minimum.[1]

### ii. VOA Is Not Broadcasting to Any Audiences in Africa or South or Central America

USAGM is required to broadcast "information about developments in *each significant region of the world*," 22 U.S.C. § 6202(b)(6) (emphasis added). Before Defendants shuttered the Agency, VOA was broadcasting throughout South and Central America, and in Africa in 16 languages: Afram Oromo, Amharic, Bambara, French, Hausa, Kinyarwanda, Kirundi, Lingala, Ndebele, Portuguese, Sango, Shona, Somali, Swahili, Tigrigna, and Wolof. Yeomans Decl. Ex. C at 5; Neeper Decl. ¶ 7. Today, VOA does not broadcast to South or Central American or African audiences at all, in any language. No reasonable interpretation of the phrase "each significant region of the world" could exclude two entire continents.

---

[1] Through 22 U.S.C. § 6201(4) Congress also contemplated that USAGM would broadcast to "other countries of Asia which lack adequate sources of free information." In its 2024 budget justification, VOA reported programming to eleven language services in its East Asia and Pacific Division-- its highest volume division. It has no plans to resume that programming other than its written Mandarin stories.

*iii.   VOA Is Failing to Broadcast Voices from Within Repressive Regimes*

VOA is required to broadcast "a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen."  22 U.S.C. § 6202(a)(7); *see also* 22 U.S.C. § 6201(4) (noting Congressional intent to "use broadcasting to support freedom and democracy in a rapidly changing international environment"). Before March 14, 2025, VOA met this statutory mandate by broadcasting voices from repressive regimes around the world including, for example, China (amplifying voices from Tibet), Vietnam, and the Democratic Republic of Congo, Mali, Sudan, and Nicaragua.  *See* Mar. 23, 2025 Decl. of Thibaut Bruttin, ECF No. 16-15 ¶¶ 10, 11, 17; Yeomans Decl. Ex. D at 14. Today, the Mandarin Language Service is "publishing five to nine [written] news stories five days each week," publishing "one or two USAGM-produced [written] editorials," and producing "one news package, adapted from the video packages provided by the Persian Language Service."  *Id.* ¶ 7. VOA has no radio broadcast to any country other than Afghanistan, and no television programming at all. ECF No. 117-2 ¶¶ 3-4. That is insufficient to meet its mandate under 22 U.S.C. § 6202(b)(7).

*iv.   Other Congressional Appropriations Are Also Statutory Mandates*

As discussed above, the 2024 Appropriations Act placed specific duties on Defendants that Defendants fail to acknowledge. Defendants have not only failed to maintain broadcasting hours to North Korea, discussed above, but they have also significantly curtailed USAGM broadcasting hours previously justified to Congress.

In its 2024 budget justification, USAGM requested $286,705,000 for Voice of America, to fund a full-time equivalent staff of 989 to carry out its broadcasting in 48 languages to nearly 100 countries and a global audience of more than 326 million people per week. Yeomans Decl.

Ex. D. Among other accomplishments, the budget justification highlighted the agency's work "countering anti-democratic regimes" in Mali, Sudan, and Nicaragua. *Id*. at 14. It spotlit its coverage in both Ukraine and Russia. *Id*. at 15, 24-26. It showcased "240 web articles, television packages, and radio pieces from five continents, looking at the many forms of" China's influence. *Id*. at 17. It touted its establishment of a Fulani service to broadcast across the Sahara region, the Sahel, and West Africa. *Id*. at 26. And it celebrated an increased commitment to reporting in the Pacific Islands. *Id*. at 29. USAGM also provided detailed metrics of VOA's broadcast hours to its Africa Division, its East Asia and Pacific Division, its Eurasia Division, its Latin America Division, its South Asia Division, its Persian News Network, and its English Division. *Id*. at 193-195.[2]

In response to the 2024 budget justification, Congress appropriated $260,032,000 for Voice of America—nearly 91% of the budget USAGM requested. It thereby signaled its intent and understanding that Voice of America would significantly continue the activities and reach that it achieved in 2023. *See Guadamuz v. Ash*, 368 F. Supp. 1233 (D.D.C. 1973) (Congressional authorization of funding indicates Congressional "intent that the program continue" for the period funded); *RFE/RL, Inc. v. Lake*, No. 1:25-CV-799-RCL, 2025 WL 1232863, at *8 (D.D.C. Apr. 29, 2025) (citing *Guadamuz* for proposition that the "Executive has no residual constitutional power to refuse to spend . . . appropriations"); *see also* Yeomans Decl. Ex. E (letter from members of Congress to Defendants Lake and Morales expressing that "Congress reaffirmed its commitment to your agency, its mission, and its personnel by funding [USAGM]

