UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATSY WIDAKUSWARA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KARI LAKE, <br> Senior Advisor to the Acting CEO of the U.S. Agency for Global Media, et al., <br><br> Defendants. | Civil Action No. 25-1015 (RCL) |
| MICHAEL ABRAMOWITZ, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KARI LAKE, <br> Senior Advisor to the Acting CEO of the U.S. Agency for Global Media, et al., <br><br> Defendants. | Civil Action No. 25-0887 (RCL) |

**DEFENDANTS' SUPPLEMENTAL RESPONSE TO
PLANTIFFS' MOTIONS FOR AN ORDER TO SHOW CAUSE**

**INTRODUCTION**

Defendants Kari Lake, in her official capacity as a Senior Advisor to the Chief Executive Officer ("CEO") of United States Agency for Global Media ("Global Media"), Victor Morales, in his official capacity as Acting CEO of Global Media, and Global Media, by and through counsel, pursuant to the Court's June 23, 2025, Order,[1] file this supplemental response in further support of their opposition to Plaintiffs' motions for an order to show cause as to Defendants' compliance with the third prong of the Court's April 22, 2025, preliminary injunction. On April 22, 2025, the Court entered a preliminary injunction ordering that Defendants, "restore [Voice of America] programming such that [Global Media] fulfills its statutory mandate that [Voice of America] 'serve as a consistently reliable and authoritative source of news, 22 U.S.C. § 6202(c).'" *See Widakuswara*, Order at 2 (ECF No. 99); *Abramowitz*, Order at 3 (ECF No. 29). Simply put, Defendants have restored Voice of American programming. Defendants have taken actual, concrete steps since entry of the Court's injunction to comply with this provision and continue to comply with the Court's injunction in good faith. In addition to the activities that Global Media has already reported on, since the hearing on June 23, 2025, Global Media is increasing its Afghan Service broadcasting to thirty-minutes a day.[2] Global Media has also resumed publishing editorial

---

[1] The Court's order requires Defendants to provide a supplemental filing with additional information pertaining to Global Media's recent activities, including any relevant information about Global Media funding decisions, personnel updates, and submissions to Congress. *Abramowitz*, June 23, 2025, Order (ECF No. 50); *Widakuswara*, June 23, 2025, Order (ECF No. 121). The Court is already in receipt of Ms. Lake's letters to Congress dated June 3, 2025 (ECF No. 120-2) and June 20, 2025 (provided by counsel for Plaintiffs during the Court's June 23, 2025, hearing), but nevertheless Defendants append a copy of them to this filing. On June 25, 2025, Ms. Lake testified to the House of Representative's Committee on Foreign Affairs regarding Global Media's activities. A recording of that testimony can be found here, https://www.youtube.com/watch?v=Be_Ty1K5On8 (last visited June 26, 2025).

[2] The Office of Cuba Broadcasting has also continued its broadcasting operations, as previously noted.

2

content. *See* https://editorials.voa.gov/ (last visited June 26, 2025). Finally, as the attached Declaration of Frank Wuco ("Wuco Decl.") explains, Global Media is increasing its shortwave radio broadacsting which will give Global Media more shortwave facility to broadcast into Afghanistan.

At bottom, Plaintiffs fail to show how Voice of America is purportedly failing to serve as a "consistently reliable and authoritative source of news." *Widakuswara*, Order at 2 (ECF No. 99); *Abramowitz*, Order at 3 (ECF No. 29). Overall, their motions fail to provide concrete examples of news they contend is neither "reliable" nor "authoritative." Their motions focus on several other aspects of the International Broadcasting Act, provisions that were not cited or relied upon by the Court when issuing its injunction. The narrow question at this juncture is whether Defendants have complied with the third provision of the Court's injunction. The answer is yes. The Court should accordingly dispense with Plaintiffs' motions for an order to show cause. Further, as discussed below, to the extent the Court considers any other type of relief (including a more severe remedy, such as a finding of contempt or the initiation of contempt proceedings), the facts on the present record do not support such drastic action, nor has the high standard for contempt been meet in this circumstance.

