UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATSY WIDAKUSWARA, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> KARI LAKE, *et al.*, <br><br> *Defendants.* | Case No. 1:25-cv-01015-RCL |
| MICHAEL ABRAMOWITZ, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> KARI LAKE, *et al.*, <br><br> *Defendants.* | Case No. 1:25-cv-00887-RCL |

## MEMORANDUM ORDER

Before the Court is the plaintiffs' Joint Motion to Pause Reductions in Force in Service of Enforcing Prong (3) of the Preliminary Injunction. *See* ECF No. 144 ("Mot."). The defendants have proposed a reduction in force ("RIF") that would separate more than 500 employees within the U.S. Agency for Global Media ("USAGM"), including a majority of the employees at Voice of America ("VOA"). *See* Declaration of Frank Wuco ¶ 3, ECF No. 153-1 ("Wuco Decl."). Pursuant to the April 22, 2025 preliminary injunction entered in this case, the defendants must "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news.'" *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 40 (D.D.C. 2025). The parties have litigated the defendants' non-compliance with that requirement throughout the summer, and the plaintiffs contend that, as the proceedings continue,

1

the proposed RIF would impede the Court's ability to ensure compliance with the preliminary injunction going forward. Consequently, they urge the Court to enter an order pausing the RIF to "preserve the status quo . . . until the Court can ascertain whether Defendants are in compliance with prong (3) of the preliminary injunction or otherwise issues a dispositive ruling in this action." Mot. at 5. For the reasons that follow, the Court will defer ruling on the Motion and hereby **SUSPENDS** the RIF pending further proceedings aimed at securing compliance with the preliminary injunction.

## I. BACKGROUND

On March 14, 2025, the President of the United States signed an Executive Order directing that "the non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law," and ordered the CEO of USAGM to "submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of [USAGM], if any, are statutorily required and to what extent." Exec. Order 14,238, 90 Fed. Reg. 13043, 13044 (Mar. 14, 2025). Beginning the next day, "the acting leadership of USAGM [took] a series of actions purportedly in furtherance of the EO's directive." *Widakuswara*, 779 F. Supp. 3d at 21. As the Court has previously recounted:

> On March 15, 2025, USAGM placed 1,042 [of its 1,142 full-time] employees on administrative leave. That same day, all USAGM grantee networks received an identical letter from the agency immediately terminating their operative grant agreements, with no explanation other than the boilerplate language that "[t]he award no longer effectuates agency priorities" and citing the EO. On March 16, 2025 "USAGM terminated contracts with all [approximately 598] personal services contractors ["PSCs"]," whose pay was scheduled to end on March 31, 2025. On March 17, 2025, USAGM instructed "all USAGM Foreign Service employees" to shut down all transmitters at their respective stations, place locally employed staff on leave, and expect to be placed on administrative leave themselves within two days. On March 25, 2025, USAGM's HR

2

> Director notified union officials at American Federation of State, County and Municipal Employees, AFL-CIO ("ASFCME," a plaintiff in this case) that USAGM intended to "send termination notices" to 29 of USAGM's 32 radio broadcast technicians ("RBT")—and because the three remaining RBTs had already submitted retirement applications, this move would effectively eliminate all RBTs. Also on March 25, USAGM's HR Director sent a notice to American Federation of Government Employees, AFL-CIO ("AFGE," also a plaintiff in this case) conveying USAGM's decision to terminate 594 AFGE members "including broadcast journalists, technicians, budget analysts, electronics engineers, and others" within weeks.

*Id.* at 21–22.

On April 22, 2025, this Court entered a preliminary injunction after concluding that the actions undertaken by the defendants were arbitrary and capricious and not in accordance with law. *See id.* at 40. The preliminary injunction includes three provisions, ordering the defendants to act as follows:

> 1) take all necessary steps to return USAGM employees and contractors to their status prior to the March 14, 2025 Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," including by restoring all USAGM employees and personal service contractors, who were placed on leave or terminated, to their status prior to March 14, 2025;
>
> 2) restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks such that international USAGM outlets can "provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b), and , to that end, provide monthly status reports on the first day of each month apprising the Court of the status of the defendants' compliance with this Order, including documentation sufficient to show the disbursement to RFA and MBN of the funds Congress appropriated; and
>
> 3) restore VOA programming such that USAGM fulfills its statutory mandate that VOA "serve as a consistently reliable and authoritative source of news," 22 U.S.C. § 6202(c).

