# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PATSY WIDAKUSWARA, et al.,

                Plaintiffs,

        v.

KARI LAKE, Senior Advisor to the Acting CEO of the United States Agency for Global Media, et al.,

                Defendants.

Civil Action No. 25-cv-1015 (RCL)

MICHAEL ABRAMOWITZ, et al.,

                Plaintiffs,

        v.

KARI LAKE, Senior Advisor to the Acting CEO of the United States Agency for Global Media, et al.,

                Defendants.

Civil Action No. 25-cv-0887 (RCL)

## MOTION TO DISSOLVE OR, ALTERNATIVELY, MODIFY PRONG (3) OF THE APRIL 22, 2025, PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

BACKGROUND...................................................................................................................3

ARGUMENT.........................................................................................................................8

   I.  The Court Should Dissolve Prong (3) of the Injunction Because It Is No Longer
Necessary and Is Causing Harms...................................................................................9

   II.  At Minimum, the Court Should Modify Prong (3) To Provide the Specificity
Required by Federal Rule of Civil Procedure 65(d). ....................................................12

   III.  In Modifying the Injunction, the Court Should Limit Its Requirements To
Binding Legal Obligations That Plaintiffs Have Article III Standing and an
APA Cause of Action To Enforce. ................................................................................15

     A.  The Injunction Should Not Impose Requirements Based On Provisions
That Are Not Judicially Enforceable. .......................................................................15

     B.  The Injunction Should Not Impose Requirements Based On Provisions That
Required Past Action But Do Not Require Any Particular Level of Ongoing
Broadcasting Activity................................................................................................20

     C.  The Injunction Should Not Impose Requirements Based On Provisions That
Plaintiffs Lack Article III Standing or an APA Cause of Action To Enforce.............23

CONCLUSION....................................................................................................................27

## INTRODUCTION

Eight months ago, upon finding that Voice of America (VOA) had "gone completely dark with no signs of returning," this Court issued a preliminary injunction that was designed to remedy that immediate problem. ECF 98 at 22. Among other things, the Court ordered Defendants to "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news,' 22 U.S.C. § 6202(c)." *Id.* at 36.

Although Defendants appealed other aspects of this Court's injunction, Defendants did not appeal that prong of the order. Instead, Defendants—in appreciation of their statutory mandate—restored VOA programming. VOA is no longer "dark," and has not been for many months. VOA is actively providing programming across multiple media (*e.g.*, radio, live satellite direct-to-home television, and multiple digital and social media platforms), in multiple languages (*e.g.*, Dari, Pashto, Farsi, and Mandarin), with plans to expand further in both broadcasting and language capacity. While there may not be as much programming or as many language services as the agency had elected to provide in prior years, those levels are not required by statute. In all events, programming has been restored; VOA is once again serving as a source of news for people in need of news and information in repressed nations and regions throughout the world. At this point, Defendants respectfully request that the Court dissolve this aspect of the injunction, and return full day-to-day control of the agency to its duly appointed leadership.

Although Defendants have sought to comply with this Court's injunction in good faith, the proceedings over the past eight months have made clear that the Court is dissatisfied with how the agency has done so. The course of proceedings has exposed that this prong of the injunction is not sufficiently clear and specific to satisfy Federal Rule of Civil Procedure 65(d). That Rule requires injunctions to specify, "in reasonable detail," "the act or acts restrained or required." It is now

clear that prong (3) fails to do so. Defendants believed they had complied once they had brought VOA back on air—but the Court appears to be construing the injunction to incorporate all sorts of other purported statutory obligations, duties, and requirements. This is untenable.

If the Court believes this prong of the injunction should remain in force, the Court should at minimum modify its terms, to provide clear notice of the particular actions it intends to require. Defendants have every intention of abiding by this Court's orders (absent, of course, appellate relief) and have consistently done so, but they are entitled to know exactly what is being required of them before they are threatened with contempt. An open-ended order to fulfill a "statutory mandate" is far too vague and uncertain, which is why "follow the law" injunctions are generally impermissible. Defendants therefore respectfully request that the Court modify its preliminary injunction to detail, with reasonable specificity, the actions Defendants must take to comply.

In doing so, Defendants respectfully submit that certain of the Court's orders have made errors in overreading not just the injunction, but also VOA's "statutory mandate." *First*, the Court has treated statutory principles, aspirations, and general statements of policy as akin to enforceable legal obligations. Congress has made findings and expressed general policy views about VOA's work, but those cannot serve as grounds for an injunction. *Second*, the Court has cited—apparently as part of the "statutory mandate" that Defendants were enjoined to fulfill—a number of acts authorizing the appropriation of funds, which apply to fiscal years long since past, and which for the most part did not impose the duties that the Court read into them. *Finally*, even as to obligations that Defendants acknowledge are imposed by law, the Court has not consistently tethered those obligations to cognizable injuries by Plaintiffs or final agency action by Defendants. Accordingly, in modifying the injunction, the Court should limit its scope to binding and extant legal obligations that Plaintiffs have Article III standing and an APA cause of action to enforce.

Defendants understand the Court is frustrated by the course of this litigation. Defendants are frustrated too. To solve this problem, Defendants request that the Court modify the injunction so that it is clear, grounded in law, and susceptible to ready compliance.[1]

## BACKGROUND

**1. The Preliminary Injunction.** On April 22, 2025, the Court entered a preliminary injunction in several related lawsuits. The Court found that VOA "ha[d] gone completely dark with no signs of returning." ECF 98 at 22.[2] Following the issuance of Executive Order 14238, the leadership at U.S. Agency for Global Media (USAGM) had placed over 1,000 employees on administrative leave and terminated grant agreements with networks. *Id.* at 5–6. The Court noted its understanding, based on the record at that stage, that "VOA [was] not reporting the news for the first time in its 80-year existence," and all VOA employees were "on administrative leave with no indication of returning." *Id.* at 6–7.

The injunction ordered Defendants, including USAGM, to do three things. *First*, the Court ordered the return of USAGM employees and contractors to their status prior to the EO. *Second*, the Court ordered Defendants to restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks, and to provide monthly status reports showing disbursement of appropriated funds.[3] *Third*, as relevant here, the Court ordered Defendants to "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news,' 22 U.S.C. § 6202(c)." *Id.* at 36.

