## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PATSY WIDAKUSWARA**, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | Case No. 1:25-cv-1015-RCL |
| **KARI LAKE**, *et al.*, | |
| *Defendants*. | |

### MEMORANDUM OPINION

Before the Court are Cross-Motions for Partial Summary Judgment asking whether Defendant Kari Lake has served as and performed the duties of the acting CEO of the U.S. Agency for Global Media ("USAGM") in violation of the Appointments Clause and the Federal Vacancies Reform Act ("Vacancies Act") since joining the agency last year. The motions ripened on March 5, 2026, and for the reasons that follow, the Court holds that the Vacancies Act and the Appointments Clause prohibit her *de jure* or *de facto* service as acting CEO; as such, the Court will **GRANT** the plaintiffs' motion and **DENY** the defendants' cross-motion by separate order.

## I.    BACKGROUND

The Court has previously recounted many of the core facts underlying this dispute. *See Widakuswara v. Lake*, 779 F. Supp. 3d 10, 19–22 (D.D.C. 2025); Order of September 29, 2025, at 2–7, ECF No. 164. The Court thus presumes familiarity with the historical circumstances of the case and restates only the essentials.

### a.    Federal Appointments Law

Article II of the Constitution defines different categories of federal personnel and prescribes procedures for their selection via the Appointments Clause. The relevant text provides that the President:

shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., art. II, § 2, cl. 2.  The Constitution thus classifies government personnel into several categories.  First, by its terms, the Appointments Clause applies only to "officers."  "An officer exercises 'significant authority pursuant to the laws of the United States,'" as apart from an employee, who does not.  *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 759 (2025) (quoting *Lucia v. SEC*, 585 U.S. 237, 245 (2018)).  Second, the Appointments Clause further refines "Officers" into subcategories, distinguishing "inferior Officers" from persons often called principal officers.  The text of the Constitution defines principal officers as "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States."  Inferior officers, by contrast "are those whose work is directed and supervised at some level by others who were appointed by presidential nomination with the advice and consent of the Senate."  *Kennedy*, 606 U.S. at 1443 (internal quotation marks omitted) (quoting *Edmond v. United States*, 520 U.S. 651, 663 (1997)).

For the purposes of the pending cross-motions, these distinctions matter because principal and inferior officers are subject to overlapping but distinct appointment procedures.  Principal officers must receive their appointment through Presidential nomination and Senatorial confirmation.  By contrast, the Appointments Clause provides that Congress may "vest the Appointment of . . . inferior Officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments."  Congress's involvement in the appointments process has long been understood as an important "guard against the appointment of unfit characters . . . from family

connection, from personal attachment, or from a view to popularity." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017) (discussing advice and consent). Indeed, as Alexander Hamilton explained, the Senate's advice-and-consent role serves as a check on the unilateral installment of "candidates who ha[ve] no other merit than that . . . of being, in some way or other, personally allied to [the President], or of possessing the necessary insignificance and pliancy to render them the obsequious instruments of his pleasure." The Federalist No. 76, at 394–95 (George W. Carey & James McClellan eds., 2001); *see also In re Grand Jury Subpoenas to Off. of N.Y. State Att'y Gen.*, — F. Supp. 3d —, 2026 WL 60793, at *5 (N.D.N.Y. Jan. 8, 2026), *appeal filed* Jan. 23, 2026.

Recognizing that the advice-and-consent process is cumbersome by design, and the inevitability of occasional vacancies, both Congress and the judiciary have long recognized that a well-functioning executive requires service by qualified temporary officers when such vacancies occur. Thus, when a vacancy arises in a principal office, a "subordinate officer" can undertake the duties of a superior officer "for a limited time, and under special and temporary conditions," without "transform[ing] into the superior and permanent official." *United States v. Eaton*, 169 U.S. 331, 343 (1898). Congress passed the Vacancies Act to specify procedures for temporarily filling vacancies in Senate-confirmed positions. *See* 5 U.S.C. § 3347(a) (identifying the Vacancies Act as "the exclusive means for temporarily authorizing an acting official to perform the functions and duties" of a vacant Senate-confirmed office). In general, the Vacancies Act applies when "a[n] officer of an Executive Agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns or is otherwise unable to perform the functions and duties of the office." *Id.* § 3345(a).

