**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MICHAEL ABRAMOWITZ**, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:25-cv-887-RCL** |
| **KARI LAKE**, *et al.*, | |
| *Defendants.* | |
| | |
| **PATSY WIDAKUSWARA**, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:25-cv-1015-RCL** |
| **KARI LAKE**, *et al.*, | |
| *Defendants.* | |

## MEMORANDUM OPINION

Before the Court are cross-motions for partial summary judgment on the Administrative Procedure Act claims raised by the plaintiffs in the above-captioned cases. The plaintiffs challenge the defendants' actions in March 2025 to dramatically downsize the United States Agency for Global Media and its subsidiary, Voice of America, as violating Sections 706(1) and (2) of the APA. After clearing a series of threshold hurdles, the Court ultimately concludes that the plaintiffs prevail on all aspects of their APA claims except for certain contractors' requests for reinstatement. Accordingly, each parties' motion will be **GRANTED IN PART** and **DENIED IN PART** as set forth in an accompanying order.

1

## I.     BACKGROUND

### a.   Statutory Structure

Voice of America ("VOA") originated as a counter-propaganda operation against the Nazi regime during World War II.  Plaintiffs' Statement of Undisputed Material Facts, ECF No. 166-2, ¶ 1 ("SUMF").[1]  Following the war, Congress codified VOA's existence as a service "to disseminate abroad information about the United States, its people and policies promulgated by the Congress, the President, the Secretary of State and other responsible officials of Government having to do with matters affecting foreign affairs."  *Id.* ¶¶ 2–3 (quoting U.S. Information and Educational Exchange Act, Pub. L. No. 80-402, § 2(1), 62 Stat. 6, 6 (1948)).  Since that time, Congress has refined the legal and administrative framework governing VOA's operations through a series of amendments.  *E.g.*, Foreign Relations Authorization Act of 1977, Pub. L. No. 94-350, § 503, 90 Stat. 823, 831 (1976) (expressing that "the long-range interests" of the United States "are served by communicating directly with the peoples of the world by radio").

The International Broadcasting Act (the "Broadcasting Act") of 1994 establishes VOA's current governance structure and places VOA under the oversight of the U.S. Agency for Global Media ("USAGM").  SUMF ¶¶ 7–8.  "The [Broadcasting Act] declared that 'it is the policy of the United States to promote the right of freedom of opinion and expression, including the freedom "to seek, receive, and impart information and ideas through any media and regardless of frontiers," in accordance with Article 19 of the Universal Declaration of Human Rights.'"  *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 345 (D.D.C. 2020) (quoting Pub. L. No. 103-2436, § 302(1), 180 Stat. 433 (1994)); *see also* 22 U.S.C. § 6201(1).

---

[1] Unless otherwise specified, ECF citations refer to the docket in *Widakuswara v. Lake, et al.*, No. 25-cv-1015-RCL. Facts cited herein are found not to be in material dispute unless specified.

The Broadcasting Act requires "United States international broadcasting" to be "conducted in accordance with the standards and principles" established by Congress in 22 U.S.C. § 6202(a)–(b) and tasks the Chief Executive Officer of USAGM with "ensur[ing]" adherence to those standards.  22 U.S.C. § 6204(3).  As to standards, Congress requires, for example, that broadcast activities "shall be consistent with the broad foreign policy objectives of the United States," *id.* § 6202(a)(1), "not duplicate the activities of private United States broadcasters" or "government supported broadcasting entities of other democratic nations," *id.* § 6202(a)(3)–(4), "be conducted in accordance with the highest professional standards of broadcast journalism," *id.* § 6202(a)(5), "be designed so as to effectively reach a significant audience," *id.* § 6202(a)(7), and "promote respect for human rights, including freedom of religion," *id.* § 6202(a)(8).  As to principles, Congress prescribes that USAGM's "broadcasting shall include news which is consistently reliable and authoritative, accurate, objective, and comprehensive," *id.* § 6202(b)(1), and "information about developments in each significant region of the world," *id.* § 6202(b)(6), among others.

In 2021, with bipartisan support, Congress created the International Broadcasting Advisory Board, which advises the CEO of USAGM and must approve, by a majority vote, the appointment and removal of the heads of USAGM's broadcasting entities, including the director of Voice of America.  SUMF ¶ 10; *see also* 22 U.S.C. § 6205(e)(1); *Abramowitz v. Lake*, 803 F. Supp. 3d 1, 6 (D.D.C. 2025), *appeal filed* Sept. 3, 2025.

### b.  Congressional funding for USAGM

USAGM and VOA receive taxpayer funding through Congressional appropriations.  In 2024, Congress appropriated $857,214,000 to USAGM to "carry out international communication activities."  SUMF ¶ 12 (quoting Further Consolidated Appropriations Act of

2024, Pub. L. No. 118-47, div. F, 138 Stat. 460, 735 (2024)).    Of those funds, Congress earmarked $260,032,000 for Voice of America.  *Id.* ("[F]unds appropriated under this heading shall be allocated in accordance with the table included under this heading in the explanatory statement described in section 4."); 118th Congress, Further Consolidated Appropriations Act, 2024, Legislative Text and Explanatory Statement at 1167 (Comm. Print 2024) (detailing VOA and grantee funding).

Prior to receiving the 2024 appropriation, USAGM had submitted a budget justification, which described the reasons for USAGM's funding requests and how such funding would be spent, including projected broadcasting hours across an array of countries and languages.  SUMF ¶ 14 (citing *Abramowitz* ECF No. 49-3 (Congressional Budget Justification for FY2025)).  In the 2024 appropriation, Congress required that "significant modifications to USAGM broadcast hours previously justified to Congress," to include "shortwave, medium wave, satellite, Internet, and television" broadcasting, "for all USAGM language services shall be subject to regular notification procedures of the Committees on Appropriations."  SUMF ¶ 13 (quoting 138 Stat. 460, 735–36).

Congress funded USAGM and VOA at the same level, and subject to the same conditions, through three successive appropriation cycles in 2024 and 2025.  SUMF ¶¶ 15–17; Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, 138 Stat. 1524 (2024) (extending funding for fiscal year 2025 "at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2024 and under the authority and conditions provided in such acts"); American Relief Act of 2025, Pub L. No. 118-158, 138 Stat. 1722, 1723 (2025) (same); H.R. 1968, 119th Cong. § 1101(a) (2025) (same).

### c. USAGM's Broadcasting Operations

On March 14, 2025, Voice of America had been providing multimedia broadcasting in forty-nine languages to approximately 362 million people around the world each week. SUMF ¶ 20 (citing Decl. of Michael Abramowitz, *Abramowitz* ECF No. 4-5 ¶ 1). USAGM and VOA collectively employed 1,147 full-time employees and had entered into service contracts with 598 contractors, whom the parties refer to as "personal service contractors" or "PSCs." *Id.* ¶ 21. VOA personnel accounted for more than 1,300 of the total number of employees and contractors at USAGM. *Id.* The contractors included VOA journalists based in foreign countries whose reporting was focused on audiences abroad. *Id.* ¶ 22. Thirty-two radio broadcast technicians also facilitated programming operations. *Id.* ¶ 23.