---

[2] In USAGM's 2022 Report to Congress, USAGM also highlighted VOA's work in Ukraine and North Korea, as well as touting its broadcast of the State of the Union and the Republican response "in Spanish, Creole, Burmese, Mandarin, Korean, Farsi, Russian, and Ukrainian. Other VOA language services livestreamed coverage of the event across digital platforms, from Azerbaijan to Zimbabwe." Yeomans Decl. Ex. C at 33.

and expects that each of the entities will continue their unique mission of broadcasting content to audiences around the world").

USAGM has abandoned nearly all of the work that it relied upon to justify Congress's 2024 appropriations and has failed to notify Congress of that abandonment, violating both the intent manifest in Congress's appropriations as well as the explicit requirement that "significant modifications to USAGM broadcast hours previously justified to Congress, including changes to transmission platforms (shortwave, medium wave, satellite, Internet, and television), for all USAGM language services shall be subject to regular notification procedures of the Committees on Appropriations." 138 Stat. 460, 735-36.

Defendants' Opposition justifies USAGM "not operating at the level that it did" previously on the ground that "the March 14, 2025 Executive Order . . . has changed the way in which [the agency's] mission is accomplished." Defs. Br. at 2. But it is one thing to alter a mission, and another to hollow out an agency by refusing to operate using the budget Congress has commanded by law. The former is legal, but the latter is not—no matter what an Executive Order may say.

Earlier this week, the U.S. Government Accountability Office (GAO) reached the same conclusion about a different agency covered by the same March 14, 2025 Executive Order. That Executive Order, entitled "Continuing the Reduction of the Federal Bureaucracy" (hereafter "EO"), directed that "the non-statutory components and functions of" the seven agencies covered by the EO "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." 90 Fed. Reg. 13043. GAO found that, following the EO, the Institute of Museum and Library Services (IMLS) had (much like

USAGM) "ceased performing agency functions and withheld funds that Congress appropriated for these functions." U.S. Gov't Accountability Off., GAO-B337375, "Institute of Museum and Library Services—Applicability of the Impoundment Control Act to Reduction of Agency Functions" (June 16, 2025), available at https://www.gao.gov/products/b-337375.  IMLS "implemented the President's directives in EO 14238 by drastically reducing IMLS operations" including, among other things, placing 85% of agency staff on administrative leave.  *Id.* at p. 5. GAO concluded that "IMLS violated the ICA by improperly withholding appropriated funds from obligation and expenditure" because, "[o]nce enacted, an appropriation is a law like any other, and the President must implement it by ensuring that appropriated funds are obligated and expended prudently during their period of availability unless and until Congress enacts another law providing otherwise." *Id.* at 7-8.

As GAO emphasized, the President does have "strictly circumscribed authority" under the Impoundment Control Act (ICA) to "withhold budget authority" by proposing "deferrals and recissions," but "the ICA requires the President first to transmit a special message to Congress outlining the amounts in question and the reasons for the proposed deferral or recission." *Id.* at p. 8.  Because "the Administration has not sent a special message [to Congress] under the ICA related to the IMLS," IMLS violated the ICA when it "reduced IMLS's staff" and other activities and "was not seeking to repurpose these funds for IMLS's obligation towards other mission activities—[it] was planning not to use them, contrary to the amounts directed in the FY 2024 and FY 2025 appropriations." *Id.* at 8-10.  *See also Rhode Island v. Trump*, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868, at *13 (D.R.I. May 6, 2025) (holding that agencies implementing same EO had acted contrary to ICA, and thus violated APA, "by acting not in accordance with their respective statutory mandates" where, as here, "the records show that these agencies are

rescinding or deferring appropriated funds and do not plan to spend them" including by retaining "such a small group of personnel" that the agency "will expend only a fraction of what it would have otherwise spent to perform to its" work).

Just as with IMLS's implementation of the EO, "the only way that [USAGM] could have sought to effectuate [its] budget cuts is by following the procedures outlined in the ICA and sending a special message to Congress." GAO-B337375 at 10 But that has not happened. The Administration *did,* on May 28, 2025, issue a special message with 22 proposed recissions, totaling $9.4 billion, affecting international relations programs—but none of those recissions involved USAGM. *See Recissions Proposals Pursuant to the Congressional Budget and Impoundment Control Act of 1974,* 90 Fed. Reg. 24298 (June 9, 2025). "[I]f the Executive does wish to rescind or defer funds appropriated to an agency, they are in luck, as the ICA sets forth clear procedures to facilitate that process under congressional oversight," however "that process was not facilitated here. Rather, [USAGM] took actions that essentially directed the rescission of funds to fulfill the President's policy—with congressional authorization glaringly absent." *Rhode Island*, 2025 WL 1303868, at *14.