**ARGUMENT**

I.  **Defendants Are Complying with the Court's Order and the International Broadcasting Act's Mandate that Voice of America Serve as a "Consistently Reliable and Authoritative Source of News"**

The Court's April 22, 2025, injunction ordered: Defendants must restore Voice of America programming such that Voice of America will "serve as a consistently reliable and authoritative source of news." *Abramowitz*, Order at 3; *Widakuswara*, Order at 2. The Court notably did not order—contrary to Plaintiffs suggestion—that Voice of America restore its broadcasting as it existed prior to March 14, 2025, nor did the Court order that Voice of America broadcast in specific

languages, specific regions of the world, put out specific content, or purport to direct Voice of America exactly *how* to fulfill its statutory mandate. For good reason—the Court left those decisions to the Agency—decisions that fall comfortably within an executive agency's discretion. To the extent the Court now believes that Voice of America is somehow not fulling its statutory mandate to "serve as a consistently reliable and authoritative source of news," 22 U.S.C. § 6202(c), it should explain exactly how Defendants efforts have purportedly failed to meet that statutory standard, and how exactly Defendants have failed to comply with the Court's order. Notably, that standard is not defined within the confines of the International Broadcasting Act, nor did the Court define its terms in issuing a preliminary injunction.

Context in this circumstance is important. The International Broadcasting Act was signed into law on April 30, 1994. *See* https://www.usagm.gov/who-we-are/oversight/legislation/international-broadcasting-act/ (last visited June 26, 2025). It was passed, in part, to streamline international broadcasting and place control of international broadcasting under the U.S. Agency for Global Media. *See generally id*. The 1994 Act also specifically incorporated Voice of America's Charter (*see* 22 U.S.C. § 6202(c)), which was created in 1976. Viewing the statute through this lens—that is, as it existed in 1976 and 1994, broadcasting capabilities, broadcasting expectations, and reliance on news was not how it exists in 2025. The world looked markedly different back then—radio and television broadcasting were mainstream; there existed no social media, no Twitter (or "X"), YouTube, TikTok, Instagram, Facebook, or the like. Cell phones were limited; people did not share information at the click of a button while on the go, nor were people tied their smart phones on a twenty-four-seven basis. The bottom line, information sharing was limited. Undoubtedly, that is no longer the situation today in 2025. This framework is relevant to understanding how Voice of America's current programming is wholly

reasonable and consistent with the statute's rationale, and comfortably in compliance with its directive to serve as a "consistently reliable and authoritative source of news." *Id*. § 6202(c)(1). While times may have changed, for its part, the International Broadcasting Act, has not.

Plaintiffs' arguments in opposition are premised on an overly expansive reading of the Court's preliminary injunction. For example, Plaintiffs argue that Defendants fail to broadcast to other regions of the world such as South and Central America, or Africa. But they point to no statutory provision that mandates such action, nor did the Court order as much in its injunction.[3] Rather, they rely on a general broadcasting principle that broadcasting include "information about developments in each significant region of the world." 22 U.S.C. § 6202(b)(6). In the absence of any clear directive, it begs the question as to how Defendants have purportedly failed to comply with the terms of the Court's order.

Nevertheless, as Voice of America's operations demonstrate, they are reaching audiences in Central America. As the Wuco Declaration explains, the Office of Cuba Broadcasting transmits Spanish-language radio and television programming into Cuba using a variety of platforms to maximize reach and accessibility. Wuco Decl. ¶ 19. These methods include satellite transmissions via Telstar 12, social media dissemination across Facebook, YouTube, and Instagram, and live feeds available through the Martínoticias.com website for both television and radio. *Id*. Additionally, Cuba Broadcasting utilizes medium wave radio broadcasting on 1180 AM from Marathon Key, Florida. *Id*. Cuba Broadcasting produces three hours of original content daily, which is then broadcast in a continuous 4-hour loop to ensure wider audience availability across

---

[3] Plaintiffs also reference the purported lack of broadcasting in North Korea, but as they themselves recognize, the statutory language surrounding North Korea indicates that it is "the sense of Congress," and therefore does not impose a mandatory requirement upon Global Media. *See* 22 U.S.C. § 7813.

different time slots. *Id*. Cuba Broadcasting likewise also carries relevant news to the U.S. national interest into Venezuela and Nicaragua. *Id*. The Telstar 12 footprint covers all Latin America and the Caribbean. And, as of June 27, 2025, Voice of America has recommenced shortwave radio broadcasts from the Edward R. Murrow Shortwave Transmitting Station in Greenville, South Carolina. *Id*. This shortwave signal blankets all Latin America and the Caribbean. *Id*.