*Id.* The defendants appealed only the first and second prongs of the preliminary injunction, which the D.C. Circuit stayed on May 3. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at

3

*1 (D.C. Cir. May 3, 2025) (per curiam). The plaintiffs then sought en banc review of the stay. The D.C. Circuit granted en banc reconsideration as to prong (2), ultimately dissolving the stay, *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) (per curiam), but denied reconsideration as to prong (1), *see Widakuswara v. Lake*, No. 25-5144, 2025 WL 156440 (D.C. Cir. May 22, 2025). In a separate statement by Chief Judge Srinivasan, however, a majority of the en banc court clarified the scope of the en banc denial regarding prong (1). That statement reads in full:

> In arguing against en banc reconsideration of the panel's stay of provision (1) of the district court's preliminary injunction while these appeals are pending, the government relies on the continued operation of provision (3) of the preliminary injunction. That provision, which remains unstayed, requires the government to restore Voice of America (VOA) programming so as to fulfill VOA's statutory mandate. Although the government relies on the continued operation of provision (3), the government also asserts that the district court lacks any authority under that provision "to order personnel actions beyond those that the [government itself] determines are necessary or appropriate to carry out its statutory mandate." The court's denial of en banc reconsideration of course should not be understood to accept or treat with the government's assertion in that regard. Rather, insofar as the issue may arise in further proceedings in the district court, that court presumably would consider it in the first instance.

*Widakuswara v. Lake*, No. 25-5144, Doc. 2117869 at 3 (D.C. Cir. May 28, 2025) (alteration in original).

As the en banc court observed, the defendants did not take an appeal from the third prong on the preliminary injunction, which therefore remained in effect since its entry on April 22. But because, until May 27, VOA had continued to "s[i]t silent," the plaintiffs moved for an order to show cause on May 31. *See* Mot. for Order to Show Cause at 2, ECF No. 122. VOA slowly began producing more content over the summer, but its limited operations continued to raise questions concerning the scope of its compliance. The Court ordered multiple rounds of briefing on the

4

show cause motion.  After a hearing on the motion on June 23, 2025, and a further round of briefing, the Court granted the motion.  The Order to Show Cause ordering the defendants to produce the following information:

> 1. Explain how, since April 22, the defendants have complied with Part III of the preliminary injunction, including:
>
>> a. How the defendants have restored VOA programming such that VOA is producing and broadcasting news consistent with the International Broadcasting Act, in each relevant medium (radio, television, and online content), and for each language in which VOA is operating;
>>
>> b. How the defendants' actions are consistent with VOA's congressional appropriations;
>>
>> c. Whether the defendants have notified Congress of their significant reduction in broadcast hours, as required by the Further Consolidated Appropriations Act of 2024;
>
> 2. Identify the precise number of USAGM employees who have been recalled from administrative leave, and explain whether they are actively working on VOA programming, and what work product they have produced; and identify the precise number of USAGM employees that remain on administrative leave.
>
> 3. Produce all documents reflecting the defendants' plan to restore VOA programming to fulfill its statutory mandate.
>
> 4. Produce all documents reflecting the defendants' plans for further termination of USAGM staff, including but not limited to any Agency RIF and Reorganization Plans ("ARRPs"), RIF notices to be provided to Agency employees or the unions representing them, lists of positions to be covered by any future RIFs, and any other relevant documents or information the defendants have drafted or compiled on these subjects to date.
>
> 5. Produce all documents otherwise relating to the defendants' plans to wind down USAGM's operations.

*Widakuswara v. Lake*, No. 25-cv-1015, 2025 WL 2159180, at *5 (D.D.C. July 30, 2025).  The information was due August 13, 2025.

The defendants' response fell short of "provid[ing] the information ordered . . . let alone explain[ing] how they are in compliance with the Court's preliminary injunction, even on [the defendants'] preferred interpretation of VOA's statutory mandate."  ECF No. 72 at 2.  Thus, after

5

another hearing, the Court granted Plaintiffs' request to depose three of members of USAGM leadership—acting CEO Kari Lake, Senior Advisor Frank Wuco, and VOA Acting Director Leili Soltani—on an expedited basis "[t]o allow the defendants one final opportunity, short of a contempt trial, to provide such explanation." *Id.* Those depositions took place throughout September and, as the Court explains below, place the defendants' compliance with the preliminary injunction and their minimum statutory obligation in serious doubt.