---

[1] Under LCvR 7(m), Defendants' counsel states that Plaintiffs' counsel were notified in advance of this motion and stated that they oppose it.

[2] Citations to "ECF" are to docket entries in *Widakuswara v. Lake*, 25-cv-1015-RCL (D.D.C.), unless otherwise noted.

[3] The grantee organizations also brought a separate set of lawsuits that resulted in a separate set of preliminary injunctions, where are not at issue here, and where the agency's compliance has not been in dispute.

**2. Appellate Proceedings.**  Defendants appealed only the first two prongs of this Court's injunction (the personnel and grants prongs).  Defendants did not appeal or seek to stay prong (3).  *See* Emergency Mot. for an Administrative Stay and Partial Stay Pending Appeal ("Stay Mot."), Doc. No. 2113018, *Widakuswara v. Lake*, No. 25-5144 (D.C. Cir. Apr. 25, 2025).

After proceedings before a motions panel and the en banc court, the D.C. Circuit eventually stayed the first prong of the Court's injunction (related to personnel decisions), but not the second prong (related to grant awards).  *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *2 (D.C. Cir. May 3, 2025); *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1556440, at *1 (D.C. Cir. May 22, 2025) (en banc); *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc). The parties have since briefed and argued the merits of the appeal.

**3. Enforcement Proceedings.**  During the pendency of the appeal as to the first two prongs of the injunction, Plaintiffs in *Widakuswara* and *Abramowitz* have filed various motions for orders to show cause and to enforce relating to prong (3) of the preliminary injunction.  In response, this Court has set hearings, ordered additional filings from Defendants, allowed discovery, and granted additional relief for Plaintiffs.  *See* ECF 112 (May 31, 2025) (motion for order to show cause); Minute Entry (June 23, 2025) (hearing held); ECF 121 (June 23, 2025) (ordering government to file a supplemental memorandum); ECF 126 (July 8, 2025) (ordering government to file a second supplemental memorandum); ECF 130 (July 30, 2025) (granting motions for an order to show cause and ordering government to file a response); Minute Order (Aug. 18, 2025) (setting hearing on order to show cause); Minute Entry (August 25, 2025) (hearing held); ECF 137 (Aug. 25, 2025) (order requiring depositions of Kari Lake, Frank Wuco, and Leili Soltani on compliance issues); ECF 144 (Sept. 8, 2025) (motion to pause RIFs "in service of enforcing prong (3) of the preliminary injunction"); Minute Entry (Sept. 29, 2025) (hearing held).

There are two relevant takeaways from those enforcement proceedings.  First is that, from Defendants' perspective, the state of affairs at VOA has changed dramatically since April 2025, and indeed Defendants maintain that they have restored VOA programming in accord with prong (3) of the injunction—consistent with the decision not to appeal it.  *See* ECF 117, 123, 127, 134, 141.  Although VOA's programming may not be as robust as in prior years, the agency is undertaking meaningful and serious efforts to satisfy its statutory mandate, entirely apart from this Court's injunction.  Among other things, VOA has resumed multi-spectral radio broadcasting in Dari and Pashto, television in Farsi, and is producing written and digital content in Dari, Pashto, Farsi, and Mandarin.  ECF 153-1 ¶ 6.  VOA is producing daily web stories and USAGM has restored a robust editorial service.  ECF 117 at 4; ECF 123 at 2–3.  VOA has resumed radio transmission to Afghanistan.  ECF 117 at 6–7.  Significant to ongoing efforts across the USAGM enterprise, the Office of Cuba Broadcasting (OCB) has also resumed shortwave radio broadcasts from the Edward R. Murrow Shortwave Transmitting Station, covering Cuba, Latin America, and the Caribbean.  ECF 123-1 ¶ 19.  To this end, Defendants have restored affiliate broadcasting from 44 radio stations across Latin America to carry news specific to the Cuba influence bloc, to include Venezuela and Nicaragua.  December 8, 2025, Declaration of Frank Wuco ("Wuco Decl.") ¶ 3.[4]  And USAGM is working to restore Korean-language and Russian-language broadcasting, into North Korea and Russia, respectively.  ECF 153 at 5; ECF 141 at 3; Wuco Decl. ¶¶ 3, 6.  Relatedly, the agency has recently resumed PBS-BBS Radyo Pilipinas World Service shortwave broadcast operations using the facilities of the Philippines Transmitting Station in Tinang, Tarlac.  Wuco Decl. ¶ 8.a.

---

[4] Exhibit A to concurrently filed surreply.

As set forth in Defendants' concurrently filed court-ordered compliance plan, the agency has also made recent capital investments that demonstrate its commitment to fulfilling its statutory mandate, aside from the injunction. Defendants have upgraded their medium-wave transmitting station in Marathon, Florida with a brand-new antenna field. *Id.* ¶ 8.c. Defendants have also commenced a significant capacity-expanding project for the Philippines shortwave transmitting facility: the agency is repurposing transmitters from a recently shut-down shortwave facility on Tinian Island, Commonwealth of the Northern Marianas (CNMI), for expanded capacity at the Philippines station. *Id.* ¶ 8.a. Not only is this a significant upgrade, but, as the transmitters are not fabricated new (which would have cost several million dollars), they represent a major cost savings to the agency and American taxpayers. *Id.* Defendants expect to facilitate additional language services with the Philippines station. *Id.* Moreover, the agency is in the third and final phase of a $13+ million project to upgrade its shortwave transmitting station in Kuwait, which is the facility from which the agency currently carries its daily news broadcasts into Afghanistan. *Id.* ¶ 8.b. This includes brand-new, fully modern Ampegon transmitters and recent major upgrades to the station's antenna field. *Id.*