The Vacancies Act establishes three paths to fill vacant a government post. The first method, and the default rule, provides that when a vacancy occurs, "the first assistant to the office

of such officer *shall* perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1) (emphasis added); *see also SW Gen.*, 580 U.S. at 305 (observing that the first assistant takes over "automatically" upon the occurrence of vacancy). The second and third options allow "the President (and only the President)" to select an alternative to the first assistant. *See id.* § 3345(a)(2)–(3). The President may select either another person serving in a Senate-confirmed office "to perform the functions and duties of the vacant office," or "an officer or employee" who has served in the affected agency for at least ninety days "during the 365-day period preceding the date" of the vacancy" and was employed by the agency on the date the vacancy occurred. *Id.*

The Vacancies Act yields if another "statutory provision expressly . . . authorizes the President, a court, or the head of an Executive Department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." *Id.* § 3347(a)(1)(A). But Congress qualified that exception: a "statutory provision providing general authority to the head of an Executive agency . . . to *delegate duties* statutorily vested in that agency head to, or to *reassign duties* among, officers or employees of such Executive agency" does not supplant the Vacancies Act's procedures. *Id.* § 3347(b) (emphases added). Only a statute that specifically authorizes the appointment of an "acting" officer can qualify for the Vacancies Act exception. *Id.* § 3347(a)(1)(A).

Finally, the Vacancies Act specifies the result when a person exercises principal officer authority without complying with the statute. "An action taken by any person who is not acting" according to the statute's provisions "in the performance of any function or duty of a vacant office" covered by the statute "shall have no force or effect." *Id.* § 3348(d)(1). Nor may any such action "be ratified" after the fact. *Id.* § 3348(d)(2).

### b.  The CEO of USAGM

The CEO of the U.S. Agency for Global Media is a principal officer and, as such, is appointed by the President with the advice and consent of the Senate.  *See* 22 U.S.C. § 6203(b)(1). The CEO, in turn, may "appoint such personnel for the Chief Executive Officer" as the CEO "may determine to be necessary."  *Id.* § 6204(a)(11).

In December 2024, then-President-elect Trump announced that Defendant Lake would serve as the director of Voice of America in the incoming administration.  *See* Statement of Undisputed Material Facts ¶ 1, ECF No. 168-2 ("SUMF").  But upon taking office in January 2025, President Trump removed six of the seven members of the International Broadcasting Advisory Board.  *Id.* ¶ 2.  Because the director of Voice of America "may only be . . . removed if such action has been approved by a majority vote of the Advisory Board," the President could not remove and replace the incumbent Voice of America director with Lake until the Board regained a quorum.  22 U.S.C. § 6205(e)(1).

All the while, on January 20, 2025, USAGM CEO Amanda Bennett resigned.  *See* Defendant's SUMF ¶ 1, ECF No. 202-2 ("DSUMF").  Rather than being nominated for the vacancy, however, Lake was appointed as Senior Advisor to acting CEO Victor Morales on February 27, 2025.[1]  *See Id.* ¶ 2.  On March 5, 2025, Morales issued a Delegation Order that "designated" Lake "to perform the functions and responsibilities specified" in all but three of the

---

[1] According to public reporting, it was Lake who announced that Morales would serve as acting CEO in an email to USAGM staff.  SUMF ¶ 5.  Although the defendants dispute the admissibility of the news reporting and contend it therefore should not be part of the summary judgment record, the Court has little doubt that the same facts could be presented in admissible form at a later date if needed, either as part of the administrative record or through the testimony of a party to the communication.  *See* Fed. R. Civ. P. 56(c)(2) (allowing objections if proffered fact "cannot *be presented* in a form that would be admissible in evidence" (emphasis added)); *Ecological Rights Found. v. U.S. Envt'l Prot. Agency*, 541 F. Supp. 3d 34, 51 (D.D.C. 2021) (holding summary judgment "evidence need not be in a form that would be admissible at trial, so long as it is capable of being converted into admissible evidence" (citation omitted)).  In any event, this detail is not dispositive of the pending motions.

twenty-two subsections of 22 U.S.C. § 6204(a) assigning the authorities of the CEO.  Ex. 2 to Cross-Reply, ECF No. 214-2 ("March Delegation").