On March 14, 2025, the President issued an Executive Order titled "Continuing the Reduction of the Federal Bureaucracy," which directed seven federal agencies, including USAGM, to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." Exec. Order No. 14,238, § 2(a)(ii), 90 Fed. Reg. 13043 (Mar. 14, 2025) (the "Executive Order" or "EO"). The President signed the 2025 appropriations law later that day, including for continued funding for USAGM and VOA as described above. SUMF ¶ 25.

The Executive Order led the defendants to bring USAGM's operations to a standstill. Defendant Kari Lake learned of the Executive Order on the evening of March 14, and USAGM's leadership immediately began implementing the EO on March 15. *Id.* ¶ 26 (citing Lake Dep. at 97:13–14, 106:4–15).[2] Although Lake's role within USAGM at the time was "Senior Adviser to

---

[2] The defendants object to considering the depositions of Kari Lake, Frank Wuco, and Leili Soltani taken during show-cause proceedings as part of the summary judgment record. The objection lacks merit. First, the defendants have long withheld the administrative record in this case despite an obligation to produce it contemporaneously with

the CEO," she testified in this case that she had been delegated nearly all of the CEO's statutory authority. *See id.* ¶ 28 (quoting Lake Dep. 55:3–13 (testifying that Lake was exercising "95 percent of" the "authorit[ies] of the CEO," including everything apart from "[w]riting reports that were due")); *see also* ECF Nos. 214-2, 214-3 (delegating CEO authorities to Lake).

According to Lake, the leadership team made a decision on March 15 to reduce USAGM's operations to the "statutory minimum" based solely on the direction contained in the Executive Order. *Id.* ¶ 26; *see also id.* ¶¶ 27–28. But before even making a determination as to what the "statutory minimum" was, the defendants immediately began winding the agency down to only skeletal operations. Effective immediately, the defendants placed nearly all USAGM staff on paid administrative leave pending further study of what the "statutory minimum" was. *Id.* ¶ 36–37. Consequently, 1,042 out of USAGM's 1,147 full-time employees were placed on administrative leave. *Id.* ¶ 37. On the same date, Lake "decided to terminate all the personal service contractors" under the ambit of VOA. *Id.* ¶ 38 (quoting Lake Dep. at 102:14–21). The next day, USAGM notified 598 contractors that their agreements with the government would be terminated effective March 31, 2025. *Id.* The defendants also "directed that VOA cease all programming" and "ordered . . . the VOA news services" to "shut down their transmitters." *Id.* ¶ 40 (quoting Lake Dep. 109:7–110:1). Within days, USAGM also notified union officials that the agency intended to terminate all radio broadcast technicians and 594 union employees,

---

the filing of their motion to dismiss. *See* LCvR 7(n)(1). Second, the depositions at issue were authorized precisely *because of* the defendants ongoing refusal to produce basic information about USAGM and VOA's operations and future plans. Indeed, not until this Court threatened the defendants with the specter of contempt proceedings did they produce the Statutory Minimum Memorandum itself, the agency action implementing the Executive Order. The defendants' persistent omission and withholding of key information in this case has been a Hallmark production in bad faith and is more than sufficient to justify consideration of the depositions. *See Safari Club Int'l v. Jewell*, 111 F. Supp. 3d 1, 5 (D.D.C. 2015) (explaining that courts may consider extra-record evidence in administrative summary judgment proceedings when, *inter alia*, "the agency acted in bad faith").

"including broadcast journalists, technicians, budget analysts, electronics engineers, and others." *Id.* ¶ 41.

The only documentation reflecting the foregoing agency action is a memorandum dated March 18, 2025 (the "Statutory Minimum Memorandum" or "Memorandum"). *See id.* ¶ 30; *see also* ECF No. 166-4. The three-page Memorandum identified sixty-eight employee or contractor positions to retain, excluding members of the Senior Executive Service, and provided that "[a]ll other positions would be terminated." *Id.* It was signed by acting CEO Victor Morales, CFO Roman Napoli, HR Director Crystal Thomas, acting CMO Christopher Luer, legal officer Royce Min, and TSI director Terry Balazs, but not by Lake herself. *See* ECF No. 166-4 at 5. Lake testified that the Memorandum was a "foundational document" that leadership intended the agency to "rely on" in implementing the Executive Order. SUMF ¶ 31 (quoting Lake Dep. at 168:13–14). Although the Memorandum described certain contents as "recommendations," *see* ECF No. 166-4 at 3, according to Lake, the Memorandum provided "guidance" on "what the statutory minimum was" so that the defendants "could effectuate the President's executive order." SUMF ¶ 31 (quoting Lake Dep. 156:13–19). The Memorandum "list[s] the number of employees that will fill various positions after the downsizing is accomplished," and the defendants do not dispute that the document "contains no findings, analysis, or consideration of any relevant factors" apart from an assertion, as inscrutable as it is conclusory, that "[t]he Voice of America functional requirement and scope is duplicative with the activities of [United States] private broadcasters." *Id.* ¶¶ 32–33. Lake testified that the Memorandum reflected USAGM leadership's "decision that this was [the] statutory minimum." *Id.* ¶ 44 (quoting Lake Dep. at 153:14–18). It was meant to be used to "guide[] the agency's decisions" in implementing the Executive Order. *Id.* As a result, for just over a year since March 15, 2025, "hundreds of VOA

7

and USAGM employees" have been "paid their full government salary but prohibited from doing any work." *Id.* ¶ 39.

### d. Procedural History

Proceedings in these cases began shortly after the foregoing events.  On March 21, 2025, the *Widakuswara* plaintiffs sued defendants Kari Lake, the U.S. Agency for Global Media, and Victor Morales, in his official capacity as the acting CEO of USAGM, in the U.S. District Court for the Southern District of New York.  *See Widakuswara* Compl., ECF No. 1.  The Southern District granted a temporary restraining order ("TRO") on March 28, 2025, concluding that the defendants likely violated several provisions of the Administrative Procedure Act ("APA"). *Widakuswara* ECF No. 54 at 21–22.

Meanwhile, on March 26, Voice of America director Michael Abramowitz, as well as three other plaintiffs,[3] sued Lake, USAGM, and Morales alleging similar legal violations based on the same facts.  *See Abramowitz* Compl., ECF No. 1.  On April 4, while the *Widakuswara* TRO was in effect but before the Southern District ruled on the pending motion for preliminary injunction, *Widakuswara* was transferred to this Court as related to *Abramowitz*.

On April 22, 2025, this Court entered a preliminary injunction granting relief in both cases, finding that the defendants had likely engaged in arbitrary and capricious action and unlawfully withheld required agency action under § 706(1) and (2) of the APA.  *See Widakuswara v. Lake*, 779 F. Supp. 3d 10, 33 (D.D.C. 2025).  As relevant here, the Court ordered the defendants to "take all necessary steps to return USAGM employees and contractors to their status prior to" the Executive Order "including by restoring all USAGM employees and personal service contractors, who were placed on leave or terminated, to their status prior to

---

[3] The first John Doe plaintiff in *Abramowitz* was terminated on March 28, 2025.