### v. Defendants Are Not Reaching A "Significant Audience"

Defendants do not dispute that VOA has a statutory mandate to create programming "designed so as to effectively reach a significant audience." 22 U.S.C. § 6202; Defs. Br. at 8. They contend, however, that the current broadcasting meets this requirement, based on two flawed interpretations of the word "significant."

First, defendants argue that "significant" means any "measurably large amount" and that USAGM can decide what constitutes a "significant audience." Defs. Br. at 8-9. Accordingly, they claim that the current "smaller scale" broadcast is still reaching a "significant audience." *Id*. But

a single number or figure is meaningless without context: "significance can accurately be assessed only when contextualized." *Rupp v. Bonta*, 723 F. Supp. 3d 837, 861 (C.D. Cal. 2024) (citing *Murr v. Wisconsin*, 582 U.S. 383, 395 (2017)); *see also Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323, 1332 (Ct. Int'l Trade 2019) ("Numbers are not 'large' or 'significant' in a vacuum; in order to consider whether such descriptors reasonably apply, the numbers must be placed in context."). Perhaps the best context for "significant audience" is VOA's prior reach: Before March 14, VOA reached 326 million people per week. Yeomans Decl. Ex. D at 2. Now, Defendants estimate that VOA programming is reaching 735,000 people. *See* Defs. Br. at 7. That is 0.2% of the previous audience. In the context of the global population and the number of people that *previously were and still could be listening* to VOA, 735,000 people is insignificant.

Second, defendants offer an alternative reading of "significant audience" to mean "individuals of significance." Def. Br. at 9. That is an implausible reading of the law. The International Broadcasting Act refers to voices "speaking to their *fellow countrymen*," indicating that citizens, not leaders, are the target audience. 22 U.S.C. § 6202(b)(7). Similarly, the statute's concern about providing news to regions that face censorship, *id.*, would be illogical if the programming were targeting those in the government carrying out the censorship.

Tellingly, USAGM itself understands "significant" to mean amount, not status. Each year, the Agency is required by the IBA to "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, [its] activities." 22 U.S.C. § 6204(a)(2). And each year, the Agency evaluates itself and justifies its continued funding based on the size of its audience. *See* Yeomans Decl. Ex. B at 13 ("VOA boasts a record-high weekly global audience of more than 356 million people."); *see also id.* at 16 ("VOA will explain the

United States election process to *the Chinese people* who are denied the right to elect their national leaders and whose media mischaracterize United States elections.") (emphasis added); Yeomans Decl. Ex. C at 1 (announcing that USAGM is reaching "larger audiences than ever before").[3]

## II.    DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FAILS TO PROVIDE EXPLANATIONS AND DOCUMENTS SOUGHT BY THE MOTION

### a.    Defendants Fail to Explain How They Will Fully Spend Congressional Appropriations or Whether They Have Notified Congress of their Reduced Operations as Required by Law

Plaintiffs' motion asked Defendants to explain how their actions are consistent with congressional appropriations. Pls. Mot. at 8.  Defendants have not done so, insisting only that (1) USAGM "is operating in accordance with the President's Executive Order"; (2) plaintiffs "have failed to show that the funds appropriated are not being used as authorized by any statute"; and (3) "[m]erely reducing the size of . . . Voice of America[] does not equate to a violation of the Appropriations and Spending Clause." Def. Br. at 9-10.  As discussed *supra* at Section I(b)(iv), those arguments are entirely unconvincing—but, more fundamentally, they are arguments about *whether* Defendants must act consistent with appropriations, not factual explanations of *how* they are doing so.

Plaintiffs' motion also asked whether Defendants "have notified Congress of their dramatic reduction in broadcast hours, as required by the Further Consolidated Appropriations

---

[3] Defendants' explanation that they do not need the Cohen building because "throughout the COVID-19 pandemic . . . most of its staff was working from home" is also unconvincing. Defs. Br. at 10. As Defendants' argument itself acknowledges, some staff was required to stay in the building to keep the programming going. In its 2020 report to Congress, the Agency also represented that, "Each day Studio and Production Operations' staff continued working in the Cohen Building maintaining the equipment and staffing Master Control and studios to keep broadcasts on the air for audiences around the world." Yeomans Decl. Ex. F at 10.