As Defendants explained in the declaration of Leili Soltani, Global Media is broadcasting in four languages, Mandarin, Dari, Pashto and Farsi. *See generally* Soltani Decl. (*Widakuswara*, ECF No. 117-1). When the International Broadcasting Act was passed in 1994, most Americans were still receiving their television news in 30-minute cycles from the national nightly news. *See* https://usinfo.org/usia/usinfo.state.gov/usa/infousa/media/media2cd.htm (last visited June 26, 2025). For example, in the 1990s (and continuing to today) ABC news produces a nightly news program ('ABC World News Tonight") that consistently runs for 30 minutes with commercial breaks. *See* https://abcnews.go.com/world-news-tonight-with-david-muir (last visited June 26, 2025) (identifying thirty-minute news segments). CBS also runs the CBS Evening News for thirty-minutes (https://www.cbsnews.com/evening-news/) (last visited June 26, 2025), as does NBC, https://www.nbcnews.com/nightly-news (last visited June 26, 2025).

Global Media is in line with these standards—indeed, these news stations, as well as several others, often tout themselves as reliable and authoritative sources of news. In line with these principles, on June 30, 2025, if not sooner, Global Media will increase its Afghan Service programming to thirty minutes. *See* Wuco Decl. ¶ 5. Global Media initiated a five-minute broadcast (two and a half minutes, each, in Dari and Pashto) on May 28, 2025. *Id*. ¶ 5. On June 6, 2025, the Afghan broadcast was increased to ten minutes (five minutes, each, in Dari and Pashto). The thirty-minute broadcast will feature fifteen minutes of news in each of the Dari and Pashto

languages, with identical content in each language. As the Wuco Declaration explains, the content is written in English and then translated into Dari and Pashto; a tedious process that requires twenty minutes of work translating and rehearsing for each minute of content written in English. *Id*. The content is broadcast live from Voice of America studios in the Wilbur J. Cohen building in Washington, DC, by two native-level Dari and Pashto hosts. *Id*. ¶ 8. The signal is carried by satellite (Yahsat Sat Service) to Global Media's Kuwait Shortwave Transmission Station and broadcast live into all of Afghanistan. *Id*. As the Wuco Declaration attests, receiving or monitoring stations in New Delhi, India and in Dushanbe, Tajikistan, confirm that Global Media shortwave transmission blankets all of Afghanistan (and somewhat beyond), daily. *Id*.

In addition, the program is also carried on the following FM affiliate stations in Afghanistan, all of which were contacted and added after the initial days of broadcasting had begun: FM Radio Raihan (with an estimated audience of 120,000). *Id*. ¶ 9. Broadcast coverage includes the center of the Takhar province and sixteen of its districts, including Khan Abad district in the Kunduz province. There is also coverage through FM Pamir Radio (estimated audience of 400,000), and coverage includes Badakhshan province, including Fayzabad city, Argo, Khash, Yaftal-e Bala, Yaftal-e Payin, and Arghanjkhwah. *Id*. There is also coverage through FM Radio Sar E Pul (with an estimated audience of 150,000) and that coverage includes Sarepul City, District of Sayed, District Soz Ma Gala, District Sayed Abad. *Id*. Finally, FM Mehran Radio (there is an estimated audience of 65,000. *Id*. Coverage includes Jawzjan province, including Aqcha, Khwaja Dukoh, Mardian, and Khanqah, Northern Afghanistan. *Id*.

Mr. Wuco also explains that Global Media will also be increasing its editorial program. Wuco Decl. ¶¶ 16-18. As such, Global Media intends on soliciting editorial content interagency, and from subject matter experts elsewhere, where they may offer comment and discourse on

various content pieces transmitted and published by Voice of America. *Id*. ¶ 16-18. Global Media anticipates that its renewed editorial program will commence sometime after July 4, 2025. *Id*.

In addition, consistent with its statutory requirements, Global Media will also devote certain programming on the individual states of the United States. *See* Pub. L. 105-277, 112 Stat. 2681-835 (1998) (noting that Voice of America shall devote programming each day to broadcasting certain information on the individual states of the United States, including information on products, tourism, and cultural and educational facilities in each state); Wuco Decl. ¶¶ 11-15. Global Media is also organizing links to YouTube videos of state tourism and other channels, so that they may be reposted on its digital platforms, with posting to begin sometime during the week of June 30, 2025. *Id*. ¶ 15.