Immediately following the Court's most recent hearing on August 25, 2025, the defendants also notified Plaintiffs AFGE and AFSCME and the Court of their intention to initiate a RIF. *See* Notice, ECF No. 138. Three days later, the President issued a further Executive Order stripping USAGM employees of collective bargaining rights. *See* Exec. Order 14,343, 90 Fed. Reg. 42683 (Aug. 28, 2025). The next day, USAGM terminated AFGE and AFSCME's collective bargaining agreements, which included a requirement for USAGM to give sixty-days' notice of any potential RIF. *See* Yeomans Decl. Exs. A, B, D, E. And later that evening, the defendants sent RIF notices to more than 500 USAGM employees, covering the majority of its remaining staff. *See* Notice, ECF No. 141 at 2. The RIF Notices give an effective date of September 30, 2025. *See* Yeomans Decl. Ex. C.

The plaintiffs filed the instant motion on September 8, 2025. They contend that the RIFs "threaten" the plaintiffs' efforts to determine whether the defendants have complied with the preliminary injunction and "will hamper the Court's ability to enforce its injunction in the future." Mot. at 2. They ask the Court to enter an order prohibiting the RIFs from going forward to "preserve the status quo . . . until the Court can ascertain whether Defendants are in compliance with prong (3) of the preliminary injunction or otherwise issues a dispositive ruling in this action." *Id.* at 5. The defendants opposed the motion on September 18, 2025, *see* ECF No. 153 ("Opp'n"),

and the plaintiffs replied on September 24, 2025, *see* ECF No. 159 ("Reply").  The Court held a hearing on the motion on September 29, 2025, and the motion now being ripe, the Court rules as follows.

## II. LEGAL STANDARDS

"A court's powers to enforce its own injunction by issuing additional orders is broad, particularly where the enjoined party has not 'fully complied with the court's earlier orders.'" *Nat'l L. Ctr on Homelessness & Poverty v. U.S. Veterans Admin.*, 98 F. Sup. 2d 25, 26–27 (D.D.C. 2000) (first citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971), then quoting *Hutto v. Finney*, 437 U.S. 678, 687 (1978)); *see also Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014) (explaining that district courts "clearly have the authority to enforce the terms of their mandates" (quoting *The Fund for Animals v. Norton*, 390 F. Supp. 2d 12, 15 (D.D.C. 2005))).  Judicial remedial authority, however, "may be exercised only on the basis of a [legal] violation." *Swann*, 402 U.S. at 16.  Thus, on a motion to enforce an existing injunction, the Court's first task is to determine whether the defendant's conduct violates the existing order. *See id.* ("Judicial authority enters only when [executive] authority defaults.").

Once a violation has been ascertained, the Court must turn to the scope of further relief.  Because equitable relief must be crafted to "meet the exigencies of the particular case" at issue, such authority permits district courts to issue further directives "beyond . . . earlier orders to address each element contributing to the violation and insure against the risk of inadequate compliance." *Gomez v. Trump*, 486 F. Supp. 3d 445, 449–50 (D.D.C. 2020) (alteration in original) (internal quotation marks omitted) (quoting *Hutto*, 437 U.S. at 687).  Furthermore, Rule 65 "authorizes a district court to issue interim relief to prevent irreparable injury and to preserve the status quo while the district court assesses the merits of a case." *Nat'l Treasury Empls. Union v.*

*Vought*, 778 F. Supp. 3d 144, 150 (D.D.C. 2025) (suspending RIF pending further proceedings to ascertain compliance with preliminary injunction).

### III. ANALYSIS

#### a. The record shows that defendants are violating prong (3) of the preliminary injunction.

Pursuant to prong (3) of the preliminary injunction, the defendants must "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news.'" *Widakuswara*, 779 F. Supp. 3d at 40. Time and time again, the defendants have resisted the Court's efforts to obtain information concerning whether they have fashioned a plan for compliance with prong (3). Now, following the ordered depositions of Defendant Lake, Ms. Soltani, and Mr. Wuco, the Court no longer harbors any doubt that defendants lack a plan to comply with the preliminary injunction, and instead have been running out the clock on the fiscal year while remaining in violation of even the most meager reading of USAGM and Voice of America's statutory obligations.