The second takeaway from the enforcement proceedings is that the Court appears to be reading prong (3) of the injunction much more broadly than Defendants. In particular, the Court's later orders have suggested it understands prong (3)'s reference to USAGM's "statutory mandate" as incorporating the general "principles" Congress articulated in the International Broadcasting Act (IBA), thereby requiring the Court to police "VOA's activities in each relevant medium" for consistency with those aspirational principles. ECF 130 at 8. For example, the Court has invoked the IBA's sweeping "[b]roadcasting principles," 22 U.S.C. § 6202(b), as imposing "duties to produce content reflecting (1) 'a variety of opinions and voices from within particular nations and

regions prevented by censorship or repression from speaking to their fellow countrymen,' and (2) 'information about developments in each significant region of the world.'" ECF 164 at 10. And it has read prong (3), in turn, as requiring compliance with those "duties." *Id.*

Moreover, the Court has apparently construed prong (3) to also require VOA to comply with purported obligations from *beyond* the IBA, including acts authorizing the appropriation of funds dating back more than thirty years, even though Plaintiffs had not shown Article III injury from an alleged failure to carry out those specific obligations or any final agency action relating to those specific obligations. *See, e.g.*, ECF 130 at 8.

Finally, in connection with Plaintiffs' most recent motion to enforce, the Court has treated prong (3) as imposing obligations on Defendants relating to personnel levels, even though the Court's preliminary injunction included a separate prong specifically about personnel—which the Court of Appeals has stayed pending appeal. *See* ECF 164 at 11–12, 16–18. Prong (3) on its face does not require any particular personnel levels; it speaks only of restoring VOA programming.

In short, the enforcement proceedings have exposed a gap between what Defendants read prong (3) to require, and what the Court has construed prong (3) to require. That conflict bears on the surreply that the Court has ordered to set forth "a plan for compliance with prong (3) of the preliminary injunction for the Court to evaluate." ECF 164 at 18. Although Defendants are filing that surreply today as required—and are committed to the compliance plan set forth therein—the disagreement over the scope and meaning of prong (3) makes it difficult to design a workable plan that will be satisfactory to the Court. Defendants therefore file this motion asking the Court either to dissolve or modify prong (3) to provide clarity about what actions the Court believes Defendants must take to comply with its directive—and to do so before considering any further compliance or enforcement measures.

## ARGUMENT

In Defendants' view, the objective of prong (3) was to bring VOA back on air, consistent with its statutory obligations, at a time when it had gone "dark." Going dark was the final agency action that the Court set aside; remedying that state of affairs has long since been accomplished. VOA is no longer dark; it has been providing programming for months and intends to continue to do so, regardless of this litigation. Accordingly, the Court should dissolve prong (3), since VOA programming has been "restored" and VOA is now once again capable of fulfilling its statutory mandate, within the broad discretion delegated to its leadership. Importantly, VOA did not appeal prong (3) of the injunction; that choice confirms that this restoration of programming is meaningful and that Defendants will not simply revert to darkness if the injunction is lifted.

To the extent that this Court believes prong (3) continues to be warranted, the Court should modify the injunction to comply with Federal Rule of Civil Procedure 65(d). As originally written, its text fails to give Defendants the specific notice regarding its obligations that the Federal Rules require. An injunction to fulfill a "statutory mandate" is simply too vague and uncertain to serve as a proper injunction—especially when there is not even clarity over which statute (or statutes) impose the relevant mandates. The past months of enforcement proceedings illustrate the moving target that this injunction has become, as the goal has moved from bringing VOA back online, to compliance with amorphous statutory "principles," to consistency with far-flung acts authorizing appropriations from years ago, and even to agency personnel decisions.

In specifying the acts that Defendants must take to comply with prong (3), Defendants respectfully ask the Court to focus on three respects in which the Court's prior orders have overread the applicable statutory mandates. *First*, many of the statutory provisions that the Court has cited in giving substance to prong (3) do not impose judicially enforceable duties—only non-binding

statements of policy or principles. *Second*, the Court has cited certain provisions outside the IBA, including some that no longer apply or that do not impose the duties that the Court has identified. *Third*, as to the statutory provisions that do impose legal obligations, the Court should consider which (if any) may properly be enforced by Plaintiffs here under Article III and consistent with the requirements of the APA's cause of action.

In short, the Court should either dissolve prong (3) as unnecessary and unworkable, or at minimum should modify the injunction to specifically identify the acts required, which should not include compliance with non-enforceable principles, inapplicable obligations, or duties as to which Plaintiffs have no cognizable interest or ripe cause of action. The Court should not proceed with further enforcement proceedings before undertaking this modification and then giving Defendants an opportunity, with fair notice of the injunction's terms, to comply.

## I.    The Court Should Dissolve Prong (3) of the Injunction Because It Is No Longer Necessary and Is Causing Harms.

At the outset, the Court should dissolve prong (3) of the injunction entirely, as the events that gave rise to its issuance have long since been overtaken, and there is no question that VOA is currently functioning and producing programming on its own accord—not "dark" by any stretch. The need for an injunction in April 2025 to address a then-existing problem during a transition period should not become a basis for day-to-day judicial oversight of this agency now that the original problem has been addressed. Yet the injunction has proved to be a vessel for such day-to-day supervision of the agency, which does not accord with the public interest.

"Because injunctive relief is drafted in light of what the court believes will be the future course of events, a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an instrument of wrong." *Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) (plurality op.). Accordingly, a court should dissolve injunctive relief

when a "significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest." *Petties ex rel. Martin v. District of Columbia*, 662 F.3d 564, 569 (D.C. Cir. 2011) (quoting *Horne v. Flores*, 557 U.S. 433, 453 (2009)); *see also, e.g.*, *Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019) (per curiam) (vacating preliminary injunction in light of "significant change[s]" to challenged executive policy); *SEC v. Vision Commc'ns, Inc.*, No. CIV. A. 94-0615, 1995 WL 109037, at *2 (D.D.C. Mar. 6, 1995) ("An injunction may be dissolved where . . . changed circumstances eviscerate the justification therefore."). One such situation is when the "threat of irreparable injury" that formed the basis for the injunction is no longer present. *Matter of Fed. Bureau of Prisons Execution Protocol Cases*, No. 05-CV-2337, 2020 WL 5604298, at *2 (D.D.C. Sept. 20, 2020); *see Petties*, 662 F.3d at 264 (faulting district court for failing to inquire "whether the risk of imminent harm that it found warranted injunctive relief . . . had been ameliorated, if not eliminated, as a result of changed circumstances").