After Lake was elevated to the position of Deputy CEO in July, Morales issued a second and materially identical delegation order.  Ex. 3 to Cross-Reply, ECF No. 214-3 ("July Delegation").  These documents corroborate testimony Lake provided during show-cause proceedings in this case, in which she stated that during her tenure as Senior Advisor and Deputy CEO, she exercised "95 percent" of the CEO's duties and the acting CEO retained responsibility for "[w]riting reports" and little else.  SUMF ¶ 6.  Although the Court sees no apparent defect in the appointment of Morales as acting CEO, it is clear that Lake had *de facto* control of the agency pursuant to these delegations.  Lake was ultimately made acting CEO beginning on July 31, 2025, and ending on November 19, 2025, two days after the filing of the plaintiffs' motion.  DSUMF ¶ 7.  She has therefore exercised control over the agency during the period relevant to the motions.

The President issued Executive Order 14,238 on March 14, 2025.  *See* 90 Fed. Reg. 13043 (Mar. 14, 2025).  The Executive Order directed that "the non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law."  SUMF ¶ 7.  Lake's testimony indicates that she took the lead for the agency in its efforts to comply with the Executive Order.  *Id.* ¶ 8.  For example, Lake cancelled USAGM's lease on new office space. *Id.* ¶ 9 (citing Lake Dep. at 124:12–19).  Lake also personally oversaw the drawdown of USAGM's broadcasting operations, including the decision to cease television broadcasting.  *Id.* ¶ 10.  Lake testified that she asked Morales and other senior career officers to recommend a plan for compliance with the Executive Order, and Lake transmitted that plan to Congress in June.  *See id.* (citing Lake Dep. 153:14–18).

Lake also took charge of personnel decisions at USAGM. Most notably for purposes of this litigation, Lake oversaw efforts to implement a reduction-in-force ("RIF") that would have removed 639 USAGM employees. *Id.* ¶ 12. In June, Lake personally signed the RIF notices after Morales "refused to do [so]." *Id.* (quoting Lake Dep. at 311:4–6). These notices were later rescinded due to errors, but Lake sent revised RIF notices to 532 employees on August 29, 2025. *Id* ¶ 13; ECF No. 144-4 (sample RIF notice). Lake also made the decision to assign Leili Soltani to perform the responsibilities of the head of programming for VOA while its director, Michael Abramowitz, was on administrative leave. *Id.* ¶ 14 (quoting Soltani Dep. at 69:9–70:12). And Lake hired new advisers, notably Frank Wuco. *Id.* (quoting Wuco Dep. at 60:5–13).

The defendants represent that Lake has returned to the role of Deputy CEO as of November 19, 2025 but do not identify who is serving as acting CEO at the present. *See* DSUMF ¶ 4.

### c. Procedural History

The plaintiffs moved to supplement the Complaint in this case on November 17, 2025, which the Court granted on December 12. *See* ECF Nos. 167-1, 179. The Supplemental Complaint set forth new allegations related to Lake's exercise of CEO authority and claims under the Appointments Clause and Vacancies Act. *See* ECF No. 167-1 at 5–6 (alleging Count X under Appointments Clause and Count XI under Vacancies Act). Also on November 17, the plaintiffs filed the instant Motion for Partial Summary Judgment, seeking judgment as a matter of law on the claims raised in the Supplemental Complaint. ECF No. 168. The defendants opposed, moved to dismiss for lack of subject-matter jurisdiction, and cross-moved for summary judgment on February 6, 2026. ECF Nos. 202, 203. The plaintiffs filed their joint reply/cross-opposition on February 17. *See* ECF Nos. 208, 209.

On February 26, 2026, the plaintiffs advised the Court in writing that Defendant Lake had reinstated a "Deferred Resignation Program" ("DRP"), allowing USAGM employees "to resign from their position at USAGM now . . . and continue receiving pay until September 5[, 2026]." Notice at 1, ECF No. 212. Employees have until March 9, 2026, to accept the DRP. *Id.* An email to USAGM staff advised that the "RIF noticed in August 2025 is currently suspended due to court order, and the Agency still intends to carry out a significant RIF as soon as [it is] able." Ex. B to Decl. of Georgina Yeomans at 5, ECF No. 212-1.