March 14, 2025" ("Prong One") and to "restore VOA programming such that USAGM fulfills its statutory mandate [to] 'serve as a consistently reliable and authoritative source of news'" ("Prong Three").[4]  *Id.* at 39–40 (quoting 22 U.S.C. § 6202(c)).  The defendants appealed Prong One and obtained a stay, *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *1 (D.C. Cir. May 3, 2025), which the en banc D.C. Circuit left in place, *see Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *2 (D.C. Cir. May 28, 2025) (en banc).  However, a majority of the en banc court wrote separately to clarify that the denial of en banc review "should not be understood to accept . . . the government's assertion" that "the district court lacks any authority . . . 'to order personnel decisions'" in the interim.  *Widakuswara v. Lake*, No. 25-5144, 2025 WL 2787974, at *1 (D.C. Cir. May 28, 2025) (en banc) (Statement of Srinivasan, C.J.).

Prong Three of the preliminary injunction remained intact, but the defendants resumed only limited operations at Voice of America.  The plaintiffs therefore moved for an order to show cause regarding the defendants' compliance with Prong Three.  After the defendants failed to provide satisfactory responses, the Court ordered the depositions of three USAGM and VOA employees: Kari Lake, Frank Wuco, and VOA Persia Service Division Director and acting Head of Programming Leili Soltani.  *See* Order on Mot. to Show Cause, *Widakuswara* ECF No. 72.

The *Abramowitz* and *Widakuswara* plaintiffs have now jointly moved for partial summary judgment on their respective APA claims.  The defendants cross-moved.  The motions are now fully briefed and ripe.[5]

---

[4] Under Prong Two of the preliminary injunction, the Court also ordered restoration of grant funding to several grantee networks in separate related cases.  *Widakuswara*, 779 F. Supp. 3d at 40.  Those grantees are not parties to the instant dispute.

[5] While these motions remained pending, on March 7, 2026, the Court granted summary judgment in favor of the *Widakuswara* plaintiffs on separate claims under the Appointments Clause and Federal Vacancies Reform Act, holding that Defendant Lake had unlawfully exercised the authorities of the CEO of USAGM.  *See* ECF Nos. 218–

## II.    LEGAL STANDARDS

### a.   Motion for Summary Judgment

A movant is entitled to summary judgment if he or she "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if "it might affect the outcome of a suit under governing law." *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted). Rule 56(c) "explicitly require[s] a party opposing summary judgment to support an assertion that a fact is genuinely disputed with materials in the record." *Oveido v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 396 (D.C. Cir. 2020). "When parties file cross-motions for summary judgment, each motion is considered separately, in the light most favorable to the non-moving party, and the court must determine, for each motion, whether the Rule 56 standard has been met." *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, 789 F. Supp. 3d 66, 80 (D.D.C. 2025).

## III.    ANALYSIS

### a.   The plaintiffs have adequately shown Article III standing.

The defendants dispute the plaintiffs' Article III standing to pursue their claims, an argument the plaintiffs unsurprisingly resist. For substantially the same reasons addressed in the Court's preliminary injunction ruling, the Court finds the associational and organizational plaintiffs have standing.

---

19. However, because the Statutory Minimum Memorandum was not issued under Lake's purported authority, the motions now before the Court continue to present a live dispute.

Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), the Court must assess the plaintiffs' standing with respect to the particular claim at issue and "each form of relief" sought, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Article III standing requires the plaintiffs to demonstrate that, for each claim, they have (1) "suffered an 'injury in fact,'" (2) that is "fairly . . . trace[able] to the challenged action of the defendant," and (3) that is "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted). At summary judgment, proof of standing must consist of "affidavits or other evidence to demonstrate the specific facts necessary to support standing." *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 188 (D.D.C. 2022). Membership-based organizations may demonstrate standing through either of two avenues: they may invoke "associational standing" to sue on behalf of their members, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on their own behalf, *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).

As the Court has previously addressed, the union plaintiffs in *Widakuswara* — the American Federation of Government Employees ("AFGE") and the American Federation of State, County, and Municipal Employees ("AFSCME") — may assert associational standing. *See Widakuswara*, 79 F. Supp. 3d at 26–27. To show associational standing, the plaintiffs must demonstrate that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). The defendants' placement of union members on administrative leave and oft-repeated intention to remove

approximately 600 of the unions' members causes injury to AFGE and AFSCME's members within the meaning of Article III. *Widakuswara*, 779 F. Supp. 3d at 26–27. As to the second and third prongs of the associational standing test, it remains germane to the unions' purpose to defend "the existence of the agency where their members work, or that funds their members' work," and "the relief that Plaintiffs seek pertains to Defendants' wholesale dissolution of USAGM and does not depend on the individual circumstances of any union member." *Id.* at 27.

The defendants' actions also inflict Article III injuries on Reporters Sans Frontières ("RSF") and its correspondents as consumers of VOA broadcasting. *See* Pl.'s Opp. to Mot. to Dismiss at 22, ECF No. 131. The Supreme Court has acknowledged a "right to 'receive information and ideas,'" and has acknowledged a cognizable injury to that right "where the listener has a concrete, specific connection to [a] speaker" whose message is curtailed by government action. *Murthy v. Missouri*, 603 U.S. 43, 75 (2024) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)). RSF's correspondents rely on VOA as a "critical flow of information" in locations around the world "where media is tightly controlled," and where VOA's broadcasts in local languages therefore "cannot be replicated by domestic outlets." Decl. of Thibaut Bruttin ¶ 9, *Widakuswara* ECF No. 16-15 ("Bruttin Decl."). Indeed, RSF has detailed at length how correspondents reporting on countries including the Democratic Republic of Congo, Ethiopia, Kenya, Tibet and Vietnam suffer due to the sudden absence of VOA broadcasting in those countries. *See also id.* ¶¶ 10–12, 16–17. For example, an RSF correspondent in Vietnam relies on regular VOA broadcasts for information about the government that is not otherwise available, and without which the correspondent would have to cultivate their own sources at potential risk to their safety. *Id.* ¶ 10 (explaining that at least one VOA journalist has been jailed in Vietnam for reporting on the government). The Court finds

that these plaintiffs' have a "concrete" and "specific connection" to USAGM's broadcasting. *Murthy*, 603 U.S. at 75. These injuries are likely to persist so long as VOA's broadcasting remains broadly inoperative, as the Statutory Minimum Memorandum would require. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (requiring plaintiffs seeking injunctive relief to show "sufficient likelihood of future injury"). Taken together, these facts support the conclusion that severing RSF members' access to VOA broadcasting causes Article III injuries, and thus, RSF has standing. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017) ("[When] constitutional standing 'can be shown for at least one plaintiff,' [the Court] need not consider the standing of the other plaintiffs to raise that claim." (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996))).[6]

### b. The plaintiffs' APA claims are ripe.

Next, the defendants contend that the plaintiffs' APA claims are not ripe. ECF No. 188 at 30. The ripeness doctrine is designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)). Constitutional ripeness, however, is "subsumed" by standing's injury-in-fact requirement. *See Am. Petroleum Inst. v EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). Thus, the plaintiffs' satisfaction of the Article III injury-in-fact requirement, as described *supra*, also satisfies the constitutional ripeness requirement.