Act of 2024." Pls. Mot. at 8. Defendants have not answered the question. Indeed, Defendants have not even made this Court aware of the June 3, 2025 letter in which Defendant Lake sent the "USAGM Statutory Minimum Memorandum" to Congress. Yeomans Decl. Ex. A. And to the extent Defendants may contend that June 3 letter was intended as the requisite notice of "significant modifications to USAGM broadcast hours previously justified to Congress, including changes to transmission platforms (shortwave, medium wave, satellite, Internet, and television), for all USAGM language services," 138 Stat. 460, 735-36, it was plainly insufficient.

### b. Defendants Have Not explained How They Intend to Staff Voice of America

Plaintiffs' motion also asked Defendants to explain how they intend to fulfill their obligations without the terminated PSCs and to explain how they intend to staff production of required content, "including as to RBTs, who must be on-site 24/7 to keep broadcasts on the air." Pls. Mot. at 9. Defendants did not respond to that request in their opposition papers. They did, however, submit a plan to Congress, which they promptly undermined by reactivating their Farsi language staff ten days later.[4]

On June 3, Defendant Lake wrote to Congress notifying it of a "potential reorganization, consolidation, and/or program termination[]." Yeomans Decl. Ex. A. The letter attached a plan that recommended retaining only 81 full-time employees of USAGM, including thirteen managers and 68 full-time staff, allocated as follows:

---

[4] Defendants assert they "began 24/7 television and digital coverage" via their Persian Language Service on June 13. Defs. Br. at 7. But their sworn declarations say they "began implementing a plan for 24/7 television and digital coverage" and "TV operations has not currently resumed." ECF No. 117-1 ¶ 6; ECF No. 117-2 ¶ 3.

- CEO & Advisory Board Executive Secretary: 1 position
- Farsi Language: 2 positions
- China Broadcasting: 2 positions
- Afghanistan: 2 positions
- VOA: 11 positions
- Engineering & Transmission: 2 positions
- Back Office Support: 15 positions

*Id*. at 2. The plan cited as its only reasoning compliance with the March 14 Executive Order

"Continuing the Reduction of the Federal Bureaucracy." For "Farsi Language" it listed "2

positions." Ten days later, Defendants recalled 75 staff to reactivate its Persian (or Farsi)

Language Service. ECF No. 117-1 ¶ 6.

Defendants' disclosure of this plan to Congress, but not to this Court, is notable.

Moreover, Defendants' plan is the height of arbitrary agency action. As this Court knows, agency

action is arbitrary and capricious if it lacks reasoned decisionmaking. *Motor Vehicle Mfrs. Ass'n*

*of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); *see also Encino*

*Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[W]here [an] agency has failed to

provide even [a] minimal level of analysis, its action is arbitrary and capricious and so cannot

carry the force of law."). The need for a reasoned explanation is especially urgent when, as in this

case, the agency changes course in its practices or policies. *Physicians for Soc. Resp. v. Wheeler*,

956 F.3d 634, 644 (D.C. Cir. 2020). In such instances, the agency must provide "good reasons for

the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And when the

previous policy has "engendered serious reliance interests," the agency must provide "a more

detailed justification." *Id.*

But the plan provides no justification besides compliance with President Trump's

executive order to reduce USAGM staffing and programming to its alleged statutory minimum.

*Id.* That is illegal, because compliance with an executive order does not turn an arbitrary and

capricious agency action into a lawful one. *See, e.g.*, *State v. Su*, 121 F.4th 1, 17 (9th Cir. 2024) ("[T]he executive order does not exempt [the agency] from basic APA requirements of reasoned decisionmaking."); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294-95 (W.D. La. 2022) (citation omitted) ("A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order."). Moreover, Defendants' abrupt change in course in bringing back 75 employees to work on its Farsi service, after reserving only two Farsi positions in its letter to Congress, further confirms that the Agency did not think through the implications or reliance interests affected by its June 3 plan.