Further, as explained during the hearing on June 23, 2025, Voice of America retains the capability, with its lean staff, to respond to events as they are happening around the world. For example, within hours of the commencement of Israeli air operations against Iran, Voice of America began detailed coverage of the strikes on the Persian digital platforms. Wuco Decl. ¶¶ 3-4. This was steadily streaming on Voice of America websites, as well as on numerous social media platforms. *Id*. ¶ 4. In less than 24 hours, Voice of America began television coverage. *Id*. On June 21, 2025, Voice of America also aired coverage following the U.S. airstrikes on Iran's nuclear facilities, including the President's address, which was carried live, and simultaneously translated. *Id. Voice* of America's Persian Service' television broadcasts are carried by satellite into Iran and the Greater Middle East via several satellites. *Id*. ¶ 4. Additionally, all content is posted to several of Voice of America's Persian Service social media accounts. *Id*. Recognizing that Voice of America may need to staff up as need arises, Global Media has exercised recalls, as appropriate,

and is initiating internal details and hiring Personal Services Contractors as needed, to maintain required levels of statutorily required activity. *Id.* ¶ 20.

Finally, the Court requested that Defendants provide any additional "relevant information" pertaining to Global Media personnel updates. *Widakuswara*, Order at 2. Presently, Global Media has approximately 209 active personnel. Wuco Decl. ¶20; *see also* Ex. 1 to Wuco Decl. A breakdown of the offices where those employees work is included in Exhibit 1. As it demonstrates, Global Media currently has 86 employees working for Voice of America and the Office of Cuba Broadcasting. These numbers are anticipated to change with anticipated flux, including a reduction in force, and as Global Media responds to current events as needed. *Id.*[4]

## II. There is No Evidence to Support the High Standard of Contempt or Sufficient to Initiate Contempt Proceedings

To begin, it is important to note that neither set of Plaintiffs raised the concept of contempt as part of their requested relief sought through the motions at issue. *See Abramowitz*, Pls.' Mot. at 8-9 (outlining a request for additional information as to how Defendants will meet statutory mandates) (ECF No. 37); *id.*, Pls.' Reply Proposed Order at 1-2 (requesting that the Court order Defendants to provide additional information as to their plan for Global Media) (ECF No. 49-1); *Widakuswara*, Pls.' Mot. at 9-10 (requesting that the Court order Defendants to provide additional information regarding their resumption of activities and noting that they "reserved the right" to seek contempt in the future) (ECF No. 112); *id.*, Proposed Order (suggesting that the Court order Defendants to provide additional information regarding their broadcasting activities and compliance with the Court's order) (ECF No. 112-1); *id.*, Pls.' Reply (same) (ECF No. 120).

When the parties appeared for a hearing before the Court on June 23, 2025, the Court raised the specter of contempt. Yet this is undoubtedly not the procedural posture in which the parties

---

[4] Should this change, Defendants will supplement their filing accordingly.

find themselves. Plaintiffs' motions sought only more information, including a detailed plan regarding Defendants activities. Notably, they did not style their motions as seeking enforcement of the Court's prior order—instead, the gravamen of their requests has been that Defendants be ordered to provide additional information as to how they are complying with the Court's orders and Global Media's organic statute.[5] Yet a court asked to enforce a prior order should only grant the motion when a "prevailing plaintiff demonstrates that a defendant has not complied with a [prior order] entered against it." *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 11 (D.D.C. 2004). At all times, the Court should demand an appropriate showing before granting any relief and wield its powers with care and due recognition for enforcing its command without any gloss. *See Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014) (cleaned up); *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984). That is especially so when matters of interbranch comity are at issue. The central question is whether the plaintiff has "received all relief required" by the Court's prior order. *Heartland Hosp.*, 328 F. Supp. 2d at 11. In this case, the Court commanded that Voice of America restore its programming—Voice of

---

[5] The *Widakuswara* Plaintiffs also raised a demand that Defendants produce documents and for discovery under Federal Rule of Civil Procedure 26. But as Defendants noted, the Court's entry of is preliminary injunction was premised on its belief that Plaintiffs were likely to succeed on the merits of their Administration Procedure Act ("APA") claims. It is well settled that APA claims are reviewed on the administrative record—no more and no less. *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 82–83 (D.D.C. 2018); *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'"). While Plaintiffs argue that they would be entitled to discovery on their constitutional claims, including claims arising under the First Amendment, Plaintiffs provide no explanation as to why would be entitled to discovery during the injunctive phase regarding Defendants compliance with claims that lack any relevance to this analysis. The Court did not enter the injunction on the First Amendment claim—it chose not to reach the merits of that claim in issuing its injunction. Mem. Op. at 16 (*Widakuswara*, ECF No. 98). Simply put, the fact that Plaintiffs have asserted claims that *may* afford them discovery at some point in the future on other claims does not support a finding of entitlement to discovery in what is a record-review claim regarding Defendants compliance with the Court's injunction.