Take, as a starting example, VOA's statutory obligation to "communicat[e] directly with the peoples of the world by radio." 22 U.S.C. § 6202(c). This provision is not just the vestigial remainder of some bygone era of analog communication. Rather, Congress has preserved this provision over the years because, as Congress specifically found, "[i]t is in the interest of the United States to support broadcasting to other nations consistent with the requirements of" the International Broadcasting Act. *Id.* § 6201(3). And specifically retaining the radio-broadcast requirement is consistent with USAGM's task of circumventing internet censorship around the world. *See id.* § 6217(c)(2) (appropriating funds to USAGM to promote techniques for subverting internet censorship); *e.g.*, Reporters Without Borders, North Korea, [https://perma.cc/6B3R-

PTHQ] (explaining that the North Korean government "has developed technical measures" to "completely control communications within the country's intranet").

The defendants contend that they are complying with VOA's statutory obligation under § 6202(c) and assert that "Voice of America is currently broadcasting in short wave radio transmissions." Reply at 5. Yet as the plaintiffs point out, "the only radio content Defendants have presented evidence of, after having been given the opportunity during three depositions, consists of a single '30-minute live radio program, broadcast five days per week, of which 15 minutes is presented in Dari and 15 minutes in Pashto.'" Reply at 4 (quoting ECF No. 153-1 at ¶ 6(d)). VOA is not running radio broadcasting in Mandarin, *see* Wuco Dep. at 129:10–130:19; Soltani Dep. at 184:1–184:10, nor does it have plans to do so in Korean or Russian, *id*. at 151:4–152:22, 161:12–163:6.

Nor are the defendants complying with Congress's language-specific broadcasting directives. Start with its Korean language broadcasting. The North Korea Human Rights Act has set a longstanding directive to USAGM, including through Voice of America, to broadcast into North Korea "12 hours per day." 22 U.S.C. § 7813(b)(2) (directing the agency to "outline[] a plan" for doing so no later than October 18, 2004). For the current fiscal year, Congress appropriated funds to USAGM specifically to "maintain broadcasting hours into North Korea at levels not less than the prior fiscal year." Further Consolidated Appropriations Act 2024, 138 Stat. 813. And yet there is no question that VOA has failed to broadcast in Korean, in violation of both plain statutory text and this Court's preliminary injunction, and that its current plans to restore Korean-language programming consists of internet content, not radio or television broadcasting. The same appears to be true for Congress's direction to broadcast in Kurdish, Croatian, and Serbian. *See, e.g.*, Foreign Relations Authorization Act, Fiscal Years 1992 and 1993, Pub. L. No.

9

102-138, § 234 ("As soon as practicable but not later than one year after enactment, the Voice of America Kurdish language programming pursuant to this section shall be broadcast for not less than 1 hour each day."); *id.* § 233 ("The Director of the United States Information Agency shall establish distinct Croatian and Serbian programs within the Yugoslavian section of the Voice of America."). As the plaintiffs convincingly point out, the defendants "rely[] on a similar appropriations [provision]" as the basis of their obligation to operate Farsi language services, yet they fail to comply with near identical statutory obligations to broadcast in key languages in eastern Europe, the Middle East, and the Korean peninsula. Reply at 6–7.

The defendants also appear to be violating their statutory duties to produce content reflecting (1) "a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen," and (2) "information about developments in each significant region of the world." 22 U.S.C. § 6202(a)(7), (b)(6) (describing broadcasting standards for USAGM). To be sure, the broad language contained in these standards leaves room for the USAGM leadership's judgment. For example, USAGM has latitude when determining criteria for what counts as a "significant region of the world" and which "developments" to highlight, or when deciding which viewpoints are subject to censorship in foreign countries and how to allocate resources among them. Yet the defendants do not even feign an effort to exercise such authority.