In ordering injunctive relief, the Court found that VOA was "not reporting the news for the first time in its 80-year existence" and that "[a]ll VOA employees remain on administrative leave with no indication of returning." ECF 98 at 6–7. But that state of affairs arose during a transition of unusual uncertainty. Now, despite a stay of the personnel prong of the injunction, VOA has brought 265 full-time equivalent employees and 57 Personal Services Contractors back to work, in addition to locally employed staff overseas. Wuco Decl. ¶ 4. Also, consistent with the decision not to appeal prong (3), VOA has resumed programming in various media and languages, is making capital investments to increase its capacity, and has meaningful plans for expansion in many respects. *Supra* at 5–6. These steps represent a genuine commitment to the agency's statutory functions. With these significant factual changes, the basis for the injunction has disappeared, and "continued enforcement [would be] detrimental to the public interest." *Petties*,

662 F.3d at 569.

Dissolving prong (3) is particularly warranted because of the risk that this injunction—despite being designed to solve an immediate problem back in April 2025—will become a vehicle for ongoing judicial superintendence of an executive agency. As the Supreme Court and the D.C. Circuit have both warned, it is inappropriate for district courts to usurp control over the Executive through burdensome injunctions or consent decrees. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996) ("[I]t is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution."); *Salazar by Salazar v. District of Columbia*, 896 F.3d 489, 497 (D.C. Cir. 2018) (recognizing injunction as "[d]oubly" exceptional "when the judicial branch undertakes to restructure the operations of an executive branch of government and to superintend its operations on an ongoing basis"); *Winpisinger v. Watson*, 628 F.2d 133, 139–40 (D.C. Cir. 1980) (rejecting forward-looking relief that would have required court to "interject itself into practically every facet of the Executive Branch," because the "judiciary is not to act as a management overseer of the Executive Branch"); *see also* Dan Dobbs, Law of Remedies § 2.9(5) (2d ed. 1993) ("[J]udicial control of legislative or executive branch decisions interferes substantially with the separation of powers system of government. If the judicial interference is substantial, judges themselves may lose their distinctive judicial character if they become managers of executive departments by way of injunction."); *cf. FEC v. Rose*, 806 F.2d 1081, 1091 (D.C. Cir. 1986) ("We are not here to run the agencies.").

Of course, injunctions are sometimes necessary and appropriate to remedy discrete injuries, but they should always be narrowly tailored to address those injuries, and not become tools for all-purpose judicial oversight. From a separation-of-powers perspective, the Court should construe prong (3), not as a generalized obligation to comply with all statutory obligations that may attach

to VOA, but rather as simply requiring Defendants to bring VOA back online.  And since that objective has long since been accomplished (and will continue to be accomplished, without the need for ongoing injunctive relief), the Court should dissolve prong (3) and allow the agency's politically accountable leadership to steer its own path going forward.

## II.    At Minimum, the Court Should Modify Prong (3) To Provide the Specificity Required by Federal Rule of Civil Procedure 65(d).

If the Court does not believe that prong (3) is ripe for dissolution, the Court should at least modify the injunction to comply with the specificity requirements of Federal Rule of Civil Procedure 65(d).  Injunctions must provide clear notice of the particular acts that are restrained or required.  That much is necessary to protect the due-process rights of the enjoined defendants; one cannot be held in contempt unless the obligations of the court's order are unambiguous and clear. Yet, as the frustrating months of enforcement proceedings have vividly illustrated, prong (3) is impermissibly vague and open-ended.  Modification is therefore required.

Rule 65(d)(1) requires that "[e]very order granting an injunction and every restraining order must … describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Under this Rule, "an injunction must provide 'explicit notice of precisely what conduct is outlawed.'"  *United States v. Philip Morris USA Inc.*, 682 F. Supp. 3d 32, 45 (D.D.C. 2023); *see also Common Cause v. Nuclear Reg. Comm'n*, 674 F.2d 921, 923–27 (D.C. Cir. 1982) (vacating injunction that "failed to give adequate notice to the Commission of the nature of the prohibited activity"); *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 843 (D.C. Cir. 1985) (similar); *Carter v. Loc. 556, Transp. Workers Union of Am.*, 156 F.4th 459, 499 (5th Cir. 2025) (stating that "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed"); *Hughey v. JMS Dev.*

*Corp.*, 78 F.3d 1523, 1532 (11th Cir. 1996) (dissolving injunction for "failure to specifically identify the acts that [defendant] was required to do or refrain from doing").

The same principle explains why so-called "follow-the-law" injunctions are generally impermissible. Ordering a defendant to comply with the law does not provide the requisite specificity, at least if there are disputes over what the law actually requires. *See, e.g.*, *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) ("[W]e have held injunctions to be too vague when they enjoin all violations of a statute in the abstract without any further specification."); *SEC v. Wash. Inv. Network*, 475 F.3d 392, 407 (D.C. Cir. 2007) (remanding for district court to "reform" injunction that simply enjoined defendants "from future violations of Sections 203(f), 206(1), and 206(2) of the Advisers Act"); *M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1249 (10th Cir. 2024) ("Injunctions simply requiring defendants to obey the law are too vague . . . . because such injunctions do not adequately inform a defendant of its obligations."); *SEC v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012) ("[O]ne of the primary problems with obey-the-law injunctions is that they often lack the specificity required by Rule 65(d).").

It is now clear that prong (3) of this Court's preliminary injunction fails the Rule 65(d)(1) requirements. Prong (3) provides only that Defendants shall "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news,' 22 U.S.C. § 6202(c)." ECF 98 at 2. What exactly does that entail? Defendants understood the order to "restore" VOA programming as a directive to engage in some material programming, not necessarily to restore programming to the precise levels and details of the prior administration. But, to be fair, the injunction does not specify a level of restoration. Instead, it says the restoration should allow USAGM to "fulfill[] its statutory mandate" for VOA to "serve as a consistently reliable and authoritative source of news." That does not provide a clear, specific

benchmark—nothing that would allow Defendants to know whether they have complied, or give the Court a meaningful standard to apply in evaluating compliance. How are Defendants supposed to know whether VOA's programming is sufficiently "reliable" or "authoritative" to satisfy prong (3)? And is that the full extent of the "statutory mandate" Defendants must fulfill, or is the excerpt from § 6202(c) only part of a broader set of obligations that are relevant for this injunction?