The defendants cross-replied on March 4, *see* ECF No. 214, and the plaintiffs sur-replied with the Court's leave on March 5, *see* ECF Nos. 216-1, 217. In light of the proposed DRP, the cross-motions are now not only ripe but pressing.

## II. LEGAL STANDARDS

### a. Motion for Summary Judgment

A movant is entitled to summary judgment if he or she "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if "it might affect the outcome of a suit under governing law." *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted). Rule 56(c) "explicitly require[s] a party opposing summary judgment to support an assertion that a fact is genuinely disputed with materials in the record." *Oveido v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 396 (D.C. Cir. 2020). "When parties file cross-motions for summary judgment, each motion is considered separately, in the light most favorable to the non-moving party, and the court must determine, for each motion, whether the Rule 56 standard has been met." *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, 789 F. Supp. 3d 66, 80 (D.D.C. 2025).

### III.    ANALYSIS

#### a.  The Court has subject-matter jurisdiction.

Before turning to the merits, the Court briefly notes that Lake purports to incorporate by reference a challenge to standing presented in a motion to dismiss the defendants filed on July 18, 2025.  *See* ECF No. 202 at 11 (citing ECF No. 128 at 7–11).  That motion, however, predates the Supplemental Complaint filed on December 12, in which the plaintiffs brought additional claims under the Vacancies Act and Appointments Clause.  *See* ECF Nos. 168, 179.  Because the standing arguments contained in the July motion target the plaintiffs' standing to bring the APA and constitutional claims presented in the original Complaint, those arguments have limited relevance to the plaintiffs' standing to bring the Appointments Clause and Vacancies Act claims at issue in this opinion.  *See Scahill v. District of Columbia*, 271 F. Supp. 3d 216, 224 (D.D.C. 2017) ("A plaintiff . . . 'must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" (quoting *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017))).

That notwithstanding, the Court has a duty to confirm its jurisdiction and readily finds that the plaintiffs here have standing.  Lake, exercising the authority of the USAGM CEO, has placed many of these employees on administrative leave and initiated a reduction in force that would permanently end the employee plaintiffs' employment, which has only been paused by ongoing litigation in this case; likewise, the same conduct would cause Article III injuries to plaintiff American Federation of State, County, and Municipal Employees ("AFSCME"), whose loss of union dues supports standing.  *See Widakuswara*, 779 F. Supp. 3d at 27–28.  The Court is thus satisfied that several classes of plaintiffs have standing to raise the present claims.  *See Newdow v. Roberts*, 603 F.3d 1002, 1008 (D.C. Cir. 2010) (explaining that courts may proceed to merits so long as at least "one plaintiff has standing" (quoting *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977))).

Lake also alludes to an argument that these claims should be channeled under the Civil Service Reform Act because the employee plaintiffs' claims depend on the harms they would suffer due to the proposed RIF. This argument fails for many reasons. First, case law makes clear that challenges to the authority of an officer purporting to implement a RIF are not subject to channeling. *See Andrade v. Lauer*, 729 F.2d 1475, 1490–96 (D.C. Cir. 1984). Second, and as this Court has previously held in a related case, claims that turn on Appointments Clause authority are similarly exempt. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 180 (2023); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010); *Abramowitz v. Lake*, 803 F. Supp. 1, 10–13 (D.D.C. 2025), *appeal filed* Sept. 3, 2025. Third, several of the plaintiffs in this case, including AFSCME and Radio Sans Frontières, raise claims not directly linked to an employment relationship and cannot be channeled. As with the defendants' prior attempts to circumvent judicial review via the CSRA, these grounds for channeling are unpersuasive.