---

[6] Although the defendants do not challenge Abramowitz's standing to assert the related but independent APA claims raised in his Complaint, *see* Compl., *Abramowitz* ECF No. 1, the Court is satisfied that his placement on administrative leave gives rise to Article III standing to raise his APA challenge.

To the extent the defendants' Cross-Motion and Opposition to Summary Judgment incorporates the prudential ripeness arguments briefly raised in their motion to dismiss, *see* ECF No. 188 at 30; ECF No. 128 at 37, their challenge mischaracterizes the plaintiffs' APA claims. To the extent it retains vitality,[7] the prudential ripeness inquiry asks courts to examine "both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *AT&T Corp. v. F.C.C.*, 349 F.3d 692, 699 (D.C. Cir. 2003) (quoting *Abbott Lab'ys*, 387 U.S. at 149). The defendants contend that this case is premature because USAGM "is not closed and has employees to provide mission support." ECF No. 128 at 37. But the plaintiffs do not premise this litigation on the literal nonexistence of USAGM. Nor does the Court take the defendants as suggesting that the Statutory Minimum Memorandum called for the closure of the agency. Rather, they dispute whether the defendants' downsizing of the agency accounted for relevant statutory factors, weighed reliance interests, and resulted in the unlawful withholding of required action. This argument provides no basis to conclude that the agency's decision is prudentially unripe.

Further, Lake's testimony makes clear that the agency had "crystalliz[ed] its policy" by March 18. *Assante v. Azar*, 436 F. Supp. 3d 215, 224 (D.D.C. 2020) (quoting *Nevada v. U.S. Dep't of Energy*, 457 F.3d 78, 84 (D.C. Cir. 2006)); *see also AT&T Corp.*, 349 F.3d at 699 ("[Claims rais[ing] purely legal questions . . . [are] presumptively suitable for judicial review."). For example, Lake testified that the Memorandum reflected USAGM leadership's "decision that this was [the] statutory minimum." SUMF ¶ 44 (quoting Lake Dep. at 153:14–18). Lake also

---

[7] The Court also harbors doubts about the vitality of the prudential ripeness doctrine, which has been questioned by the Supreme Court by both word and deed in recent years. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (doubting whether a court could "deem . . . claims nonjusticiable 'on grounds that are "prudential" rather than constitutional'" when a "'court's obligation to hear and decide' cases within its jurisdiction" is otherwise "virtually unflagging" (quoting *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014))).

testified that the agency has continued to rely on the Statutory Minimum Memorandum for "guidance" as to its ongoing operations,[8] *see id.* ¶ 31 (quoting Lake Dep. 156:13–19), confirming that the policy is already in place and that the Court need not wait for the defendants' decisions to "tak[e] on a more definite form," *AT&T Corp.*, 349 F.3d at 699–700.   In light of these undisputed facts, there is no reason to think the issues on which the plaintiffs seek summary judgment would benefit from further factual development or that resolving those issues now would work a hardship on the defendants.   *See id.* at 700 ("[W]here there are no institutional interests favoring postponement of review, [the plaintiff] need not satisfy the hardship prong."). The claims before the Court do not raise theoretical disagreement over agency policies yet to be implemented or subject to future contingencies.   *Cf. Trump v. New York*, 592 U.S. 125, 134 (2020).   Rather, the plaintiffs challenge identifiable agency action whose "effects" are manifestly being "felt in a concrete way" by USAGM personnel and consumers.   *Abbott Lab'ys*, 387 U.S. at 148.

### c.  The Civil Service Reform Act does not extinguish jurisdiction over the plaintiffs' claims.

The defendants next contend that only the Merit Systems Protection Board ("MSPB"), and not a federal district court, may exercise jurisdiction over the plaintiffs' APA claims because, in the defendants' view, the APA claims are quintessentially employment disputes subject to the Civil Service Reform Act ("CSRA").   The plaintiffs maintain that their APA challenge is trained on the Statutory Minimum Memorandum's programmatic decision to draw down agency operations, not individual employment decisions, and that in any event, the claims of plaintiff RSF should be not channeled to the MSPB because their claims do not stem from

---

[8] As addressed further in the merits discussion that follows, to the extent the defendants have deviated from the Statutory Minimum Memorandum, they have done so only in response to the unstayed portions of the preliminary injunction entered in this case.

their own employment losses. *See* Reply at 10; *Widakuswara*, 779 F. Supp. 3d at 30 (observing that RSF, RSF-USA, and TNG-CWA "are not implicated" by the jurisdictional bar because their claims are not premised on employment relationships with the government).

Subject to constitutional limitations, "Congress decides what cases the federal courts have jurisdiction to consider." *Bowles v. Russell*, 551 U.S. 205, 212 (2007). Thus, although district courts ordinarily enjoy jurisdiction over claims arising under federal law, *see* 28 U.S.C. § 1331, Congress may "preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review," *Am. Fed. of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019). The defendants' argument invokes that power. When determining whether Congress has established an alternative statutory scheme, courts apply the two-step framework set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). Applying the *Thunder Basin* inquiry, a court may find "Congress intended that a litigant proceed exclusively through a statutory scheme," thereby barring original district court jurisdiction, "when (i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin*, 510 U.S. at 207).

In the context of government employment, the CSRA, which includes the Federal Service Labor-Management Relations Statute, "regulates virtually every aspect of federal employment." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009). But although Congress "carefully constructed a system for review and resolution of federal *employment* disputes," *Filebark v. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) (emphasis added), the defendants overstep the bounds of Congress's discernible intent by arguing that the non-employee plaintiffs' claims must be channeled under the CSRA. RSF, as explained *supra*, and

TNG-CWA raise claims based on their status as listeners of USAGM-sponsored broadcasts, and their claims against the defendants are wholly independent of the merits of any individual or collective employment actions taken by the defendants. *See* Part III.a *supra* (discussing RSF).

The defendants' sole response is that the relief RSF and TNG-CWA "seek is undeniably based on injuries that would result from Defendants' employment decisions," citing *Maryland v. U.S. Department of Agriculture*, 151 F.4th 197, 206 (4th Cir. 2025). *See* ECF No. 188 at 20. But *Maryland* involved a distinct arrangement of facts; there, several states sued the federal government alleging violations of the notice requirements for a reduction-in-force of federal employees. *See* 151 F.4th at 206. The Fourth Circuit held that those states lacked standing (not that the states' claims were subject to *Thunder Basin* channeling) because the states' alleged informational injuries were not cognizable. *Id.* at 209. "The real and direct harms were suffered not by the States, but by the terminated . . . employees," none of whom were party to the lawsuit. *Id.* at 210. The Court also reasoned that even assuming the states could show injury-in-fact, those injuries were unlikely to be redressable, in part because the CSRA would preclude affording the employees, and therefore the states, relief. *Id.* at 215. RSF's theory of standing, premised on harm to their rights as listeners and traceable to the Statutory Minimum Memorandum and its effects, does not suffer from these defects. Nor does the resolution of their claims turn on a merits-based determination of the employment actions that give rise to the employees' injuries. The record thus continues to compel the same conclusion that the Court reached at the preliminary injunction stage, which is that any jurisdictional bar would not apply

17

to the claims brought by non-employee plaintiffs like RSF.[9]  *Widakuswara*, 779 F. Supp. 3d at 30.