### c.  Defendants Failed to Produce a Plan to Restore VOA Programming to Fulfil Its Statutory Mandate

In the Motion, Plaintiffs' requested relief included the production of documents related to Defendants' plan to restore VOA Programming to fulfil its statutory mandate. In light of Defendants' ongoing failure to comply with Part (3) of the preliminary injunction, Plaintiffs respectfully reiterate their request that the Court order Defendants to promptly submit to the Court their "plan to restore VOA programming to fulfill its statutory mandate." Pls. Mot. at 9. Defendants should submit a plan which reflects (1) how Defendants will operate VOA such that it delivers, through all communication means including radio, television, and online print articles, meaningful programming to a global audience in compliance with statutory mandates; (2) how Defendants will spend VOA's Congressional appropriation as Congress intended; (3) that Defendants have brought back sufficient personnel to create and disseminate programming that complies with statutory mandates; and (4) that Defendants have restored VOA's operational capacity such that it can meet its mandate and spend its appropriation. Because Defendants have been in violation of Part (3) of the Court's April 22, 2025 preliminary injunction for two months, and in violation of the statutory broadcasting mandates for over three months, Plaintiffs request

that Defendants be ordered to submit this plan to the Court within 10 days and that they publicly file a status update on their progress of complying with the plan every 30 days thereafter.

Plaintiffs also reiterate their request for all documents relating to Defendants' plans. Should the Court issue the requested order, the discovery requested by the motion, s*ee* Pls. Mot. at 9, could be accomplished by the promulgation of expedited requests served by Plaintiffs consistent with the Order.  Specifically, Plaintiffs could serve targeted discovery: (1) requests for production of documents "reflecting Defendants' plan to restore VOA programming to fulfill its statutory mandate," Pls. Mot. at 9, including documents sufficient to show how USAGM historically (before March 14, 2025) ensured VOA's compliance with the statutory broadcasting standards; (2) requests for production of documents "reflecting Defendants' plans for further termination of USAGM staff," *id.*, including documents sufficient to show how, if at all, Defendants have determined that VOA can comply with its statutory broadcasting standards at drastically reduced staffing levels; and, if the Court feels it to be appropriate (3) other related requests.

The limited discovery, which was requested in our opening brief, is appropriate here, as it will provide much needed insight into Defendants' efforts to dismantle the Agency over the past three months and assist Plaintiffs and the Court in evaluating Defendants' plan for compliance with the Court's preliminary injunction.

Expedited discovery can be appropriate "in some cases, such as those involving requests for a preliminary injunction." *New Mexico v. Musk*, No. 25-CV-429 (TSC), 2025 WL 783192, at *2 (D.D.C. Mar. 12, 2025) (quoting Advisory Committee's Notes to Fed. R. Civ. P. 26(d)).  In this district, courts apply a five-factor "reasonableness test" to requests for expedited discovery, including: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery

requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Id.* (quoting *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 98 (D.D.C. 2014)). "Courts are not limited to these factors, however." *Id.* (cleaned up).

Here, the applicable factors weigh in favor of allowing Plaintiffs to take this limited discovery relevant to the issue of Defendants' compliance with Part (3) of the preliminary injunction. As for the first factor, a preliminary injunction has been granted and Plaintiffs seek discovery that directly bears on a likely forthcoming motion to enforce that same preliminary injunction. As for the second and third factors, which "are closely related," *id.* at *3, the discovery requests are narrow, and their purpose is to gauge compliance with the preliminary injunction. "Courts permit discovery narrowly tailored to reveal information related to [a] preliminary injunction." *Id.* at *3 (cleaned up). Plaintiffs only seek expedited discovery regarding topics that are directly relevant to Part (3) of the preliminary injunction, which is concerned with Defendants' compliance with its statutory broadcasting mandates. *Third*, the discovery Plaintiffs seek is not unduly burdensome. "Courts have routinely granted expedited discovery in cases involving challenges to constitutionality of government action." *Id.* at *5 (cleaned up). "Given the limited discovery requested here," compliance is not unduly burdensome and will not "interfere with the Executive's Article II prerogatives." *Id.* (cleaned up). Finally, the timing of this request, which is made before Defendants' answer or motion to dismiss, "holds little weight." *Id.* at *6. "[T]he mere possibility that a defendant may defeat a complaint at a later stage is not a legitimate basis to deny a Rule 26(d)(1) expedited discovery motion that otherwise satisfies Rule 26's discovery standards." *Id.* (cleaned up). Expedited discovery is reasonable and should be ordered here.

## CONCLUSION

For the foregoing reasons and those provided in Plaintiffs' opening brief, Plaintiffs'

motion for an order to show cause should be granted, including but not limited to Plaintiffs'

requests that Defendants be ordered to produce their "plan to restore VOA programming to fulfill

its statutory mandate" and that Plaintiffs be allowed limited expedited discovery.