America did so. The Court also commanded that Voice of America "serve as a consistently reliable and authoritative source of news," 22 U.S.C. § 6202(c), and while the parties may dispute what those undefined statutory terms mean or require—Defendants have not failed to comply with any clear or unambiguous directive.

"Civil contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous," *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991), and the violation must be proved by "clear and convincing" evidence. *Washington–Baltimore Newspaper Guild, Local 35 v. Washington Post Co.*, 626 F.2d 1029, 1031 (D.C. Cir. 1980); *Armstrong v. Exec. Off. of the Pres., Off. of Admin.*, 1 F.3d 1274, 1289 (D.C. Cir. 1993). Clear and convincing evidence in the context of civil contempt means "a quantum of proof adequate to demonstrate to a 'reasonable certainty' that a violation has occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002); *see also SEC v. Bilzerian*, 613 F. Supp. 2d 66, 70 (D.D.C. 2009). "Furthermore, if the order contains any ambiguities, the Court must resolve those issues in favor of the party against whom contempt is sought." *Broderick v. Donaldson*, 338 F. Supp. 2d 30, 47 (D.D.C. 2004) (citing *United States v. Microsoft Corp.*, 980 F. Supp. 537, 541 (D.D.C. 1997)). The order is to be interpreted using an objective test that considers the plain language of the order and the circumstances surrounding its issuance. *Cobell v. Babbitt*, 37 F. Supp. 2d 6, 16 (D.D.C. 1999) (citing *United States v. Young*, 107 F.3d 903, 907 (D.C. Cir. 1997)). The movant bears the initial burden of demonstrating by clear and convincing evidence that: (1) there was a clear and unambiguous court order in place; (2) that order required certain conduct by Defendants; and (3) Defendants failed to comply with that order. *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 2d 35, 38 (D.D.C. 2010).

Neither Plaintiffs have moved on these grounds, and there is no such clear and convincing evidence here. Defendants restored programming to Voice of America as quickly as practicable following entry of the Court's injunction. This is underscored by the significant logistics Global Media had to undertake to recall its personnel, reactive network access, and ensure an orderly transition back into Global Media's offices. *See* April 24, 2025, Declaration of Crystal Thomas ¶¶ 3-10 (ECF No. 102-2). Nor have Plaintiffs pointed to any clear and convincing evidence that Defendants have violated the Court's preliminary injunction. Moreover, where an order contains any ambiguities, this Court is required to resolve those ambiguities in favor of Defendants. The Court did not define what it means to serve as a "consistently reliable and authoritative source of news." *Widakuswara*, Order at 3; *Abramowitz*, Order at 2. The International Broadcasting Act similarly does not define these terms. And undoubtedly, measuring Voice of America's compliance against its activities during a previous administration is not the measure of compliance. Priorities and activities shift from administration to administration. Simply because Voice of America operated one way in 2024 does not require the Agency to continue operating in the same way in 2025, absent a statutory mandate to do so. As previously explained, Defendants are putting out content, producing programming, and broadcasting in Dari, Pashto, Farsi, and Mandarin, as well as through the Office of Cuba Broadcasting. And indeed, to increase its broadcasting, Voice of America has now increased its Persian service to thirty-minutes of programming a day, and is in the process of adding editorial content, among others. Wuco Decl. ¶¶ 5, 11-18. This evidence could hardly suggest that there is clear and convincing evidence to support a finding of contempt, or even to initiate contempt proceedings. To the extent the Court has any concerns regarding Defendants compliance, it should implement appropriately tailored relief, allowing Defendants notice and an opportunity to be heard as to the grounds of any such relief. And it should further

adequately explain exactly why the Court is of the belief that Defendants are not complying with the injunction in place.

## CONCLUSION

For the reasons explained here and in Defendants' opposition to Plaintiffs' motions to show cause, the Court should deny the motions.

Dated: June 27, 2025
       Washington, DC

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: */s/ Brenda González Horowitz*
    BRENDA GONZÁLEZ HOROWITZ
    D.C. Bar No. 1017243
    STEPHANIE R. JOHNSON
    Assistant United States Attorneys
    601 D Street, NW
    Washington, DC 20530
    Main: (202) 252-2500

*Attorneys for the United States of America*