To the contrary, the defendants thumb their noses at Congress's commands and give responses that are dripping with indifference to their statutory obligations. Defendant Lake, for example, admits that she has not "given it a lot of thought" whether the continent of Africa, where USAGM and VOA have ceased all operations, is a "significant region of the world" within the meaning of § 6202(b)(6). Lake Dep. at 285:2–19. Defendant Lake *does* consider South and

Central America to be "significant region[s] of the world," yet she concedes that the only programming relevant to developments in Central America concerns Cuba, and that Voice of America currently produces no programming for or about South America. *Id*. at 286:9–287:10. When asked "[w]hich countries in Asia lack adequate sources of free information," Defendant Lake confesses that she does not "have an opinion" on the question. *Id.* at 247:9–15, 249:3–250:9. *But see* 22 U.S.C. § 6201(4) (requiring broadcasting to "the People's Republic of China and other countries of Asia which lack adequate sources of free information"). These responses are the height of arbitrariness. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that "[n]ormally," agency action is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem").[1]

### b. The RIF would further impede the defendants' ability to operate Voice of America consistent with statutory requirements and the preliminary injunction.

As the foregoing discussion shows, Voice of America is currently operating in direct violation of language-specific, medium-specific, and audience-specific requirements under the International Broadcasting Act and related statutes. The plaintiffs convincingly explain that the proposed reduction in force would "[c]ement" such noncompliance. That is because the acting director of Voice of America is currently producing content "based on the resources [available to her] and the current staff." Soltani Dep. at 183:21–184:21. Even the defendants justify the RIF

---

[1] So far as Defendant Lake supposes that her testimony "answer[s]" the Court's ongoing concerns "to the best of [her] ability," Lake Dep. at 422:10–13, her brazen disinterest in the unambiguous statutory obligations implicates her competence to implement the President's directives in a manner consistent with fundamental tenets of administrative law, *see* Exec. Order No. 14,238, 90 Fed. Reg. 13043, 13044 (Mar. 14, 2025) (directing the downsizing of USAGM "consistent with applicable law"), to say nothing of the statutes regulating USAGM's operations. Indeed, the text of President Trump's order reflects a foundational principle under the separation of powers: that "the President may not decline to follow a statutory mandate or prohibition simply because of policy objections," let alone apathy. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.); *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). Despite her pugnacious assertions of authority in connection with this case, Defendant Lake certainly wields no more power than the President in this regard.

11

on its merits only by asserting that the staffing reduction would "not affect Voice of America's ability to broadcast as it is *currently broadcasting*." Opp'n at 9 (emphasis added). Their theory of legality thus turns on the adequacy of VOA's current operations, when in fact, for the reasons just explained, VOA's current programming is statutorily deficient.

The RIF would further impede statutory compliance along many aspects of these deficiencies, beginning with its broadcasting obligations. It would be nearly impossible for VOA to ramp up its broadcasting to meet its statutory obligations with the radio operations staff that would remain following the RIF. The defendants plan to fire all radio master control technicians and all but three radio broadcast technicians. *See* Suppl. Decl. of John Dryden ¶ 7, Ex. A to Reply, ECF No. 159-1 ("Dryden Decl."). As the Court has previously found, radio broadcast technicians "are essential to carry[ing] out broadcasting, as they are required to be on-site 24/7 to broadcast programming, and 'it is not possible to operate VOA without radio engineers.'"[2] *Widakuswara*, 779 F. Supp. 3d at 21 n.7 (citation omitted). Broadcasting is much of the ball game, given its centrality to VOA's statutorily required functions. But the Court is similarly persuaded that the RIF's termination of VOA's subject-matter expertise across key regions and other mediums would make it impossible for VOA to comply with its statutory mandate. Moreover, although USAGM has tried to remove these employees since as early as March 25, *see id*. at 21–22, the defendants *still* have not provided the Court a non-arbitrary justification for the proposed reduction in force.

---

[2] USAGM's previous attempt to terminate radio broadcast technicians was similar in scope, as it intended to terminate "29 of USAGM's 32 radio broadcast technicians," leaving only three in place. *Widakuswara*, 779 F. Supp. 3d at 21. And because each of the remaining technicians "had already submitted retirement applications," the RIF would have "effectively eliminate[d] all" radio broadcast technicians. *Id.* at 22. It is unclear from the present record whether the same three broadcast technicians are the ones who would remain after the proposed RIF. In any case, the Court is convinced by plaintiffs' showing that retaining just three radio broadcast technicians is unlikely to supply the operational capacity necessary for VOA to produce radio programming consistent with its statutory mandate.