The past months of enforcement proceedings are Exhibit A for the vagueness of prong (3). In the course of addressing motions to enforce and to show cause, the Court has invoked principles from the IBA *beyond* the language about a "reliable and authoritative source of news." *See, e.g.*, ECF 130 at 8; ECF 164 at 8, 10–11. That suggests the Court views the relevant "statutory mandate" as broader than set forth in the injunction itself. Moreover, the Court has invoked statutes *beyond the IBA*, likewise in a way that suggests they are incorporated into the injunction. *See, e.g.*, ECF 130 at 8; ECF 164 at 9–10. The Court has expressed that it needs to evaluate, in detail, the nature of VOA's ongoing programming, suggesting it intended prong (3) to require restoration to a level that the Court deems sufficient. *See, e.g.*, ECF 130 at 10–11. As a result, the Court has inquired into programming hours, modes of broadcast, languages, and operations across the globe—most of which are not specifically prescribed by Congress—in seeking to evaluate compliance with prong (3). *See id.* Most recently, the Court has also treated prong (3) as requiring the agency to maintain (unstated and unspecified) staffing levels, even though there was an entirely distinct prong of the injunction (now stayed pending appeal) that spoke to USAGM personnel decisions. *See* ECF 164 at 16–18.

With respect, Defendants were not on fair notice that prong (3) included such specific and detailed obligations, because the injunction itself lacks that specificity and detail. That reveals a violation of Federal Rule 65(d)(1). Not only does the injunction impermissibly fail to specifically

identify the acts that are restrained or required, but by incorporating VOA's "statutory mandate," it also represents an improper "follow-the-law" injunction. Not surprisingly, there are real and legitimate disputes over how far VOA's "statutory mandate" extends. *See infra* Part III.

Accordingly, if the Court does not dissolve prong (3) entirely, Defendants request that the Court modify the injunction to make clear exactly what actions are necessary to fulfill USAGM's "statutory mandate." Only after such modification and a fair opportunity to permit compliance with any aspects of the modified injunction not already addressed—just as Defendants have fully complied with each and every of the other unstayed injunctions this Court has entered in these and related cases—should the Court proceed to evaluate a compliance plan and consider any further enforcement orders.

## III. In Modifying the Injunction, the Court Should Limit Its Requirements To Binding Legal Obligations That Plaintiffs Have Article III Standing and an APA Cause of Action To Enforce.

For the reasons explained above, the Court at minimum should modify prong (3) to set out explicitly what Defendants must do to comply. But, in doing so, the Court should take care not to require actions (i) that are drawn only from aspirational principles or other non-binding statements of policy; (ii) that are not required by extant legal obligations; or (iii) that Plaintiffs lack Article III standing or an APA cause of action to enforce. The Court's orders have suggested an untenably overbroad reading of not only the injunction, but also VOA's statutory mandate. Modification is the right time to revisit these issues and ensure that any injunction stands on firm legal footing.

### A. The Injunction Should Not Impose Requirements Based On Provisions That Are Not Judicially Enforceable.

To start, the Court's orders addressing enforcement of prong (3) have relied on various congressional statements of policy, including generalized "standards and principles" for USAGM and VOA broadcasting. But such provisions are not susceptible to judicial enforcement. They are

merely hortatory or aspirational—not binding legal obligations under the APA or otherwise. It is therefore legally erroneous to enjoin Defendants to comply with those general statements of policy or principle, and they should play no role in a modified version of prong (3).

**1.** The Supreme Court's decision in *Pennhurst State Schools & Hospitals v. Halderman*, 451 U.S. 1 (1981), provides guidance on this issue. There, the Court held that a provision describing Congress's "findings" that "[p]ersons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities" and that such "treatment, services, and habilitation . . . should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty," did "no more than express a congressional preference for certain kinds of treatment." *Id.* at 13, 19 (quoting 42 U.S.C. § 6010(1)–(2)). Those legislative "findings," despite being written into the statute, "when viewed in the context of the more specific provisions of the Act, represent[ed] general statements of federal policy, not newly created legal duties." *Id.* at 22–23; *see also Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (explaining that "manifestly precatory" statements cannot "fairly be read to impose a binding obligation on a governmental unit").

The D.C. Circuit has likewise contrasted "policy goals and general preferences," which "leave much room for governmental officials to determine the means by which these goals and preferences are to be carried out," with "specific language of obligation," which "narrowly cabins the discretion of officials." *Edwards v. District of Columbia*, 821 F.2d 651, 656 (D.C. Cir. 1987). Only the latter are subject to judicial enforcement. *Edwards* involved a statute providing that it was federal "policy" to "assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income"; that "policy" also extended to the goal of "vest[ing] in

local public housing agencies the maximum amount of responsibility in the administration of their housing programs." *Edwards v. District of Columbia*, 628 F. Supp. 333, 336 (D.D.C. 1985) (quoting 42 U.S.C. § 1437).  Rejecting the argument that § 1437 "confer[red] a federal statutory right to decent, safe and sanitary housing," the district court held that the statute was "a statement of policy" that did "not create an enforceable federal statutory right." *Edwards*, 628 F. Supp. at 341.  And the D.C. Circuit affirmed.  *See* 821 F.2d at 652.

Other courts in this Circuit have accordingly declined to find enforceable legal duties in Congress's broad policy statements.  *See, e.g.*, *Barry Farm Tenants v. D.C. Hous. Auth.*, 311 F. Supp. 3d 57, 75 (D.D.C. 2018) (rejecting attempt to rely on "Declaration of Policy" provision to determine "whether a statute creates enforceable rights"); *Ute Indian Tribe of Uintah & Ouray Rsrv. v. U.S. Dep't of Interior*, 560 F. Supp. 3d 247, 262 (D.D.C. 2021) (rejecting argument that statutory statement that "irrigation systems" would be held "in trust for the Indians" created "an enforceable trust duty to manage and maintain . . . assets for the Tribe").