### b. Lake's purported appointment as acting CEO violates the Vacancies Act.

The limits on Presidential authority to appoint acting officers without the Senate's advice and consent provides "a critical 'structural safeguard . . . of the constitutional scheme.'" *SW Gen., Inc.*, 580 U.S. at 293 (quoting *Edmond*, 520 U.S. at 659). As discussed above, the Vacancies Act permits three avenues by which a government official can hold a vacant office in an acting capacity without separate advice and consent. To begin, by default, the "first assistant" of the vacant office automatically becomes the acting principal. 5 U.S.C. § 3345(a)(1). Second, "the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office." *Id.* § 3345(a)(2). Third, "'the President (and only the President) may direct an officer or employee of' the agency experiencing the vacancy 'to perform

the functions and duties of the vacant office,' but only if that individual served in a senior position in that agency for at least 90 days 'during the 365-day period preceding' the occurrence of the vacancy."  *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 24 (D.D.C. 2020) (quoting 5 U.S.C. § 3345(a)(3)).

Lake is plainly ineligible to serve under subsection (a)(2) because she was not "serv[ing] in an office for which appointment" is subject to advice and consent prior to her designation as acting CEO.  22 U.S.C. § 3345(a)(2).  Nor can she serve under subsection (a)(3) because she was not employed by USAGM in any capacity prior to the occurrence of the vacancy.

She insists, however, that her designation as acting CEO is proper under subsection (a)(1) because she was serving as Deputy CEO, the first assistant to the CEO, at the time that Morales was removed as acting CEO.  Adopting Lake's position would require the Court to find that the President can fill a first assistantship at any time during a vacancy in a Senate-confirmed office and then fall back on subsection (a)(1) to elevate the first assistant to serve as the acting officer. Agreeing with other judicial decisions that have addressed this question, the Court concludes that Lake's argument is inconsistent with the text and structure of the Vacancies Act.  *See Giraud*, 160 F.4th at 397–401; *In re Grand Jury Subpoenas*, 2026 WL 60793, at *5.  Instead, subsection (a)(1) applies only to a first assistant who occupies that position at the time the vacancy occurs.  Because Lake was not first assistant at the time of the vacancy, she lacks authority to serve as the acting CEO.

As an initial matter, the Court joins in the observation that "[t]he text of subsection (a)(1) alone is . . . silent as to whether the first assistant must be in the role at the time of the vacancy." *Giraud*, 160 F.4th at 397.  Neither the D.C. Circuit nor the Supreme Court has had "the occasion to resolve" the question.  *L.M.-M.*, 442 F. Supp. 3d at 24 (citing *SW Gen., Inc. v. NLRB*, 796 F.3d

67, 76 (D.C. Cir. 2015)).[2]  Applying ordinary principles of statutory construction, however, the Court finds that the best interpretation of the statute favors the plaintiffs.

First, it is undisputed that subsection (a)(1) is triggered "automatic[ally]" by the occurrence of a vacancy in a Senate-confirmed position.  *SW Gen.*, 580 U.S. at 305.  Several textual clues support this conclusion.  Upon the occurrence of an officer vacancy, "the first assistant to the office of such officer *shall* perform the functions and duties of the office temporarily in an acting capacity."  5 U.S.C. § 3345(a)(1) (emphasis added).  "[T]he word 'shall' imposes a mandatory command."  *Bufkin v. Collins*, 604 U.S. 369, 379 (2025).  And in the context of subsection (a)(1), the word "shall" imposes a "directive that [the first assistant] perform acting duties."  *SW Gen.*, 580 U.S. at 303.  Lake acknowledges as much in her briefing.  *See* ECF No. 202 at 16 ("[A]bsent any presidential designation, the first assistant to the office shall perform its functions and duties." (citing 5 U.S.C. § 3345(a)(1))).

The use of "shall" distinguishes (a)(1) from the operative language in subsections (a)(2) and (a)(3).  Each of those subsections speaks of other officers or employees whom "the President (and only the President) *may direct* . . . to perform the functions and duties of the vacant office."  5 U.S.C. § 3345(a)(2)–(3) (emphasis added); *see also SW Gen.*, 580 U.S. at 303 ("Compare the mandatory language of subsection (a)(1) to (a)(2) and (a)(3).").  In other words, "[t]he President may essentially override the automatic first assistant appointment by choosing a different person who qualifies under subsections (a)(2) or (a)(3), but neither the President nor anyone else has a role in the automatic elevation of the first assistant when the vacancy occurs."  *Giraud*, 160 F.4th at 398.