### d. The Tucker Act precludes the Court from reinstating the personal service contractors' agreements.

The defendants next contend that the Tucker Act extinguishes the Court's jurisdiction to hear the APA claims of contractor Plaintiffs Anthony LaBruto, *Abramowitz* John Doe 2, and *Widakuswara* John Does 3 and 4 (together, the "Contractor Plaintiffs").  Opp'n at 25.  On this point, the Court agrees with the defendants.  Following the approach and reasoning in *American Association of Physics Teachers v. National Science Foundation*, the Court concludes that it lacks jurisdiction over the named Contractor Plaintiffs' APA claims insofar as they seek an order reversing the cancellation of individual personal service contracts because those claims "are 'at [their] essence' contract actions 'over which the Court of [Federal] Claims has exclusive jurisdiction.'"  804 F. Supp. 3d 45, 60 (D.C.C. 2025) (alterations in original) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)).

First, these plaintiffs were in a contractual relationship with the government.  *See* SUMF ¶ 21; *see also* 48 C.F.R. § 37.104 (Federal Acquisition Regulation defining "personal services contract" as being "characterized by the employer-employee relationship it creates between the Government and the contractor's personnel").  Plaintiffs do not dispute this fact, nor do they argue that their particular agreements with the government would fail to qualify as contracts for

---

[9] It bears mentioning that no D.C. Circuit ruling has reasoned to the contrary.  The stay panel decision disagreed with this Court's conclusion that the *employees* did not raise employment disputes (and therefore were not subject to channeling), but it did not address the Court's alternative holding that the RSF TNG-CWA's claims were not employment claims.  *See Widakuswara v. Lake*, 2025 WL 1288817, at *2 (D.C. Cir. May 3, 2025) (per curiam), *vacated in part*, 2025 WL 1521355 (May 28, 2025).  And the panel decision in a separate case set aside the jurisdictional bar based on similar reasoning.  *See Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 776 (D.C. Cir. 2025), *reh'g en banc granted, opinion vacated*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).

purposes of the Tucker Act.  *See Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (quoting *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997)).

Second, the APA claims raised by the Contractor Plaintiffs are contractual in essence. Under binding precedent, "[c]laims based on 'truly independent legal grounds,' such as statutes or the Constitution, can be heard in district court, while those that 'sound[] genuinely in contract' belong in the Court of Federal Claims."  *Am. Ass'n of Physics Tchrs.*, 804 F. Supp. 3d at 62 (alterations in original) (quoting *Megapulse*, 672 F.2d at 969–70).  *Megapulse* directs courts to examine the "essence" of APA claims implicating contractual arrangements with the government to determine whether the claim "presents a disguised contract action."  672 F.2d at 967–68.  To do so, the Court engages in a two-part inquiry, analyzing "the source of the rights" from which the claim arises and "the type of relief sought (or appropriate)."  *Id.* at 968.

The first prong points to the contracts as the source of the rights at issue.  The Contractor Plaintiffs' right to relief is premised on their contractual relationship with USAGM.  "[I]n no sense did it exist independently of th[ose] contract[s]."  *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).  The plaintiffs argue that the defendants were generally "required to comply with the APA before taking actions that resulted in the cessation of relied-upon government services" and ask the Court to "set aside" the "[c]ancell[ation] [of]contracts with [the] approximately 589 [contractors]" that were engaged by USAGM prior to May 30. Pl.'s Mot. at 31–32.  But they do not argue, for example, that the defendants were under an independent and specific statutory obligation to enter into contracts with them.  *Cf. Open Tech. Fund v. Lake*, No. 1:25-cv-840, 2025 WL 3289166, at *6 (D.D.C. Nov. 25, 2025) (holding that because appropriations statutes "mandate[d] that USAGM allocate funding to OTF" through grant agreements, APA claims challenging withholding of grant funds were grounded in

appropriations law, not contracts).  The Contractor Plaintiffs "thus 'complain[] of wrongful termination' of their government contract[s]," and their claims are therefore "founded upon the contract[s]." *Am. Ass'n of Physics Tchrs.*, 804 F. Supp. 3d at 62 (quoting *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985)).

Prong two also points toward Court of Federal Claims jurisdiction.  An order setting aside not just the Statutory Minimum Memorandum but also the service-contract cancellations would implicitly require the defendants to continue to perform under — rather than breach — the contracts.  In these circumstances, an injunction of that nature would amount to an order for specific performance.  And case after case in the D.C. Circuit has made clear that where the relief sought "would mean that the government must perform" according to the terms of a written agreement, the case must "be resolved by" the Court of Federal Claims.  *See Ingersoll-Rand*, 780 F.2d at 79–80 (holding that "an order directing the Air Force to reinstitute" a contract "amount[s] to a request for specific performance"); *Spectrum Leasing*, 764 F.2d at 894 (similar); *Am. Ass'n of Physics Tchrs.*, 804 F. Supp. 3d at 62–63.

To be sure, the plaintiffs challenge not only the termination of their individual contracts but also the upstream agency action — including the Statutory Minimum Memorandum — that served as "guidance" for those determinations.  SUMF ¶ 31 (explaining that Lake characterized the Statutory Minimum Memorandum as "guidance" for the actions that followed, including the termination of contractors (quoting Lake Dep. 156:13–19)).  The foregoing analysis does not affect the Court's jurisdiction over the Contractor Plaintiffs', or any other plaintiff's, challenge to the Memorandum.  That challenge is "legally distinct" from the claim seeking performance of agreements affected by the guidance.  *See Nat'l Inst. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Mem.) (Barrett, J., concurring).  The mere fact that agency guidance

20

affects internal policies related to contractual performance "does not transform a challenge to that guidance into a claim 'founded . . . upon' [a] contract that only the [Court of Federal Claims] can hear." *Id.* (quoting 28 U.S.C. § 1491(a)(1)). Nevertheless, just "because [this] Court is the right forum for [a] challenge to the guidance" does not mean "it is necessarily also the right forum for the challenge to the [contract] terminations." *Id.* The defendants will therefore receive a limited grant of partial summary judgment for lack of jurisdiction under the Tucker Act on the Contractor Plaintiffs' APA claims insofar as they seek reinstatement or specific performance of their individual agreements.