Dated:          June 19, 2025                          Respectfully Submitted,


GOVERNMENT ACCOUNTABILITY                    EMERY CELLI BRINCKERHOFF
PROJECT                                      ABADY WARD & MAAZEL LLP


_____/s/_____                          _____/s/_____
David Z. Seide (D.C. Bar # 421899)           Andrew G. Celli, Jr.**
1612 K Street, NW                            Debra L. Greenberger**
Washington, DC 20006                         Daniel M. Eisenberg (D.C. Bar # 90017823)
(202) 457-0034                               Nick Bourland**
davids@whistleblower.org                     One Rockefeller Plaza, 8th Floor
                                             New York, New York 10020
*Counsel for Plaintiffs Patsy*               (212) 763-5000
*Widakuswara, Jessica Jerreat, Kathryn*      acelli@ecbawm.com
*Neeper, John Doe 1, John Doe 2, John*       dgreenberger@ecbawm.com
*Doe 3, and John Doe 4*                      deisenberg@ecbawm.com
                                             nbourland@ecbawm.com
AMERICAN FEDERATION OF
STATE, COUNTY, AND MUNICIPAL                 *Counsel for Plaintiffs Patsy Widakuswara,*
EMPLOYEES, AFL-CIO (AFSCME)                  *Jessica Jerreat, Kathryn Neeper, John Doe 1,*
                                             *John Doe 2, John Doe 3, John Doe 4,*
                                             *American Federation of State, County and*
_____/s/_____                          *Municipal Employees (AFSCME); American*
Teague Paterson (D.C. Bar # 144528)          *Federation of Government Employees*
Matthew Blumin (D.C. Bar # 1007008)          *(AFGE); American Foreign Service*
Georgina Yeomans (D.C. Bar #                 *Association (AFSA); and the NewsGuild-CWA*
1510777)
1625 L Street, N.W.                          AMERICAN FOREIGN SERVICE
Washington, D.C. 20036                       ASSOCIATION
(202) 775-5900
Tpaterson@afscme.org
Mblumin@afscme.org                           _____/s/_____
Gyeomans@afscme.org                          Sharon Papp (D.C. Bar # 107992)
                                             Raeka Safai (D.C. Bar # 977301)
*Counsel for Plaintiff American*             2101 E Street, N.W.
*Federation of State, County, and*           Washington, D.C. 20037
*Municipal Employees, AFL-CIO*               (202) 338-4045
*(AFSCME)*                                   papp@afsa.org
                                             safai@afsa.org


                                             *Counsel for Plaintiff American Foreign*
                                             *Service Association (AFSA)*

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO

_____/s/_____
Rushab Sanghvi (DC Bar # 1012814)
80 F. Street, NW
Washington, DC 20001
(202) 639-6424
SanghR@afge.org

*Counsel for American Federation of
Government Employees, AFL-CIO (AFGE).*


DEMOCRACY FORWARD FOUNDATION

_____/s/_____
Kristin Bateman***
Robin F. Thurston (D.C. Bar # 1531399)
Skye L. Perryman (D.C. Bar # 984573)
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs American Federation of
State, County and Municipal Employees
(AFSCME); American Federation of
Government Employees (AFGE); American
Foreign Service Association (AFSA); and the
NewsGuild-CWA*

STATE DEMOCRACY DEFENDERS FUND

_____/s/_____
Norman L. Eisen (D.C. Bar # 435051)
Joshua Kolb*
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Norman@statedemocracydefenders.org
Joshua@statedemocracydefenders.org

*Counsel for Reporters Sans Frontières,
Reporters Without Borders, Inc., American
Federation of State, County and Municipal
Employees (AFSCME); and American
Federation of Government Employees (AFGE)*


MEDIA FREEDOM & INFORMATION
ACCESS CLINIC - YALE LAW SCHOOL[5]

_____/s/_____
David A. Schulz (D.C. Bar # 459197)
127 Wall Street
New Haven, CT 06520
tobin.raju@YLSClinics.org
David.schulz@YLSClinics.org

*Counsel for Plaintiffs Patsy Widakuswara,
Jessica Jerreat, Kathryn Neeper, and John
Does 1-4*


\* *Pro hac vice* application forthcoming

\*\* *Pro hac vice* application pending

\*\* D.C. Bar admission pending. Admitted
only in California; practice supervised by
members of the D.C. Bar.

---

[5] The views expressed herein do not purport to represent the institutional views of Yale Law School, if any.