Instead, the record remains "a total explanatory void." *Brotherhood of Locomotive Engineers & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020).

### c. The Court can enforce the preliminary injunction.

Rather than providing a rationale for the RIF on its merits, the defendants instead offer an array of other reasons not to grant relief. But even a cursory examination of the relevant law and key facts reveal these objections are all bark and no bite.

The defendant falter from the start by ignoring key features of the appellate record in this very case. The defendants insist that prong (3) has nothing to do with personnel issues, and they reiterate their view that the "D.C. Circuit has already spoken on th[e] issue" of whether the Court could enjoin personnel actions taken in connection with Executive Order 14,238 when it stayed prong (1) of the preliminary injunction. Opp'n at 12. In doing so, they cling to the stay panel's ruling with respect to prong (1) of the preliminary injunction, which stayed the restoration of employees to their status prior to March 15, 2025, explaining that this Court "likely lacked jurisdiction over [USAGM's] personnel actions" because such claims should be channeled under the CSRA. *Widakuswara*, 2024 WL 1288817, at *2. To be sure, the *en banc* D.C. Circuit denied reconsideration of that stay. *Widakuswara v. Lake*, No. 25-5144, Doc. No. 2117031 (D.C. Cir. May 22, 2025) (per curiam). But a majority of the judges on the en banc panel cautioned that the denial "should not be understood to accept . . . the government's assertion" that "the district court lacks any authority under [prong (3) of the preliminary injunction] 'to order personnel actions beyond those that the [government itself] determines are necessary or appropriate to carry out its statutory mandate." *Id.* at *3 (second alteration in original) (Srinivasan, C.J., respecting the denial of reconsideration en banc, with the concurrence of seven circuit judges); *see also id.* at 8 (Pillard, J., respecting the denial of reconsideration en banc) (observing that the en banc ruling "has not limited the district court's remedial options going forward" and that the Court "has authority to

13

modify the preliminary injunction as circumstances develop, even while the appeal of the preliminary injunction is pending"). The stay panel's ruling simply does not bar the relief the plaintiffs seek; rather, the en banc majority encourages the Court to consider it.

Nor does the D.C. Circuit's ruling in *National Treasury Employees Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025), preclude such relief. In that case, the D.C. Circuit analyzed CSRA-channeling of challenges to adverse actions taken *en masse* against employees of the Consumer Financial Protection Bureau. The Circuit concluded that federal jurisdiction over such claims turned on the identity of the plaintiffs and their resulting harm. Union and employee association plaintiffs alleged injuries linked to "their members' loss of employment," and the Circuit held that the CSRA scheme "governs such claims and ousts the district courts of [subject-matter] jurisdiction." *Id.* at 774. But the remaining plaintiffs did not "seek redress for employment-related injuries." *Id.* at 776. The National Association for the Advancement of Colored People ("NAACP"), for example, asserted that the shuttering of CFPB had denied its member access to resources the agency had offered that "address[ed] predatory practices for NAACP members who were victims of the Los Angeles wildfires." *Id.* The NAACP's standing "suffice[d] to tee up the dispositive questions" presented to the court even though the employment-injury claims were subject to CSRA channeling. *Id.* at 777.

The defendants neglect to address *NTEU*'s holding with respect to non-employment injuries, despite the recurring nature of this issue in these proceedings. Here, Reporters Sans Frontières and Reporters Without Borders, Inc. (the "RSF Plaintiffs") and The NewsGuild-CWA ("TNG-CWA") allege parallel harms to the NAACP in *NTEU*. Indeed, this Court has already found irreparable harm to the RSF Plaintiffs "because the shutdown of VOA 'depriv[es] correspondents of a trustworthy source of news' in countries 'where VOA is one of the few, if not