**2.**  Turning to this case, the IBA includes congressional "findings and declaration of purposes" in 22 U.S.C. § 6201, and "[s]tandards and principles" in 22 U.S.C. § 6202, that represent precisely the sort of general, aspirational, hortatory policies and amorphous, open-ended principles that cannot be subject to judicial enforcement in the form of an injunction.

Section 6201 contains Congress's "findings and declarations" respecting international broadcasting.  22 U.S.C. § 6201.  Specifically, § 6201(3) states that "[i]t is in the interest of the United States to support broadcasting to other nations consistent with the requirements of this chapter."  Section 6201(4) contains a similarly aspirational statement that "[t]he continuation of existing United States international broadcasting, and the creation of a new broadcasting service to the people of the People's Republic of China and other countries of Asia which lack adequate

sources of free information, would enhance the promotion of information and ideas, while advancing the goals of United States foreign policy."

This Court has cited these provisions in construing the preliminary injunction. But as broadly worded, precatory statements of the United States's "interest"—in a section devoted to Congress's overarching "findings and declarations"—§ 6201 plainly does not impose enforceable legal obligations or duties. *See Livadas*, 512 U.S. at 132. That is particularly evident given that the Act contains other, more specific provisions that describe required activities. To Defendants' knowledge, no court has found an enforceable duty in § 6201 before this litigation.

Section 6202 contains "standards" and "principles" to govern "international broadcasting." Section 6202(a) sets forth "standards"—directing that U.S. international broadcasting should be, for example, "consistent with the broad foreign policy objectives of the United States," "conducted in accordance with the highest professional standards of broadcast journalism," and "designed so as to effectively reach a significant audience." 22 U.S.C. § 6202(a)(1), (5), (7). Section 6202(b) sets forth "principles"—stating that U.S. international broadcasting shall include, for example, "news which is consistently reliable and authoritative, accurate, objective, and comprehensive," "a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society," "information about developments in each significant region of the world," and "a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen." *Id.* § 6202(b)(1), (2), (6), (7). Section 6202(c), finally, sets forth three "principles" to "govern" VOA's broadcasts—that VOA "will serve as a consistently reliable and authoritative source of news," "will represent America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and

institutions," and "will present the policies of the United States clearly and effectively, and will also present responsible discussions and opinion on these policies."

The Court has cited several of these provisions too, in its orders relating to prong (3) of the injunction. *See* ECF 164 at 10–11. Indeed, prong (3) itself quotes from one of the three principles for VOA broadcasting in § 6202(c). ECF 98 at 36. But these provisions too plainly do not amount to enforceable statutory duties. They are, by their own terms, merely "principles"—not obligations or duties. Such generalized, amorphous standards cannot possibly be enforced by courts in any meaningful way, especially given their constitutional implications. How could a court determine if VOA broadcasts are "consistent with the broad foreign policy objectives of the United States"? Or adjudicate whether VOA's programming is "reliable," "accurate," "objective," or "balanced"? Or test whether VOA is "represent[ing] America, not any single segment of American society," or is adequately "present[ing] the policies of the United States clearly and effectively"?

Like the findings in § 6201, the standards and principles in § 6202 are not themselves legal obligations (and have never been found otherwise by any court, to Defendants' knowledge). They instead provide guidance for the agency leadership to consider and apply in their discretion. *See Pennhurst*, 451 U.S. at 19 (holding that "findings" regarding rights of persons with disabilities "guide[d] the Secretary in his review" but did not create enforceable rights); *Edwards*, 821 F.2d at 656 (explaining that statutory "policy goals and general preferences . . . leave much room for governmental officials to determine the means by which the[] goals and preferences are to be carried out"). Indeed, the IBA specifically charges the USAGM CEO with the responsibility to "ensure that United States international broadcasting is conducted in accordance with the standards and principles contained in section 6202." 22 U.S.C. § 6204(a)(3). The CEO also has the authority (among other things) to "review, evaluate, and determine, at least annually, after consultation with

the Secretary of State, the addition or deletion of language services." *Id.* § 6204(a)(4). There is thus no room for a court to enforce the IBA's findings, standards, or principles.

Finally, even to the extent that the Court views §§ 6201 and 6202 as imposing legally enforceable requirements, it cannot enforce them directly. As the Supreme Court has recognized, "Congress has often enacted" statutes where "the agency is authorized to exercise a degree of discretion." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2004). These types of provisions "leave agencies with flexibility." *Id.* at 395. "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* But because Rule 65 requires *ex ante* clarity on the scope of the agency's responsibility, the Court must first explicate the meaning of these terms; it cannot simply set those terms as an injunction enforceable by contempt without more detailed explanation.

Accordingly, the modified iteration of prong (3) should not impose the findings in § 6201, or the standards and principles in § 6202, as requirements of an injunction.

**B. The Injunction Should Not Impose Requirements Based On Provisions That Required Past Action But Do Not Require Any Particular Level of Ongoing Broadcasting Activity.**

Three provisions cited in the Court's orders on prong (3) appear in or near authorizations of appropriations and contain more specific requirements than the general principles and standards referenced above. They do not, however, require any sustained level of programming at this time. Respectfully, the Court's recent orders overread those provisions.

*First*, 22 U.S.C. § 6217(c)(2) authorizes the following appropriation "for fiscal year 2023":

(2) $49,000,000 to the United States Agency for Global Media (referred to in this section as the "USAGM") and its grantees, for internet freedom and circumvention technologies that are designed—

(A) for open-source tools and techniques to securely develop and

20

distribute digital content produced by the USAGM and its grantees;

(B) to facilitate audience access to such digital content on websites that
are censored;

(C) to coordinate the distribution of such digital content to targeted
regional audiences; and

(D) to promote and distribute such tools and techniques, including
digital security techniques.