---

[2] Although the D.C. Circuit has not decided the question presented here, the panel in *Southwest General* drew the same assumption as part of its reasoning.  796 F.3d at 76 ("Although we do not decide its meaning today, subsection (a)(1) may refer to the person who is serving as first assistant *when the vacancy occurs.*").

Subsections (a)(2) and (a)(3) also reflect a careful balance between "honor[ing] the Senate's advice-and-consent role" and "reconiz[ing] a need for some flexibility in choosing an acting officer." *Id.* They do so by "cabin[ing] the pool of eligible people" for acting service to two narrowly defined groups: "those the Senate has already confirmed" to another office (which may be indicia of fitness for federal leadership) "or those with [recent] expertise within the agency" (which may confer relevant substantive experience). *Id.* Lake's view of subsection (a)(1) is therefore difficult to square with the decisions Congress made in enacting (a)(2) and (a)(3). That is because "while subsections (a)(2) and (a)(3) narrowly constrain who 'the President (and only the President)' may direct to take an acting role," Lake's reading of subsection (a)(1) would allow the President "to, in effect, appoint almost anyone, whether or not the person is previously Senate-confirmed to another role, and whether or not the person has any recent experience in the agency," merely by installing them as a non-Senate-confirmed first assistant. *Id.* at 399 (citations omitted). Allowing the President to circumvent Congress's carefully crafted limitations in this way would relegate subsections (a)(2) and (a)(3) — to say nothing of the advice-and-consent requirement — to vestigial surplusage. The Court declines Lake's invitation to do such violence to the statutory and constitutional scheme.

Lake warns that the reading the Court adopts today would "upend the functioning of the Executive Branch, which routinely relies on acting officers who serve in that capacity upon being installed as first assistants after . . . the officer position became vacant." ECF No. 202 at 17. She observes that "[t]his practice is most common at the beginning of a new Administration, which typically fills vacancies in Senate-confirmed positions by appointing first assistants, who then serve in an acting capacity until the Senate confirms the new Administration's nominees." *Id.* at 17–18. But "just because a practice previously went unchallenged does not mean it complies with

13

the [Vacancies Act]." *Giraud*, 160 F.4th at 400.  And the government has never "identif[ied] a single example of a post-vacancy first assistant serving in an acting capacity prior to enactment of the [Vacancies Act]."  *Id.* (quoting *L.M.-M.*, 442 F. Supp. 3d at 27–28).  Thus, any "practice of elevating later-named first assistants is a recent development . . . not a practice to which Congress has acquiesced," let alone "a process essential to the Government's ability to function."  *Id.*  In sum, § 3345 does not authorize Lake to serve as acting CEO.

### c. Lake cannot exercise the duties of the USAGM CEO through delegation.

As a fallback position, Lake contends that even if she is not the acting CEO of USAGM under the Vacancies Act, she may nevertheless continue to exercise the authorities delegated to her by Victor Morales.  This argument falters out of the gate.

Lake contends that then-acting CEO Morales assigned the duties and responsibilities of CEO to her in a series of formal delegations issued pursuant to 22 U.S.C. §§6204(a)(17)–18 and § 1435.  By statute, the CEO may "utilize the provisions of titles III, IV, V, VII, VIII, IX, and X of the United States Information and Educational Exchange Act [the "Smith-Mundt Act"] . . . to the extent the [CEO] considers necessary in carrying out the provisions and purposes of this chapter."  *Id.* § 6204(a)(17).  Title X of the Smith-Mundt Act, in turn, includes the provision now codified at 22 U.S.C. § 1435, and Lake contends this provision empowers "the highest official — such as the UASGM CEO or Acting CEO — to delegate powers conferred by the Act to appropriate government officers."  Cross-Reply at 7.  The problem for Lake is that the provision she cites says not one word about delegation by the CEO.  Instead, the Act provides that "[t]he *Secretary*," meaning the Secretary of State,[3] "may delegate, to such officers of the Government as the Secretary determines to be appropriate, any of the powers conferred upon him by this chapter."

---

[3] *See* 22 U.S.C. § 1433(1) ("When used in this chapter, the term 'Secretary' means the 'Secretary of State.'")