### e. Merits

#### 1. The plaintiffs challenge a discrete and final agency action.

The threshold question on the merits of this case is whether the plaintiffs have challenged a discrete, final agency action for which judicial review is available under § 706(2) of the APA. The Court begins with the discreteness requirement. A "person claiming a right to sue" under § 706(2) "must identify some 'agency action' that affects him." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (quoting 5 U.S.C. § 702). The APA defines "agency action" to mean "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The Supreme Court has inferred from that definition that a cognizable agency action must be "circumscribed" and "discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).

The Statutory Minimum Memorandum meets the APA's qualifications for a rule or the equivalent thereof. To qualify as a "rule" or the "equivalent thereof" (is the latter being the category to which the plaintiffs assign the Statutory Minimum Memorandum), the action must be an "agency statement . . . designed to implement, interpret, or prescribe law or policy." 5 U.S.C.

21

§ 551(4). Here the defendants spoke through an official written document that reflected the agency's decision to reduce its future operations. And although, as discussed further below, the Memorandum contains no analysis or reasoning, it nevertheless reflects the agency's official position regarding its existing legal obligations. *Cf. Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (describing an interpretive rule as one that purports to "derive[]" its conclusions from "statute[s]" or other "existing . . . document[s]" that the agency interprets as "compel[ling] or logically justif[ying] the proposition"). As Lake testified, and the defendants do not seriously dispute, the Memorandum reflected USAGM leadership's "decision" about what constituted the "statutory minimum" level of agency operations. SUMF ¶ 44 (quoting Lake Dep. at 153:14–18). Indeed, efforts to align USAGM's operations with the Memorandum had already been set into motion in the seventy-two hours before it was signed on March 18, including by placing employees on leave effective March 15, terminating contractors, and bringing broadcasting operations to a halt. *Id.* ¶¶ 36–38. Critically, Lake testified that the Memorandum reflected not only a justification of the decisions made in the preceding days, but should serve as a forward-looking guide for future agency operations. *See Biden v. Nebraska*, 597 U.S. 785, 809–10 (2022) (holding that memoranda that "*bound* DHS *staff* by forbidding them to continue the [challenged] program in any way from that moment on" were "agency actions" that fit the § 551(4) definition of a rule (emphases added) (citation omitted)). Thus, the plaintiffs do not request "wholesale judicial review of Global Media's management of the agency," as the defendants contend, *Lujan*, 497 U.S. at 890 n.2, but instead challenge a particular and identifiable action that prescribed future agency operations.

The Court next turns to whether the Statutory Minimum Memorandum and its implementation constitute *final* agency action. *See* 5 U.S.C. § 704. "As a general matter, two

22

conditions must be satisfied for agency action to be 'final.'" *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process," rather than "of a merely tentative or interlocutory nature." *Id.* at 177–78 (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). These well-settled principles are meant to facilitate a "pragmatic and flexible" inquiry that evades "self-implementing, bright-line rule[s]." *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1027 (D.C. Cir. 2016) (citation omitted).

That standard is readily met here. The record confirms that the Memorandum reflected the defendants' "decision" about what constituted the "statutory minimum" operations under the laws governing USAGM. SUMF ¶ 44 (quoting Lake Dep. at 153:14–18). The decision has never been revisited, nor has Lake hinted that it might be. To the contrary, the agency has continued to take steps to implement the Statutory Minimum Memorandum, including by attempting to effectuate a reduction-in-force of USAGM staff in August 2025 and a deferred-resignation program as an interim measure. *See* Notice of February 26, 2026, ECF No. 212 (describing proposed deferred-resignation program); *see also* ECF Nos. 219–20 (vacating reduction-in-force due improper appointment of Lake as acting USAGM CEO). And concrete consequences have flowed from the decision, including the placement of hundreds of employees on administrative leave and the cessation of most Voice of America broadcasting.

In the alternative, each implementing action taken by defendants as part of the drawdown of USAGM would be independently reviewable agency action under the APA. Indeed, as the

Court held at the preliminary injunction stage, the "blanket placement of employees on administrative leave, termination of entire bargaining units of employees, [and] termination of [contractors] . . . are . . . discrete, final agency actions subject to judicial review." *Widakuswara*, 779 F. Supp. 3d at 33. Even under the defendants' preferred view of the law, these actions are undoubtedly subject to APA review. *See Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 784 (D.C. Cir. 2025 (explaining that "firing employees" and "cancelling contracts" are "discrete actions"), *reh'g en banc granted, opinion vacated*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).

Finally, the defendants' limited restoration of certain employees and broadcasting operations since March 2025 does not alter the finality of the agency action in this case. Broadcasting operations restarted only protracted litigation to enforce the preliminary injunction in this case. The defendants thus strain the boundaries of the *post hoc ergo propter hoc* fallacy to the extent they assert that they revived such operations on their own initiative. In any event, even if the Court were to credit the incredible, "[t]he possibility of revision is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." *POET Biorefining, LLC v. Ent'l Prot. Agency*, 970 F.3d 392, 404 (D.C. Cir. 2020) (quoting *U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016). As Lake's testimony in this case make clear, the defendants "consummated [their] decision" in the actions challenged in this case. The Statutory Minimum Memorandum was signed by the bulk of the agency's nominal leadership, with Lake's apparent approval, and it reflected their "decision that this was [the] statutory minimum." SUMF ¶ 44 (quoting Lake Dep. at 153:14–18). The Court takes the defendants at their word.

**2. The agency action is arbitrary and capricious because the defendants failed to consider statutory factors, Congressional appropriations, and reliance interests.**

Arbitrary and capricious review is "narrow," evaluating only whether the defendants "examined 'the relevant data' and articulated 'a satisfactory explanation' for [their] decision, 'including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court may not "substitute [its] judgment" for that of the agency, "but instead must confine [itself] to ensuring that [they] remained 'within the bounds of reasoned decisionmaking.'" *Id.* (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)).

To implement a new policy without violating the APA, the defendants were required to demonstrate that they had considered whether "the new policy is permissible under the [governing] statute, that there are good reasons for it, and that the agency believes it to be better" than its old policy. *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 515 (2009). They must offer that explanation "contemporaneous[ly]" with their actions, and "post hoc rationalizations" are inadequate. *See, e.g.*, *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1351 (D.C. Cir. 2014) (internal quotation marks and citation omitted). Courts are thus appropriately skeptical of swings in core agency policy unaccompanied by substantive explanation because such conduct violates the "fundamental requirement" that the agency "set forth its reasons." *Tourus Recs. Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001). "[C]onclusory statements do not suffice to explain" agency action. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016); *see also Open Tech. Fund*, 2025 WL 3289166, at *10 (same).

As the Court explained at the preliminary injunction stage, "[n]ot only is there an absence of 'reasoned analysis' from the defendants; there is an absence of any analysis whatsoever."