14

the only, sources of independent and reliable news,' and impedes RSF's ability to 'disseminat[e] vital public interest information for journalists and public safety.'" *Widakuswara*, 779 F. Supp. 3d at 38. So too for the TNG-CWA members on H1-B visas, who, absent their jobs, "face 'deport[ation] to their home countries where they could face threats, harassment, or imprisonment for their work as journalists.'" *Id.* Although the defendants declined to challenge the very same harms at the preliminary injunction stage, *see id.*, they now contend that such harms to the RSF and TNG-CWA plaintiffs are merely "speculative." Opp'n at 17. Yet apart from recitation of case law, the defendants offer no more than a conclusory assertion that those plaintiffs' showing is insufficient." *Id.* The preliminary injunction record belies that assertion. As the record shows, RSF Plaintiffs rely on VOA programming in "Afghanistan, Armenia, Azerbaijan, Bangladesh, Burundi, Cambodia, China (including Hong Kong and Tibet), Colombia, Democratic Republic of Congo, Myanmar, Ukraine, Pakistan, Venezuela, El Salvador, Vietnam, and Zimbabwe." ECF No. 16-15 ¶ 7. The defendants only intend to broadcast in two of those countries, Afghanistan and China, and have tailored the proposed RIF to staff the agency accordingly. Wuco Decl. ECF No. 153-1 ¶¶ 4, 6; Wuco Dep. 170:1–171:1. These harms are non-speculative, and the presence of the RSF Plaintiffs makes this case consistent with *NTEU*, not anathema to it.

Finally, the defendants point to two stay-posture cases in the Supreme Court that enjoined RIFs at the Department of Education, *see McMahon v. New York*, 145 S. Ct. 2643 (2025) (Mem.), and six other agencies, *see Office of Personnel Management v. AFGE*, 145 S. Ct. 1914 (2025) (Mem.). In doing so, the defendants invite the Court to infer from those orders a blanket rule favoring RIFs in this posture. The Court, of course, accords the utmost respect to the Supreme Court's stay-posture rulings. Yet any appellate decision cannot provide precedential guidance without a statement of reasons from which the Court can analogize to the present facts. *Compare*

*McMahon*, 145 S. Ct. at 2643 *and AFGE*, 145 S. Ct. at 1914 *with, e.g.*, *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam).  To follow the defendants' lead would, in effect, countenance letting the government fill in the blanks of the Supreme Court's emergency rulings, relinquishing the "basic judicial task" of deciding what the law is.  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 410 (2024).  And to infer an ironclad prohibition against preliminarily enjoining RIFs pending further litigation would disregard the essence of equitable relief.  Equity is allergic to rigidity.  Although "courts of equity must be governed by rules and precedents no less than the courts of law," such "exercise of a court's equity powers" nevertheless "must be made on a case-by-case basis."  *Holland v. Florida*, 560 U.S. 631, 649–50 (2010).  Rarely is this truer than in the crafting and enforcement of a preliminary injunction, which is "dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017).  Nor does this Court believe the Supreme Court expects district courts to do otherwise.

### d. The scope of relief.

"[A]n injunction must be narrowly tailored to remedy the harm shown."  *J.D. v. Azar*, 925 F.3d 1291, 1335 (D.C. Cir. 2019).  In this case, such relief would entail pausing the RIF announced on August 29, 2025, pending further proceedings to secure compliance with the preliminary injunction.  The defendants offer two proposals to narrow the interim relief sought here.  First, they suppose that further relief should reach only "the plaintiffs."  Opp'n at 18.  But this proposal stumbles out of the gate.  Because the Court would grant relief in the name of the non-employee plaintiffs, limiting the scope of the injunction to those plaintiffs merely begs the question of which of *employees* would need to fall within the scope of the injunction to facilitate statutory compliance.

16

In the alternative, the defendants contend that a further order should be limited to VOA employees, rather than USAGM employees, given that the relevant provision of the preliminary injunction refers only to VOA's statutory mandate. *See* Opp'n at 19. On this score, the Court still disagrees with the defendants, at least based on the current record and the structure of the present RIF. Future proceedings will presumably address the need for further factual inquiry concerning the role non-VOA employees play in VOA's current operations and the role they may play in securing future compliance with the preliminary injunction. Furthermore, as the plaintiffs explain, the retention registers associated with the proposed reduction RIF "define[] multiple competitive levels to include both VOA and USAGM employees," making it unworkable to carve out USAGM employees while preserving the retention judgments among employees that the defendants have already made.[3]