Each of the paragraphs focuses on "digital" content and techniques. Although the Court cited

this provision to support its opinion that "specifically retaining the radio-broadcast requirement

is consistent with USAGM's task of circumventing internet censorship around the world," ECF

164 at 8, § 6217(c)(2) does not require radio broadcasting. Nor does it have any continuing

force after fiscal year 2023. Anyway, even if § 6217(c)(2) had continuing force, Defendants

would have satisfied it by making grants to Open Technology Fund, as this Court is aware from

a related case. *See* ECF 35, *Open Tech. Fund v. Lake*, 1:25-cv-00840 (D.D.C.).

*Second*, 22 U.S.C. § 7813(b)(2) provides that, "[n]ot later than 120 days after October

18, 2004, the Broadcasting Board of Governors shall submit to the appropriate congressional

committees a report" outlining "a plan for increasing such broadcasts [to North Korea] to 12

hours per day, including a detailed description of the technical and fiscal requirements necessary

to implement the plan." This provision required submission of a specific report over twenty

years ago; it does not purport to require action in the present day. Indeed, a preceding subsection

makes clear the absence of a concrete programming requirement: § 7813(a)(1) describes "the

sense of Congress" that "the Broadcasting Board of Governors should increase such broadcasts,

including news rebroadcasts, to North Korea from current levels, *with a goal of providing* 12-

hour-per-day broadcasting to North Korea . . . ." In context, the "plan" that Congress required

the Broadcasting Board of Governors to submit by early 2005 was just that: a "plan" for meeting

a "goal" of broadcasting for 12 hours per day—not a programming requirement that "shall" be implemented on an indefinite future basis.

*Third*, § 233 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993, Pub. L. No. 102-138, provided that "[t]he Director of the United States Information Agency shall establish distinct Croatian and Serbian programs within the Yugoslavian section of the Voice of America." This provision did not impose an ongoing obligation to broadcast Croatian or Serbian programming; instead, it required "establish[ment]" of programs over 30 years ago. Even if establishing the programs could be interpreted to require broadcasting within those programs, it would not follow that USAGM violates the statute by not broadcasting in 2025 or 2026; the statute provides no information about how much broadcasting should be conducted or for how long. Congress knows how to use words that impose a continuing obligation, and it did not here. *See Bldg. & Const. Trades Dep't, AFL-CIO v. Martin*, 961 F.2d 269, 274 (D.C. Cir. 1992) (noting that "[p]rincipally, courts have recognized that when Congress intends a provision in an appropriations bill to have permanent effect, it uses words of permanency or futurity (such as 'to apply in all years hereafter')," and declining to "infer from the absence of an appropriation standing alone that Congress intended to impose a permanent ban" where "Congress used no words of futurity or permanency"). Prior administrations apparently agreed: the Croatian broadcasting programming was discontinued *over a decade ago*, in 2011.[5] In sum, § 233 does not require USAGM to conduct "radio or television broadcasting" in "Croatian[] and Serbian" on an ongoing and indefinite basis. *Contra* ECF 164 at 9–10.

---

[5] *See* "VOA Ends Croatian Broadcasts" (Nov. 22, 2011), https://www.insidevoa.com/a/voa-ends-croatian-broadcasts-------134407798/178578.html (last accessed Dec. 8, 2025).

### C. The Injunction Should Not Impose Requirements Based On Provisions That Plaintiffs Lack Article III Standing or an APA Cause of Action To Enforce.

There are, of course, some statutory provisions that do impose real, enforceable duties on Defendants. And in a proper lawsuit—invoking a viable cause of action on behalf of Plaintiffs with Article III standing—a court could enforce those provisions accordingly. But, as to a number of the specific provisions that the Court has cited, this Court has not previously determined that Plaintiffs in these cases have suffered cognizable injury-in-fact from any failure by Defendants to fully execute those statutory duties. Nor has the Court found final agency action relating to these obligations, or sufficient inaction to warrant an APA claim for agency action unlawfully withheld under 5 U.S.C. § 706(1). Absent such a showing and finding, these provisions should not be incorporated into a modified prong (3) of the injunction either.

**1.** Under Article III, Plaintiffs must meet the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To meet that requirement, Plaintiffs must establish that they "[have] suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). Critically, the Supreme Court has emphasized that "standing is not dispensed in gross." *Id.* at 61 (quotation omitted); *see also id.* (holding that the circuit court in that case had erred by treating the plaintiffs and defendants, respectively, "as a unified whole"). Thus, Plaintiffs "must demonstrate standing for each claim that they press" against each defendant, "*and for each form of relief that they seek*." *Id.* (emphasis added) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

Here, the Court has cited (ECF 164 at 9–10) two statutory provisions that require particular levels of foreign-language broadcasting. First, under § 234 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993, "Kurdish language programming pursuant to this section shall

be broadcast for not less than 1 hour each day." Pub. L. No. 102-138, § 234.  Second, § 7043(e)(2) of the Further Consolidated Appropriations Act 2024 contains mandatory forward-looking language about ongoing broadcasting requirements into North Korea: "Funds appropriated by this Act under the heading 'International Broadcasting Operations' shall be made available to maintain broadcasting hours into North Korea at levels not less than the prior fiscal year."  Pub. L. 118-47, 138 Stat. 813 (March 23, 2024).  (Notably, this provision is unlike 22 U.S.C. § 7813, discussed above, which also addressed North Korean broadcasting levels, but only by requiring submission of a report to Congress in service of an aspirational goal.)

Defendants are taking steps to comply with those mandates, as set forth in the concurrently filed surreply and accompanying declaration.  Nonetheless, those statutory obligations are not properly the subject of an injunction in this case, because Plaintiffs have not established (or even alleged) Article III standing based on VOA's failure to comply with the Kurdish and North Korean broadcasting requirements.  The Complaint contains no allegation that would establish standing for Plaintiffs to obtain relief for insufficient Kurdish programming or inadequate "broadcasting hours into North Korea."  Nor do Plaintiffs' preliminary injunction submissions show that they are suffering any cognizable injury from those alleged violations.  Granting relief to Plaintiffs on the mere basis that they think the law is being violated is contrary to bedrock principles of Article III. *See, e.g.*, *Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923).