22 U.S.C. § 1435 (emphasis added).  Although the Court assumes that this citation was not purposely misleading, Lake does not acknowledge the gap between her characterization of § 1435 and its plain next, let alone suggest why the Court should infer that when Congress explicitly referred to the Secretary of State, it in fact meant to include the CEO of USAGM.  *See Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016) ("Absent persuasive indications to the contrary, [courts] presume Congress says what it means and means what it says.").

Nor does Lake contend with a further hurdle: the separate and specific anti-delegation provisions of the Vacancies Act.  The Vacancies Act provides "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office."  5 U.S.C. § 3347(a).  "But the [Vacancies Act] also prohibits the use of general vesting and delegation statutes to 'temporarily authoriz[e] an acting official to perform the functions and duties'" of a vacant office.  *Giraud*, 160 F.4th at 403 (quoting 5 U.S.C. § 3347(b)).  In other words, delegation statutes cannot function as an end-run around the provisions of § 3345(a).  So even if the Smith-Mundt Act authorized delegations by the CEO of USAGM — a proposition Lake has not established — that statute still could not transform Lake into the *de facto* acting CEO, as she supposes, because the Vacancies Act forbids it.  Like her reading of subsection (a)(1), her approach would "bypass[] the constitutional [advice-and-consent] process entirely" and functionally "eliminate[] the requirements of the [Vacancies Act]."  *Id.*

But that has not stopped Lake from trying.  The exhibits Lake has submitted in support of her cross-reply corroborate her testimony that Morales delegated to her nearly all statutory authorities of the Chief Executive Officer apart from the making of reports.  *See* SUMF ¶ 6 (citing deposition testimony that Lake exercised "95 percent" of the CEO's duties and acting CEOs retained responsibility only for "[w]riting reports").  Lake has provided nearly identical delegation

orders dated March 5 and July 11, 2025, in which Morales delegated nearly all of his statutory authority as acting CEO under 22 U.S.C. § 6204(a).  *See* March Delegation; July Delegation.  The only powers reserved to Morales were those contained in § 6204(a)(9) (making annual reports to Congress), § 6204(a)(19) (authorizing expenses for personnel stationed in the Northern Mariana Islands), and § 6204(a)(22)(B)–(C) (reporting of "biased, unprofessional, or otherwise problematic content" to Congress).  Pursuant to these delegations, and in violation of the Vacancies Act's anti-delegation provisions, Lake assumed authority "[t]o supervise all broadcasting activities" of USAGM, *id.* § 6204(a)(1), to "determine . . . the addition or deletion of language services," *id.* § 6204(a)(4), "[t]o make and supervise grants and cooperative agreements for broadcasting," *id.* § 6204(a)(5), and "[t]o allocate" congressionally appropriated money "for international broadcasting activities among the various elements of" USAGM, *id.* § 6204(a)(6), among many other important responsibilities in furtherance of the "broad foreign policy objectives of the United States," *id.* § 6204(a)(2).  The Court finds that these expansive delegations were an unlawful effort to transform Lake into the CEO of U.S. Agency for Global Media in all but name, and therefore violated § 3347(b) of the Vacancies Act.

### d.  Remedy

Only the Appointments Clause or the Vacancies Act's exclusive structure may authorize service as a principal officer, and Lake satisfies the requirements of neither the statute nor the Constitution.  "[A]ction taken by any person who is not acting" in compliance with the Vacancies Act's provisions "in the performance of any function or duty of a vacant office . . . shall have no force or effect."  5 U.S.C. § 3348(d)(1).  Nor may any such action "be ratified."  *Id.* § 3348(d)(2).  As a consequence, any actions taken by Lake during her asserted tenure as acting CEO between

July 31 and November 19, 2025, including but not limited to the August 29 reduction-in-force effort, or actions taken pursuant to the March or July delegations of CEO authority, are void.

## IV.  CONCLUSION

Based on the foregoing, the Court will **GRANT** the [168] Motion for Partial Summary Judgment as to Counts X and XI and **DENY** the [202] Cross-Motion.  Because the August 29 RIF lacks legal effect, the Court will also find as **MOOT** the Plaintiffs' pending [144] Motion to Enforce the Preliminary Injunction that requested an injunction prohibiting that RIF.

An accompanying order shall issue this date.

Date: March 7, 2026

Royce C. Lamberth
United States District Judge

17