25

*Widakuswara*, 779 F. Supp. 3d at 33.  Although the Court reached that conclusion prior to the defendants' production of the Statutory Minimum Memorandum, which reflects the only contemporaneous justification for the agency action at issue in this case, the Memorandum and the rest of the summary judgment record do nothing to change the Court's preliminary bottom line.  The Memorandum is little more than a list of positions that the agency concluded are necessary to fulfill minimum statutory obligations.  SUMF ¶ 32.  It does not mention, let alone analyze, whether such staffing would permit the agency to comply with the broadcasting standards and principles set by Congress in 22 U.S.C. § 6202(a)–(b).  The failure to do so is arbitrary and capricious in its own right, particularly given the duty "[t]o ensure that United States international broadcasting is conducted in accordance with the standards and principles contained in section 6202."  *Id.* § 6204(4).

Although the Memorandum quotes certain statutes mandating the existence of certain positions, such as the director of Voice of America and the Office of Cuba Broadcasting, it fails to address many requirements established by appropriation statutes, including notification requirements and region- and medium-specific broadcasting requirements.  *See, e.g.*, 138 Stat. 460, 735–36.  Nor does the agency explain why it considered certain statutory requirements of the CEO to the exclusion of so many others.  For example, the Memorandum references the CEO's obligation "[t]o submit to the President and the Congress an annual report" concerning broadcasting activities.  *See* ECF No. 166-4 at 5; 22 U.S.C. § 6204(9).  But, for example, it gives no indication that the agency complied with the CEO's obligation to "undertake . . . studies" in order "to identify areas in which broadcasting activities under its authority could be made more efficient and economical."  22 U.S.C. § 6204(8).  It certainly does not account for reliance interests of the employees, the consuming public, or anyone else.

The one substantive requirement the agency did appear to address is the obligation to "consult[] with the Secretary of State" prior to "the addition or deletion of language services." *Id.* § 6204(4); *see* ECF No. 166-4 at 3 ("As part of this process, USAGM should engage with the State Department based on the deletion of services."). But because the Memorandum constituted USAGM leadership's "decision that this was [the] statutory minimum," it necessarily put the cart before the horse — effectuating the deletion of language services through the removal of staff *before* consulting the State Department. SUMF ¶ 44 (quoting Lake Dep. at 153:14–18). At bottom, the Memorandum is consistent with the Court's characterization at the preliminary injunction stage: "a hasty, indiscriminate approach" to administrative action. *Widakuswara*, 779 F. Supp. 3d at 34.

Nor does it suffice that, as Lake later explained, the action was taken in compliance with an Executive Order. SUMF ¶ 26 (explaining the leadership team decided the next day to reduce USAGM's operations to the "statutory minimum" based solely on the direction contained in the Executive Order). "If an agency could avoid the need to justify its decisions simply by gesturing to an Executive Order . . . the President could unilaterally eviscerate . . . the APA simply by issuing a carbon-copy executive order mandating that an agency act in a particular way before it does so." *Kingdom v. Trump*, No. 1:25-cv-691-RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025). And the agency similarly failed to consider either reliance interests or relevant statutory factors (and are therefore contrary to such laws). *See* ECF No. 166-1 at 36–39. Thus, the agency's action cannot stand even under the "deferential" arbitrary-and-capricious standard. *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019). The defendants do not offer, nor does the record disclose, any discernible "rational connection between the facts found and the

27

choice made." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *State Farm*, 463 U.S. 43). On the face of the Memorandum itself, all signs point to arbitrariness.

In response, and as at the preliminary injunction stage, the defendants do not defend their action on the merits. Instead, the defendants attempt to evade APA review by suggesting that the relevant statutory factors are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "[T]he APA explicitly excludes from judicial review those agency actions that are 'committed to agency discretion by law.'" *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011). The defendants are correct that, ordinarily, agency action qualifies for that exception when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," rendering "meaningful judicial review impossible." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1984)). And it is true that the International Broadcasting Act tasks the CEO of USAGM with overseeing compliance with the broadcasting standards and principles set forth in § 6202(a) and (b) in the agency's broadcasting operations. *See* 22 U.S.C. § 6204(3).

Nevertheless, the defendants overreach by contending that the allocation of *some* discretion is sufficient to render that discretion unreviewable, for two reasons. First, administrative law embodies "a 'strong presumption' in favor of judicial review of administrative action, which can only be overcome by 'clear and convincing evidence of congressional intent to preclude judicial review.'" *Castaneira v. Noem*, 138 F.4th 540, 549 (D.C. Cir. 2025) (quoting *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020)). The defendants point to nothing in the Broadcasting Act apart from language conferring *some* discretion to suggest that Congress intended to foreclose review entirely. That text alone cannot bear the weight the defendants place on it. *Compare* 22 U.S.C. § 6204(a) (requiring CEO to

"ensure that United States international broadcasting is conducted in accordance with the standards and principles contained in [§ 6202]") *with Castaneira*, 138 F.4th at 549 (delegating USCIS "*sole and unreviewable* discretion" to make risk assessments (emphasis added) (quoting 8 U.S.C. § 1154a)(1)(A)(viii)(I))).  To the contrary, the statute commands that the CEO "shall" ensure compliance with the standards and principles in § 6202.  *See* 22 U.S.C. § 6204(a); *Bufkin v. Collins*, 604 U.S. 369, 379 (2025) (holding that "the word 'shall' imposes a mandatory command" and "means 'must'" (first quoting *Shapiro v. McManus*, 577 U.S. 39, 43 (2025), then quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171–72 (2016))).

Second, even if the statute committed the issue to the CEO's discretion, the CEO still must *exercise* that discretion to fulfill Congress's command, and "[a] grant of discretion to an agency does not . . . authorize it to make an unprincipled decision." *Ky. Mun. Energy Agency v. Fed. Energy Regul. Comm'n*, 45 F.4th 162, 186 (D.C. Cir. 2022) (quoting *Chippewa & Flambeau Improvement Co. v. FERC*, 325 F.3d 353, 358 (D.C. Cir. 2003)).  Here, a textual commitment of discretion could not change the fact that the defendants have provided nothing approaching a principled basis for their decision.

The Court thus concludes that the plaintiffs are entitled to partial summary judgment on their § 706(2) claim.

### 3.  The defendants have unlawfully withheld agency action.

While the foregoing broadly addresses the plaintiffs' claim under § 706(2) of the APA, they also claim they are entitled to judgment and relief under 5 U.S.C. § 706(1), which requires courts to "compel agency action unlawfully withheld or unreasonably delayed."  To prevail on a § 706(1) claim, a plaintiff must demonstrate that the "agency failed to take a *discrete* agency action that it is *required to* take." *Norton*, 542 U.S. at 64.  The obligation "must amount to 'a

specific, unequivocal command.'" *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1241 (D.C. Cir. 2018) (quoting *Norton*, 542 U.S. 63–64).

The Court must therefore "satisfy [itself] that," first, "there indeed exists . . . a duty" for the agency to act," and second, that the agency either has withheld or "has 'unreasonably delayed' the contemplated action." *Bluewater*, 234 F.3d at 1315 (quoting 5 U.S.C. § 706(1)).