That said, as the Court has previously explained, the preliminary injunction "is a stopgap measure . . . intended to maintain a status quo." *Widakuswara v. Lake*, No. 25-cv-1015, 2025 WL 1219037 *3 (D.D.C. 2025) (quoting *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012)). And as the Court specifically explained in denying the defendants' motion for a stay pending appeal of the preliminary injunction, even prong (1) of the injunction "does not reach so far" as to "prohibit[] [USAGM] from making use of any reductions in force regardless of reason." *Id.* The Court certainly does not take the position that any particular level of staffing at VOA or USAGM should constitute a fixed "benchmark for minimum statutory compliance," *id.* and appreciates that continued proceedings will likely result in eventual reductions in force. Pausing the proposed RIF

---

[3] A "competitive level" consists of "all positions in a competitive area . . . which are sufficiently alike in duties, qualification requirements, pay schedules, and working conditions." 5 C.F.R. § 351.403(a)(1). "When a RIF occurs, those in the same competitive area and at the same competitive level must be ranked on the basis of employment tenure, military service, service date and job performance, and those at the bottom of the retention list must be released before those at higher levels." *Mayo v. Hodel*, 741 F.2d 441, 443 (D.C. Cir. 1984) (citing 5 C.F.R. § 351.401–.501).

is not an end in itself, but a means toward a resolution of this case, and an implementation of the Executive Branch's goals, that complies with applicable law.

## IV.    CONCLUSION

Based on the foregoing, to facilitate enforcement of prong (3) of the Court's April 22 preliminary injunction, it is hereby **ORDERED** that:

A. The Court defers a final ruling on the Motion pending the proceedings described below.

B. The defendants shall file a sur-reply to the pending motion no later than October 14, 2025. The defendants' submission shall set forth a plan for compliance with prong (3) of the preliminary injunction for the Court to evaluate as an exhibit to the sur-reply. Plaintiffs shall file any further reply thereto no later than October 21, 2025.

C. The Reduction in Force announced by Defendant Lake on or about August 29, 2025, is **SUSPENDED** and may **NOT** be implemented, effectuated, or completed in any way until this Court has ruled on the plaintiffs' Motion following the briefing submitted under Paragraph B of this Order.

\*\*\*

The Court must offer an observation on the concerning disrespect the defendants have shown toward the Court's orders since the entry of the preliminary injunction. It is the Court's view that the defendants' disregard for its earlier orders to produce information would more than support a trial on civil contempt. For the moment, the Court focuses on the example most germane to the current proceedings. The Court's July 30 order granting the motion to show cause ordered the defendants to "produce all documents reflecting the defendants' plans for future termination of USAGM staff, including but not limited to any Agency RIF and Reorganization Plans." *Widakuswara*, 2025 WL 2159180, at *5. The defendants' response suggested that they were in discussions concerning "the possibility of one or more future RIFs of USAGM employees," suggesting no course of action had then been decided upon. *See* Declaration of Kari Lake, ECF No. 134-2. Then, at an August 25 hearing, counsel for the defendants speculated that "maybe . . . eventually there is [sic] a RIF" and that there was "uncertainty" as to how many employees "should

18

be subject to RIFs." Rough Tr. at 48:18–20, 51:25–52:3. Again, the defendants gave the impression no decision on a RIF had been made. Yet just hours after that hearing, the defendants initiated the RIF at issue in this case. Notice dated August 29, 2025, at 2, ECF No. 138 ("This morning, Counsel for Defendants became aware that yesterday USAGM notified relevant unions with copies of annotated retention registers to be used to issue specific notices to affected bargaining unit employees regarding reduction in force and transfer of function."). Given the timing of those events, it strains credulity to think the RIF was "uncertain[]" or a mere "possibility" as the defendants repeatedly represented to this Court.

The defendants' obfuscation of this Court's requests for information regarding whether their RIF plans comported with the preliminary injunction has wasted precious judicial time and resources and readily support contempt proceedings. That said, the plaintiffs have not requested such proceedings, and the Court declines to pursue contempt *sua sponte*. However, its deference to the plaintiffs with respect to further proceedings should not be mistaken for lenience toward the defendants' egregious erstwhile conduct.

Date: September 29, 2025
4:35 P.M.

Royce C. Lamberth
United States District Judge