Notably, when this Court originally granted the preliminary injunction, its analysis of Plaintiffs' standing focused—understandably, given the situation at the time—on whether they had shown standing to challenge the "wholesale dissolution of USAGM" and defend "the existence of the agency."  ECF 98 at 15.  The injury to Plaintiffs stemmed from the fact that VOA was, at that time, "not operational."  *Id.* at 16.  Much of the analysis also turned on the employment-related

harms that stemmed from the challenged agency action.  *See id.* at 15–17 (citing termination of union employees, elimination of union bargaining unit, and loss of benefits and visas).  But the Court had no occasion to decide—and thus did not decide—whether Plaintiffs had standing to seek to enforce the one-hour-per-day requirement for Kurdish programming, or the hourly requirement for broadcasting into North Korea.  The record as it stands does not support a finding that Plaintiffs have Article III standing to challenge those asserted failures by VOA.  As such, those provisions should not be included in any modified version of prong (3).

**2.** Relatedly, the record does not show that Plaintiffs would have a viable cause of action under the APA to challenge Defendants' alleged failures to provide sufficient Kurdish language broadcasting or broadcasting into North Korea (or, for that matter, as to any other specific duties relating to programming levels).  In April, this Court found that Plaintiffs could challenge final agency action in the form of "blanket placement of employees on administrative leave, termination of entire bargaining units of employees, termination of PSCs, and cancellation of grants dispensing congressionally appropriated funds."  ECF 98 at 24–25.  But if Plaintiffs wanted to challenge, for instance, the sufficiency of VOA's Kurdish-language programming (and had standing to do so), that would raise a separate APA question that the Court would need to address separately.

The APA authorizes judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  "Agency action" is defined to include the "whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  Accordingly, the APA allows only for judicial review of "circumscribed, discrete agency actions," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004), not "everything done by an administrative agency," *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (alteration in the original) (quoting *Hearst Radio,*

*Inc. v. FCC,* 167 F.2d 225, 227 (D.C. Cir. 1948)).  In line with constitutional limits on the judicial role, the APA does not empower a federal court to enter "into day-to-day agency management," *S. Utah Wilderness All.*, 542 U.S. at 67, or allow for judicial oversight of the "common business of managing government programs," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006); *cf. TransUnion LLC*, 594 U.S. at 423–24 ("Federal courts do not exercise general legal oversight of the . . . Executive Branch[].").  Even if an act at issue qualifies as an agency "action" under the APA, it remains unreviewable unless it is "final."  An action is final only if it "mark[s] the 'consummation' of the agency's decisionmaking process," and if it is one by which "rights or obligations have been determined," or from which "legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted).

Moreover, when plaintiffs challenge agency *inaction*, the proper vehicle for suit is 5 U.S.C. § 706(1), which authorizes an action to compel agency action unlawfully withheld.  "Section 706(1) permits judicial review of agency inaction, but only within strict limits," mirroring "the common law writ of mandamus."  *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016).  As the D.C. Circuit has made clear, relief under Section 706(1) is controlled by the mandamus standard, and "starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act."  *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000)).  Reflecting the traditional limitations on mandatory injunctions issued to co-equal branches, "[i]n the case of agency inaction" the Court "not only must satisfy [itself] that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action."  *Bluewater*, 234 F.3d at 1315 (quoting 5 U.S.C. § 706(1)).  And even once there has been an "unreasonable delay" in fulfilling the required statutory duty, this Court evaluates

"whether the agency's delay is so egregious as to warrant mandamus." *Core Communications,* *Inc.*, 531 F.3d at 855 (quoting *Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984)). Where there is sufficiently egregious delay in performance of a required duty, courts must still be careful not to "enmesh[]" the judiciary "in the minutiae of agency administration." *Cobell v. Norton*, 240 F.3d 1081, 1108–09 (D.C. Cir. 2001).

Any modified version of prong (3) should reflect these limitations and standards. The APA does not allow Plaintiffs to seek, or authorize the Court to enter, programmatic relief concerning Defendants' compliance with broad statutory mandates writ large. *See S. Utah Wilderness All.*, 542 U.S. at 67. Instead, the burden is on Plaintiffs to identify discrete and final agency action concerning Defendants' obligations under these statutes—or a failure to act that rises to the level sufficient to warrant relief under § 706(1)'s demanding, mandamus-like standards. With respect to the Kurdish and North Korean obligations—and any other specific language or programming mandates that the Court believes are imposed by law—Plaintiffs have not come close to meeting this burden. They have not shown, for example, that the agency made a final decision to cease the provision of Kurdish-language broadcasting or broadcasting into North Korea. Nor have they shown egregious delay that would warrant mandamus relief. To the contrary, the compliance plan filed today reflects that Defendants intend to resume those services and are working to do so. In these circumstances, a revised prong (3) should not incorporate these statutory duties.

## CONCLUSION

For the reasons set forth, the Court should dissolve prong (3) of its preliminary injunction. In the alternative, the Court should modify prong (3) to make clear exactly what Defendants must do to fulfill USAGM's "statutory mandate." And the modified order should not require any actions

based on provisions that are not judicially enforceable, are otherwise inapplicable, or that Plaintiffs

lack Article III standing or a ripe APA cause of action to enforce.


Dated: December 8, 2025                         Respectfully submitted,

                                                BRETT A. SHUMATE
                                                Assistant Attorney General

                                                ERIC J. HAMILTON
                                                Deputy Assistant Attorney General
                                                Civil Division, Federal Programs Branch

                                                */s/ Abigail Stout*
                                                ABIGAIL STOUT (DC Bar No. 90009415)
                                                ELIZABETH HEDGES
                                                BRANTLEY T. MAYERS
                                                Counsel to the Assistant Attorney General
                                                Civil Division
                                                United States Department of Justice
                                                950 Pennsylvania Avenue NW
                                                Washington, DC 20530
                                                Telephone: (202) 514-2000
                                                Abigail.Stout@usdoj.gov

                                                *Attorneys for Defendants*