The plaintiffs contend that the staffing levels required by the Statutory Minimum Memorandum and the placement of most employees on administrative leave cause the agency to violate the International Broadcasting Act and various language-specific broadcasting requirements. By law, Voice of America must "communicat[e] directly with the peoples of the world by radio." 22 U.S.C. § 6202(c). In doing so, it must ensure that broadcasting includes "information about developments in each significant region of the world" and "a variety of opinions and voices from within particular nations and regions prevented by censorship or repression from speaking to their fellow countrymen." *Id.* § 6202(b)(6)–(7). USAGM is also required, by law, to maintain "research capacity," "transmitter and relay capacity," and "capability to provide a surge capacity to support United States foreign policy objectives during crises abroad." *Id.* § 6202(b)(4), (8), (9). Congress has also identified particular countries to which broadcasting must be directed. Unsurprisingly, these include North Korea, Iran, and former members of the Soviet Union. *See id.* §§ 7813, 7814(a)(5)–(7), 8754, 8927. These provisions amount to "*discrete* agency action" that USAGM "is *required to* take," *Norton*, 542 U.S. at 64, namely, that USAGM must broadcast by radio to particular areas of the world and must retain surge capacity to deploy during foreign crises. While these statutes undoubtedly call for USAGM leadership's judgment regarding *how* to effectuate Congress's broadcasting

30

directives, they have *no* discretion regarding *whether* to do so.  *See AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 803 F. Supp. 3d 164, 186 (D.D.C. 2025) (similar).

The defendants do not dispute key facts demonstrating that they are in violation of these provisions.  To start, the defendants do not substantively dispute the factual claim that "VOA ceased all broadcasting activities" in March 2025.  SUMF ¶ 42.  Nor do defendants dispute that in response this Court's earlier orders, defendants have begun a skeletal operation including "four language services in a substantially reduced fashion," and "digital programming" in Russian and Korean.  *Id.* ¶ 44.  According to a declaration filed by Lake herself, of these four language services — Mandarin, Farsi, Pashto, and Dari — only Pashto and Dari are broadcast via radio.  *See* ECF No. 69-2 ¶ 6.  And the plaintiffs have offered unrebutted evidence that USAGM's surge capacity in fact amounts to little more than "minor fluctuations in staffing" when "big stor[ies]" occur.  SUMF ¶ 45.  Moreover, there is no dispute that the placement of most staff on administrative leave pursuant to the Statutory Minimum Memorandum leaves USAGM *incapable* of operating in regions where it is statutorily required to do so.  For example, the plaintiffs offer undisputed evidence that Voice of America is unable to operate its Iran service at current staffing levels, despite a statutory mandate to do so.  *Id.* ¶ 46 (conceding, in deposition testimony, that "[c]urrent operation of [the] Persian service with two employees and zero [contractors] is not possible" (citation omitted)).  Apart from boilerplate responses, the defendants rebut none of these facts.[10]  The Court thus finds that the defendants are unlawfully withholding mandatory agency action.

---

[10] Although the defendants do not offer any specific rebuttal of the foregoing facts, they did attempt to dispute the plaintiffs' broader characterization of USAGM's skeletal operations in dispute through a declaration filed by Frank Wuco during earlier proceedings in this case.  *See* Decl. of Frank Wuco, *Widakuswara* ECF No. 174-1 ("Wuco Decl.").  The Wuco Declaration, however, is hardly a robust defense of VOA's current operations, primarily describing *future* broadcasting operations, not current activities.  *E.g.*, *id.* ¶ 6 (describing future plans for Korean

The withholding of these mandatory actions requires relief.  Defendant Lake has repeatedly thumbed her nose at these statutory requirements, testifying that she has no opinion about which countries censor and repress their people — or even the basic question of which regions of the world qualify as significant, as would be required just to *feign* compliance with 22 U.S.C. § 6202(b)(6) and (7).  *See* SUMF ¶ 47.  These refusals constitute a "transparent violation[] of a clear duty to act."  *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000)).  It is a "bedrock principle[] of constitutional law" that the Executive Branch "must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute."  *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) (granting mandamus).  Following the defendants' flagrant and nearly year-long refusal to do so in this case, the Court will grant the plaintiffs partial summary judgment on their § 706(1) claim.

### f.  Vacatur is the proper remedy.

The foregoing discussion leaves the question of remedy.  "Vacatur is the 'normal remedy' for 'unsustainable agency action.'"  *See Ky. Mun. Energy Agency*, 45 F.4th at 179.  Indeed, the plain text of the APA makes clear that a "reviewing court *shall* . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Yet despite the presumption in favor of vacatur, the defendants resist such vacatur in this case based on mistakes of both law

---

language "[c]ontent" that "*will be* delivered via terrestrial radio and on digital platforms" (emphasis added)); *id.* ¶ 7 (same, for Kurdish broadcasting operations).  In any event, the Court need not consider the declaration, as the defendants do not rely on it in their responses to the plaintiffs' statement of undisputed facts.  *See* D.C. LCvR 7(h)(1) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."); Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials.").

and fact.  First, on the facts: the defendants suggest that the plaintiffs seek vacatur of the Executive Order.  But the record makes crystal clear that the plaintiffs APA challenge targets the actions taken to *implement* the President's decision to downsize the agency, including as reflected in the Statutory Minimum Memorandum.  Second, as to the law, the defendants rely almost entirely on Justice Gorsuch's concurrence in *United States v. Texas*, an opinion which, while thought provoking, does not reflect the current state of the law.  *See United States v. Texas*, 599 U.S. 670, 701 (2023) (Gorsuch, J., concurring) (acknowledging that "vacatur has been the ordinary result when the D.C. Circuit determines that agency regulations are unlawful").  Nor does the Supreme Court's ruling in *Trump v. CASA, Inc.* affect the availability of vacatur, as the Court reserved judgment on the "question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."  606 U.S. 831, 847 n.10 (2025).

Although a court, in narrow circumstances, may justify departure from the normal rule of vacatur, those circumstances are not present here.  Departures may be proper based on (1) "the seriousness of the deficiencies of the action," *e.g.*, "how likely it is the agency will be able to justify its decision on remand," and (2) any "disruptive consequences of vacatur."  *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009).  Both factors favor the plaintiffs.  First, the defendants have made no effort to defend the merits of the downsizing decision, and "[v]acatur is appropriate" in such circumstances.  *Burke v. Coggins*, 521 F. Supp. 3d 31, 44 (D.D.C. 2021).  The Court can hardly imagine the defendants have a non-arbitrary justification for these actions on remand after they have failed to muster one in litigation.  Second, the potential for disruption *favors* vacatur, not an exception.  The effect of the defendants' action has been to keep USAGM employees on administrative leave despite

Congress's repeated appropriations at levels indicating a clear intent to maintain substantial broadcasting operations. Vacatur vindicates, rather than frustrates, that intent.

## IV.    CONCLUSION

Based on the foregoing, the Court will **GRANT IN PART** and **DENY IN PART** each motion, and the Statutory Minimum Memorandum, the placement of USAGM employees on administrative leave, and the cessation of USAGM broadcasting shall be **VACATED** and **SET ASIDE.** A separate order consistent with this opinion shall issue this date.

Date: March 17, 2026

Royce C. Lamberth
United States District Judge